# 13-4791-cv

# United States Court of Appeals
## for the
## Second Circuit

IN RE: VITAMIN C ANTITRUST LITIGATION

ANIMAL SCIENCE PRODUCTS, INC., THE RANIS COMPANY, INC.,

*Plaintiffs-Appellees,*

— v. —

HEBEI WELCOME PHARMACEUTICAL CO. LTD.,
NORTH CHINA PHARMACEUTICAL GROUP CORPORATION,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# BRIEF FOR *AMICUS CURIAE* MINISTRY OF COMMERCE OF THE PEOPLE'S REPUBLIC OF CHINA IN SUPPORT OF DEFENDANTS-APPELLANTS

JOEL M. MITNICK
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

CARTER G. PHILLIPS
KWAKU A. AKOWUAH
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

*Attorneys for Amicus Curiae Ministry of Commerce
of the People's Republic of China*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. ii

INTEREST OF *AMICUS CURIAE* THE MINISTRY OF COMMERCE OF
THE PEOPLE'S REPUBLIC OF CHINA ....................................... 1

STATEMENT OF THE CASE ............................................................ 3

SUMMARY OF ARGUMENT .......................................................... 12

ARGUMENT ................................................................................... 13

I.   UNDER *UNITED STATES V. PINK*, MOFCOM'S
     INTERPRETATION OF CHINESE LAW IS "CONTROLLING" ............. 14

II.  AT A MINIMUM, "CONCLUSIVE" DEFERENCE IS
     WARRANTED IN FOREIGN SOVEREIGN COMPULSION
     CASES ................................................................................. 18

III. THE DISTRICT COURT'S REFUSAL TO GIVE ANY
     DEFERENCE TO MOFCOM'S INTERPRETATION WARRANTS
     REVERSAL ............................................................................ 21

     A.   The District Court's Case-Specific Reasons For Denying
          Deference Are Erroneous Or Insubstantial ......................... 24

          1.   Specificity .............................................................. 25

          2.   China's Statements to the WTO Are Consistent With
               MOFCOM's Positions in this Case ............................ 27

          3.   The Factual Record ................................................. 29

     B.   The District Court's Analysis Was Fatally Flawed In Its Own
          Terms ................................................................................. 30

CONCLUSION ............................................................................... 32

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abbott v. Abbott*,
    560 U.S. 1 (2010)..........................................................................................16, 19

*Agency of Canadian Car & Foundry Co. v. Am. Can Co.*,
    258 F. 363 (2d Cir. 1919) ......................................................................... 15-16

*Agostini v. Felton*,
    521 U.S. 203 (1997 .........................................................................................17

*Auer v. Robbins*,
    519 U.S. 452 (1997)..........................................................................................31

*Bader v. Kramer*,
    484 F.3d 666 (4th Cir. 2007) .............................................................................23

*Elmendorf v. Taylor*,
    23 U.S. (10 Wheat.) 152 (1825) ........................................................................15

*F. Hoffman-LaRoche v. Empagran*,
    542 U.S. 155 (2004)............................................................................................3

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    313 F.3d 70 (2d Cir. 2002) ....................................................7, 14, 16, 19, 23, 24

*Mannington Mills, Inc. v. Congoleum Corp.*,
    595 F.2d 1287 (3d Cir. 1979) .............................................................................3

*Murarka v. Bachrack Bros.*,
    215 F.2d 547 (2d Cir. 1954) .............................................................................21

*Nitro-Lift Techs., LLC v. Howard*,
    133 S. Ct. 500 (2012)........................................................................................18

*In re Oil Spill by the Amoco Cadiz*,
    954 F.2d 1279 (7th Cir. 1992) ...........................................................................23

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*,
830 F.2d 449 (2d Cir. 1987) ...................................................................3, 16, 21

*Pasquantino v. United States*,
544 U.S. 349 (2005 .................................................................................17

*Richmark Corp. v. Timber Falling Consultants*,
959 F.2d 1468 (9th Cir. 1992) .................................................................23

*State Oil Co. v. Khan*,
522 U.S. 3 (1997).....................................................................................25

*United States v. Pink*,
315 U.S. 203 (1942)..................................................... 13, 14, 15, 16, 17, 18, 19

*Villegas Duran v. Arribada Beaumont*,
534 F.3d 142 (2d Cir. 2008), *vacated*, 560 U.S. 921 (2010).......................16, 19

*Whallon v. Lynn*,
230 F.3d 450 (1st Cir. 2000)....................................................................22

*Zschernig v. Miller*,
389 U.S. 429 (1968).................................................................................21

## RULE

Fed. R. Civ. P. 44.1 ..................................................................6, 16, 17, 18

## INTERNATIONAL TRADE MATERIALS

Council for Trade in Goods, *Transitional Review Under Article 18 of the
Protocol of Accession of the People's Republic of China*, G/C/W/438
(Nov. 20, 2002), *available at* https://docs.wto.org/dol2fe/Pages/FE_
Search/DDFDocuments/65661/Q/G/C/W438.pdf ..............................................27

Opening Oral Statement of the Complainants, *China – Measures Related to
the Exportation of Various Raw Materials*, WT/DS394/DS395/DS398
(Aug. 31, 2010), *available at* http://www.ustr.gov/webfm_send/2251..............28

Trade Policy Review Body, *China Trade Policy Review 2006*,
WT/TPR/S/161 (Feb. 28, 2006), *available at*
https://docs.wto.org/dol2fe/Pages/FE_Search/ExportFile.aspx?Id=68101
&filename=Q/WT/TPR/S161-3.pdf ...............................................................28

iii

**OTHER AUTHORITIES**

Brief for the United States as *Amicus Curiae* in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 1985 WL 669667 (June 17, 1985) ........................................................ 14, 19-20

Opinion of United States Attorney General (May 7, 1981), *republished in* 1981-1 Trade Cas. (CCH) ¶ 63,998 .................................................................20

Restatement (Third) Foreign Relations Law of the United States (1987)...............19

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement Guidelines for International Operations* (Apr. 1995), *available at* http://www.justice.gov/atr/public/guidelines/internat.htm ................................20

## Interest of *Amicus Curiae*
## The Ministry of Commerce of the People's Republic of China[1]

The Ministry of Commerce of the People's Republic of China

("MOFCOM") is a component of the central Chinese government and the highest

administrative authority in China authorized to regulate trade between China and

other countries, including all export commerce.[2]  It is the equivalent in the Chinese

governmental system of a cabinet-level department of the United States

government.  MOFCOM formulates strategies, guidelines, and policies concerning

domestic and foreign trade and international cooperation.  MOFCOM also drafts

and enforces laws and regulations governing domestic and foreign trade, and

regulates markets to achieve an integrated, competitive, and orderly market system.

MOFCOM has been actively involved in this litigation since 2006, when it

filed an *amicus* brief in support of defendants' motion to dismiss.  That appearance

was historic.  It marked the first time that any entity of the Government of China

had appeared as an *amicus* in any U.S. court.  MOFCOM's participation was not

only extraordinary, it should have been dispositive, because the first-order question

---

[1]  In accordance with Federal Rule of Appellate Procedure 29(c)(5) and Local Rule
29.1, MOFCOM states the following: (A) no party's counsel authored this brief in
whole or in part; (B) no party or party's counsel contributed money that was
intended to fund preparing or submitting the brief; and (C) no person, other than
MOFCOM or its counsel, contributed money that was intended to fund preparing
or submitting this brief.  All parties have consented to this filing.

[2]  Some filings refer to MOFCOM as "the Ministry"; they are synonymous.

in this case is whether defendants' coordinated conduct with respect to vitamin C exports was compelled by Chinese law, and as such was completely immune from U.S. antitrust liability. In the *amicus* brief and two subsequent filings, MOFCOM explained to the district court that MOFCOM had directed the defendants' conduct, and endeavored to describe the varying regulatory mechanisms used to compel defendants' compliance.

MOFCOM has a compelling interest in this appeal because the district court refused to defer to MOFCOM's interpretation of Chinese law and announced its own contrary view of what Chinese law required of the defendants. Moreover, the district court implied that MOFCOM's interpretation was not just wrong, but intentionally false: "a post-hoc attempt to shield defendants' conduct from antitrust scrutiny." That charge is profoundly disrespectful, and wholly unfounded. MOFCOM files this brief to set straight the record about its regulatory and litigation conduct; to ensure that this Court understands the Chinese Government's displeasure about the district court's treatment of MOFCOM; and to urge reversal of the judgment below, which unfairly penalizes a Chinese company for complying with Chinese law. MOFCOM believes its perspective will assist this Court in resolving the present appeal.

2

## STATEMENT OF THE CASE

The jury imposed a nine-figure damages award on two Chinese defendants, finding that their conduct, within China, violated U.S. antitrust law. The Sherman Act does apply to some conduct beyond U.S. borders, but "[n]o one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs." *F. Hoffman-LaRoche v. Empagran, S.A.*, 542 U.S. 155, 165 (2004). Accordingly, antitrust liability under U.S. law does not extend to one circumstance where that conflict would be especially acute: where a foreign sovereign compelled a private party to engage in anticompetitive conduct within that sovereign's borders. *See, e.g.*, *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 453 (2d Cir. 1987); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979). Defendants relied below on that established antitrust principle (and on related act-of-state and comity defenses), contending that at all relevant times, Chinese law required them to coordinate in setting minimum export prices and maximum export quantities for vitamin C.[3]

---

[3] One defendant, North China Pharmaceutical Group, denied (and continues to deny) that it participated in the challenged conduct. That position is consistent with the testimony of former MOFCOM official Qiao Haili. *See* Tr.1017:25-1020:24.

When defendants moved to dismiss, MOFCOM filed an *amicus* brief explaining that Chinese law had compelled defendants' relevant conduct. The brief also endeavored to describe legal structures and concepts unique to Chinese law, to outline various regulatory mechanisms MOFCOM had employed to achieve an integrated and competitive market, and to situate those regulatory changes within China's transition from a state-run economy to a market economy.

The brief first explained that the Chamber of Commerce of Medicines and Health Products Importers & Exporters ("Chamber") is vastly different from a U.S. trade association or private Chamber of Commerce. Instead, the Chamber—which ordered or oversaw many of the activities that underlie plaintiffs' complaint—operates under MOFCOM's "plenary" control and subject to its "direct and active supervision." [4] Dkt. 69 at 5, 9.

The *amicus* brief further explained that in 1997, MOFCOM ordered the Chamber to create a Vitamin C Sub-Committee. Dkt. 69 at 9. A subsequent order "limited participation in the vitamin C export industry to those companies qualified to be members of the Sub-Committee," required those same companies to participate in the Sub-Committee, and authorized them to receive vitamin C export

---

[4] In this respect alone, the district court deferred to MOFCOM, accepting that the Chamber is an "'instrumentality through which [MOFCOM] oversees and regulates'" international trade in medicinal products, including vitamin C. SPA-79 & n.37.

licenses that could be revised or revoked if a licensee failed to comply with mandatory export price and quantity constraints. Dkt. 69 at 11. The 1997 system thus delegated to the Sub-Committee authority "to set export prices that exporters were then required to implement, subject to a verification system that included severe penalties for non-compliance." Dkt. 69 at 12.

In 2002, "the Ministry changed the way in which compliance" with these restrictions was enforced. Dkt. 69 at 14. Under the new system, known as "verification and chop," manufacturers submitted documentation indicating the price and volume of export goods, which were "verified" by the Chamber. If the price were at or above the minimum acceptable price, the Chamber would affix to the contract a special seal, known as a "chop." Customs would review the contract and permit export only if the contract bore the Chamber's "chop." The rule was thus as clear as the mode of enforcement. Exporters were required to comply with negotiated price and volume constraints. If they did not, they risked being excluded from global export markets. A 2003 MOFCOM regulation maintained in force the "verification and chop" system for vitamin C well past the June 30, 2006 close of the damages class period in this case. Dkt. 69 at 14-15.

Before the district court ruled on defendants' motion to dismiss, MOFCOM submitted a second statement emphasizing that it had "participated actively in the drafting of [the amicus] brief," and that the brief "accurately sets forth

[MOFCOM's] views." Dkt. 306-3 at 1. Notwithstanding the direct explanations of Chinese law in the amicus brief and this June 2008 statement, the district court denied the motion, finding the record before it insufficiently complete. SPA-31.

At summary judgment, MOFCOM filed a third supporting statement. That August 2009 statement likewise referenced MOFCOM's *amicus* brief and "reiterate[d] … that the alleged conduct by the defendant Chinese vitamin C exporters is the result of the defendants' performing their obligations to comply with Chinese laws." Dkt. 400-2 at 1. Notably, the 2009 statement also reaffirmed that Chinese law required defendants to participate in China's "'system of self-discipline,'" and thus to "consult with each other to reach consensus on coordinated activities," subject to "penalties for failure to participate in such coordination, or for non-compliance with self-discipline." Dkt. 400-2 at 2.

The district court denied summary judgment. It did not question the basic tenets of the foreign sovereign compulsion doctrine, but held on the basis of its independent assessment of Chinese law, and in direct contradiction to MOFCOM's interpretation, that Chinese law "did not compel defendants' conduct." SPA-78. The district court acknowledged that both the Supreme Court and the Second Circuit have held that a foreign government's statement concerning the meaning of its own law is "'conclusive'" of that law's meaning. SPA-62. It nonetheless declined to apply that rule, viewing Federal Rule of Civil Procedure 44.1

(respecting determinations of foreign law) and this Court's panel decision in *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70 (2d Cir. 2002), as establishing instead that only "some degree of deference" is required. *Id.* at 92.

The district court then announced it would "decline to defer to [MOFCOM's] interpretation of Chinese law," SPA-79, citing this Court's statement that "[w]here a choice between two interpretations of ambiguous foreign law rests finely balanced, the support of a foreign sovereign for one interpretation furnishes legitimate assistance." 313 F.3d at 92. The district court appeared to draw from this that deference is unwarranted if a foreign law question is not "finely balanced," and outlined its grounds for refusing to defer in this case. SPA-79-81.

The district court first said that the 2009 statement was "particularly undeserving of deference" because it did not "cite to any [specific] sources to support its broad assertions about the regulatory system governing vitamin C exports," contained "ambiguous terms and phrases," and did not "distinguish between" the 1997 and 2002 export regulatory regimes. SPA-79-80. The district court conceded, however, that MOFCOM's *amicus* brief, on which the 2009 statement expressly relied, "attempted to explain the regulatory system governing vitamin C exports by citing to, and discussing, specific governmental directives

7

and Chamber documents." SPA-79. The district court next pointed to statements China had made to the World Trade Organization ("WTO") indicating that "'export administration … of vitamin C'" ceased on January 1, 2002. It asserted that this statement "appear[ed] to contradict [MOFCOM's] position in the instant litigation," and deemed this a "further reason not to defer." SPA-80 (omission in original). Third, the district court stated that "more careful scrutiny of a foreign government's statement is warranted" when "the alleged compulsion is in the defendants' own self-interest." SPA-80-81. Finally, the district court opined that "the factual record contradicts [MOFCOM's] position." SPA-81.

Having thus determined that it would not defer to MOFCOM's interpretation of Chinese law, the district court conducted an independent review of Chinese law, including documents the court described as "traditional sources of foreign law." SPA-82. The district court at points suggested it would rely on the "plain language" of these documents, SPA-65, but its analysis also contained a series of inferences about how to interpret Chinese legal texts. None of those inferences was premised, at least expressly, on any principle of Chinese law.[5]

For example, the district court interpreted a provision of the 2002 MOFCOM regulation that repealed the 1997 export license regime and established

---

[5] The district court not only rejected MOFCOM's interpretation, but also rejected the views of defendants' Chinese legal expert. *See, e.g.*, SPA-81. Plaintiffs did not present any Chinese law expert at summary judgment. SPA-38 n.5.

"verification and chop" in a manner that concededly was not compelled by the text alone. The provision stated: "'customs and chambers may suspend export price review for certain products with the approvals of'" industry participants. SPA-82-83. The district court acknowledged that this phrase could mean that Customs and Chambers were empowered to suspend price review, but only if the regulated parties concurred. The court nonetheless found the text "ambiguous" and construed it to mean that defendants had "*unilateral* power to suspend verification and chop," deeming this reading "most plausible" because it "would make little sense" to give regulated parties power to veto regulators' decisions without also allowing them to decide for themselves. SPA-83 (emphasis added). The district court did not cite any principle of Chinese law for this assumption.

It nonetheless applied this construction of the 2002 order to the 2003 MOFCOM order that continued the "verification and chop" system, despite recognizing that the 2003 order "does not contain a similar explicit suspension provision." *Id.* The district court reasoned, however, that this secondary interpretation was appropriate because "[n]othing in the record" expressly ruled it out. *Id.* Alternatively, the district court suggested that the 2003 order conferred an analogous "power to effectively suspend verification and chop simply by not reaching any agreements in the first instance," intuiting that because no provision "*explicitly* direct[ed] defendants to reach any agreements in the first instance," "it

can be *assumed* that either a chop would be granted to any contract submitted to the Chamber irrespective of the contract price or that the requirement for chops would simply be abandoned." SPA-84 (emphasis added). Again, the district court did not identify anything in Chinese law that would support these critical assumptions. *See id.* (describing the above conclusions as "standing alone, sufficient reason to deny summary judgment").

This freestyle mode of analysis was not confined to the district court's reading of specific texts. The district court also reinterpreted the Chinese legal concept of self-discipline, which as MOFCOM had explained, mandated that regulated parties "consult with each other to reach consensus on coordinated activities," subject to "penalties for failure to participate in such coordination, or for non-compliance with self-discipline." Dkt. 400-2 at 2. Based solely on its inferential reasoning, the district court held that self-discipline "does not involve coercion." SPA-103; *see also* SPA-55 n.17. Similarly, the district court stated that "in interpreting Chinese law, I cannot ignore the obvious fact that a compulsory legal regime is unlikely to be present where the defendants' economic interest is in accordance with the allegedly compelled conduct." SPA-81. Here too, the district court cited no evidence that this inference (which it appeared to draw from an article discussing U.S. antitrust principles, *see* SPA-87-88) has any relationship to recognized principles of Chinese law.

10

The case was tried to a jury charged to determine whether "the Chinese government actually compelled" the defendants to coordinate export prices and quantities.  That jury was not permitted to view any copies of Chinese law or regulations, or to hear any "witness testimony about the meaning and content of those laws."  SPA-260.  The jury returned a verdict in favor of the plaintiff class and against the remaining defendants, awarding damages for conduct that occurred between December 2001 and June 2006.  The judgment also enjoins defendants from agreeing to set the price or supply of vitamin C sold in the United States. Defendants now appeal.

## SUMMARY OF ARGUMENT

The district court erred by disregarding MOFCOM's formal statements of Chinese law, conducting an independent examination of that law based on "plain language" of translated texts and ungrounded assumptions about how to interpret Chinese law, and declaring that MOFCOM's interpretation of Chinese law was exactly backwards. The court's erroneous conclusions were not supported by any determination of any Chinese government official, Chinese court, or Chinese scholar, and yet exposed Chinese companies to massive class-action antitrust liability for conduct occurring solely within China. Several companies yielded to that *in terrorem* pressure and settled. The remaining defendants face a nine-figure judgment that should be vacated for at least three reasons.

First, the district court failed to follow Supreme Court precedent holding that a foreign government's formal statements about the interpretation of its own law are "conclusive" in American courts.

Second, the district court overlooked comity concerns that at a minimum demand that "conclusive" deference to such statements must be given when foreign sovereign compulsion is asserted as a defense in a private antitrust suit. The foreign sovereign compulsion doctrine owes its very existence to the recognition that significant questions of international law and comity would arise if U.S. courts allowed American law to override a foreign sovereign's contrary

command about how to organize its own domestic commerce. When a foreign sovereign appears in such a case to say what it demanded of a defendant, it should not be open to a district court to deny the command was given.

Third, the district court expressly "decline[d] to defer to [MOFCOM's] interpretation of Chinese law." Instead, the district court simply resolved all questions as it saw fit, applying self-made interpretive canons not grounded in Chinese law, and as such reached a conclusion that is contrary to Chinese law. The district court's approach and result have deeply troubled the Chinese government, which has sent a diplomatic note concerning this case to the U.S. State Department. This Court should reverse, and in so doing reaffirm that principles of international comity require district courts to treat official statements of a foreign government with a high degree of deference and respect, and with due caution about the court's ability to determine accurately the law of an unfamiliar legal system.

## ARGUMENT

When a foreign government official having "power to interpret existing [foreign] law" provides an interpretation of foreign law to an American court, the resulting "official declaration is conclusive so far as the intended … effect of [that law] is concerned." *United States v. Pink*, 315 U.S. 203, 220 (1942). Likewise, when a foreign sovereign appears in a private antitrust suit to state that its law

13

forced the defendant to engage in allegedly anticompetitive conduct, "American courts are obligated to accept that statement at face value."  Brief for the United States as *Amicus Curiae* at *23, in *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 1985 WL 669667 (June 17, 1985) ("U.S. Br.").

The district court ignored these fundamental precepts.  It instead purported to follow a non-antitrust decision of this Court that, without addressing *Pink*, vaguely observed that "*some* degree of deference" is due to a foreign government's interpretation of foreign law.  See *Karaha Bodas*, 313 F.3d at 92 (emphasis added). But the district court did not accord any deference to MOFCOM's statements and instead invented its own mode of analysis that yielded a strikingly incorrect conclusion of Chinese law.  Under any standard, the decision below should be reversed.

## I.     UNDER *UNITED STATES V. PINK*, MOFCOM'S INTERPRETATION OF CHINESE LAW IS "CONTROLLING."

MOFCOM has unquestioned authority to interpret applicable Chinese law. MOFCOM explained to the district court that Chinese law required defendants to engage in the conduct plaintiffs challenged.  Under *United States v. Pink*, the district court was required to give conclusive effect to that representation.

In *Pink*, the Supreme Court faced a critical question of foreign law arising out of nationalization decrees issued after the Russian Revolution.  See 315 U.S. at

217 n.2.  Among other controversies, American courts had to determine whether the decrees (which did not expressly speak to the point) applied to property in other countries.  Based on a "voluminous record," and consistent with "expert testimony tendered by the United States," the New York Court of Appeals held "that the Russian decrees … had no extraterritorial effect."  *Id.* at 217-18.  But that conclusion conflicted with the "official declaration by the [Russian] Commissariat for Justice" that the decrees also applied to property outside Russia.  *Id.* at 218-20.

The Supreme Court reversed.  It held that the New York court erred in announcing its own conclusion of Russian law, given the Commissariat's acknowledged "power to interpret existing Russian law.  That being true, this official declaration is conclusive so far as the intended extraterritorial effect of the Russian decree is concerned."  *Id.* at 220.

The Supreme Court has never questioned or qualified that holding, which reflects notions of comity long recognized by the Supreme Court and this Court.  *See, e.g.*, *Elmendorf v. Taylor*, 23 U.S. (10 Wheat.) 152, 159-60 (1825) (Marshall, C.J.) ("no Court in the universe … would, we presume, undertake to say, that the Courts of … any other nation, had misunderstood their own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding"); *Agency of Canadian Car & Foundry Co. v. Am. Can Co.*, 258 F. 363, 368-69 (2d Cir. 1919) ("authoritative representation by the Russian government" held "binding and

15

conclusive in the courts of the United States"); *O.N.E. Shipping*, 830 F.2d at 452 (emphasizing importance of "avoid[ing] judicial inquiry into … the underlying reasons and motivations for the actions of the foreign government"). Far from it, the Supreme Court has treated such statements as dispositive, though it has not expressly relied on *Pink* in doing so.

One recent decision is particularly telling. In *Abbott v. Abbott*, 560 U.S. 1 (2010), a treaty interpretation question turned in part on a question of Chilean family law. A Chilean official had provided an authoritative construction of that law, but this Court stated, contrary to *Pink*, that "the district court was not bound to follow it." See *Villegas Duran v. Arribada Beaumont*, 534 F.3d 142, 148 (2d. Cir. 2008) (Cogan, D.J.), *vacated*, 560 U.S. 921 (2010) (in light of *Abbott*). When the Supreme Court reviewed the same legal question in *Abbott*, the High Court embraced the official Chilean statement without independent analysis, reciting at least six times its conclusion that Chilean law created a "joint" or "shared" right to determine a child's place of residence. *Abbott*, 560 U.S. at 10-12, 14-15. That deferential approach is wholly consistent with *Pink*, and is flatly at odds with the district court's approach below, which placed express reliance on *Villegas Duran* and read *Karaha Bodas*, in conjunction with Federal Civil Procedure Rule 44.1 and a federal antitrust enforcement guideline, to establish that "the law of the Circuit" no longer follows *Pink*. SPA-64-65.

It should go without saying that neither an enforcement guideline nor this Court can abrogate a legal rule adopted by the Supreme Court. Rule 44.1, which sets forth general standards for determining questions of foreign law, likewise did not justify the district court's decision to treat *Pink* as dead letter. For one, the Supreme Court has admonished that even when its own rulings undermine the rationale of prior precedent, lower courts must "'leav[e] to [the Supreme] Court the prerogative of overruling its own decisions.'" *Agostini v. Felton*, 521 U.S. 203, 237 (1997). For another, because *Pink* reversed a state court decision, the view that Rule 44.1 abrogated its conclusive deference rule would lead to the improbable conclusion that *state* courts (in which Rule 44.1 has no force) are still bound to give conclusive weight to a foreign government's statement of its law, but federal courts are free to disregard it.

Unsurprisingly, then, neither plaintiffs nor the district court cited any evidence that Rule 44.1 was intended to overrule *Pink* or empower district courts to conduct inquiries forbidden to state courts. All indications are instead that Rule 44.1 was addressed to typical Advisory Committee concerns like simplifying pleading and clarifying appellate review standards. *See* Advisory Committee Notes to Rule 44.1 (1966); *see also Pasquantino v. United States*, 544 U.S. 349, 370 (2005) (parallel criminal procedure rule was intended to simplify "cumbersome" common-law procedures). Moreover, contrary to the district

17

court's suggestion, it is not difficult to square the thrust of Rule 44.1—that district courts ordinarily have broad scope to determine questions of foreign law—with *Pink*'s declaration that where a foreign government provides a formal statement of its laws, the foreign government's view must be regarded as "conclusive." It is an "ancient interpretive principle that the specific governs the general" in cases of conflict between the two. *Nitro-Lift Techs., LLC v. Howard*, 133 S. Ct. 500, 504 (2012) (per curiam). Being far more specific to this context, it is the Supreme Court's rule that a foreign government's statement interpreting its own law is "conclusive" in U.S. courts that governs here.

## II. AT A MINIMUM, "CONCLUSIVE" DEFERENCE IS WARRANTED IN FOREIGN SOVEREIGN COMPULSION CASES.

Though it is best read more broadly, *Pink* at a minimum requires U.S. courts to treat foreign government statements of law as "conclusive" where re-litigating the foreign government's position would raise heightened comity concerns. That kind of concern was plainly present in *Pink*, where "the existence of unpaid claims against Russia and its nationals … had long been one impediment to resumption of friendly relations." 315 U.S. at 224-25. Allowing a New York court to revise the scope of Russia's nationalization decrees thus threatened significant comity interests. See *id.* at 225 (recognizing importance of deciding the case "constantly

with the purpose of [a related] compact to eliminate all possible sources of friction between these two great nations").[6]

As defendants advised below, SPA-64, the parties in *Karaha Bodas* did not cite *Pink* as a relevant precedent, and the panel's decision likewise did not. But *Pink* may have been found distinguishable because *Karaha Bodas* did not present acute comity concerns. Indonesian law was relevant there only because New York had modified the traditional rule that the law of the place governs rights in local property. *See Karaha Bodas*, 313 F.3d at 85 & n.15. That policy choice was not compelled by international comity principles, however, which broadly recognize that the traditional test remains appropriate. *See* Restatement (Third) Foreign Relations Law of the United States §402(1)(b) (1987) (generally, "a state has jurisdiction to prescribe law with respect to … interests in things, present within its territory").

In contrast, heightened comity concerns are present whenever a foreign sovereign compulsion defense is raised because it "would 'touch … sharply on national nerves' were American courts to hold foreign firms liable for engaging in

---

[6] The Supreme Court's decision in *Abbott* may likewise reflect an understanding that conclusive deference should be accorded where special comity concerns are present—that case involved a domestic relations law, and so posed an inherent risk of undermining particular cultural views on family organization. That consideration may explain why *Abbott* (in contrast to this Court's vacated decision in *Villegas Duran*) accepted without further inquiry a foreign official's construction of Chilean child custody law.

conduct that is compelled by their home nations." U.S. Br. at *19 (citation
omitted). For that reason, the Solicitor General has explained that when a foreign
sovereign states that its law forced the defendant to engage in allegedly
anticompetitive conduct, "American courts are obligated to accept that statement at
face value." *Id.* at *23.

Federal antitrust enforcement guidelines similarly state that a "foreign
government's formal representation" generally is "sufficient to establish that the
conduct in question has been compelled." U.S. Dep't of Justice & Fed. Trade
Comm'n, *Antitrust Enforcement Guidelines for International Operations*, §3.32
(Apr. 1995), *available at*
http://www.justice.gov/atr/public/guidelines/internat.htm.[7] To be sure, the
guidelines acknowledge that a "statement that is ambiguous or that on its face
appears to be internally inconsistent" might not be treated as dispositive, and that
antitrust authorities may "request further information if the source of power to
compel is unclear." *Id.* §3.32 n.94. It is only natural that U.S. regulators might
engage with foreign counterparts to address uncertainty about the precise import of
a formal legal statement, and only appropriate that actual or apparent conflicts

---

[7] *See also* Opinion of United States Attorney General (May 7, 1981), *republished
in* 1981-1 Trade Cas. (CCH) ¶ 63,998 (Japan's formal statement that "it would be a
violation of Japanese law to export cars without an export license," led Attorney
General to conclude without further inquiry that "compliance with export
limitations …would properly be viewed as having been compelled").

between the economic regulations of a foreign state and U.S. antitrust law should be addressed "through diplomatic channels," such as the process described in the guidelines. *See O.N.E. Shipping*, 830 F.2d at 453-54. But neither there nor elsewhere do the guidelines suggest that American antitrust officials should attempt an independent assessment of foreign law or scour the world for materials to measure against a foreign government's statement—let alone that "the unnecessary irritant of a private antitrust action," *id.* at 454, should be permitted to supplant dialogue between sovereigns about the meaning and effect of foreign law. That approach was an invention of the district court in this case. It should not stand.

## III.    THE DISTRICT COURT'S REFUSAL TO GIVE ANY DEFERENCE TO MOFCOM'S INTERPRETATION WARRANTS REVERSAL.

The district court expressly declined to defer to MOFCOM's interpretation of Chinese law, even going so far as to assert that MOFCOM's unprecedented *amicus* filing was merely "a post-hoc attempt to shield defendants' conduct from antitrust scrutiny." SPA-81. That assertion is not just false, but also clearly contrary to the Supreme Court's disapproval of lower court opinions weighing "whether the representation of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith." *Zschernig v. Miller*, 389 U.S. 429, 434 (1968); *see also Murarka v. Bachrack Bros.*, 215 F.2d 547, 553 (2d Cir. 1954) (Harlan, J.) (a "presumption of regularity … has long attached to the

procedures of foreign governments and agencies"). That disrespectful statement also illustrates the risk to international comity inherent in any approach that declines to treat a foreign government's formal statement about the meaning of its own law with at least a high degree of deference. There can be no serious doubt that the United States would demand that its citizens should be protected from prohibitory foreign laws that apply to conduct within the U.S. if American authorities formally stated that U.S. law mandated contrary action. Such respect can only be reasonably requested if U.S. courts properly defer to statements of foreign law offered by a foreign sovereign. Accordingly, if U.S. authorities expect (as they rightly should) that the Government of China and its courts would defer to their formal interpretation of U.S. law, then MOFCOM legitimately should insist that its view of Chinese law should be adopted by U.S. courts.

The concern, however, goes beyond comity; it extends to accuracy as well. It is no simple matter for American courts to understand and apply the laws of a foreign country. The First Circuit thus cautioned that in construing a "relevant source of [foreign] law …. [c]are must be taken to avoid imposing American legal concepts onto another legal culture." *Whallon v. Lynn*, 230 F.3d 450, 456 (1st Cir. 2000). Likewise, the Fourth Circuit warned that attempts to rely on the "plain and ordinary meaning" of a foreign law are "problematic" because they may yield a

definition "divorced from that term's meaning in the law of the [foreign] country." *Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir. 2007).

U.S. courts accordingly should welcome a foreign government's assistance in resolving questions of foreign law, including by according their formal statements at least considerable deference and respect. Typically, they do. The Ninth Circuit "expressly accept[ed] as valid [a letter from a Chinese state-owned enterprise] interpreting the State Secrets Act," a Chinese law that in that instance barred a party from complying with a district court's discovery order. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1474 n.7 (9th Cir. 1992). The Seventh Circuit likewise held that "[a] court of the United States owes substantial deference to the construction France places on its domestic law," stating that it would be "unacceptable" for a court to grant "the conclusions of a sovereign nation less respect than those of an administrative agency." *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1312 (7th Cir. 1992). As noted, the Supreme Court has treated foreign government statements as dispositive of foreign law questions in cases before it. And *Karaha Bodas*, which expressed agreement with the Seventh Circuit's approach and emphasized the "legitimate assistance" that such a statement can provide to a U.S. court, also should be read to fit within the basic principles announced in those cases. 313 F.3d at 92.

As against those decisions, the district court's opinion in this case is a clear outlier. So far as undersigned counsel are aware, no other judicial decision has ever subjected a foreign government's formal statement of its own law to the kind of derisive scrutiny applied below. The district court's anomalous approach rests on two fundamental errors beyond those already discussed. First, even assuming *arguendo* that *Karaha Bodas* may be properly read to hold that no degree of deference should be given unless "two interpretations of ambiguous foreign law rest[] finely balanced," *id.*,[8] the district court plainly erred in denying deference here because its justifications for doing so were flimsy at best. Second, once it decided to strike off on its own, the district court did not apply Chinese law at all—it simply announced decisional principles of its own making. Both errors warrant reversal.

### A.     The District Court's Case-Specific Reasons For Denying Deference Are Erroneous Or Insubstantial.

The district court offered four basic justifications for refusing deference. SPA-79-81. One—that "more careful scrutiny of a foreign government's statement is warranted" when "the alleged compulsion is in the defendants' own self-interest"—should be regarded as self-refuting. *Id.* That naked supposition has

---

[8] That aspect of *Karaha Bodas* may be best viewed as dicta because nothing in that case turned on whether the foreign law question was close. *See* 313 F.3d at 90-91 (Indonesian law question was one-sided); *id.* at 92 (citing New York law in ruling against Indonesian entity on a second issue).

nothing to do with the comity or accuracy concerns that properly animate the deference doctrine; it is simply a personal predilection of the district court. The other three justifications are equally unavailing but require more detailed discussion.

      1.    *Specificity.*

The district court first described MOFCOM's 2009 statement as "particularly undeserving of deference," because the district court found the statement bereft of citations. But as the district court also allowed, the 2006 amicus brief provided much of the specific citation to Chinese law that the district court appeared to seek. The district court also indicated that MOFCOM should have provided positive law sources establishing the precise scope of "self-discipline," or other general principles of Chinese law. In that regard this Court should consider what positive enactment an American lawyer would cite in a foreign court to prove up basic principles like non-retroactivity or qualified immunity. Contrary to the district court's presumption, not all of the law (let alone all of U.S. antitrust law, much of which is derived from common-law adjudication, *see State Oil Co. v. Khan*, 522 U.S. 3, 20-21 (1997)) is set out in "a published series of conduct-dictating prohibitions or compulsions with an identified sanctions system." SPA-77. Some of it sits outside of enacted instruments.

The district court also asserted that the 2009 statement merited no deference because it supposedly "ma[d]e no attempt to distinguish between" the 1997 and 2002 export control regimes. SPA-80. To be sure, the 2009 statement emphasized elements common to MOFCOM's regulatory measures because the single most salient point in this case is that throughout "the relevant period [MOFCOM] required vitamin C exporting companies to coordinate among themselves on export price and production volume." Dkt. 400-2 at 2. But again, MOFCOM's *amicus* brief expressly addressed the 2002 amendments to the export control regime. Dkt. 69 at 14-15. Seemingly recognizing this, the district court's answer to this was to accuse the *amicus* brief of being "less than straightforward" because it did not cite a revised charter that the Vitamin C Sub-Committee adopted in 2002. SPA-89 n.45. But the *amicus* brief cited and explained at length the 2002 MOFCOM regulations that pre-dated the new charter and governed the Sub-Committee's conduct. MOFCOM's reliance on its own regulation rather than a statement promulgated by its subordinate simply reflects MOFCOM's legal view that its own regulatory act was key. That judgment, which is properly MOFCOM's to make, provides no basis to deny deference to MOFCOM's interpretation of applicable Chinese law.

2. *China's Statements to the WTO Are Consistent With MOFCOM's Positions in this Case*.

The district court asserted that China's statements to the WTO that it had given up "'export administration … of vitamin C' as of January 1, 2002," "appear to contradict" MOFCOM's position that Chinese law continued after that date to require industry coordination of export price and quantity. SPA-80 (omission in original). That conclusion, however, reflects a basic misunderstanding of the technical trade-policy context in which those statements were made.

The statements cited by the district court relate to a "transitional review" in which China participated following its 2001 accession to the WTO. Each statement provides in part that "on 1 January 2002, China gave up export administration" of certain goods, including "vitamin C." But in context—and as indicated by the headings that preceded them—these statements indicated only that China abandoned "*restrictions on exports through non-automatic licensing*" on that date,[9] and not that China eliminated every existing export restriction in one stroke. A third document cited by the district court unambiguously demonstrates that this more confined reading is precisely what China intended. That document,

---

[9] Council for Trade in Goods, *Transitional Review Under Article 18 of the Protocol of Accession of the People's Republic of China*, G/C/W/438, at 2-3, ¶5(a) (Nov. 20, 2002) (emphasis added), *available at* https://docs.wto.org/dol2fe/Pages/FE_Search/DDFDocuments/65661/Q/G/C/W438 .pdf.

27

dated February 28, 2006, is a report by the WTO Secretariat summarizing its "trade policy review" with respect to China. Citing one of the two "export administration" statements described above, the WTO Secretariat explained that "[o]n 1 January 2002, China abolished *export quotas and licenses* for … Vitamin C."[10] Thus, the WTO Secretariat expressly interpreted China's earlier "export administration" statements to relate to abolition of "export quotas and licenses for … Vitamin C," but not all other forms of export regulation.

The United States government adopted exactly this same construction in a 2009 WTO dispute resolution proceeding, alleging (as China later acknowledged), that China had maintained "a system that prevents exportation unless the seller meets or exceeds the minimum export price."[11] In other words, the United States adopted exactly the same position in WTO dispute settlement proceedings that MOFCOM has urged in this case: after 2002, China was still requiring exporters to abide by a price-setting regime. China's statements to the WTO, accordingly, did

---

[10] Trade Policy Review Body, *China Trade Policy Review 2006*, WT/TPR/S/161, at 104 ¶141 & n.120 (Feb. 28, 2006) (emphasis added), *available at* https://docs.wto.org/dol2fe/Pages/FE_Search/ExportFile.aspx?Id=68101&filename =Q/WT/TPR/S161-3.pdf. Footnote 120 cites China's statements in document G/C/W/438 (*see* n.9, *supra*).

[11] *See* Opening Oral Statement of the Complainants, *China—Measures Related to the Exportation of Various Raw Materials*, WT/DS395/DS398, ¶31 (Aug. 31, 2010), *available at* http://www.ustr.gov/webfm_send/2251.

not provide any basis for the district court to refuse to accord MOFCOM deference.

        3.    *The Factual Record*

The district court also asserted that deference was not warranted because "the factual record contradicts the Ministry's position." SPA-81. As the district court's subsequent discussion demonstrates, however, the parties' factual disputes supplied no basis for this conclusion.

As an initial matter, the district court concluded that it, and not the jury, would resolve all "disputed facts underlying" any question of Chinese law. SPA-97. Pursuant to that view, it decided a number of hotly disputed matters against the defendants and contrary to MOFCOM's legal interpretation, ruling for example that a document "susceptible to multiple interpretations" did not count as evidence of compulsion, SPA-100, and rejecting deposition testimony supplied by several witnesses as "incredible" or "unconvincing," insofar as they averred that defendants' conduct had been compelled. SPA-102-103.

The most that the district court fairly could have concluded from these points, at least insofar as deference is concerned, was that the factual record was contested. And that conclusion should have led the district court to defer to MOFCOM's interpretations, not discard them.

## B. The District Court's Analysis Was Fatally Flawed In Its Own Terms.

Once the district court decided, erroneously, to conduct an independent analysis of Chinese law, the court at a minimum had a duty to resolve the case by applying *the law of China*. It did not. Rather, time and again, the district court simply resolved questions as it saw fit, and without regard to any source of Chinese law.

Several such instances are catalogued in the statement of the case, *supra*, at pages 8-10. On each of those interpretive questions, which the district court itself found pivotal in deciding whether defendants' conduct was compelled by Chinese law, SPA-84, the district court simply applied its own standard and made no attempt to discern whether Chinese law would call for application of a different one. There are many others as well—too many to fully describe in the allotted space. But a few examples serve to illustrate the point.

To take one, the district court noted that a document relevant to whether defendants' conduct was compelled by Chinese law was "susceptible to multiple interpretations" but "interpret[ed] it to mean that the Chamber was announcing that defendants were able to reach, and implement, an agreement without the government's intervention." SPA-100. The district court gave no reason for that interpretation, and conveyed no sign that Chinese law drove the decision.

The district court held "as a question of foreign law" that "*all evidence*" of events that took place after the plaintiffs' filed their initial complaint was "irrelevant" to interpreting Chinese law. SPA-98 (emphasis added). If that conclusion had a basis in Chinese law, the district court did not cite it.

And it mused, without support from any Chinese source, that under "verification and chop," "if all the members simply resigned from the Subcommittee," they likely would have been permitted to export without any applicable "price or output restrictions." SPA-91. No indication was given as to why that counter-intuitive position accurately states Chinese law.

MOFCOM grants that a district court that faces a contested question of foreign law with no aid from a foreign government often will have no choice but to grasp the nettle and do its best. But here, the district court's confusion was self-inflicted. MOFCOM offered an authoritative view of Chinese law. The district court erroneously refused that assistance and then, predictably, floundered in its attempt to discern the operation of a complex foreign regulatory system. The district court instead should have deferred, as it unquestionably would have been required to do had a U.S. regulator presented an analogous statement in a brief. *Auer v. Robbins*, 519 U.S. 452, 462 (1997). Its failure to do so, or at a minimum to apply Chinese legal principles to its independent analysis, requires reversal.

31

## CONCLUSION

For the foregoing reasons, MOFCOM respectfully asks this Court to vacate the judgment in this matter and enter judgment for the defendants.  Alternatively, the Court may remand for the district court to address the defendants' legal compulsion defenses under an appropriate standard of deference.

Dated: April 14, 2014

/s/ Carter G. Phillips
Carter G. Phillips
Kwaku A. Akowuah
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

Joel M. Mitnick
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. 32(a)(7)(B)

1.  This brief complies with the type-volume limitations of Federal Rules of
    Appellate Procedure 29(d) and 32(a)(7)(B) because this brief contains 6,998
    words, excluding the parts of the brief exempted by Federal Rule of
    Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the requirements of Federal Rule of Appellate
    Procedure 29(c), the typeface requirements of Federal Rule of Appellate
    Procedure 32(a)(5) and the type style requirements of Federal Rule of
    Appellate Procedure 32(a)(6) because this brief has been prepared in a
    proportionally spaced typeface using Microsoft Word 2007 in Times New
    Roman 14-point font.

Dated: April 14, 2014

> */s/* Carter G. Phillips
> Carter G. Phillips
> SIDLEY AUSTIN LLP
> 1501 K Street, NW
> Washington, DC 20005
> (202) 736-8000