# 13-4791-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

In Re: Vitamin C Antitrust Litigation

ANIMAL SCIENCE PRODUCTS, INC., THE RANIS COMPANY, INC.,

*Plaintiffs-Appellees,*

—against—

HEBEI WELCOME PHARMACEUTICAL CO. LTD., and NORTH CHINA
PHARMACEUTICAL GROUP CORPORATION,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME VI OF XV
## (Pages A-1501 to A-1800)

JONATHAN M. JACOBSON
DANIEL P. WEICK
JUSTIN A. COHEN
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas,
  40th Floor
New York, New York 10019
(212) 999-5800

SCOTT A. SHER
BRADLEY T. TENNIS
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1700 K Street, N.W., 5th Floor
Washington, D.C. 20006
(202) 973-8800

*Attorneys for Defendants-Appellants*
*(Counsel continued on inside cover)*

WILLIAM A. ISAACSON
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
(202) 237-2727

BRENT W. LANDAU
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, Pennsylvania 19106
(215) 985-3273

MICHAEL D. HAUSFELD
BRIAN A. RATNER
MELINDA R. COOLIDGE
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
(202) 540-7200

JAMES T. SOUTHWICK
SHAWN L. RAYMOND
KATHERINE KUNZ
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

PAGE

Docket Entries .......................................................... A-1

Transfer Order, dated February 14, 2006 ............................ A-144

Brief of Amicus Curiae The Ministry of Commerce of The People's
    Republic of China in Support of the Defendants' Motion to
    Dismiss the Complaint, dated September 22, 2006 ................ A-147

**Memorandum in Support of the Ranis Company's
Motion for Class Certification, dated April 11, 2007**

    Exhibit A—
    China Chamber of Commerce of Medicines and Health Products
    Importers and Exporters ......................................... A-176

Declaration of Darrell Prescott in Support of Defendants'
    Memorandum of Law in Opposition to the Motion of The Ranis
    Company for Class Certification, dated August 2, 2007 ........... A-186

    Exhibit H to Prescott Declaration—
    Email from Robert Conway to David Kang,
    dated September 24, 2003 ....................................... A-188

    Exhibit L to Prescott Declaration—
    Email from David Kang to Robert Conway,
    dated September 21, 2004 ....................................... A-192

Declaration of Yang Jianfu in Support of Motion of North China
    Pharmaceutical Group Corp. to Dismiss the Complaint,
    dated April 11, 2008 ........................................... A-194

ii

PAGE

**Letter from Joel M. Mitnick to The Honorable David G. Trager, dated June 9, 2008**

Attachment II—
Statement in *In Re Vitamin C Antitrust Litigation*,
dated June 9, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-205

Letter from Kenneth A. Lapatine to The Honorable James Orenstein,
dated August 26, 2008, with Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . A-208

Letter from Joel M. Mitnick to The Honorable James Orenstein,
dated August 29, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-294

**Declaration of Annabelle Chan in Support of Defendants' Motion for Summary Judgment or, in the Alternative, for Determination of Foreign Law and Entry of Judgment Pursuant to Rule 44.1, Fed. R. Civ. P., dated August 31, 2009**

Exhibit 2—
Letter from Joel M. Mitnick to The Honorable James Orenstein,
dated September 29, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-299

Exhibit 4—
Report of Professor Shen Sibao . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-302

Exhibit 5—
Report of Professor James B. Speta . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-369

Exhibit 15—
China Chamber of Commerce of Medicines & Health Products
Importers & Exporters, Publication of Administration and
Regulation (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-407

Exhibit 42—
Excerpts of Deposition Transcript of Dr. Paula Stern,
dated July 28, 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-441

Exhibit 43—
Report of Dr. Paula Stern . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-461

iii

PAGE

**Declaration of Jennifer Milici in Support of Plaintiffs' Opposition
to Defendants' Motion for Summary Judgment or, in the Alternative,
for Determination of Foreign Law and Entry of Judgment,
dated October 16, 2009**

Exhibit P—
Decree of the State Council of the People's Republic of China,
No. 332, Regulations of the People's Republic of China on the
Administration of the Import and Export of Goods ................ A-488

Exhibit Q—
Excerpts of Deposition Transcript of Professor Shen Sibao,
dated April 16, 2009 ............................................. A-507

Exhibit T—
World Trade Organization Communication from China ........... A-519

Exhibit KK—
Ministry of Commerce of the People's Republic of China
Announcement, No. 12, 2008, March 6, 2008 ..................... A-562

Exhibit LL—
Transcript of Motion, dated June 5, 2007 ......................... A-599

Exhibit MM—
Circular of the General Office of the State Council on the
Reiteration of the Provisions Concerning the Promulgation of
National Regulations and Policies on Foreign Economic
Relations and Trade ............................................. A-631

Exhibit YY—
Excerpts of Deposition Transcript of James B. Speta,
dated May 1, 2009 .............................................. A-635

**Letter from Richard S. Goldstein to The Honorable David G. Trager,
dated November 23, 2009**

Attached to Letter—
Statement in *In Re Vitamin C Antitrust Litigation*,
06-MD-1738 (DGT), dated August 31, 2009 ..................... A-650

iv

PAGE

Order Reassigning Litigation, dated January 19, 2011 . . . . . . . . . . . . . . . . . A-658

Northeast Pharmaceutical Group Co., Ltd.'s Objection to Magistrate
    Orenstein's January 20, 2011 Memorandum and Order,
    dated February 3, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-659

Letter from Richard S. Goldstein to The Honorable James Orenstein,
    dated February 9, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-679

**Non-Settling Defendants' Notice of Filing of Affidavit of Qiao Haili
Pursuant to the Court's Order of July 11, 2012 and Statement Thereon,
dated August 8, 2012**

    Exhibit B to Letter—
    Affidavit of Qiao Haili Pursuant to the Court Order of
    July 11, 2012, dated August 5, 2012, with exhibits . . . . . . . . . . . . . . . A-683

Select Statements of Fact Made by the Ministry of Commerce of the
    People's Republic of China in its *Amicus Curiae* Brief in Support
    of Defendants' Motion to Dismiss, dated August 15, 2012 . . . . . . . . A-986

    Exhibit 6—
    Expert Report of Lawrence Wu, dated June 29, 2012
    (Redacted, Sealed Version in Volume XV) . . . . . . . . . . . . . . . . . . . . . . A-990

    Exhibit 8—
    Excerpts of the Deposition Transcript of
    Douglas Bernheim, PhD, dated May 16, 2012 . . . . . . . . . . . . . . . . . . . A-993

Proffer of Testimony of Qiao Haili Pursuant to the Court Order of
    October 12, 2012, dated October 29, 2012 . . . . . . . . . . . . . . . . . . . . . . . A-999

Memorandum Decision and Order Denying North China
    Pharmaceutical Group Corporation's Motion for Summary
    Judgment and Granting in Part and Denying in Part Plaintiffs'
    Motion to Compel, dated February 8, 2013 . . . . . . . . . . . . . . . . . . . . . A-1030

v

PAGE

Defendants' Proposed Preliminary Jury Instructions,
dated February 23, 2013 ....................................... A-1050

**Defendants' Notice of Motion and Renewed Motion for Judgment
as a Matter of Law under Fed. R. Civ. P. 50(B) Based on Act of State
and Foreign Sovereign Compulsion and International Comity,
dated April 11, 2013**

Exhibit M—
China-Measures Related to the Exportation of Various Raw
Materials, Reports of the Panel ................................. A-1073

Exhibit N—
2003 Report to Congress on China's WTO Compliance .......... A-1389

Exhibit O—
2004 Report to Congress on China's WTO Compliance .......... A-1463

Exhibit P—
2006 Report to Congress on China's WTO Compliance .......... A-1554

Exhibit Q—
Article titled "US Vitamin fine 'unfair and inappropriate' says
Mofcom"...................................................... A-1664

Exhibit R—
Article titled "China Criticizes U.S. Ruling on Vitamin C
Makers"...................................................... A-1667

Exhibit S—
Article titled "MOFCOM's Shang says US judgment in vitamin C
case shows 'disrespect'" ...................................... A-1669

**Defendants' Reply in Support of Their Renewed Motion
for Judgment as a Matter of Law, dated May 31, 2013**

Exhibit A—
Regular Press Conference of the Ministry of Commerce
on March 19, 2013........................................... A-1673

vi

## Excerpts of Trial Transcripts

Trial Transcript, dated February 26, 2013 .......................... A-1683

Trial Transcript, dated February 27, 2013 .......................... A-1713

Trial Transcript, dated February 28, 2013 .......................... A-1732

Trial Transcript, dated March 4, 2013 ............................. A-1748

Trial Transcript, dated March 5, 2013 ............................. A-1755

Trial Transcript, dated March 6, 2013 ............................. A-1776

Trial Transcript, dated March 7, 2013 ............................. A-1823

Trial Transcript, dated March 11, 2013 ............................ A-1856

Trial Transcript, dated March 12, 2013 ............................ A-1866

Trial Transcript, dated March 13, 2013 ............................ A-1889

Trial Transcript, dated March 14, 2013 ............................ A-1911

## Plaintiff's Trial Exhibits

Exhibit 42—
2006 VC and product lines American marketing and sales
strategy ....................................................... A-1913

Exhibit 52—
China Chamber of Commerce for Import and Export of
Medicines and Health Products ................................. A-1934

Exhibit 53—
VC Chapter Meeting Memo (07/23-2003) ....................... A-1939

Exhibit 57—
Memorandum of CCCMHPIE Meeting, dated March 19, 2004 .... A-1943

vii

PAGE

Exhibit 58—
VC Subcommittee Memorandum (12/10/04) . . . . . . . . . . . . . . . . . . . . . A-1948

Exhibit 73—
China Chamber of Commerce for Import & Export of Medicines
& Health Products VC Subcommittee . . . . . . . . . . . . . . . . . . . . . . . . . . A-1953

Exhibit 78—
Import/Export Department June Work Summary . . . . . . . . . . . . . . . . A-1967

Exhibit 81—
Import Export Department February 2004 Work Summary . . . . . . . A-1973

Exhibit 83—
June 2004 Work Summary Import/Export Department . . . . . . . . . . . A-1978

Exhibit 85—
Interim Meeting Memorandum, dated May 28, 2004 . . . . . . . . . . . . . A-1985

Exhibit 86—
Email from Wang Qi, dated January 5, 2005 . . . . . . . . . . . . . . . . . . . . A-1992

Exhibit 87—
Email from Wang Qi, dated May 22, 2005 . . . . . . . . . . . . . . . . . . . . . . A-2000

Exhibit 111—
Email from tangql@mail.ncpcwelcome.com,
dated March 14, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2005

Exhibit 118—
Memorandum, dated September 26, 2007 . . . . . . . . . . . . . . . . . . . . . . . A-2035

Exhibit 119—
North China Pharmaceutical Group Corporation Work Summary
for January to June, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2042

Exhibit 124—
CCCMHPIE Major Events, November-December, 2004 . . . . . . . . . . A-2061

Exhibit 133—
Email from Wang Qi, dated September 4, 2005 . . . . . . . . . . . . . . . . . . A-2070

viii

PAGE

Exhibit 134—
China Chamber of Commerce of Medicines & Health Products
Importers & Exporters ......................................... A-2078

Exhibit 135—
Import and Export Work Summary for April [2003] ............. A-2091

Exhibit 137—
Periodical Summary for December-Import and Export ........... A-2099

Exhibit 139—
Email from Chu Jiang, dated April 8, 2004 ...................... A-2105

Exhibit 141—
Recognize New Trends, Develop on Both Fronts, and Build a
Healthy, Sustainable and Harmonious Jiangshan,
dated January 28, 2005 ......................................... A-2110

Exhibit 142—
Memorandum of VC Chapter Meeting of CCCMHPIE,
dated April 19, 2005 ............................................ A-2147

Exhibit 144—
Memo, dated November 16, 2005 ............................... A-2153

Exhibit 151—
Chamber Meeting Memorandum ................................ A-2159

Exhibit 165—
The Prospect of VC Series Products in the First Half of the Next
Year and Our Corresponding Measures ......................... A-2161

Exhibit 173—
Memorandum, dated April 13, 2001 ............................ A-2166

Exhibit 234—
Chamber of Commerce for Import & Export of Medicines &
Health Products (CCCMHPIE) .................................. A-2173

ix

PAGE

Exhibit 249—
Charter of the Vitamin C Subcommittee of the China Chamber of
Commerce of Medicines and Health Products Importers and
Exporters ................................................................ A-2180

Exhibit 252—
Report on Henan Xinxiang Housing Pharmaceuticals' Refusal to
Comply with the Industry's Self-Regulation Agreement.......... A-2201

Exhibit 259—
Email from Wang Qiang, dated November 16, 2005 ............. A-2206

Exhibit 273A—
Meeting Summary ........................................... A-2216

Exhibit 300—
North China Pharmaceutical Group Corporation
Company Profile .............................................. A-2221

Exhibit 301—
North China Pharmaceutical Group Corporation Products ........ A-2224

Exhibit 302—
North China Pharmaceutical Group Corporation Products ........ A-2228

Exhibit 306—
North China Pharmaceutical Group Corporation
Work Summary 2004 ......................................... A-2233

Exhibit 318—
Import & Export Dept. May 2004 Work Summary ............... A-2249

Exhibit 320—
Report on the Current International VC Market:
Status and Trends............................................. A-2254

Exhibit 386—
Sales Contract ............................................... A-2267

Exhibit 386A—
Sales Contract ............................................... A-2540

x

PAGE

Exhibit 386B—
Sales Contract ............................................... A-2545

Exhibit 425—
Sales Contract ............................................... A-2565

Exhibit 425A—
Sales Confirmation ........................................... A-2971

Exhibit 425B—
Sales Contract ............................................... A-3014

Exhibit 426—
Sales Contract ............................................... A-3020

Exhibit 426A—
Sales Contract ............................................... A-3376

Exhibit 427—
Sales Contract ............................................... A-3431

Exhibit 442—
China Economic Development Forum, November 7, 2003 ........ A-3670

### Defendant's Trial Exhibits

Exhibit 3—
Regulations of the Ministry of Foreign Trade and Economic
Cooperation on Enhancing Coordination Regulation of Export
Commodity.................................................... A-3691

Exhibit 4—
MOFTEC Measures for Social Organizations.................... A-3712

Exhibit 6A—
Interim Provisions for Administration of Export Commodities
(approved by the States Council on December 21, 1992, issued
and announced by the Ministry of Foreign Trade and Economic
Cooperation on December 29, 1992) ........................... A-3747

xi

PAGE

Exhibit 6B—
Interim Provisions for Administration of Export Commodities
(Promulgated by the Ministry of Foreign Economic Relations and
Trade on December 29, 1992) .................................. A-3755

Exhibit 7—
Notice of Ministry of Foreign Trade and Economic Cooperation
regarding Printing and Distribution of Several Regulations for
Personnel Management of Chambers of Commerce for Importers
and Exporters ................................................ A-3769

Exhibit 9—
Interim Regulations of the Ministry of Foreign Trade and
Economic Cooperation on Punishment for Conduct of Exporting
at Lower-than-Normal Price ................................... A-3795

Exhibit 12—
1997 MOFTEC & SDA Notice ................................. A-3821

Exhibit 13—
Document of Personnel, Education and Labor Department
of Ministry of Foreign Trade & Economic Cooperation .......... A-3852

Exhibit 28—
China Chamber of Commerce of Medicines & Health Products
Importers & Exporters ........................................ A-3879

Exhibit 29—
List of the Fourth Batch of Departmental Decisions Abolished
by the Ministry of Foreign Trade and Economic Cooperation..... A-3886

Exhibit 31—
2002 MOFTEC & Customs Notice.............................. A-3893

Exhibit 31A—
2002 MOFTEC & Customs Notice as Presented to the Jury ...... A-3917

Exhibit 32A—
Charter of the Vitamin C Subcommittee of the China Chamber
of Commerce of Medicines and Health Products Importers and
Exporters ................................................... A-3926

xii

PAGE

Exhibit 32B—
China Chamber of Commerce for Import & Export of Medicines
& Health Products VC Subcommittee . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3947

Exhibit 44—
Announcement of Ministry of Commerce of the People's
Republic of China, General Administration of Customs of the
People's Republic of China (No. 36, 2003) . . . . . . . . . . . . . . . . . . . . . . A-3961

Exhibit 68—
Chamber of Commerce Meeting Minutes,
dated December 23, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3976

Exhibit 96—
North China Pharmaceutical Group Corporation Contact
Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3979

Exhibit 97—
North China Pharmaceutical Group Corp. Listed Companies
Temporary and Periodic Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3980

Exhibit 98—
North China Pharmaceutical Group Corp. List of Group
Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3984

Exhibit 99—
NCPC Hebei Welcome Pharmaceutical Co., Ltd. Website . . . . . . . . A-3988

**Video Exhibits**

Exhibit 5—
Qiao, Haili-08/31/2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3991

Exhibit 6—
Qiao, Haili-08/30/2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4005

xiii

PAGE

Notice of Appeal, dated December 23, 2013 ......................... A-4008

Amended Notice of Appeal, dated January 6, 2014................... A-4010

Second Amended Notice of Appeal, dated February 18, 2014......... A-4013

**Filed Under Seal**

**Defendants' Notice of Motion and Motion to Exclude Foreign Purchases from Plaintiffs' Claims for Lack of Subject Matter Jurisdiction and to Exclude Certain Other Claims as Without Evidentiary Support, dated September 28, 2012**

Exhibit 6—
Excerpts of Expert Report of Lawrence Wu,
dated June 29, 2012........................................... A-4016

In September and November 2004, the United States continued to press China for complete elimination of the annual export quota on coke.  Along with other WTO members, including the EC and Japan, the United States raised its concerns at the WTO during the transitional reviews before the Committee on Market Access and the Council for Trade in Goods as well as during side meetings.  The United States also reiterated its concerns in bilateral meetings in Beijing in November 2004.  The United States will continue to pursue this issue vigorously in 2005.

Fluorspar is another example of a raw material subject to export restrictions.  China imposes quotas and license fees on fluorspar exports, apparently with the objective of supporting China's domestic users of fluorspar, which face no comparable restrictions.  Since shortly after China's WTO accession, the United States has raised its concerns about these restrictions bilaterally with China.  The United States has also worked with other WTO members with an interest in this issue, including Japan, and it raised this issue during the transitional reviews of China's compliance efforts before the Council for Trade in Goods in 2002 and 2003 and both the Committee on Market Access and the Council for Trade in Goods in 2004.  To date, however, China has refused to modify its practices in this area.  The United States will continue to urge China to lift these restrictions in 2005.

**Internal Policies Affecting Trade**

*Non-discrimination*

China agreed to assume the obligations of GATT 1994, the WTO agreement that lays down the core principles that constrain and guide WTO members' policies relating to trade in goods.  The two most fundamental of these core principles are the Most-Favored Nation (MFN), or non-discrimination, rule – referred to in the United States as "normal trade relations" – and the rule of national treatment.

The MFN rule (set forth in Article I of GATT 1994) attempts to put the goods of all of an importing WTO member's trading partners on equal terms with one another by requiring the same treatment to be applied to goods of any origin.  It generally provides that if a WTO member grants another country's goods a benefit or advantage, it must immediately and unconditionally grant the same treatment to imported goods from all WTO members.  This rule applies to customs duties and charges of any kind connected with importing and exporting.  It also applies to internal taxes and charges, among other internal measures.

The national treatment rule (set forth in Article III of GATT 1994) complements the MFN rule.  It attempts to put the goods of an importing WTO member's trading partners on equal terms with the importing member's goods by requiring, among other things, that a WTO member accord no less favorable treatment to imported goods than it does for like domestic goods.  Generally, once imported goods have passed across the national border and import duties have been paid, the importing WTO member may not subject those goods to internal taxes or charges in excess of those applied to domestic goods.  Similarly, with regard to measures affecting the

*Page 35*

internal sale, purchase, transportation, distribution or use of goods, the importing WTO member may not treat imported goods less favorably than domestic goods.

In its accession agreement, China agreed to repeal or revise all laws, regulations and other measures that were inconsistent with the MFN, or non-discrimination, rule upon accession. China also confirmed that it would observe this rule with regard to all WTO members, including separate customs territories, such as Hong Kong, Macau and Taiwan. In addition, China undertook to observe this rule when providing preferential arrangements to foreign-invested enterprises within special economic areas.

With regard to the national treatment rule, China similarly agreed to repeal or revise all inconsistent laws, regulations and other measures. China also specifically acknowledged that its national treatment obligation extended to the price and availability of goods or services supplied by government authorities or state-owned enterprises as well as to the provision of inputs and services necessary for the production, marketing or sale of finished products. Among other things, this latter commitment precludes dual pricing, i.e., the practice of charging foreign or foreign-invested enterprises more for inputs and related services than Chinese enterprises. China also agreed to ensure national treatment in respect of certain specified goods and services, which had traditionally received discriminatory treatment in China, such as boilers and pressure vessels (upon accession), after sales service (upon accession), and pharmaceuticals, chemicals and spirits (one year after accession).

As previously reported, China reviewed its pre-WTO accession laws and regulations and revised many of those which conflicted with its WTO MFN and national treatment obligations in 2002. Most of these revisions were made to secure national treatment, including with regard to boilers and pressure vessels, after sales service, and the pricing of pharmaceutical products, among other areas. In 2003, China made further revisions covering registration requirements for foreign chemical products and the regulation of spirits.

However, China does not appear to have observed MFN and national treatment requirements in all areas. For example, U.S. pharmaceutical manufacturers continue to raise national treatment concerns in the areas of price controls on medicines and drug reimbursement. Actions taken by China in these areas often appear to be designed to benefit domestic pharmaceutical manufacturers at the expense of foreign pharmaceutical manufacturers. The United States has urged the Chinese regulatory authorities to work with U.S. companies when making changes in these areas and to adhere strictly to China's WTO obligations. The United States will continue to monitor these areas closely in 2005.

China's border trade policy continues to generate MFN and other concerns. China provides preferential import duty and VAT treatment to certain products, often from Russia, apparently even when those products are not confined to frontier traffic as envisioned by Article XXIV of GATT 1994. In June 2003, China began to address these concerns when it eliminated

preferential treatment for boric acid and 19 other products.  However, several other products continue to benefit from preferential treatment.

Furthermore, several U.S. industries reported that China continued to apply the value-added tax in a manner that unfairly discriminates between imported and domestic goods, both through official measures and on an *ad hoc* basis, as discussed below in the Taxation section.  It also appears that China has applied sanitary and phytosanitary measures in a discriminatory manner continually since it acceded to the WTO, as discussed below in the Agriculture section.

The United States continued to address the range of MFN and national treatment issues with China in 2004, both bilaterally and in WTO meetings, such as the transitional reviews before the Council for Trade in Goods.  The United States will continue to pursue these issues in 2005.

Meanwhile, China did undertake a major restructuring of its trade and investment-related ministries in mid-2003, following significant changes in the leadership of China's Communist Party and the national government.  One principal component of this restructuring was combining domestic and foreign trade-related functions into one agency (as SETC and parts of the State Development and Planning Commission, or SDPC, were folded into MOFTEC, which became known as the Ministry of Commerce, or MOFCOM), in part to foster better adherence to the WTO's national treatment principle.  In addition, the successor to SDPC, the National Development and Reform Commission (NDRC), has become much more open to discussing the policy concerns of foreign businesses, which contrasts sharply with its prior reputation.

*Taxation*

China committed to ensure that its laws and regulations relating to taxes and charges levied on imports and exports would be in full conformity with WTO rules upon accession, including, in particular, the MFN and national treatment provisions of Articles I and III of GATT 1994.

<u>VAT Policies</u>

Certain aspects of China's VAT system continued to raise serious national treatment concerns in 2004, particularly with regard to the discriminatory rates being applied to imports versus domestically produced semiconductors and fertilizer.

China began to encourage the development of China's domestic integrated circuit (IC) industry through the announcement of discriminatory VAT policies beginning shortly before its WTO accession, although they did not become operational until 2004.  Pursuant to a series of measures, China provided for the rebate of a substantial portion of the 17 percent VAT paid by domestic manufacturers on their locally produced ICs.  A similar VAT rebate was available to imported ICs, but only if they had been designed in China.  China charged the full 17 percent VAT on all other imported ICs.

The United States raised this issue with China in several bilateral meetings, including the Trade Dialogue held in Beijing in February 2003, and at the WTO during the transitional review before the Committee on Market Access in October 2003. In August 2003, in response to the concerns raised by the United States, China reportedly formed an inter-agency group, composed of representatives from the Ministry of Information Industry (MII), the State Taxation Administration, the Customs Administration and MOFCOM, to evaluate the WTO-compatibility of its tax treatment of ICs. However, during high-level meetings in Beijing in October 2003 and again during the November 2003 Trade Dialogue, China appeared to have hardened its conviction that its differential tax treatment of ICs was consistent with its WTO obligations.

During the run-up to the April 2004 JCCT meeting, it became clear that further talks would not convince China to eliminate its differential tax treatment of imported ICs. With U.S. exports of ICs to China totaling approximately $2 billion in 2003 and growing, and with China's policies encouraging the shifting of investment in IC manufacturing to China, the United States took appropriate action at the WTO. The United States initiated dispute settlement in March 2004 by requesting formal consultations with China. In the ensuing consultations, which took place in April 2004 in Geneva, with third party participation by Japan, the EC and Mexico, the United States laid out its claims under Article III of GATT 1994, which sets forth the WTO's national treatment principle. Shortly thereafter, China signaled its willingness to discuss a possible resolution of this matter. A series of bilateral meetings subsequently took place in Washington and Beijing, and in July 2004 a settlement was reached. China agreed to immediately cease adding Chinese IC manufacturers to the list of entities eligible for the VAT rebate and to issue the necessary regulations to eliminate the VAT rebate entirely by November 1, 2004, to be effective no later than April 1, 2005. China also agreed to repeal the relevant implementing rules that had made VAT rebates available for ICs designed in China but manufactured abroad by September 1, 2004, to be effective no later than October 1, 2004.

China has also used VAT policies to benefit domestic fertilizer production. In July 2001, the Ministry of Finance (MOF) and the State Administration of Taxation issued a circular exempting all phosphate fertilizers except DAP from a 13 percent VAT. DAP, a product that the United States exports to China, competes with similar phosphate fertilizers produced in China, particularly monoammonium phosphate. The circular also allowed a partial VAT rebate for domestic producers of urea, a nitrogen fertilizer, through the end of 2002. The United States raised this issue bilaterally with China soon after it acceded to the WTO, and in many subsequent bilateral meetings, including the Trade Dialogue meetings held in February and November 2003, among other high-level meetings. The United States also raised this issue at the WTO, both in regular meetings of the Committee on Market Access and during the transitional reviews held in 2002, 2003 and 2004. So far, however, China has refused to make any changes, although it did allow the special tax treatment for domestic urea to expire at the end of 2002. The United States will continue to press its concerns regarding this issue in 2005.

Meanwhile, several U.S. industries have complained more generally about the unfair operation of China's VAT system. Often, Chinese producers are able to avoid payment of the VAT on their products, either as a result of poor collection procedures, special deals or even fraud, while the full VAT still must be paid on competing imports. In discussions with Chinese government officials on this issue, the United States has raised its serious concerns about the discriminatory treatment effectively accorded to foreign products. The United States has also emphasized the value to China of a properly functioning VAT system as a revenue source, and it has continued to explore possible technical assistance that might help to alleviate this problem.

<u>Consumption Taxes</u>

National treatment concerns also continue to surround China's consumption tax regulations, which first went into effect in 1993 and apply to a range of consumer products, including spirits and alcoholic beverages, tobacco, cosmetics and skin and hair care preparations, jewelry, fireworks, rubber, motorcycles and automobiles. Under these regulations, China uses different tax bases to compute consumption taxes for domestic and imported products, with the apparent result that the effective consumption tax rate for imported products is substantially higher than for domestic products. Since China's accession, the United States has raised this issue with China, both bilaterally and during the transitional reviews conducted by the WTO Committee on Market Access in 2002, 2003 and 2004. However, China has so far not revised these regulations. The United States will continue to insist on the revision of these regulations in 2005.

*Subsidies*

Upon its accession to the WTO, China agreed to assume the obligations of the WTO Subsidies Agreement, which addresses not only the use of CVD measures by individual WTO members (see the section above on Import Regulation, under the heading of Countervailing Duties), but also a government's use of subsidies and the application of remedies through enforcement proceedings at the WTO. As part of its accession agreement, China committed that it would eliminate, by the time of its accession, all subsidy programs prohibited under Article 3 of the Subsidies Agreement, i.e., subsidies contingent on export performance (export subsidies) and subsidies contingent on the use of domestic over imported goods (import substitution subsidies). This commitment expressly extended throughout China's customs territory, including in special economic zones and other special economic areas.

China also agreed to various special rules which apply when other WTO members seek to enforce the disciplines of the Subsidies Agreement against Chinese subsidies (either in individual WTO members' CVD proceedings or in WTO enforcement proceedings). Under these rules, in certain circumstances, WTO members can identify and measure Chinese subsidies using alternative methods in order to account for the special characteristics of China's economy. For example, in certain circumstances, when determining whether preferential government benefits have been provided to a Chinese enterprise via, e.g., a loan, WTO members can use foreign or other

market-based criteria rather than Chinese benchmarks to ascertain the preferentiality of that loan and its terms. Special rules also govern the actionability of subsidies provided to state-owned enterprises.

After three years of WTO membership, China had still not fulfilled one key requirement of the Subsidies Agreement, which is to notify certain information about its subsidy programs to the WTO (on an annual basis). Timely and informative notifications are vital to satisfying the rights of other WTO members to know and understand the range and operation of a member's subsidy programs and to be assured that the member is not maintaining any prohibited subsidies. Although China submitted a subsidies notification in an annex to its accession agreement, that notification only contained information through 1998 or 1999, and China acknowledged that it was far from comprehensive.

The United States has raised China's failure to make a subsidies notification in every transitional review before the WTO's Subsidies Committee, including the one held in November 2004, during which the United States and other WTO members, including the EC, again urged China to submit a full and updated notification as soon as possible. In addition, in advance of the November meeting of the Subsidies Committee, the United States submitted a request under Article 25.8 of the Subsidies Agreement for China to provide detailed information regarding several programs and practices that appeared to constitute subsidies. The request identified programs and practices providing benefits to agricultural products, forest and paper products, textiles and various high technology products, among others, and included some programs and practices that appeared to constitute prohibited subsidies within the meaning of Article 3 of the Subsidies Agreement. At the November 2004 Subsidies Committee meeting, China made no commitment to make a subsidies notification or to provide the specific information requested by the United States. During the transitional review before the Council for Trade in Goods later in November 2004, however, China did commit to submit its long-overdue subsidies notification within the next year.

In 2005, the United States will maintain a focus on China's commitment to provide a subsidies notification, both at the WTO and through vigorous bilateral engagement. The United States will also continue to investigate and analyze Chinese subsidy programs and practices.

## Price Controls

In its accession agreement, China agreed that it would not use price controls to restrict the level of imports of goods or services. In addition, in an annex to the agreement, China listed the limited number of products and services remaining subject to price control or government guidance pricing, and it provided detailed information on the procedures used for establishing prices. China agreed that it would try to reduce the number of products and services on this list and that it would not add any products or services to the list, except in extraordinary circumstances.

In 2004, China continued to maintain price controls on several products and services covering both state-owned enterprises and private enterprises. These price controls may be in the form of either absolute mandated prices or specific pricing policy guidelines as directed by the government and include items such as pharmaceuticals, natural gas, transportation (including freight transportation), and tobacco and certain other agricultural products. Until this year, information on price controls was published in the Gazette of the People's Republic of China, which has been discontinued. Now, price control information, including the list of products and services subject to pricing administration, price-setting mechanisms and pricing policies, are published through the China Economic Herald and the NDRC's website.

During the transitional review before the Subsidies Committee in November 2004, as in prior years, the United States sought updated information from China on its use of price controls and future plans, with a particular focus on input pricing. The United States will continue to monitor China's progress in eliminating price controls in 2005.

### Standards, Technical Regulations and Conformity Assessment Procedures

With its accession to the WTO, China also assumed obligations under the Agreement on Technical Barriers to Trade (TBT Agreement), which establishes rules and procedures regarding the development, adoption and application of voluntary product standards, mandatory technical regulations, and the procedures (such as testing or certification) used to determine whether a particular product meets such standards or regulations. Its aim is to prevent the use of technical requirements as unnecessary barriers to trade. The TBT Agreement applies to a broad range of industrial and agricultural products. It establishes rules that help to distinguish legitimate standards and technical regulations from protectionist measures. Among other things, standards, technical regulations and conformity assessment procedures are to be developed and applied transparently and on a non-discriminatory basis and should be based on relevant international standards and guidelines, when appropriate.

In its WTO accession agreement, China also specifically committed that it would ensure that its conformity assessment bodies operate with transparency, apply the same technical regulations, standards and conformity assessment procedures to both imported and domestic goods and use the same fees, processing periods and complaint procedures for both imported and domestic goods. In addition, China agreed to ensure that all of its conformity assessment bodies are authorized to handle both imported and domestic goods within one year of accession. China also consented to accept the Code of Good Practice (set forth in an annex to the TBT Agreement) within four months after accession, which it has done, and to speed up its process of reviewing existing technical regulations, standards and conformity assessment procedures and harmonizing them with international norms.

In addition, in the Services Schedule accompanying its WTO accession agreement, China committed to permit foreign service suppliers that have been engaged in inspection services in their home countries for more than three years to establish minority foreign-owned joint venture

technical testing, analysis and freight inspection companies upon China's accession to the WTO, with majority foreign ownership no later than two years after accession and wholly foreign-owned subsidiaries four years after accession. China further agreed that qualifying joint venture and wholly foreign-owned enterprises would be eligible for accreditation in China and accorded national treatment.

Restructuring of Regulators

In anticipation of its WTO accession, China made significant progress in the areas of standards and technical regulations. China addressed problems that foreign companies had encountered in locating relevant regulations and how they would be implemented, and it took steps to overcome poor coordination among the numerous regulators in China. In October 2001, China announced the creation of the Standardization Administration of China (SAC) under AQSIQ. SAC is charged with unifying China's administration of product standards and aligning its standards and technical regulations with international practices and China's commitments under the TBT Agreement. SAC is the Chinese member of the International Organization for Standardization and the International Electro-technical Commission.

China also began to take steps in 2001 to address problems associated with its multiplicity of conformity assessment bodies, whose task it is to determine if standards and technical regulations are being observed. AQSIQ was established as a new ministry-level agency in April 2001. It is the result of a merger of the State Administration for Quality and Technical Supervision and the State Administration for Entry-Exit Inspection and Quarantine. China's officials explained that this merger was designed to eliminate discriminatory treatment of imports and requirements for multiple testing simply because a product was imported rather than domestically produced. China also formed the quasi-independent National Certification and Accreditation Administration, which is attached to AQSIQ and is charged with the task of unifying the country's conformity assessment regime. Despite these changes, in some sectors, the testing of foreign products takes place in specially designated laboratories, separate from the laboratories used for the testing of domestic products, which can lead to uneven treatment.

Transparency

In the area of transparency, AQSIQ's TBT inquiry point, established shortly after China acceded to the WTO, has continued to be helpful to U.S. companies as they try to navigate China's system of standards, technical regulations and conformity assessment procedures. In addition, China's designated notification authority, MOFCOM, has been notifying proposed technical regulations and conformity assessment procedures to WTO members, as required by the TBT Agreement. Almost all of these notified TBT measures have emanated from AQSIQ or SAC, however, and have not included measures from other agencies that appear to require notification. In late 2003, in part to address this problem, China reportedly formed a new inter-agency committee, with representatives from approximately 20 ministries and agencies and chaired by AQSIQ, to achieve better coordination on TBT (and sanitary and phytosanitary) matters. In

addition, in 2004, SAC circulated a series of draft reports studying how to inject more transparency into the standards-setting process in China. The United States, meanwhile, has been working to bring notification-related questions to the attention of the relevant Chinese government officials so that they can be addressed on a timely basis.

As the United States pointed out during the transitional review before the TBT Committee in November 2004, as in prior years, the comment periods established by China for the TBT measures actually notified were unacceptably brief in some cases. In other cases, some U.S. companies reported that even when sufficient time was provided, written comments submitted by U.S. and other foreign interested parties seemed to be wholly disregarded. In still other cases, insufficient time was provided for Chinese regulatory authorities to consider interested parties' comments before a regulation was adopted.

<u>Standards and Technical Regulations</u>

Since AQSIQ's issuance of rules in January 2002 to facilitate its adoption of international standards, China has made significant progress toward its goal of having 70 percent of its nearly 20,000 technical regulations based on international standards within 5 years of its accession to the WTO. However, in a number of sectors, including, for example, autos, telecommunications equipment, wireless local area networks, radio frequency identification tag technology, audio video coding, whiskey and other distilled spirits, and fertilizer, concern has grown over the past few years as China is actively pursuing the development of unique requirements, despite the existence of well-established international standards. This course of action will create significant barriers to entry into its markets, as the cost of compliance will be high for foreign companies. At the same time, China will also be placing its own companies at a disadvantage in its export markets, where international standards prevail.

A particularly significant example of China's pursuit of unique requirements arose in May 2003, when China issued two mandatory standards for encryption over Wireless Local Area Networks (WLANs), applicable to domestic and imported equipment containing WLAN (also known as Wi-Fi) technologies. These standards, which were originally scheduled to go into effect in December 2003 and were never notified to the TBT Committee, incorporated the WLAN Authentication and Privacy Infrastructure (WAPI) encryption technique for secure communications. This component of the standards differed significantly from the internationally recognized standard that U.S. companies have adopted for global production, and China was set to enforce it by providing the necessary algorithms only to eleven Chinese companies. U.S. and other foreign manufacturers would have to work with and through these companies, some of which are their competitors, and provide them with technical product specifications, if their products were to continue to enter China's market.

Working closely with U.S. industry, the United States repeatedly raised its concerns with China throughout the remainder of 2003 regarding the WAPI issue. The United States focused on the WTO compatibility of China's implementation of the standards, including the denial of national

treatment to imported products, the use of standards that are more trade-restrictive than necessary to fulfill a legitimate objective, the use of mandatory standards that do not comply with accepted international standards, local content requirements for access to the Chinese market, and the lack of notification of these standards to the WTO.

In 2004, the United States continued to press China on the WAPI issue, making it one of the United States' priority issues during the run-up to the April 2004 JCCT meeting. The United States was particularly concerned about the precedent that could be established if China were allowed to enforce unique mandatory standards in the fast-developing information technology sector. During the JCCT meeting, the United States and China were able to resolve the WAPI issue. China announced that it would suspend indefinitely its proposed implementation of WAPI as a mandatory wireless encryption standard, that it would work to revise its WAPI standard, taking into account comments received from Chinese and foreign enterprises, and that it would participate in international standards bodies addressing WAPI and wireless encryption for computer networks generally.

The United States also elevated another standards issue to the JCCT level. The U.S. telecommunications industry was very concerned about increasing interference from Chinese regulators, both with regard to the selection of 3G telecommunications standards and in the negotiation of contracts between foreign telecommunications service providers and their Chinese counterparts. During the run-up to the April 2004 JCCT meeting, the United States continually urged China to take a market-based and technology neutral approach to the development of next generation wireless standards for computers and mobile telephones. Demonstrating progress in moving away from industrial policies in favor of market mechanisms, China announced that it would support technology neutrality with regard to the adoption of 3G telecommunications standards and that telecommunications service providers in China would be allowed to make their own choices about which standard to adopt, depending on their individual needs. China also announced that Chinese regulators would not be involved in negotiating royalty payment terms with relevant intellectual property rights holders. However, by the end of the year, it had become evident that there was still pressure from within the Chinese government to ensure a place for China's home-grown 3G telecommunications standard. The United States will therefore carefully monitor developments in this area in 2005.

Near the end of 2003, AQSIQ issued a notice announcing the creation of a new requirement that exporters of recycled scrap to China must register with AQSIQ. Although this notice established a deadline of July 1, 2004, it was not until May 2004 that AQSIQ issued a second notice establishing the procedures and substantive requirements that recycled scrap exporters must satisfy to register with AQSIQ. U.S. exporters, which account for nearly $2 billion of recycled scrap exports to China annually, were concerned because several of the procedures and substantive requirements established by AQSIQ lacked clarity. During ensuing discussions with U.S. government and private sector representatives, AQSIQ provided needed clarifications and subsequently showed some flexibility by agreeing to extend the deadline for filing an application to August 1, 2004. AQSIQ also indicated that exporters that filed incomplete applications

would have until September 30, 2004 to correct their applications.  However, the United States was still concerned because it appeared that existing shippers, or new shippers, that missed the August 1, 2004 application deadline would be precluded by AQSIQ from applying for registration until some indefinite time in the future.  While the United States recognized that AQSIQ may have a legitimate basis for insisting that the exporters complete the registration process and obtain a registration number before exporting to China, it did not agree that AQSIQ had a legitimate basis for effectively barring their registration by not allowing them to apply after a certain date.  Following further bilateral engagement, AQSIQ announced in October 2004 that it would delay implementation of the new registration requirement from November 1, 2004 until January 1, 2005.  To date, hundreds of U.S. exporters have become registered suppliers of recycled scrap.  As 2004 was drawing to a close and successful registrations continued to be announced, the United States was carefully reviewing the results of the registration process.  The United States will examine closely AQSIQ's implementation of the new registration requirement once it becomes fully operational in 2005.

As previously reported, in October 2003, in order to increase U.S.-China cooperation on issues relating to standards and technical regulations, the United States obtained AQSIQ's support in principle for the establishment of a new U.S. private sector standards office in Beijing.  This new office, which received funding from the U.S. Department of Commerce in October 2004 to facilitate its opening and operation, will focus on strengthening ties with Chinese government regulatory authorities, Chinese industry associations and Chinese standards developers and, in particular, on ensuring that close communication exists between U.S. and Chinese standards developers.

The United States also continued to provide technical assistance to China on both standards and conformity assessment procedures.  In 2004, this technical assistance focused on broad standards-development issues as well as specific standards in a number of industries, including information and telecommunications technology, steel, petroleum, water conservation, energy efficiency, hydrogen infrastructure, elevators, electrical safety, gas appliances and heating, ventilation and air conditioning.

<u>Conformity Assessment Procedures</u>

As previously reported, AQSIQ's regulations establishing a new Compulsory Product Certification System, issued in December 2001, took full effect on August 1, 2003, following a transition period that lasted for fifteen months.  Under this system, there is now one safety mark, called the "China Compulsory Certification" or "CCC" mark, issued to both Chinese and foreign products.  Under the old system, domestic products were only required to obtain the "Great Wall" mark, while imported products needed both the "Great Wall" mark and the "CCIB" mark. In 2004, U.S. companies continued to complain that the regulations lack clarity regarding the products that require a CCC mark.  They also have reported that China is applying the CCC mark requirements inconsistently and that many domestic products required by AQSIQ's regulations to have the CCC mark are still being sold without the mark.  In addition, despite the

changes made by the regulations, U.S. companies in some sectors continued to complain in 2004 about duplication in certification requirements, particularly for telecommunications products.

Meanwhile, to date, China has granted 68 Chinese enterprises accreditation to test and certify for purposes of the CCC mark. Despite China's commitment that qualifying minority foreign-owned (upon China's accession to the WTO) and majority foreign-owned (two years later) joint venture conformity assessment bodies would be eligible for accreditation and would be accorded national treatment, China so far has not granted accreditation to any foreign-invested enterprises.

In 2004, as in prior years, the United States raised its concerns in this area with China bilaterally and during meetings of the WTO's TBT Committee, including the transitional review held in November 2004, where it received support from the EC and Japan. The United States will continue to be in close contact with the relevant Chinese authorities in these areas in 2005.

### *Other Internal Policies*

#### State-Owned and State-Invested Enterprises

While many provisions in China's WTO accession agreement indirectly discipline the activities of state-owned and state-invested enterprises, China also agreed to some specific disciplines. In particular, it agreed that laws, regulations and other measures relating to the purchase of goods or services for commercial sale by state-owned and state-invested enterprises, or relating to the production of goods or supply of services for commercial sale or for non-governmental purposes by state-owned and state-invested enterprises, would be subject to WTO rules. China also affirmatively agreed that state-owned and state-invested enterprises would have to make purchases and sales based solely on commercial considerations, such as price, quality, marketability and availability, and that the government would not influence the commercial decisions of state-owned and state-invested enterprises. Since China's accession to the WTO, U.S. officials have not heard complaints from U.S. companies regarding WTO compliance problems in this area, although a lack of available information continues to make it a difficult area to assess.

#### State Trading Enterprises

In its WTO accession agreement, China also agreed to disciplines on the importing and exporting activities of state trading enterprises. China committed to provide full information on the pricing mechanisms of state trading enterprises and to ensure that their import purchasing procedures are transparent and fully in compliance with WTO rules. China also agreed that state trading enterprises would limit the mark-up on goods that they import in order to avoid trade distortions. Since China's WTO accession, the United States and other WTO members have sought information from China on the pricing and purchasing practices of state trading enterprises, principally through the transitional reviews at the WTO. So far, however, China has only

provided general information, which does not allow a meaningful assessment of China's compliance efforts.

<u>Government Procurement</u>

The WTO Agreement on Government Procurement (GPA) is a plurilateral agreement and currently covers the United States and 37 other WTO members that have decided to join it. The GPA applies to the procurement of goods and services by central and sub-central government entities listed by each Party, subject to thresholds and certain exceptions.  It requires GPA Parties to provide MFN and national treatment to the goods, services and suppliers of other GPA Parties and to apply detailed procedures designed to ensure fairness and predictability in the procurement process.

At present, China is not a GPA member.  It committed to become an observer to the GPA upon its WTO accession, and in February 2002 it became an observer to the WTO Committee on Government Procurement.  China also committed, in its WTO accession agreement, to initiate negotiations for accession to the GPA "as soon as possible," but it has not yet done so.  In late 2003, MOF established a working group to study the possibility of initiating negotiations for accession to the GPA.  In response to U.S. questions during the transitional review before the Council for Trade in Goods in November 2004, China stated that the working group was still studying the issue.

In the interim, China agreed that all of its central and local government entities would conduct their procurements in a transparent manner, as reflected in its WTO accession agreement.  China also agreed that, if a procurement were opened to foreign suppliers, it would provide MFN treatment by allowing all foreign suppliers an equal opportunity to participate in the bidding process.

In June 2002, China adopted its *Government Procurement Law*, which became effective on January 1, 2003.  This law attempts to follow the spirit of the GPA and incorporates provisions from the United Nations Model Law on Procurement of Goods.  The law also directs central and sub-central government entities to give priority to "local" goods and services, with limited exceptions, as China is permitted to do, because it is not yet a GPA member.  China envisions that this law will improve transparency, reduce corruption and lower government costs, and it is also seen as a necessary step toward reforming China's government procurement system in preparation for China eventually becoming a Party to the GPA.

China began the process of drafting regulations implementing the *Government Procurement Law* in 2002.  MOF circulated a draft of the *Measures on the Administration of Bidding for Government-Procured Goods and Services* for public comment in December 2002.  The United States submitted written comments, which focused on promoting transparency and clarifying the scope and coverage of the *Government Procurement Law*.  The United States followed up on these comments during bilateral meetings with MOF officials.  MOF issued the final version of the

*Page 47*

regulations in August 2004. These regulations set out detailed procedures for the solicitation, submission and evaluation of bids for government procurement contracts relating to goods ands services and help to clarify the scope and coverage of the *Government Procurement Law*. At the same time, MOF also issued several sets of implementing rules, including measures relating to the announcement of government procurements and the handling of complaints by government procurement suppliers.

In 2005, the United States will continue to urge China to initiate negotiations for accession to the GPA. It will also monitor the treatment accorded to U.S. suppliers under the *Government Procurement Law* and urge China to apply its new regulations and implementing rules in a transparent, non-discriminatory manner.

Meanwhile, U.S. companies continued to express concern about the implementing rules on government software procurement being drafted by MOF. As initially drafted in 2003, when China's software market totaled $3.3 billion and was projected to grow by more than 50 percent annually, these rules reportedly contained guidelines mandating that central and local governments – the largest purchasers of software in China – should purchase software developed in China to the extent possible. Later that year, the United States organized an industry roundtable to inform the relevant Chinese ministries of the views and concerns of interested U.S. trade associations. U.S. industry officials have pointed out that the creation of a domestic software industry cut off from global standards would lead to inefficiencies and would limit, rather than promote, the development of China's software industry. At the roundtable, Chinese government officials explained that they were considering a definition for "domestic products" that would include products of foreign companies with established roots in China.

In October 2004, MOF issued a notice seeking input from foreign enterprises regarding the software procurement rules being drafted. Although no actual draft of those rules was included, it appeared that MOF was taking a very restrictive approach in defining "domestic products." Working closely with U.S. industry, the United States submitted written comments to MOF in November 2004. Concerned that China could pursue a similar approach in other sectors, the United States strongly reiterated its concerns with China during ensuing bilateral meetings in Beijing and Geneva.

**Investment**

The Agreement on Trade-Related Investment Measures (TRIMS Agreement) prohibits investment measures that violate GATT Article III obligations to treat imports no less favorably than domestic products or the GATT Article XI obligation not to impose quantitative restrictions on imports. The TRIMS Agreement thus expressly requires elimination of measures such as those that require or provide benefits for the incorporation of local inputs ("local content requirements") in the manufacturing process, or measures that restrict a firm's imports to an amount related to its exports or related to the amount of foreign exchange a firm earns ("trade balancing requirements"). In its accession agreement, China also specifically agreed to eliminate

export performance, local content and foreign exchange balancing requirements from its laws, regulations and other measures, and not to enforce the terms of any contracts imposing these requirements. In addition, China agreed that it would no longer condition importation or investment approvals on these requirements or on requirements such as technology transfer and offsets.

Beginning before its accession to the WTO, China revised its laws and regulations on foreign-invested enterprises to eliminate WTO-inconsistent requirements relating to export performance, local content and foreign exchange balancing as well as technology transfer. However, some of the revised laws and regulations continue to "encourage" technology transfer, without formally requiring it. U.S. companies are concerned that this "encouragement" will in practice amount to a "requirement" in many cases, particularly in light of the high degree of discretion provided to Chinese government officials when reviewing investment applications. In addition, according to U.S. companies, some Chinese government officials in 2004 still consider factors such as export performance and local content when deciding whether to approve an investment or to recommend approval of a loan from a Chinese policy bank, which is often essential to the success of an investment project. The United States and other WTO members, including the EC and Japan, raised concerns in this area during the transitional reviews conducted by the WTO's Committee on Trade-Related Investment Measures (TRIMS Committee) in 2002, 2003 and 2004. The United States will continue to follow this situation closely in 2005.

In a separate commitment, China agreed to revise its Industrial Policy for the Automotive Sector to make it compatible with WTO rules and principles by the time of its accession. However, China missed this deadline, and U.S. industry reported that some local officials were continuing to enforce the WTO-incompatible provisions of the policy. In mid-2003, China began circulating a draft of a new automobile industrial policy for review by select domestic enterprises, and some of these enterprises forwarded the draft to their foreign joint venture partners. It was the United States' understanding that this draft, among other things, discouraged the importation of auto parts, sought to restrict imports of complete knocked-down auto kits, and set targets encouraging the use of domestic technology. China was also reportedly considering a requirement that separate distribution channels be used for domestic and imported autos.

In 2003, working closely with U.S. industry, the United States pressed China for full implementation of its commitment to make its automobile industrial policy compatible with WTO rules as well as related commitments scheduled to be phased in over time. In a series of bilateral meetings with China, including the Trade Dialogue meetings held in Beijing in November 2003, the United States made clear that discriminatory industrial policies, whether for the automotive or other sectors, are not in keeping with China's WTO commitments and create unacceptable distortions in China's economy. In addition, the United States and other WTO members, including the EC and Japan, presented their concerns about the types of provisions being considered by China during the transitional reviews before the TRIMS Committee, the Market Access Committee and the Council for Trade in Services in 2003. They also urged China to circulate a draft of the new automobile industrial policy more widely, in accordance

with its commitment to provide an opportunity for public comment on new or revised trade-related laws and regulations.

The United States continued to press China bilaterally on this issue in 2004. In May 2004, China issued the final version of its new automobile industrial policy. This policy had been revised to eliminate any requirement that separate distribution channels be used for domestic and imported autos, although it continued to include provisions discouraging the importation of auto parts and encouraging the use of domestic technology. It also included a number of provisions that were too vague to assess, such as in the area of complete knocked-down auto kits. The United States, the EC and Japan sought clarifications on these matters during the transitional reviews before the Committee on Market Access, the TRIMS Committee and the Council for Trade in Goods in September, October and November 2004. The United States will closely monitor how China implements its new automobile industrial policy in 2005.

In 2004, the State Council made no changes to the *Sectoral Guidelines Catalogue for Foreign Investment*. This catalogue, when last issued in March 2002, had reflected China's decision to adhere to its commitment to open up certain sectors to foreign investment, including travel agencies, human resources companies, cinemas, railway cargo and publications distribution (see the Services section below), while it had also signaled the opening-up of a number of other sectors not covered by China's accession agreement. One notable exception to this progress was the area of production and development of genetically modified plant seeds, which China changed to the "prohibited" category. During the transitional review before the TRIMS Committee in October 2004, China indicated that it had no immediate plans to revise the catalogue.

**Agriculture**

Upon its accession to the WTO, China assumed the obligations of the WTO Agreement on Agriculture, which contains commitments in three main policy areas for agricultural products: market access, domestic support and export subsidies. In some instances, China also made further commitments, as specified in its accession agreement.

In the area of market access, WTO members committed to the establishment of a tariff-only regime, tariff reduction and the binding of all tariffs. As a result of its accession negotiations, China agreed to significant reductions in tariff rates on a wide range of agricultural products. China also agreed to eliminate quotas and implement a system of TRQs designed to provide significant market access for certain bulk commodities upon accession. This TRQ system is very similar to the one governing fertilizers (discussed above in the Import Regulation section). China's goods schedule sets forth detailed rules intended to limit the discretion of the agriculture TRQ administrator, the SDPC (known as the National Development and Reform Commission, or NDRC, since the March 2003 government restructuring) and to require SDPC to operate with transparency and according to precise procedures for accepting quota applications, allocating quotas and reallocating unused quotas.

In the area of domestic support, the basic objective is to encourage a shift in policy to the use of measures that minimize the distortion of production and trade. Essentially, WTO members committed to reduce over time the types of domestic subsidies and other support measures that distort production and trade, while WTO members remain free to maintain or even increase support measures that have little or no distorting effect, such as agricultural research or training by the government. China committed to a cap for trade- and production-distorting domestic subsidies that is lower than the cap permitted for developing countries and that includes the same elements that developed countries use in determining whether the cap has been reached.

In the area of export subsidies, WTO members committed to ban the use of these subsidies unless they fall within one of four categories of exceptions, the principal one of which allows export subsidies subject to certain reduction commitments. However, like many other WTO members, China agreed to eliminate all export subsidies upon its accession to the WTO and did not take any exceptions.

Another important agricultural area is covered by the WTO Agreement on the Application of Sanitary and Phytosanitary Measures (SPS Agreement), under which China also became obligated. The SPS Agreement establishes rules and procedures regarding the formulation and application of sanitary and phytosanitary measures, i.e., measures taken to protect against risks associated with plant or animal borne pests and diseases, additives, contaminants, toxins and disease-causing organisms in foods, beverages or feedstuffs. The rules and procedures in the SPS Agreement require that sanitary and phytosanitary measures address legitimate human, animal and plant health concerns, do not arbitrarily or unjustifiably discriminate between WTO members' agricultural and food products, and are not disguised restrictions on international trade. The SPS Agreement requires that the measures in question be based on scientific grounds and developed through risk assessment procedures, while at the same time it preserves each member's right to choose the level of protection it considers appropriate with regard to sanitary and phytosanitary risks.

Other WTO agreements also place significant obligations on China in the area of agriculture. Three of the most important ones are GATT 1994, the Import Licensing Agreement and the TBT Agreement, which are discussed above (in the sections on Import Regulation and Internal Policies Affecting Trade).

China also made several additional commitments intended to rectify other problematic agricultural policies, either upon accession or after limited transition periods. For example, China agreed to permit non-state trading enterprises to import specified TRQ shares of wheat, corn, cotton and vegetable oil, although these products have been subject to import monopolies by state trading enterprises.

Overall, while progress was achieved in some contentious areas in 2004, China's compliance efforts in the agriculture sector continued to produce mixed results, as in prior years. According to one trade association, "[t]ariff reductions . . . have certainly encouraged sales, but increased

imports has largely been the result of greater demand for raw materials such as cotton, hides, and wood products, as well as increased demand for livestock feed and livestock products." On the other hand, this association explained that, "[d]espite record growth, there continues to be substantial impediments to agricultural trade with China. Some have been resolved through negotiations, others remain in force, and new problems can appear overnight. Non-tariff barriers remain the biggest source of frustration to U.S. exporters."

On the positive side, some U.S. agricultural products continued to experience dramatic increases in sales to China, while others showed substantial increases for the first time in 2004. China is now the United States' fourth largest agricultural export market, as U.S. exports to China totaled $4.1 billion from January through September 2004, representing a 44 percent increase over the same period in 2003, a very successful year. Indeed, in 2003, U.S. exports exceeded $5.4 billion, more than twice the level in 2002 and more than five times the level in 1999. In addition, during the run-up to the April 2004 JCCT meeting, China addressed one of the most troublesome problems of 2002 and 2003 – the requirements of China's biotechnology regulations – by issuing final safety certificates for U.S. soybeans and several other products in early 2004. Near the end of the year, China also lifted a ban on U.S. poultry exports that had been imposed because of outbreaks of Avian Influenza (AI) and was preparing to lift a ban on non-risk bovine products, which China had included in the larger banning of U.S. beef following the discovery of bovine spongiform encephalopathy (BSE) in a cow imported into the United States from Canada.

Nevertheless, serious problems continued to be encountered on many fronts. The key problems involved the non-transparent application of sanitary and phytosanitary measures, which seemed to have no scientific basis and impeded market access for many U.S. agricultural products, as well as inspection-related requirements. In addition, despite some progress, China's administration of TRQs on bulk agricultural commodities was still not functioning entirely as envisioned in China's WTO accession agreement, as it continued to be impaired by inadequate transparency.

In 2005, the United States will continue to pursue vigorous bilateral engagement with China in order to obtain progress on its outstanding concerns. As part of this effort, the United States will use a new high-level U.S.-China working group, created at the April 2004 JCCT meeting as a vehicle to address each side's concerns in the agriculture area.

*Tariffs*

China implemented the required tariff changes on agricultural goods for 2004 on schedule on January 1, 2004, just as it did for industrial goods. These tariff changes further increased market access for many U.S. agricultural exporters, as China continued the scheduled reduction of tariff rates on agricultural goods of greatest importance to U.S. farmers and ranchers from a 1997 average of 31 percent to 14 percent, in almost all cases over a period of five years running from January 1, 2002.

The tariff reductions made by China contributed to a marked increase in certain U.S. exports to
China, some of which were also aided by increased demand.  Exports of some bulk agricultural
commodities increased dramatically, particularly cotton and wheat (see Tariff-rate Quotas on
Bulk Agricultural Commodities section below), while exports of soybeans continued to perform
strongly (see China's Biotechnology Regulations section below).  Exports of consumer-oriented
agricultural products increased by 20 percent from January through September 2004, when
compared to the same period in 2003, and were projected to reach $526 million by the end of the
year.  Exports of forest products such as lumber also performed strongly, increasing by nearly 60
percent for the first nine months of 2004, with a projected year-end total exceeding $400 million.
Meanwhile, fish and seafood exports, after having increased from $119 million in 2001 to $135
million in 2002, and then to $176 million in 2003, rose by another 55 percent in the first nine
months of 2004 and were projected to reach $274 million by the end of the year.

However, not all of China's tariff cuts resulted in improved market access in 2004.  As discussed
below, because of problems that arose with some non-tariff barriers, market access for many U.S.
agricultural products was still impeded.

### China's Biotechnology Regulations

One of the most contentious agriculture issues that arose during China's first year of WTO
membership involved new rules implementing June 2001 regulations relating to biotechnology
safety, testing and labeling.  The implementing rules, issued by China's Ministry of Agriculture
(MOA) shortly before China's WTO accession, did not provide adequate time for scientific
assessment and the issuance of final safety certificates for biotechnology products.  As the March
2002 effective date for these implementing rules approached, trade in biotechnology products
began to be disrupted.  The U.S. products most affected were soybeans, which had seen exports
to China grow to more than $1 billion in 2001, while corn and other commodities, such as
consumer products made from biotech commodities, remained at risk.  Following concerted,
high-level pressure from the United States, China agreed to a temporary solution in March 2002,
which provided for a nine-month delay, effected through the issuance of temporary safety
certificates, good though December 20, 2002.  When it became apparent that this extension
would not be sufficient, further high-level engagement produced another agreed extension until
September 2003.

In early 2003, it became clear that China would not be in a position to issue final safety
certificates by September 2003.  As a result, following further high-level meetings, China agreed
to extend the interim agreement through April 2004.  In the Fall of 2003, the United States
again urged China to issue final safety certificates in a number of high-level meetings, including
the November 2003 Trade Dialogue meetings, in an effort to ensure that further trade
disruptions were avoided.  In December 2003, China announced that it would issue final safety
certificates by February 2004.

As promised, China issued a final safety certificate for a U.S. biotech soybeans known as Roundup Ready soybeans in February 2004.  In addition, by the time of the April 2004 JCCT, China had also issued final safety certificates for seven corn events, seven canola events and two cotton events, leaving only one corn event still awaiting final approval.  The Ministry of Agriculture has indicated that action on the remaining corn event can be expected by early 2005.

With some stability added to the China soybean market through the extensions in 2003 and the issuance of the final safety certificate for Roundup Ready soybeans in February 2004, U.S. exports of soybeans remained strong.  In 2003, they reached a record level of $2.9 billion, representing an increase of 190 percent over 2002.  Meanwhile, from January through September of 2004, U.S. soybean exports totaled $929 million, a decrease of 23 percent when compared to the same period in 2003, although China remained the leading purchaser of U.S. soybeans.

Meanwhile, other U.S. concerns with China's biotechnology regulations and implementing rules remain, particularly with regard to risk assessment, labeling and field trials.  These issues are being discussed by a high-level U.S.-China working group, formed in July 2002.  In addition, a newly created sub-group of experts focuses on specific, technical issues.  Together, these two groups have made substantial progress, and they will continue to work through the range of issues in 2005.

### Tariff-rate Quotas on Bulk Agricultural Commodities

Another issue of particular concern involves China's commitments relating to TRQs on bulk agricultural commodities, which include several commodities of particular importance to U.S. farmers, such as wheat, corn, cotton and vegetable oils.  Since SDPC (and later NDRC) began implementing these commitments following China's accession, a series of problems have undermined the market access envisioned by WTO members.

As previously reported, when initially setting up its TRQ system for 2002, SDPC issued flawed regulations.  They did not provide for the required transparency, imposed burdensome licensing procedures, and appeared to contravene agreed rules in China's accession agreement by establishing a separate sub-quota for the processing and re-export trade.  Then, once implementation began, all of the available information indicated that SDPC had decided to allocate TRQs in a manner that would protect domestic farm interests and maintain the monopoly enjoyed by state trading enterprises.  SDPC operated with only limited transparency, refusing to provide specific details on the amounts and the recipients of the allocations.  At the same time, SDPC reserved a significant portion of the TRQs for the processing and re-export trade, despite China's commitment to provide market access and national treatment for imported products.  SDPC also allocated a portion of the TRQs for some commodities in smaller than commercially viable quantities, and it employed burdensome licensing requirements.

As these problems became apparent in the first several months of 2002, the United States repeatedly engaged China bilaterally, at all levels of government, and it also raised its concerns at

the WTO during meetings of the Committee on Agriculture.  In July 2002, the United States requested formal consultations with China under the headnotes contained in China's WTO goods schedule, which took place in September 2002 in Geneva.

Subsequently, SDPC's performance improved in certain respects.  SDPC was able to complete the required re-allocation of 2002 TRQs in a timely manner, and it issued 2003 TRQs close to the prescribed time.  Nevertheless, the United States remained concerned, particularly because 2002 trade data showed extremely low fill-rates for the TRQ commodities of the most interest to U.S. industry.  The fill-rates for wheat, corn and cotton were 7 percent, 0.1 percent and 22 percent, respectively.

Following the 2003 TRQ allocations, it became clear that the most serious first-year problems – lack of transparency, sub-division of the TRQ, small allocation sizes and burdensome licensing – persisted.  The United States again engaged China bilaterally on several occasions, culminating with high-level meetings in Beijing in June 2003.  At these meetings, China agreed to take steps to address most of the United States' concerns.  Meanwhile, the 2003 fill-rates for wheat, corn and cotton ended up at 5 percent, 0.1 percent and 102 percent, respectively.

China followed through on its June 2003 commitments in part in October 2003, when NDRC issued new regulations for shipments beginning January 1, 2004.  Key changes made by these regulations include the elimination of separate allocations for general trade and processing trade, the elimination of certain unnecessary licensing requirements, and the creation of a new mechanism for identifying allocation recipients.

In 2004, as the United States focused on how NDRC was enforcing its new regulations in a series of bilateral meetings during the run-up to the April 2004 JCCT meeting, improvements in NDRC's TRQ administration became evident.  NDRC implemented the regulatory provision calling for the elimination of separate allocations for general trade and processing trade, increased the size of quota allocations, and improved its handling of reallocations.  At the same time, transparency continues to be problematic, although some improvement did take place for some of the commodities subject to TRQs.

While these systemic changes were taking place, exports of some bulk agricultural commodities from the United States continued to show substantial increases, largely due to market conditions. In particular, despite some lingering concerns with NDRC's handling of the cotton TRQs, U.S. cotton exports totaled $1.3 billion during the period from January through September 2004, representing a 270 percent increase over the record level for the same period in 2003.  In addition, U.S. wheat exports totaled $414 million during the period from January through September 2004, representing an increase of nearly 1,600 percent over the same period in 2003.

The United States continued to raise transparency and other concerns in 2004, both in bilateral meetings and during the transitional review before the Committee on Agriculture in September 2004.  In 2005, the United States will continue to work to ensure that NDRC administers TRQs

in a manner that is consistent with China's commitments, transparent and in a manner that does not impede market access or commercial decisions.

*Sanitary and Phytosanitary Issues*

Over the last year, China subjected U.S. agricultural exports to an increasing number of SPS measures that raised WTO concerns.  Two new ones involved BSE and AI.

In December 2003, China and other countries imposed bans on U.S. bovine products in response to a case of BSE found in the United States.  China's ban included not only beef, but low-risk bovine products, i.e., bovine semen and embryos, protein-free tallow and non-ruminant origin (i.e., porcine, poultry, etc.) feeds and fats, which pose no risk of BSE and should not be banned under existing international standards.  After numerous bilateral meetings and technical discussions, including a visit to U.S. bovine facilities by Chinese food safety officials, China announced a lifting of its BSE ban for low-risk ruminant bovine products in late September 2004.  However, China conditioned the lifting of the ban on the negotiation of protocol agreements setting technical and certification parameters for incoming low-risk bovine products.  In November 2004, U.S. and Chinese officials finalized and signed protocols that would enable a resumption in exports of U.S.-origin bovine semen and embryos, along with non-ruminant origin feeds and fats.  Exports of bovine semen and embryos are contingent on facility certification by Chinese regulatory authorities.  U.S. and Chinese officials were unable to reach agreement on provisions that would enable a resumption in exports of U.S.-origin protein-free tallow to China, and by early December 2004 trade in low-risk bovine products had not yet resumed.

In February 2004, China imposed a nationwide ban on U.S. poultry in response to cases of low-pathogenic AI found in Delaware and did not modify this nationwide ban when a case of highly pathogenic AI was subsequently discovered in Texas.  Throughout 2004, the U.S. provided technical information to China on the U.S. AI situation, and in August a high-level Chinese delegation conducted a review of the status of AI eradication efforts in the United States.  The United States emphasized it had been recognized as free of high pathogenic AI under international standards.  In November 2004, China lifted its nationwide ban on U.S. poultry, leaving in place a ban only for the states of Connecticut and Rhode Island.  The United States will soon be providing China with requested information regarding the status of AI in those two states.

Meanwhile, while the 1999 U.S.-China Agricultural Cooperation Agreement established an agreed level of TCK fungus tolerance in U.S. wheat, and China no longer routinely blocks U.S. wheat exports from the Pacific Northwest on the basis of the TCK fungus, China has imposed a maximum residue level (MRL) for selenium that is below the international standard and threatens all U.S. wheat exports to China.  In addition, China has imposed an MRL for vomitoxin in wheat in the absence of any international standard.  Although these measures are problematic, U.S. exports of wheat to China increased dramatically in 2004 (see Tariff-rate

Quotas on Bulk Agricultural Commodities section above), as China does not appear to be enforcing them.

With regard to raw poultry and meat, China continues to apply certain standards that do not appear to be based on scientific evidence, which has had the effect of slowing imports from the United States. In particular, in 2002, China declared zero tolerance for pathogens in imported raw poultry and meat. While it is possible to reduce contamination through cooking, the complete elimination of pathogens in raw poultry and meat is not reasonably achievable, nor scientifically justifiable. Moreover, China apparently does not apply this same standard to domestic raw poultry and meat, contrary to WTO national treatment principles.

Another problematic area involves China's overly restrictive food additive standards. China continues to block many U.S. processed food products from entering the Chinese market by banning certain food additives that are widely used in other countries and have been approved by the World Health Organization.

In 2004, as in prior years, the United States repeatedly engaged China on these and other SPS issues, both in bilateral meetings, including high-level meetings, and during meetings of the WTO's SPS Committee and Council for Trade in Goods, including the transitional reviews held in October and November 2004. The United States also provided technical assistance to China's regulatory authorities. To date, however, little progress has been achieved, except in the case of the BSE and AI bans. The United States will continue to press for resolution of these issues in 2005.

Finally, in August 2003, as previously reported, AQSIQ announced plans to suspend soybean imports from four companies trading U.S. soybeans, along with companies from Argentina and Brazil. According to AQSIQ, this action was based on detections of Phytophthora sojae in shipments of soybeans beginning in the Spring of 2003. The United States immediately raised serious concerns with this announcement in a series of high-level meetings. Not only was there no apparent legitimate purpose for AQSIQ's delay in making the announcement, but also it is unusual for an inspection and quarantine agency not to set a date upon which a suspension would take place. These circumstances suggested that AQSIQ's intent was to disrupt the importation of U.S. soybeans, and not to address a legitimate phytosanitary concern. Indeed, the presence of Phytophthora sojae in soybeans is ubiquitous in many parts of the world, including China itself. In September 2003, China agreed to technical level meetings of U.S. and Chinese agricultural experts (which took place in mid-December 2003), and in the interim it committed not to impose any suspensions. In 2004, this issue did not appear to have had any effect on U.S. exports of soybeans to China.

*Inspection-related Requirements*

The United States continues to have concerns about AQSIQ's administration of import licensing procedures. As in 2002 and 2003, U.S. exporters are complaining about AQSIQ's arbitrary use

of inspection-related requirements to restrict, delay and increase the cost of U.S. agricultural exports, particularly commodities like soybeans, cotton, meat and poultry.

Two AQSIQ measures – the *Administrative Measures for the Entry-Exit Inspection and Quarantine for Grains and Feed Stuff*, which became effective on March 1, 2002, and the *Administrative Measures for Entry Animal and Plant Quarantine*, which became effective September 1, 2002 – require importers to obtain an import inspection permit or a quarantine inspection permit for many agricultural goods before they can enter China, such as livestock, poultry, grains, oilseeds, planting seeds, horticultural products, and hides and skins. U.S. exporters have reported that AQSIQ is using the procedures provided for by these measures to control the pace and quantity of some imports, which would be contrary to China's market access and import licensing commitments. They have also been concerned about the burdensome nature of these procedures and selective enforcement by AQSIQ.

The United States sought to resolve its concerns in bilateral meetings with China in 2002 and 2003, including the February and November 2003 Trade Dialogues. The United States also raised its concerns during meetings of the Committee on Agriculture, the SPS Committee and the Import Licensing Committee, including the transitional reviews conducted in 2002 and 2003. Some progress appeared to have been achieved in early 2003, as China discontinued arbitrary limits on imported poultry and pork shipments. However, many concerns raised by the United States were not addressed, and the United States continued to seek resolutions in 2004.

In June 2004, fulfilling a Chinese commitment made in connection with the April 2004 JCCT meeting, AQSIQ issued a new decree (known as Decree 73), the *Items on Handling the Review and Approval for Entry Animal and Plant Quarantine*, which made quarantine inspection permits for animal and plant products more workable by extending their validity period from three to six months and thereby providing importers with a longer window of opportunity to purchase, transport and discharge their cargoes before their permits expire. In August 2004, China also issued an announcement that appears to exempt 15 categories of animal and plant products from the requirement to obtain quarantine inspection permits in advance of entry and prior to signing an import contract.

The United States welcomed both of these developments, although Decree 73 raised some new concerns with regard to required contract terms and commercial risk. In an environment where AQSIQ has changed regulations with little or no warning, many U.S. shippers complained that Decree 73 increased the financial risk for exporters shipping commodities to China. The United States engaged China bilaterally, through a series of meetings during the last half of 2004, and multilaterally, during the transitional reviews before the Committee on Market Access, the SPS Committee and the Council for Trade in Goods in September, October and November 2004, in an effort to address these concerns. China repeatedly assured the United States that Decree 73 was not intended to introduce any new requirements and that U.S. soybean exports, in particular, would not be affected by it. As 2004 was drawing to an end, it appeared that Decree 73 may have created uncertainty about China's presence in the soybean market and contributed to

*Page 58*

general downward pressure on world soybean prices.  Nevertheless, U.S. soybean exports to China continued to go forward, and trade in the other grains and feeds affected by Decree 73 did not appear to have been negatively impacted.

*Export Subsidies*

Since shortly after China's accession to the WTO, U.S. industry has been concerned that China provides export subsidies on corn, despite China's WTO commitment to eliminate all export subsidies upon accession to the WTO.  In past years, it appeared that significant quantities of corn had been exported from China, including corn from Chinese government stocks, at prices that may have been 15 to 20 percent below domestic prices in China.  As a result, U.S. corn exporters were losing market share for corn in their traditional Asian markets, such as South Korea and Malaysia, while China was exporting record amounts of corn.

The United States raised concerns about possible export subsidies on corn with China in bilateral meetings throughout 2002 and 2003, including the Trade Dialogues held in February and November 2003.  It also sought information about China's corn policies during meetings before the Committee on Agriculture, including the transitional reviews held in September 2002 and September 2003.  However, it proved difficult to develop the necessary evidence to confirm that China was subsidizing its corn exports.

In 2004, trade analysts have begun to conclude that, because of several economic factors, including changes in the relationship between domestic prices and world prices, China is now trending toward becoming a net importer of corn.  One result appeared to be that China's exports were made on a commercial basis in 2004.

The United States will continue to investigate China's subsidies practices in the agriculture area in 2005 and will make every effort to ensure that any use of export subsidies is eliminated.

## Intellectual Property Rights

With its acceptance of the TRIPS Agreement, China took on the obligations to adhere to internationally accepted norms to protect and enforce the intellectual property rights held by U.S. and other foreign companies and individuals in China.  Specifically, the TRIPS Agreement sets minimum standards of protection for copyrights and neighboring rights, trademarks, geographical indications, industrial designs, patents, integrated-circuit layout designs and undisclosed information.  Minimum standards are also established by the TRIPS Agreement for IPR enforcement in administrative and civil actions and, in regard to copyright piracy and trademark counterfeiting, in criminal actions and actions at the border.  The TRIPS Agreement requires as well that, with very limited exceptions, WTO members provide national and most-favored-nation treatment to the nationals of other WTO members with regard to the protection and enforcement of intellectual property rights.

Overall, China's efforts to bring its framework of laws, regulations and implementing rules into compliance with the TRIPS Agreement have been largely satisfactory, although some improvements still need to be made.  Enforcement of these measures, however, remained ineffective in 2004.  Indeed, some U.S. rights holders reported that IPR infringement worsened in 2004, and the United States used high-level meetings to strongly urge China to take immediate and substantial steps to put it on the path toward compliance with its critical TRIPS Agreement obligation to make available effective enforcement mechanisms.

China had taken an important step forward in October 2003 when it constituted a new IPR Leading Group, signaling a more focused and sustained effort by China to tackle the IPR enforcement problem.  Vice Premier Wu, the Chair of this group, acknowledged at an OECD-China IPR Workshop in early 2004 that "[t]here are still problems and challenges in the development process of IPR protections in China.  But," she emphasized, "the government is resolute about improving the IPR system . . . and effectively protecting intellectual property rights.  To this end, China is ready to learn from the experiences of other countries and international organizations . . . ."

The United States made IPR enforcement its highest priority during the run-up to the April 2004 JCCT meeting, as it emphasized its serious concerns in a series of high-level meetings in Washington and Beijing.  China announced a comprehensive action plan on IPR enforcement when the JCCT convened, with the stated goal of significantly reducing infringement across the country.   China specifically committed that it would:  (1) significantly reduce IPR infringement levels; (2) take steps by the end of 2004 to increase penalties for IPR violations by subjecting a greater range of violations to criminal investigation, applying criminal sanctions to the import, export, storage and distribution of pirated and counterfeit products and applying criminal sanctions to on-line piracy; (3) crack down on IPR violators by conducting nation-wide enforcement actions and increasing customs enforcement actions; (4) improve protection of electronic works by ratifying and implementing the World Intellectual Property Organization (WIPO) Internet-related treaties as soon as possible, and by extending an existing ban on the use of pirated software in government offices; and (5) launch a national IPR education campaign.  China also agreed to establish an IPR working group that would function under the auspices of the JCCT to consult and cooperate with the United States on the full range of issues described in China's IPR action plan.

U.S. companies and trade associations welcomed the progress made through the April 2004 JCCT meeting and expressed the hope that China's action plan would be fully implemented.  The president of an association representing many U.S. businesses operating in China stated that "[t]he agreements reached at the April meetings in Washington . . . , if fully lived up to in the months and years to come, are important indicators that continuing U.S.-China engagement can result in successful agreements of great importance to China's WTO standing and to the interests of U.S. companies, workers and communities."

Since the April 2004 JCCT meeting, several bilateral meetings have taken place, as the United States has pressed China to move forward aggressively in pursuit of significantly reduced IPR infringement levels.  The United States also raised its concerns forcefully at the WTO during the transitional review conducted by the Council for Trade-related Aspects of Intellectual Property Rights (TRIPS Council) in December 2004.

In the months following the April 2004 JCCT meeting, Vice Premier Wu pledged that China would move forward with the legislative and judicial measures needed to improve China's IPR protection regime.  Vice Premier Wu also made clear that China would turn its attention to educating consumers and enforcing laws already in place.  In August 2004, at the Xiamen China International Fair for Investment and Trade, Vice Premier Wu proclaimed that China would soon launch a year-long campaign targeting IPR infringement that would focus on import/export activities, trade fairs and exhibitions, distribution, brand name processing trade and publishing.  She explained that this campaign would proceed in three phases:  (1) planning and mobilization (September 2004); (2) implementation (October 2004 to June 2005); and (3) summary (July to August 2005).  This campaign, intended to implement China's JCCT commitments to conduct nation-wide enforcement actions and educate the public about IPR, seeks to integrate the work of multiple government agencies to combat IPR abuses in fifteen provinces and cities designated for priority action.  U.S. companies have welcomed this display of China's determination to curb IPR abuses.

In early 2005, the United States will conduct an out-of-cycle review under the Special 301 provisions of U.S. trade law.  This review will examine China's progress in implementing the action plan that Vice Premier Wu announced at the April 2004 JCCT meeting with the stated intent of significantly reducing IPR infringement levels in China.  In preparation for this review, USTR has initiated a systematic evaluation of China's entire IPR enforcement regime and has also asked U.S. manufacturers and businesses to document IPR infringement to the extent possible.  The United States is prepared to take whatever action is necessary at the conclusion of this review to ensure that China develops and implements an effective system of IPR enforcement, as required by the TRIPS Agreement.

*Legal Framework*

At the time of its accession to the WTO, China was in the process of modifying the full range of IPR laws, regulations and implementing rules, including those relating to patents, trademarks and copyrights.  China had completed amendments to its patent law, trademark law and copyright law, along with regulations for the patent law.  Within several months after its accession, China issued regulations for the trademark law and the copyright law.  China also issued various sets of implementing rules, as well as regulations and implementing rules covering specific subject areas, such as integrated circuits, computer software and pharmaceuticals.

As previously reported, U.S. experts carefully reviewed China's new IPR laws, regulations and implementing rules and, together with other WTO members, participated in a comprehensive

*Page 61*

review of them as part of the first transitional review of China before the TRIPS Council in 2002. In 2003, China issued several new measures in the patent, trademark and copyright areas, which were reviewed during the transitional review before the TRIPS Council in November 2003. While this process identified various areas where China could make improvements, and the United States and U.S. industry continue to press China to do so, overall the legal changes made by China through 2003 were major improvements that moved China generally in line with international norms in most key areas.

In the trademark area, some progress was made this year on the recognition of foreign well-known marks, more than a year after the issuance of implementing rules on well-known marks.  A handful of foreign marks have been recognized as well-known, all in the last year.  The Trademark Administration also announced plans to amend its *Regulations on Trademark Administrative Enforcement* later this year in order to guide regional industrial and commercial administrations in facilitating effective trademark enforcement and protection.  In addition, in November 2004, six Chinese provinces signed an agreement to establish an IPR alliance, with a focus on the trademark area.  Intellectual property bureau directors of Shanxi, Henan, Anhui, Jiangxi, Hubei and Hunan signed the Agreement on IPR Development and Cooperation Mechanism in Six Central Provinces pledging the establishment of an inter-province administrative law enforcement mechanism, the opening of a central-six regional economic development and IPR strategy website, and the establishment of an IPR development coordination leading small group.  Many local governments are also reportedly drafting their own action plans to further implement China's commitment to significantly reduce IPR infringement levels.

With regard to copyright protection over information networks, China is currently drafting revisions to its 2001 Internet-related implementing rules to provide better IPR protection on the Internet.  This development is welcomed by the U.S. Government as a concrete step in line with China's JCCT commitments to improve protection of electronic data and apply criminal sanctions to on-line piracy.  U.S. companies also welcome this step because loopholes in those rules have allowed copyright infringement on the Internet to become a growing phenomenon in China.  In addition, at the provincial and local levels, a number of initiatives have been undertaken.  In November 2004, the State Intellectual Property Office and MII jointly organized a hearing on their *Draft Measures on Administrative Protection of Internet Information Broadcasting Rights*.  These draft implementing rules would require Internet service providers to take remedial actions to delete contents that infringe on copyrights upon receipt of a complaint from the right holder, or face administrative penalties ranging from confiscation of illegal gains to fines of up to RMB 100,000 ($12,060).  The implementing rules are expected to be issued by the end of this year.  Meanwhile, the State Council Legislative Affairs Office put a separate – and likely more authoritative – measure, the *Regulations on the Protection of Copyright Over Information Networks*, on its 2005 legislative agenda.

MOF and other relevant agencies are currently drafting regulations on government procurement of software that require central government departments to use only legitimate software products

and encourage agencies to add funds to their budgets to cover legitimate software purchases. These draft regulations directly address China's JCCT commitment to extend an existing ban on the use of pirated software in central, provincial and local government agencies. Recently, the central government authorized the National Copyright Administration to conduct audits of central government offices in an effort to ensure that only legal software is deployed. In addition, Vice Premier Wu directed all provincial-level agencies to begin using only legal software by the end of 2004. Several provincial governments and the governments of Shanghai, Beijing, Guangzhou and Zhejiang, among other municipalities, have also taken steps toward ensuring that only legal software is used within their agencies.

Meanwhile, by the end of its third year of WTO membership, China still had not acceded to the 1996 WIPO Internet-related treaties, which entered into force in 2002 and have been ratified by many developed and developing countries. Although China is not obligated under WTO rules to accede to the WIPO treaties, the United States considers these treaties to reflect international norms for providing copyright protection over the Internet. While China's existing regulations and implementing rules do address certain copyright issues related to the Internet, and China is in the process of drafting further revisions, the United States has urged China for some time to accede to the WIPO treaties and fully harmonize its regulations and implementing rules with them. At the April 2004 JCCT meeting, China agreed to ratify and implement the WIPO treaties as soon as possible, although it has not yet done so.

With regard to China's JCCT commitment to increase border measures protecting against the import and export of infringing products and to make it easier for rights-holders to secure effective enforcement at the border, a series of new Customs Administration regulations and implementing rules have been issued this year. Earlier this year, the Customs Administration issued the *Regulations on Customs Protection of Intellectual Property Rights*, which went into effect in March 2004. The Customs Administration subsequently issued implementing rules for these regulations, effective July 2004. These new regulations and implementing rules address the duties of the Customs Administration and improve guidance on the implementation of the customs IPR recordal mechanism. In other areas, however, the new regulations and implementing rules lack clarity or could benefit from further changes, such as with regard to the storage and disposition of infringing goods and the transferral of cases for possible criminal prosecution.

*Enforcement*

The TRIPS Agreement requires China to implement effective enforcement procedures and to provide civil and criminal remedies that have a deterrent effect. Although the central government displayed strong leadership in modifying the full range of China's IPR laws and regulations in an effort to bring them into line with China's WTO commitments, effective IPR enforcement has not been achieved, and IPR infringement remains a serious problem throughout China. IPR enforcement is hampered by lack of coordination among Chinese government ministries and agencies, local protectionism and corruption, high thresholds for criminal prosecution, lack of training and weak punishments.

In 2002, one trade association explained that "[e]ffective enforcement against [IPR] infringement in China is universally recognized as the chief concern of [IPR] rights-holders, as piracy rates in China in all areas, including copyright, trademark and patents, continue to be excessively high." This statement was consistent with figures released by the State Council's Development Research Center in July 2003, which showed that the market value of counterfeit and pirated goods in China was between $19 billion and $24 billion in 2001, translating into enormous losses for IPR rights-holders.

In 2004, nearly three years after China's accession to the WTO, U.S. rights-holders uniformly report that IPR infringement in China is rampant, and some witnesses testified at the TPSC hearing held in September 2004 that the situation has actually worsened. One U.S. trade association reports that "[c]ounterfeiting and piracy [in China] remain among the highest in the world – more than 90 [percent] of virtually every form of intellectual property." Current estimates of U.S. losses due to the piracy of copyrighted materials alone range between $2.5 billion and $3.8 billion annually. As one association executive explained, "[l]ack of transparency and coordination among government agencies, local protectionism and corruption, high thresholds for criminal prosecution, and lack of resources and training all hinder enforcement."

IPR infringement in China in 2004 continued to affect products, brands and technologies from a wide range of industries, including films, music, publishing, software, pharmaceuticals, chemicals, information technology, consumer goods, electrical equipment, automotive parts and industrial products, among many others. This situation not only has had an enormous economic impact, but also presents a direct challenge to China's ability to regulate many products that have health and safety implications for China's population and, as an increasing amount of counterfeit and pirated products are being exported from China, for others around the world.

The United States places the highest priority on addressing IPR enforcement problems in China, and in 2004 it devoted additional staff and resources, both in Washington and in Beijing, to address these problems. While a domestic Chinese business constituency is increasingly active in promoting IPR enforcement, it is clear that there will continue to be a need for sustained efforts from the United States and other WTO members, along with the devotion of considerable resources and political will to IPR enforcement by the Chinese government, if significant improvements are to be achieved on this front.

In Beijing, Shanghai and other localities in 2004, authorities did crack down on certain marketplaces known for selling counterfeit and pirated goods. For example, both the Beijing and Shanghai Industrial and Commercial Administrations issued bans on certain designated famous trademark products in these marketplaces, facilitating more direct and rapid enforcement against these products, all of which are presumed to be counterfeit. Nevertheless, while local measures are desirable, a cohesive central, provincial and local enforcement scheme is necessary to effective reduction of IPR infringement.

*Page 64*

Since China issued its new IPR laws, regulations and implementing rules, the United States has worked with central and local government officials in China in a determined and sustained effort to improve China's IPR enforcement. A variety of U.S. agencies have held regular bilateral discussions with their Chinese counterparts and have conducted numerous technical assistance programs for central and local government officials on TRIPS Agreement rules, IPR enforcement and rule of law issues. In addition, the United States has organized annual roundtable meetings in Beijing designed to bring together U.S. and Chinese government and industry officials. The United States' effort has also benefitted from cooperation with Japan and other WTO members to seek improvements in China's IPR enforcement, both on the ground in China and at meetings of the TRIPS Council.

In addition, the United States has worked to block counterfeit and pirated goods at the U.S. border. Since 2000, seizures of counterfeit and pirated goods at U.S. land borders and seaports are up 100 percent. The number of U.S. International Trade Commission proceedings instituted to enforce intellectual property rights and to prevent imports of infringing goods from China and other countries is up 65 percent over the last four years, when compared to the previous four years. Morever, in October 2004, the United States announced the most comprehensive initiative ever advanced to combat the multi-billion dollar global trade in counterfeit and pirated goods. Developed over the preceding year, the Strategy Targeting Organized Piracy (STOP!) is a U.S. government-wide effort to empower U.S. businesses to secure and enforce their intellectual property rights in overseas markets, to stop fakes at the U.S. borders, to expose international counterfeiters and pirates, to keep global supply chains free of infringing goods, to dismantle criminal enterprises that steal U.S. intellectual property and to reach out to like-minded U.S. trading partners in order to build an international coalition to stop counterfeiting and piracy worldwide.

Below, the three different mechanisms for IPR enforcement created by China's IPR laws and regulations – enforcement by administrative authorities, criminal prosecutions and civil actions for monetary damages – are examined. As the United States and other WTO members have been urging, China needs to take immediate steps to improve each of these enforcement mechanisms, particularly criminal enforcement, if China is to even approach the minimum standards for IPR enforcement established by the TRIPS Agreement.

Administrative Enforcement

China continues to take a large number of administrative enforcement actions against IPR violators. However, they are not having a deterrent effect.

Although the central government continues to promote periodic anti-counterfeiting and anti-piracy campaigns, and these campaigns result in high numbers of seizures of infringing materials, they are largely ineffective. For one thing, the cases subsequently brought by the administrative authorities usually result in extremely low fines. When the administrative authorities decide on fines, the fine amounts are kept artificially low because many administrative

authorities do not treat the infringing goods as having the value of the genuine articles, but rather establish value based on the price charged for the counterfeit or pirated goods. In addition, evidence showing that a person was caught warehousing infringing goods is not sufficient to prove an intent to sell them, and as a result the administrative authorities will not even include those goods in the value of the infringing goods when determining the fine amounts. The lack of deterrence from the fines is compounded by the fact that the administrative authorities rarely forward an administrative case on to the Ministry of Public Security for criminal investigation, even for commercial-scale counterfeiting or piracy. As a result, the infringers consider the seizures and fines simply to be a cost of doing business, and they are usually able to resume their operations without much difficulty.

In September 2004, the Customs Administration issued new regulations on administrative penalties in the customs context, the *Implementing Regulations for the Imposition of Administrative Penalties by the General Administration of Customs*, effective November 1, 2004. In an apparent improvement over the prior regulations, these new regulations do not impose a "knowledge" requirement before penalties can be imposed. However, the new regulations provide for fines not to exceed 30 percent of the value of the goods confiscated, or RMB 50,000 ($6,030), whichever is lower. In contrast, the prior regulations allowed for fines up to the full value of the goods confiscated. The fines allowed under the new regulations are also lower than those imposed by other Chinese agencies focusing on domestic IPR infringement.

The Customs Administration has also developed an IPR action plan calling for increased enforcement over exports of infringing goods, in conformity with China's JCCT commitments. At least one port (Ningbo) has significantly increased resources by creating an expert team to implement the work plan, resulting in an increase in inspections. According to the Customs Administration, under this initiative, inspections have increased by 300 percent, as the amount of shipments inspected has risen from about 2 percent to between 6 and 7 percent.

In bilateral meetings with China throughout 2004, the United States continued to emphasize that China needs to revise its IPR legal framework to provide for substantially higher administrative fines, and the administrative authorities then need to impose and publicize them so they will have a deterrent effect, including facilitating referrals for criminal prosecution.

<u>Criminal Enforcement</u>

In the view of the United States and U.S. industry, the most critical steps for China to take in improving its IPR enforcement are in the criminal area. Effective criminal enforcement offers the deterrence needed for China to begin to handle the rampant IPR infringement hurting both foreign and domestic enterprises. For this reason, the United States sought and obtained at the JCCT meeting a commitment by China to apply criminal sanctions to a wider range of IPR-infringing activities and to increase the penalties for IPR violations.

*Page 66*

At present, criminal enforcement has virtually no deterrent effect on infringers. China's authorities have pursued criminal prosecutions in a small number of cases, and a lack of transparency makes it sometimes difficult to find out if they resulted in convictions and, if so, what penalties were imposed. If this situation is to change, China needs to revise its laws, regulations and other measures, including judicial interpretations, and investigate, prosecute, convict and sentence a much higher percentage of IPR infringers, particularly those engaged in commercial-scale counterfeiting or piracy and repeat offenders. China also needs to increase the criminal penalties available.

Partly because of these weaknesses in China's laws and regulations, China rarely pursues criminal prosecutions. While the Customs Administration reported in November 2004 that it had referred two cases involving U.S. rights-holders to the Ministry of Public Security for criminal prosecution, U.S. companies continued to complain that, in most regions of China, the police are either not interested in pursuing counterfeiting and piracy cases or simply lack the resources and training required to investigate these types of cases effectively. In addition, in some circumstances, it is not clear under China's laws and regulations whether a particular activity warrants administrative, civil or criminal enforcement. When that happens, criminal enforcement is not pursued. Moreover, even when IPR violations are referred for criminal enforcement, the actual prosecution of IPR crimes frequently requires coordination among a relatively large number of agencies at the national and local levels. Coordination remains problematic, however, with different agencies using different standards to determine whether criminal conduct exists and some agencies apparently unwilling or unable to work together.

One critical legal change that is needed involves criminal liability thresholds. At present, these thresholds are very high and seldom met. Under a Supreme People's Court interpretation, in order to bring a criminal action against an alleged infringer, there must be evidentiary proof of sales totaling RMB 200,000 ($24,100) for enterprises and RMB 50,000 ($6,030) for individuals. This proof-of-sale requirement has been unworkable, as it does not apply to counterfeit or pirated goods discovered in a warehouse but not yet sold, and infringers generally do not issue receipts or keep detailed records of the sales that they have made. The proof-of-sale requirement is also misguided, as the amount of counterfeit or pirated goods sold should only be relevant to the severity of the penalty imposed, not to the decisions to investigate, prosecute or convict. In its accession agreement, China committed that its administrative authorities would work with the Supreme People's Court in an attempt to address these concerns, but this work seems to have been stalled this year.

At the April 2004 JCCT meeting, China pledged that, by the end of this year, it would issue judicial interpretations that lower the value thresholds that trigger criminal investigations and prosecutions, and that apply criminal sanctions to the import, export, distribution and storage of counterfeit goods as well as to on-line piracy. At present, China is still drafting these judicial interpretations. However, despite multiple requests, China has so far refused to share any drafts of the judicial interpretations, while reiterating its commitment to issue them by the end of this year. The United States will continue to press China to circulate the proposed judicial

interpretations for public comment, in accordance with the transparency commitments in China's WTO accession agreement. The United States will also closely monitor how China implements the judicial interpretations in 2005.

<u>Civil Enforcement</u>

In part because of the ineffectiveness of the administrative and criminal enforcement mechanisms in China, there has been an increase in the number of civil actions being brought for monetary damages or injunctive relief. Most of these actions have been brought by Chinese rights-holders. This increased use of civil actions has coincided with an increasing sophistication on behalf of China's IPR courts, as China continues to make efforts to upgrade its judicial system. These efforts are still in progress, however. U.S. companies continued to complain in 2004 that there is still a lack of consistent and fair enforcement of China's IPR laws and regulations in the courts. They have found that most judges lack necessary technical training and that court rules regarding evidence, expert witnesses, and protection of confidential information are vague or ineffective. In addition, in the patent area, where enforcement through civil litigation is of particular importance, a single case still takes four to seven years to complete, rendering the new damages provisions adopted to comply with China's TRIPS Agreement obligations less meaningful.

**Services**

The commitments that China made in the services area begin with the General Agreement on Trade in Services (GATS). The GATS provides a legal framework for addressing market access and national treatment limitations affecting trade and investment in services. It includes specific commitments by WTO members to restrict their use of those limitations and provides a forum for further negotiations to open services markets around the world. These commitments are contained in national services schedules, similar to the national schedules for tariffs.

In its services schedule, China committed to the substantial opening of a broad range of services sectors through the elimination of many existing limitations on market access, at all levels of government, particularly in sectors of importance to the United States, such as banking, insurance, telecommunications and professional services. These commitments are far-reaching, particularly when compared to the services commitments of many other WTO members.

China also made certain "horizontal" commitments, which are commitments that apply to all sectors listed in its services schedule. The two most important of these cross-cutting commitments involve acquired rights and the licensing process. Under the acquired rights commitment, China agreed that the conditions of ownership, operation and scope of activities for a foreign company, as set out in the respective contractual or shareholder agreement or in a license establishing or authorizing the operation or supply of services by an existing foreign service supplier, will not be made more restrictive than they were on the date of China's accession to the WTO. In other words, if a foreign company had pre-WTO accession rights that went beyond the

commitments made by China in its services schedule, that company could continue to operate with those rights.

In the licensing area, prior to China's WTO accession, foreign companies in many service sectors did not have an unqualified right to apply for a license to establish or otherwise provide services in China. They could only apply for a license if they first received an invitation from the relevant Chinese regulatory authorities, and even then the decision-making process lacked transparency and was subject to inordinate delay and discretion. In its accession agreement, China committed to licensing procedures that were streamlined, transparent and more predictable.

As the third year of China's WTO membership nears its completion, challenges remain in securing the benefits of these commitments. According to a trade association with broad representation among U.S. service suppliers, "[f]oreign companies are . . . seeking a more consistent approach from China in meeting its WTO obligations. . . . [I]mplementation remains uneven, and, in many instances, unrealized in key areas, including . . . market access for key services sectors." This trade association also cautioned that "the U.S. business community continues to harbor significant concerns over the role of state intervention in designated strategic sectors of China's economy. China's inability to establish independent regulators in the telecommunications and express delivery services sectors is symptomatic of continuing resistance within the government to fully divorce itself from key decision making that affects the commercial environment for both foreign and domestic companies."

While China continued to keep pace nominally with the openings required by its WTO accession agreement, it frequently maintained or erected terms of entry that were so high or cumbersome as to prevent or discourage foreign suppliers from gaining market access. For example, despite some progress, excessive capital requirements restrict market entry for foreign suppliers in many sectors, such as insurance, banking, telecommunications and non-bank motor vehicle financing, among several others. In addition, in sectors such as insurance and legal services, branching restrictions have been put into effect that call into question commitments made by China in its Services Schedule. In other sectors, particularly express delivery and construction services, problematic measures continue to threaten to take away previously acquired market access rights.

Progress was made on some fronts in 2004, however. For example, China lifted geographic restrictions in the banking and insurance sectors on schedule. In addition, the licensing process in many sectors has proceeded in a workman-like fashion. Indeed, every U.S. insurer that has applied to enter the China market has now received a license, while licenses are beginning to be granted to U.S. and other foreign institutions in the non-bank motor vehicle financing sector. Meanwhile, the new *Administrative Licensing Law*, which took effect on July 1, 2004, should increase transparency in the licensing process, while reducing procedural obstacles and strengthening the legal environment for domestic and foreign enterprises. This law seeks to ensure the reasonable use of administrative licensing powers, to protect the interests of corporations and individuals, and to promote efficient administrative management by requiring

government agencies to set up special offices for issuing licenses and to respond to applications within 20 days.

Meanwhile, China went beyond its WTO commitments when it entered into bilateral aviation and maritime agreements with the United States.

### *Financial Services*

<u>Banking</u>

Prior to its accession to the WTO, China had allowed foreign banks to conduct foreign currency business in selected cities. Although China had also permitted foreign banks, on an experimental basis, to conduct local currency business, the experiment was limited to foreign customers in two cities.

In its accession agreement, China committed to a five-year phase-in for banking services by foreign banks. Specifically, China agreed that, immediately upon its accession, it would allow U.S. and other foreign banks to conduct foreign currency business without any market access or national treatment limitations and conduct local currency business with foreign-invested enterprises and foreign individuals, subject to certain geographic restrictions. The ability of U.S. and other foreign banks to conduct domestic currency business with Chinese enterprises and individuals is to be phased in. Within two years after accession, foreign banks will be able to conduct domestic currency business with Chinese enterprises, subject to certain geographic restrictions. Within five years after accession, foreign banks will be able to conduct domestic currency business with Chinese individuals, and all geographic restrictions will be lifted. Foreign banks will also be permitted to provide financial leasing services at the same time that Chinese banks are permitted to do so.

Shortly after China's accession to the WTO, the People's Bank of China (PBOC) issued regulations governing foreign-funded banks, along with implementing rules, which became effective February 1, 2002. The PBOC also issued several other related measures. Although these measures kept pace with the WTO commitments that China made, it became clear that the PBOC had decided to exercise extreme caution in opening up the banking sector. In particular, it imposed working capital requirements and other prudential rules that far exceeded international norms, both for the foreign banks' headquarters and branches, making it more difficult for foreign banks to establish and expand their market presence in China. For example, the PBOC allowed foreign-funded banks to open only one branch every 12 months.

Initially, in 2002, the PBOC was also slow to act on foreign banks' applications for approval to conduct foreign currency business or local currency business with foreign-invested enterprises and foreign individuals. Beginning in 2003, however, this situation improved noticeably. Currently, a number of foreign banks, including at least 13 U.S. banks, have branches or representative offices

Case 13-4791, Document 160, 07/28/2014, 1280897, Page52 of 315

**A-1537**

Case 1:06-md-01738-BMC-JO   Document 691-16   Filed 04/11/13   Page 75 of 91 PageID #: 20969

in China, although only major banks have been large enough to satisfy the application requirements.

According to the PBOC, the domestic currency business of U.S. banks grew rapidly in the first two years after China's WTO accession, even though the banks' clients were then limited to foreign-invested enterprises and foreign individuals.  Following the PBOC's December 2003 announcement that foreign banks would be permitted to conduct domestic currency business with Chinese enterprises, which keeps pace with China's WTO commitments, the growth in U.S. banks' domestic currency business has accelerated.

In several bilateral meetings since China's WTO accession, the United States has urged the PBOC to reconsider its prudential requirements and to bring them in line with international norms.  Together with other WTO members, the United States also raised these same concerns during meetings of the WTO's Committee on Trade in Financial Services, including the transitional reviews held in 2002 and 2003. In December 2003, some progress took place, as the PBOC reduced working capital requirements for various categories of foreign banks by at least RMB 100 million ($12.06 million).  Capital requirements for other categories of foreign banks were reduced in July 2004 with the issuance of the *Implementing Rules for the Administrative Regulations on Foreign-Invested Financial Institutions* by the China Banking Regulatory Commission (CBRC).  This measure also removed the restriction that had limited foreign-funded banks to opening only one new branch every 12 months.  Nevertheless, the United States, along with Australia, Canada, the EC and Japan, continued to urge China to make its banking sector more accessible to foreign banks, as reflected in the transitional review before the Committee on Trade in Financial Services, held in November 2004.

In a measure issued in early December 2004, CBRC opened up five additional cities to foreign banks seeking to conduct local currency business, including two cities (Xian and Shenyang) one year ahead of the commitment in China's Services Schedule.  As a result, foreign banks can now conduct local currency business in 18 Chinese cities.

<u>Insurance</u>

Prior to its accession, China allowed selected foreign insurers to operate in China on a limited basis and in only two cities.  Three U.S. insurers had licenses to operate, and several more were either waiting for approval of their licenses or were qualified to operate but had not yet been invited to apply for a license by China's insurance regulator, the China Insurance Regulatory Commission (CIRC).

In its accession agreement, China agreed to phase out existing geographic restrictions on all types of insurance operations during the first three years after accession.  It also agreed to expand the ownership rights of foreign companies.  Upon accession, foreign life insurers must be permitted to hold 50 percent equity share in a joint venture.  Foreign property, casualty and other non-life insurers must be permitted to establish as a branch or as a joint venture with 51 percent foreign

*Page 71*

equity share upon accession, and they must be able to establish as a wholly foreign-owned subsidiary two years after accession.  In addition, foreign insurers handling large scale commercial risks, marine, aviation and transport insurance, and reinsurance must be permitted 50 percent foreign equity share in a joint venture upon accession, while they must be able to own 51 percent three years after accession and establish as a wholly foreign-owned subsidiary five years after accession.  China further agreed that all foreign insurers will be permitted to expand the scope of their activities to include group, health and pension lines of insurance within three years after accession.

CIRC issued several new insurance regulations shortly after acceding to the WTO, including ones directed at the regulation of foreign insurance companies.  These regulations implemented many of China's commitments, but they also created problems in three critical areas – capitalization requirements, transparency and branching.  In particular, China's capitalization requirements were significantly more exacting than those of other populous countries with no less an interest in preserving a healthy insurance market, and they limited the ability of foreign insurers to make necessary joint venture arrangements.  The regulations also continued to permit considerable bureaucratic discretion and to offer limited predictability to foreign insurers seeking to operate in China's market.  With regard to branching, China scheduled a commitment to allow non-life firms to establish as a branch in China upon accession and to permit internal branching in accordance with the lifting of China's geographic restrictions.  China further agreed that foreign insurers already established in China that were seeking authorization to establish branches or sub-branches would not have to satisfy the requirements applicable to foreign insurers seeking a license to enter China's market.  Notwithstanding these commitments, the regulations are vague on foreign insurers' branching rights, and CIRC has so far insisted that non-life insurers that are already in the market as a branch and that wish to branch or sub-branch cannot do so unless they first establish as a subsidiary, a costly – and unnecessary – condition.  Further complicating this issue, CIRC has apparently waived this requirement for at least one foreign non-life insurer, but has not explained how or whether other foreign insurers could apply for this waiver.

In close consultation with U.S. insurers, the United States first raised these issues in 2002 in several bilateral meetings with CIRC, MOFTEC and the State Council and at WTO meetings, with support from Canada, the EC, Japan and Switzerland.  Following high-level bilateral meetings during the run-up to the October 2002 Summit between Presidents Bush and Jiang, China began to show some flexibility.  CIRC agreed to establish a working group, composed of U.S. regulators and insurers, to discuss insurance issues, with a particular focus on appropriate capitalization requirements and other prudential standards.  The first meeting of the working group took place in December 2002.

Following further bilateral meetings in 2003, including the February 2003 Trade Dialogue in Beijing, China issued draft implementing rules in August 2003.  Although these draft rules demonstrated some progress with regard to capitalization requirements and transparency, the United States made clear in written comments that more progress was needed.  The United

*Page 72*

States also continued to press its concerns, particularly with regard to branching, in high-level meetings in Beijing in September and October 2003, during the November 2003 Trade Dialogue meetings, and at the transitional review before the Committee on Trade in Financial Services in December 2003.

CIRC issued final implementing rules, the *Detailed Rules on the Regulations for the Administration of Foreign-Invested Insurance Companies*, in May 2004. These new rules lower capital requirements for national licenses from RMB 500 million ($60.3 million) to RMB 200 million ($24.1 million) and for branch offices from RMB 50 million ($6.03 million) to RMB 20 million ($2.41 million). These changes have been welcomed by some U.S. insurers, but others still consider them to be too high. The new rules also streamlined licensing application procedures and shortened approval times, although some procedures remained unclear. Meanwhile, the new rules did not adequately address branching rights, as many aspects of this issue remained vague.

At the April 2004 JCCT meeting, the United States had sought and obtained a commitment from China to re-start the CIRC working group, so that U.S. regulators and insurers could discuss the range of insurance issues with CIRC officials. The United States attempted to schedule these discussions shortly after the May 2004 implementing rules were issued, but without success. Later in the year, the United States raised its concerns in the insurance area during the transitional review before the Committee on Trade in Financial Services, held in November 2004, with support from Canada and Japan. At about the same time, CIRC agreed to schedule working group discussions for March 2005.

As previously reported, CIRC lifted certain geographic restrictions applicable to foreign life insurers ahead of schedule. In 2002, CIRC approved life insurance operations for U.S. insurers in Beijing, Suzhou and Tianjin, two years before China had committed to do so in its Services Schedule. In 2003, CIRC approved life insurance operations for a U.S. insurer in Chongqing nearly one year ahead of schedule. With those moves, China became obligated to provide other life insurers the same access to those cities.

By 2004, the last year in which China can maintain geographic restrictions, the operations of foreign insurers in China had grown quickly. While foreign insurers still had a relatively low share of the national market, they reportedly had captured encouraging market shares in particular localities, such as Shanghai, Guangzhou and Beijing.

At the same time, U.S. and other foreign insurers began to complain in 2004 about another issue, not addressed by the new rules issued in May 2004. In practice, it appears that established Chinese insurers are being granted new branch approvals on a concurrent basis, meaning more than one branch at a time. In contrast, foreign insurers so far have only received approvals on a consecutive basis, meaning one branch at a time. The United States expressed concern about this discriminatory treatment during the transitional review before the Committee on Trade in Financial Services in November 2004 and will press China for further information on its branch approval practices in 2005.

In 2005, the United States will continue to seek market access for foreign insurers on a fair and equitable basis.  In particular, the United States plans to reconvene its working group with CIRC to discuss the further development of China's insurance sector along the lines envisioned in China's WTO accession agreement.  The United States will also continue to urge CIRC not to use its regulatory powers to restrict the access of foreign insurers to China's market.

<u>Motor Vehicle Financing</u>

In its WTO accession agreement, China agreed to open up the motor vehicle financing sector to foreign non-bank financial institutions for the first time, and it did so without any limitations on market access or national treatment.  These commitments became effective immediately upon China's accession to the WTO.

Despite these commitments, China did not open up this sector to foreign financial institutions upon its accession, leaving China's commercial banks as the only financial institutions able to offer auto loans.  However, by the end of its second year of WTO membership, China finally issued all of the measures necessary to allow foreign financial institutions to offer auto loans.

As previously reported, the Chinese regulator, the China Banking Regulatory Commission (CBRC), issued long-awaited regulations permitting foreign financial institutions to offer auto loans in October 2003.  One month later, CBRC issued implementing rules setting forth the procedures for foreign financial institutions to apply for licenses to begin operations.  Although the regulations reduced the capital requirements from the levels set in earlier circulated drafts, they still remain relatively high, as the minimum registered capital is RMB 300 million ($36.2 million), and the minimum paid-in capital is RMB 500 million ($60.3 million).

During the November 2003 Trade Dialogue meetings, the United States urged CBRC to reconsider the high capital requirements and also emphasized the importance of quick action by CBRC on license applications, as U.S. companies were beginning to take steps to obtain licenses to begin operations.  In addition, the United States began to work closely with the U.S. companies to ensure that CBRC acted promptly on their applications.  In January 2004, CBRC granted licenses for one U.S. auto company and two other foreign auto companies to set up non-bank motor vehicle financing institutions.

In subsequent bilateral meetings and during the transitional review before the Committee on Trade in Financial Services in November 2004, the United States, with support from Australia, Canada, the EC and Japan, continued to urge China to increase market access in this sector, particularly for small and medium-sized enterprises, by lowering the capital requirements established by CBRC's regulations.  The United States will continue to press this issue in 2005 and will also work closely with U.S. companies to ensure that CBRC applies all aspects of its new regulations and implementing rules in accordance with China's commitments.

*Legal Services*

Prior to its WTO accession, China had imposed various restrictions in the area of legal services. It maintained a prohibition against representative offices of foreign law firms practicing Chinese law or engaging in profit-making activities of any kind.  It also imposed restrictions on foreign law firms' formal affiliation with Chinese law firms, limited foreign law firms to one representative office and maintained geographic restrictions.

China's accession agreement provides that, upon China's accession to the WTO, foreign law firms may provide legal services through one profit-making representative office, which must be located in one of several designated cities in China.  The foreign representative offices may advise clients on foreign legal matters and provide information on the impact of the Chinese legal environment, among other things.  They may also maintain long-term "entrustment" relationships with Chinese law firms and instruct lawyers in the Chinese law firm as agreed between the two law firms.  In addition, all quantitative and geographic limitations were to have been phased out within one year of China's accession to the WTO, which means that foreign law firms should have been able to open more than one office anywhere in China beginning on December 11, 2002.

In December 2001, the State Council issued the *Regulations on the Administration of Foreign Law Firm Representative Offices*.  In July 2002, the Ministry of Justice issued implementing rules. While these new measures removed some market access barriers, they also generated concern among foreign law firms doing business in China.  In many areas, these measures were ambiguous. For example, it appeared that these measures created an economic needs test for foreign law firms that want to establish offices in China, contrary to China's GATS commitments.  These measures also seemed to take an overly restrictive view of the types of legal services that foreign law firms may provide.  In addition, the procedures for establishing a new office or an additional office were unnecessarily time-consuming.

In consultation with U.S. law firms, the United States carefully reviewed the new measures and expressed its concerns in written comments in 2002.  The United States also held bilateral meetings with China's Ministry of Justice and MOFTEC in 2002 and again in 2003, including during the Trade Dialogue meetings in Beijing in February 2003.  In addition, together with the EC and other WTO members, the United States presented its concerns to China in connection with the transitional reviews before the Council for Trade in Services in 2002, 2003 and 2004. Although a number of U.S. and other foreign law firms have been able to open a second office in China in 2003 and 2004, little progress has been made on the problematic aspects of the new measures, particularly the economic needs test, the unreasonable restrictions on the types of legal services that can be provided and the unnecessary delays that must be endured when seeking to establish new offices.  The United States will continue to work with China in 2005 in an attempt to resolve these outstanding concerns.

*Telecommunications*

In the Services Schedule accompanying its WTO accession agreement, China committed to permit foreign suppliers to provide a broad range of telecommunications services through joint ventures with Chinese companies, including domestic and international wired services, mobile voice and data services, value-added services (such as electronic mail, voice mail and on-line information and database retrieval) and paging services. The foreign stake permitted in the joint ventures is to increase over time, reaching a maximum of 49 percent for most types of services. In addition, all geographical restrictions are to be eliminated within two to six years after China's WTO accession, depending on the particular services sector.

Importantly, China also accepted key principles from the WTO Reference Paper on regulatory principles. As a result, China became obligated to separate the regulatory and operating functions of MII (which had been both the telecommunications regulatory agency in China and the operator of China Telecom) upon its accession. China also became obligated to adopt pro-competitive regulatory principles, such as cost-based pricing and the right of interconnection, which are necessary for foreign-invested joint ventures to compete with incumbent suppliers such as China Telecom, China Netcom and China Unicom.

In December 2001, the State Council issued regulations on the administration of foreign-invested telecommunications enterprises. These regulations implement China's commitments by providing for the establishment of foreign-invested joint ventures, and they set forth relatively clear procedures and requirements for the joint ventures when applying for approval to commence operations, although, as in several other services sectors, they also established high capital requirements (particularly for basic telecommunications services) that pose a barrier to entry for many potential foreign suppliers.

At the same time, China has not yet established a truly independent regulator in the telecommunications sector. The current regulator, MII, while nominally separate from the current telecommunications operators, maintains extensive influence and control over their operations and continues to use its regulatory authority to disadvantage foreign firms.

In April 2003, new problems developed with MII's issuance of the Catalogue of Telecommunications Services. MII reclassified several telecommunications services from the value-added category to the basic category, contrary to widely accepted international practice. MII also placed restrictions on what new services could be classified under the value-added category. These moves have limited the ability of U.S. firms to access China's telecommunications market. Under China's Services Schedule, basic services are on a slower liberalization schedule, and MII subjects them to higher capitalization requirements. Indeed, MII requires suppliers of basic services to satisfy an excessive registered capital requirement of RMB 2 billion ($241.2 million). A review of capital requirements around the world shows essentially no capital requirements in many WTO member markets, including, for example, Argentina, Australia, Brazil, Chile, the member States of the European Union, Japan and the United States.

Where capital-related requirements do exist, they typically take the form of guarantees. For example, Korea requires a $2.5 million bank guarantee or performance bond, while India requires a bank guarantee ranging from $5 million to $80 million, depending on geographic scope.

Meanwhile, MII continues to process applications very slowly for the few foreign-invested telecommunications enterprises that have attempted to satisfy MII's licensing requirements. For example, as China nears the end of its third year of WTO membership, the United States is not aware of a single application for a license to provide value-added services that has completed the MII licensing process.

In 2004, a draft of the long-awaited *Telecommunications Law* began to circulate among Chinese ministries and agencies. The United States and U.S. industry have urged China also to circulate the draft law for public comment. If China takes the initiative, this law could be a vehicle for addressing existing market access barriers and other problematic aspects of China's current telecommunications regime.

The United States has repeatedly raised its concerns with China, using both bilateral meetings, including the Trade Dialogues in February and November 2003, and the transitional reviews before the Council for Trade in Services in 2002, 2003 and 2004, where it has received support from the EC and Japan. The United States will continue to press China on these matters in 2005.

### *Express Delivery Services*

The specific commitments that China made in the area of express delivery services did not require China to take implementation action upon its accession to the WTO. Basically, China agreed to increase the stake allowed by foreign express delivery companies in joint ventures over a period of years, with wholly foreign-owned subsidiaries allowed within four years of accession.

Nevertheless, shortly after becoming a WTO member, China issued two problematic measures. These measures required Chinese and foreign-invested international express delivery companies, including those that were already licensed by MOFTEC to provide international express delivery services (except for the delivery of private letters), to apply for and obtain so-called "entrustment" authority from China's postal authorities, China Post, their direct competitor, if they wanted to continue to provide express delivery services. The measures also placed new weight and rate restrictions on the letters that the companies could handle, assuming that they could obtain entrustment authority, in apparent contravention of China's horizontal "acquired rights" commitment (discussed at the beginning of the Services section).

Working closely with U.S. express delivery companies and other affected WTO members, particularly the EC and Japan, the United States led a sustained effort that eventually convinced China to revise these measures. In September 2002, China issued a new measure, which eliminated the weight and rate restrictions and eased burdensome aspects of the entrustment

application process.  In bilateral meetings, China also provided assurances that the regulatory and operational functions of China Post would be split up and that MOFTEC would seek to ensure that China Post did not abuse its regulatory authority.  Subsequently, in October 2002, China issued another measure streamlining the entrustment application process even further and effectively eliminated China Post's ability to exercise its discretionary authority  to reject entrustment applications from foreign-invested express delivery companies already licensed by MOFTEC.  The measure also provided that these companies do not have to apply for separate entrustment certificates for existing or new branches.

In November 2002, U.S. express delivery companies and their Chinese joint venture partners subsequently applied for and obtained the needed entrustment authority from China Post.  Since then, they have been able to continue to operate without disruption, while expanding their business operations in China.

In July 2003, however, China began circulating draft amendments to its postal services law, which generated two immediate concerns among U.S. companies.  First, the draft amendments purported to give China Post a monopoly over the delivery of letters under 500 grams, which would have constituted a new restriction on the scope of activities of existing foreign-invested express delivery companies, contrary to China's horizontal "acquired rights" commitment.  Second, the draft amendments did not address the need for an independent regulator.  In the ensuing months, U.S. express delivery companies and their joint venture partners submitted written comments to the State Council, which was in charge of the draft amendments, and the United States held a series of bilateral meetings with China.

In September, October and November 2003, the State Council circulated new sets of draft amendments, as written comments continued to be submitted and bilateral meetings continued to take place, including the November 2003 Trade Dialogue in Beijing.  While each set of draft amendments included a different definition of the China Post monopoly, the November 2003 draft amendments again provided China Post with a monopoly on letters weighing less than 500 grams.  These draft amendments also included other problematic provisions.  They appeared to create a new, more burdensome licensing process to replace the existing entrustment process, and they seemed to require express couriers to pay four percent of their revenue from the delivery of letters into a universal service fund.

In 2004, the United States made express delivery services one of its priority issues during the run-up to the April JCCT.  The United States focused its engagement with China on the weight restriction, which would cut back on the scope of activities that foreign-invested express delivery companies had been licensed to provide prior to China's WTO accession.  At the JCCT meeting, Vice Premier Wu committed that old problems, like the weight restriction, would not resurface as new problems.

In July 2004, the State Council circulated another set of draft amendments to the postal services law.  Despite Vice Premier Wu's commitment, these draft amendments continued to include a

weight restriction, now reduced from 500 grams to 350 grams.  They also did little to address other U.S. concerns.

In bilateral meetings and during the transitional review before the WTO's Council for Trade in Services in November 2004, where it received support from the EC, the United States raised its concerns with the draft amendments.  The United States will continue to work closely with U.S. express delivery companies ion 2005 in urging China to issue a sensible and WTO-consistent set of amendments.

### Construction and Related Engineering Services

Upon its WTO accession, China committed to permit foreign service suppliers to supply construction and related engineering services through joint ventures with foreign majority ownership, subject to the requirement that those services only be undertaken in connection with foreign-invested construction projects and subject to registered capital requirements that were slightly different from those of Chinese enterprises.  Within three years of accession, China agreed to remove those conditions, and it also agreed to allow wholly foreign-owned enterprises to supply construction and related engineering services for four specified types of construction projects.

In September 2002, the Ministry of Construction and MOFTEC jointly issued the *Rules on the Administration of Foreign-Invested Construction Enterprises* (known as Decree 113) and the *Rules on the Administration of Foreign-Invested Construction Engineering Design Enterprises* (known as Decree 114).  These decrees provide schedules for the opening up of construction services and related construction engineering design services to joint ventures with majority foreign ownership and wholly foreign-owned enterprises, although to date the necessary implementing rules have only been issued for Decree 113, the construction regulations.  These decrees created concerns for U.S. and other foreign firms by imposing new and more restrictive conditions than existed prior to China's WTO accession, when they were permitted to work in China on a project-by-project basis pursuant to Ministry of Construction rules.  In particular, these decrees for the first time require foreign firms to obtain qualification certificates, effective October 1, 2003.  In addition, these decrees for the first time require foreign-invested enterprises to incorporate in China, and they impose high minimum registered capital requirements and foreign personnel residency requirements that are difficult for many foreign-invested enterprises to satisfy.

In consultation with U.S. industry, the United States, in a high-level intervention, pressed its concerns about Decrees 113 and 114 and sought a delay before the decrees' problematic requirements would become effective.  In September 2003, the Ministry of Construction agreed to extend the implementation date from October 1, 2003 until April 1, 2004.  The United States and U.S. industry used this extension to pursue these issues further with the Ministry of Construction and MOFCOM.

In April 2004, Decree 113 went into effect.  However, in September 2004, the Ministry of Construction and MOFCOM issued Circular 159, which permitted foreign providers of construction services and related construction engineering design services to continue operating on a project by-project basis until July 1, 2005, effectively extending the effective date of the incorporation-related requirements.  After that date, U.S. and other foreign companies will face a great deal of uncertainty as they seek to participate in projects in China.

Throughout 2004, the United States engaged both the Ministry of Construction and MOFCOM in an effort to obtain improvements in Decree 113.  The United States also sought the opportunity to comment on a draft of the implementing rules for Decree 114.  The United States will continue to press its concerns in 2005.

In late November 2004, the Ministry of Construction issued the *Provisional Measures for Construction Project Management* (known as Decree 200), scheduled to become effective on December 1, 2004.  Among other things, Decree 200 appears to preclude the same company from providing construction services and related construction engineering design services if it is also providing project management services on the same project.  This aspect of the decree raises concerns because U.S. companies often provide all of these services in combination when working on a project in a foreign market.  The United States is currently seeking to clarify this and other aspects of Decree 200.

*Aviation Services*

Even though China made no WTO commitments to open up its aviation services sector, it took a significant step in July 2004 to increase market access for U.S. service providers.  China signed a landmark aviation agreement with the United States that will more than double the number of U.S. airlines operating in China and that will increase by five times the number of flights providing passenger and cargo services between the two countries over the next six years.  The agreement also allows each countries' carriers to serve any city in the other country, provides for unlimited code-sharing between them, expands opportunities for charter operators, grants cargo carriers the right to provide door-to-door delivery services, and eliminates government regulation of pricing as of 2008.  U.S. airlines and U.S. express delivery companies have since obtained additional routes and increased flight frequencies, as envisioned by the agreement.

*Maritime Services*

Even though China made no WTO commitments to open up its maritime services sector, it took a significant step in December 2003 to increase market access for U.S. service providers.  The United States and China signed a far-reaching, five-year bilateral maritime agreement, which will give U.S.-registered companies the legal flexibility to perform an extensive range of additional shipping and logistics activities in China.  U.S. shipping and container transport services companies, along with their subsidiaries, affiliates and joint ventures, will also be able to establish branch offices in China without geographic limitation.

### Other Services

In its accession agreement, China agreed to give foreign service suppliers increased access in several other sectors, including several types of professional services, tourism and travel-related services, educational services and environmental services. In each of these sectors, China committed to the phased elimination or reduction of various market access and national treatment limitations. To date, the United States has not discovered significant problems with China's implementation of the commitments made in these sectors, and U.S. companies confirm that the relevant laws and regulations are generally in compliance with China's WTO commitments.

In some sectors, China has actually gone beyond its commitments. For example, even though China had only committed to permit majority foreign-owned joint ventures in the convention services sector, MOFCOM opened this sector to wholly foreign-owned enterprises in February 2004.

In other sectors, however, such as audio-visual services, China has been less willing to increase market access for foreign service providers. Despite the fact that its restrictive approach encourages the illegal copying and sale of foreign films in China, China treats its commitment to allow the importation of 20 foreign films per year for theatrical release on a revenue-sharing basis as a ceiling rather than a floor and further constrains the timely release of these films through distribution and marketing restrictions and lengthy film approval requirements. The United States raised these concerns with China at high levels in 2004 in an attempt to obtain better, and more useful, market access for U.S. service providers. These efforts generated some progress when MOFCOM approved a U.S.-invested film distribution joint venture and took steps to shorten the time required to bring films to market.

Meanwhile, when China issued its revised *Foreign Trade Law* in April 2004, it included a provision that appears to provide broad authority for the imposition of services safeguards. However, the GATS does not provide for a safeguard mechanism, and a safeguard in a scheduled service sector would likely run afoul of China's GATS commitments. In response to concerns raised by the United States and other WTO members, China explained that this provision would only be applied in a way that was consistent with China's WTO obligations.

### Legal Framework

In order to address major concerns raised by WTO members during its lengthy WTO accession negotiations, China committed to broad legal reforms in the areas of transparency, uniform application of laws and judicial review. Each of these reforms, if implemented, will strengthen the rule of law in China's economy and help to address pre-WTO accession practices that made it difficult for U.S. and other foreign companies to do business in China.

*Transparency*

<u>Public Comment</u>

China made a number of transparency commitments in its accession agreement.  One of the most important of these commitments concerned the procedures for adopting or revising laws and regulations affecting trade in goods, services, TRIPS or the control of foreign exchange, given that China's accession to the WTO became effective while China was still in the process of revising its trade-related laws and regulations to become WTO-consistent.  China agreed to provide a reasonable period for public comment on these new or modified laws and regulations before implementing them, except in certain specific instances, enumerated in China's accession agreement.  China also agreed to translate all of its trade-related laws and regulations into one or more of the WTO languages (English, French and Spanish) and to publish them in an official journal.

The principal focus of China's first year of WTO membership was on its framework of laws and regulations governing trade in goods, trade in services, IPR and trade remedies.  Most of this work took place at the central government level, with more than 2,500 trade-related laws and regulations reportedly being reviewed for WTO consistency.  As a result of this review, China reportedly repealed more than 800 laws and regulations, while it issued almost 450 new or revised ones.  In 2003, the central government continued this work, issuing more than 100 new or revised laws and regulations in an effort to meet China's WTO obligations.  China's 31 provinces and autonomous regions and 49 major cities also reportedly made progress, as they repealed nearly 500 trade-related measures and amended almost 200 more.

Despite the tremendous amount of work that China put into overhauling its framework of trade-related laws and regulations in 2002 and 2003, China's ministries and agencies still had a poor record of providing an opportunity for public comment *before* new or modified laws and regulations are implemented.  Although the State Council issued regulations in December 2001 addressing the procedures for the formulation of administrative regulations and rules and expressly allowing public comment, many of China's ministries and agencies in 2002 continued to follow the practice prior to China's accession to the WTO, and no notable progress took place in 2003.  Typically, the ministry or agency drafting a new or revised law or regulation consulted with and submitted drafts to other ministries and agencies, Chinese experts and affected Chinese companies.  At times, it also consulted with select foreign companies, although it would not necessarily share drafts with them.  As a result, only a small proportion of new or revised laws and regulations were issued after a period for public comment, and even in those cases the amount of time provided for public comment was generally too short.

In 2004, some improvements took place, particularly on the part of MOFCOM, which began following the rules set forth in its *Provisional Regulations on Administrative Transparency*, issued in November 2003.  Those rules could potentially serve as a model for other ministries and agencies seeking to improve their transparency.  Nevertheless, basic compliance with China's notice-and-

comment commitment continued to be uneven. For example, China issued several major trade-related laws and regulations in 2004, including a revised *Foreign Trade Law*, insurance regulations, government procurement regulations and several sets of implementing rules, a new automobile industrial policy, regulations on rules of origin for imports and exports, and customs regulations on administrative penalties for IPR infringement. Encouragingly, drafts of the insurance regulations and most of the government procurement measures were circulated for public comment. However, drafts of the *Foreign Trade Law*, the automobile industrial policy, the rules of origin regulations and the customs regulations were either selectively circulated or not circulated at all.

Meanwhile, China's ministries and agencies continue to have a much better record when it comes to making new or revised laws and regulations available to the public. In accordance with State Council regulations issued in December 2001, which require the publication of new or amended regulations thirty days before their implementation, almost all new or revised laws and regulations have been available (in Chinese) soon after issuance and prior to their effective date, an improvement over pre-WTO accession practice. Indeed, these laws and regulations are often published not only in official journals, but also on the Internet. At the same time, however, China continues to lag behind in its obligation to provide translations of these laws and regulations.

In numerous bilateral meetings with the State Council, MOFCOM and other Chinese ministries since China's WTO accession, including high-level meetings, the United States has emphasized the importance of China's adherence to the notice-and-comment commitment in China's accession agreement, both in terms of fairness to WTO members and the benefits that would accrue to China. In addition, the United States continues to provide technical assistance to facilitate Chinese ministries' understanding of the workings, and benefits, of an open and transparent rulemaking process. Together with other WTO members, the United States also raised this issue during regular WTO meetings and as part of the transitional reviews conducted in 2002, 2003 and 2004 before various WTO councils and committees. The United States will continue to work to secure China's full compliance with this fundamental commitment in 2005.

<u>Enquiry Points</u>

Another important transparency commitment requires China to establish enquiry points, where any WTO member or foreign company or individual may obtain information. As previously reported, China complied with this obligation by establishing a WTO Enquiry and Notification Center, now operated by MOFCOM's Department of WTO Affairs, in January 2002. Other ministries and agencies have also established formal or informal, subject-specific enquiry points. Since the creation of these various enquiry points, U.S. companies have generally found these various enquiry points to be responsive and helpful, and they have generally received timely replies. In addition, some ministries and agencies have begun to create websites to provide answers to frequently asked questions as well as further guidance and information.

<u>Official Journal</u>

In its WTO accession agreement, China committed to establish or designate an official journal dedicated to the publication of all laws, regulations and other measures pertaining to or affecting trade in goods, services, TRIPS or the control of foreign exchange.  China also committed to publish this journal on a regular basis and to make copies of all issues of this journal readily available to enterprises and individuals.  China has yet to either establish or designate an official journal for this purpose.  Rather, China currently relies on multiple channels, including ministry websites, newspapers and a variety of journals, to provide information on trade-related measures.  The establishment or designation of a single journal would greatly enhance the ability of WTO members to track the drafting, issuance and implementation of trade-related measures.  Furthermore, the use of a single journal to request comments on proposed trade-related measures, as envisioned in China's WTO accession agreement, would facilitate the timely notification of comment periods and submission of comments.  The United States will work with China and other interested WTO members in 2005 to secure China's full compliance with this commitment.

*Uniform Application of Laws*

In its accession agreement, China committed, at all levels of government, to apply, implement and administer its laws, regulations and other measures relating to trade in goods and services in a uniform and impartial manner throughout China, including in special economic areas.  In support of this commitment, China agreed to establish an internal review mechanism to investigate and address cases of non-uniform application of laws based on information provided by companies or individuals.

In China's first year of WTO membership, the central government launched an extensive campaign to inform and educate both central and local government officials and State-owned enterprise managers about WTO rules and their benefits.  In addition, several provinces and municipalities established their own WTO centers, designed to supplement the central government's efforts and to position themselves so that they would be able to take full advantage of the benefits of China's WTO membership.

In 2002, China also established an internal review mechanism, now overseen by MOFCOM's Department of WTO Affairs, to handle cases of non-uniform application of laws.  The actual workings of this mechanism still remain unclear in 2004, however.

During 2004, as in prior years, some problems with uniformity persisted.  These problems are discussed above in the sections on Customs and Trade Administration, Taxation, Investment and Intellectual Property Rights.

*Page 84*

### Judicial Review

China agreed to establish tribunals for the review of all administrative actions relating to the implementation of laws, regulations, judicial decisions and administrative rulings on trade-related matters. These tribunals must be impartial and independent of the government authorities entrusted with the administrative enforcement in question, and their review procedures must include the right of appeal.

Beginning before China's accession to the WTO, China had taken steps to improve the quality of its judges. For example, in 1999, the Supreme People's Court began requiring judges to be appointed based on merit and educational background and experience, rather than through politics or favoritism. However, existing judges, many of whom have had no legal training, were grandfathered in. In part because of this situation, many U.S. companies in 2004 continued to express serious concern about the independence of China's judiciary. In their experience and observation, Chinese judges are often influenced by political, government or business pressures, particularly outside of China's big cities.

Meanwhile, in 2004, the United States continued to monitor how the courts designated by the Supreme People's Court's *Rules on Certain Issues Related to Hearings of International Trade Administrative Cases*, which went into effect in October 2002, have handled cases involving administrative agency decisions relating to international trade in goods or services or intellectual property rights. So far, however, there is still little data, as few foreign companies have had experience with these courts.

A-1552

## APPENDIX 1

**List of Written Submissions
Submitted in Response to Request for Public Comment
by the Trade Policy Staff Committee
on China WTO Compliance**

1.  U.S.-China Business Council
2.  U.S. Chamber of Commerce
3.  American Chamber of Commerce-China/American Chamber of Commerce-Shanghai
4.  Semiconductor Industry Association
5.  U.S. Information Technology Office
6.  North American Export Grain Association
7.  American Iron and Steel Institute
8.  Motor and Equipment Manufacturers Association
9.  Coalition of Service Industries
10. Conference of Asia-Pacific Express Carriers/Air Courier Conference of America
11. International AntiCounterfeiting Coalition, Inc.
12. Information Technology Association of America
13. U.S. Council of International Business
14. American Chemistry Council
15. ANSAC
16. California Cherry Advisory Board
17. Ranchers-Cattlemen Action Legal Fund – United Stockgrowers of America
18. U.S. Dairy Export Council/National Milk Producers Federation
19. U.S. Wheat Associates
20. American Forest and Paper Association
21. Distilled Spirits Council of the United States, Inc.
22. United States Motorcycle Manufacturers Association
23. Nintendo of America, Inc.
24. Outdoor Power Equipment Institute
25. U.S.-China Economic and Security Review Commission

**A-1553**

<u>APPENDIX 2</u>

**List of Witnesses
Testifying at the Public Hearing
before the Trade Policy Staff Committee
on China WTO Compliance**
Washington, D.C.
September 23, 2004

1.  Robert A. Kapp
    President
    US-China Business Council

2.  Myron Brilliant
    Vice President, East Asia
    U.S. Chamber of Commerce

3.  Jim Gradoville
    Chairman
    American Chamber of Commerce-China
    and
    Jeff Bernstein
    Emerge Logistics on behalf of American Chamber of Commerce-Shanghai

4.  Kevin Dempsey
    Dewey Ballantine on behalf of Semiconductor Industry Association

5.  Mark Bohannon
    General Council and Senior Vice President for Public Policy
    Software and Information Industry Association
    on behalf of United States Information Technology Office

6.  Gary C. Martin
    President and Chief Executive Officer
    North American Export Grain Association

7.  Andrew G. Sharkey III
    President and Chief Executive Officer
    American Iron and Steel Institute

8.  Scott Meyer
    President
    Motor and Equipment Manufacturers Association

9.  Robert Vastine
    President
    Coalition of Service Industries

A-1554

# EXHIBIT P

**A-1555**

# 2006 REPORT TO CONGRESS ON CHINA'S WTO COMPLIANCE



**United States Trade Representative**

# 2006 REPORT TO CONGRESS
# ON CHINA'S WTO COMPLIANCE

**December 11, 2006**

**United States Trade Representative**

# TABLE OF CONTENTS

*Page*

**FOREWORD** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

**BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    **China's WTO Accession Negotiations** . . . . . . . . . . . . . . . . . . . . . . . .   11
    **Overview of China's WTO Commitments** . . . . . . . . . . . . . . . . . . . . . . 11

**STATUS OF CHINA'S WTO COMPLIANCE EFFORTS** . . . . . . . . . . . . . .   13
    **Trading Rights and Distribution Services** . . . . . . . . . . . . . . . . . . . . . . 13
        *Trading Rights* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
        *Distribution Services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
    **Import Regulation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
        *Tariffs* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        *Customs and Trade Administration* . . . . . . . . . . . . . . . . . . . . . . . . .   26
        *Non-tariff Measures* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
        *Tariff-rate Quotas on Industrial Products* . . . . . . . . . . . . . . . . . .   30
        *Other Import Regulation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
    **Export Regulation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
    **Internal Policies Affecting Trade** . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
        *Non-discrimination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
        *Taxation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40
        *Subsidies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41
        *Price Controls* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43
        *Standards, Technical Regulations and*
            *Conformity Assessment Procedures* . . . . . . . . . . . . . . . . . . . . . . . 44
        *Other Internal Policies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51
    **Investment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54
    **Agriculture** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59
        *Tariffs* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
        *China's Biotechnology Regulations* . . . . . . . . . . . . . . . . . . . . . . . . 62
        *Tariff-rate Quotas on Bulk Agricultural Commodities* . . . . . . . . .   63
        *Sanitary and Phytosanitary Issues* . . . . . . . . . . . . . . . . . . . . . . . .   64
        *Inspection-related Requirements* . . . . . . . . . . . . . . . . . . . . . . . . .   68
        *Export Subsidies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   69

## **TABLE OF CONTENTS** (cont'd)

*Page*

**Intellectual Property Rights** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70
    *Legal Framework* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   72
    *Enforcement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76
**Services** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79
    *Financial Services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81
    *Legal Services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   88
    *Telecommunications* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
    *Construction and Related Engineering Services* . . . . . . . . . . . . .   91
    *Express Delivery Services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   92
    *Aviation Services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94
    *Maritime Services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   95
    *Other Services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   95
**Legal Framework** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   96
    *Transparency* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   96
    *Uniform Application of Laws* . . . . . . . . . . . . . . . . . . . . . . . . . .   99
    *Judicial Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   99

**APPENDIX 1** (List of Written Submissions)

**APPENDIX 2** (List of Witnesses)

## FOREWORD

This is the fifth report prepared pursuant to section 421 of the U.S.-China Relations Act of 2000 (P.L. 106-286), 22 U.S.C. § 6951 (the Act), which requires the United States Trade Representative (USTR) to report annually to Congress on compliance by the People's Republic of China (China) with commitments made in connection with its accession to the World Trade Organization (WTO), including both multilateral commitments and any bilateral commitments made to the United States. The report also incorporates the findings of the Overseas Compliance Program, as required by section 413(b)(2) of the Act, 22 U.S.C. § 6943(b)(2).

Like the prior reports, this report is structured as an examination of the nine broad categories of WTO commitments undertaken by China. Throughout the report, USTR has attempted to provide as complete a picture of China's WTO compliance as possible, subject to the inherent constraints presented by the sheer volume and complexity of the required changes to China's trade regime and transparency obstacles. The report identifies areas where progress has been achieved and underscores shortcomings, as appropriate, with regard to the commitments that became effective upon China's accession to the WTO as well as those commitments scheduled to be phased in over time.

The focus of the report's analysis continues to be on trade concerns raised by U.S. stakeholders that, in the view of the U.S. Government, merit attention within the WTO context. The report does not provide an exhaustive analysis of the many areas in which China's WTO compliance efforts have or have not, in the view of the U.S. Government, satisfied particular commitments made in China's WTO accession agreement.

In preparing this report, USTR drew on its experience in overseeing the U.S. Government's monitoring of China's WTO compliance efforts. USTR chairs the Trade Policy Staff Committee (TPSC) Subcommittee on China WTO Compliance, an inter-agency body whose mandate is devoted to China and the extent to which it is complying with its WTO commitments. This TPSC subcommittee is composed of experts from USTR, the Departments of Commerce, State, Agriculture and Treasury, and the U.S. Patent and Trademark Office, among other agencies. It works closely with State Department economic officers, Foreign Commercial Service officers and Market Access and Compliance officers from the Commerce Department, Foreign Agricultural Service officers and Customs attaches at the U.S. Embassy and Consulates General in China, who are active in gathering and analyzing information, maintaining regular contacts with U.S. industries operating in China and maintaining a regular dialogue with Chinese government officials at key ministries and agencies. The subcommittee meets in order to evaluate, coordinate and prioritize the monitoring activities being undertaken and to review the steps that China has taken to implement its commitments.

*Page 2*

To aid in its preparation of this report, USTR also published a notice in the Federal Register on July 28, 2006, asking for written comments and testimony from the public and scheduling a public hearing before the TPSC, which took place on September 28, 2006.  A list of the written submissions received from interested parties is set forth in Appendix 1, and the persons who testified before the TPSC are identified in Appendix 2.

Case 13-4791, Document 160, 07/28/2014, 1280897, Page78 of 315

**A-1563**

Case 1:06-md-01738-BMC-JO   Document 691-17   Filed 04/11/13   Page 10 of 110 PageID #: 20995

## EXECUTIVE SUMMARY

When China acceded to the World Trade Organization on December 11, 2001, it committed to implement over time a set of sweeping reforms that required it to lower trade barriers in virtually every sector of the economy, provide national treatment and improved market access to goods and services imported from the United States and other WTO members, and protect intellectual property rights.  Five years later, the deadlines for almost all of China's commitments have passed, and China's transition period as a new WTO Member is now essentially over.  This report provides an assessment of China's performance in meeting its WTO obligations during this transition period, with a particular emphasis on developments during the past year.

China has taken significant and often impressive steps to reform its economy since acceding to the WTO.  During this period, China has repealed, revised or enacted more than one thousand laws, regulations and other measures in an effort to bring its trading system into basic compliance with WTO standards.  China has also taken steps to implement numerous specific commitments pursuant to schedules set forth in its WTO accession agreement.  Each year, China has made annual reductions in its tariff rates, eliminated non-tariff barriers, expanded market access for foreign services providers and improved transparency.  All of these steps were designed to deepen China's integration into the international trading system, as well as to facilitate and strengthen economic reforms that China had begun 20 years earlier.  The United States – including U.S. workers, businesses, farmers, service providers and consumers – has benefitted significantly from these steps and continues to do so as U.S.-China trade grows.

Nevertheless, despite significant progress in many areas, China's record in implementing WTO commitments is decidedly mixed.  China continues to pursue problematic industrial policies that rely on trade-distorting measures such as local content requirements, import and export restrictions, discriminatory regulations and prohibited subsidies, all of which raise serious WTO concerns.  China's shortcomings in enforcing laws in areas where detailed WTO disciplines apply, such as intellectual property rights (IPR), have also created serious problems for the United States and its other trading partners.

U.S. industry traces many of the United States' most difficult trade issues with China to excessive Chinese government intervention in the market through policy directives and the actions of individual officials.  This government intervention, evident in many areas of China's economy, is a reflection of China's historic yet unfinished transition from a centrally planned economy to a free-market economy governed by rule of law.  To some extent, these difficulties were anticipated.  During the fifteen years of negotiations leading up to China's WTO accession, the United States and other WTO members were aware of the state's large role in China's economy and carefully negotiated conditions for China's WTO accession that would, when implemented, lead to significantly reduced levels of government intervention in the market and distortions in trade flows attributable to it.

*Page 4*

Noteworthy progress was made as a result of economic reforms adopted by China before and in the first few years after its accession to the WTO.  But, there are indications that progress toward further market liberalization slowed in 2006, as several U.S. trade associations highlighted in their written comments and testimony this Fall before USTR and the other agencies that comprise the Trade Policy Staff Committee.

One trade association official explained:

> Recent public policy debates in China have indicated a dampening of enthusiasm in some quarters for foreign participation in the economy.  Some in China also appear to want to expand the government's role in directing the economy and in developing internationally competitive Chinese enterprises, while also restricting the role of international companies in certain sectors.

Another trade association official cautioned:

> Over the past 12 months we have seen an upsurge in industrial planning measures as tools of economic development by central government authorities.  China's leaders currently face a choice:  either to narrowly interpret WTO commitments and maximize the use of government intervention to protect and nurture Chinese industries, or to apply the letter and spirit of the WTO and recommit to the broadest possible use of markets to drive innovation, job creation, and economic growth.  While IPR remains the number one issue in our bilateral economic relationship . . . , the continued and expanding use of government intervention and industrial policies . . . have the potential to create even sharper frictions in bilateral economic relations than IPR.

Developments evidencing this reduced momentum for economic reforms over the past year make clear that China has not yet fully institutionalized market mechanisms, and that some Chinese government agencies and officials have not yet fully embraced the key WTO principles of market access, non-discrimination, national treatment and transparency.  A lack of consensus within China's government and competing Chinese government priorities – including differences in views and approaches among China's central, provincial and local governments – have also contributed to the reduced momentum for economic reforms, as have systemic rule of law problems.

Recognizing these challenges, USTR announced, in a "top-to-bottom" review of U.S.-China trade relations issued earlier this year, that it would adopt a dual-track approach to resolving its WTO concerns.  The United States will continue to seek cooperative and pragmatic resolutions through bilateral dialogue with China, including the Joint Commission on Commerce and Trade (JCCT) as well as ad hoc bilateral meetings and a variety of sector-specific dialogues.  However,

*Page 5*

when bilateral dialogue fails to succeed in addressing U.S. concerns, the United States will not hesitate to exercise its WTO rights through the initiation of dispute settlement against China, as it would with any other mature WTO trading partner.

The United States achieved some important successes through bilateral dialogue in 2006, including at a JCCT meeting in April.  At that meeting, China made several commitments related to IPR protection and enforcement, and it also committed to eliminate duplicative testing and certification requirements applicable to imported medical devices, to make adjustments to its registered capital requirements for telecommunications service providers, and to finalize a protocol allowing the resumption of trade in U.S. beef and beef products.  China also reaffirmed past commitments to technology neutrality for 3G telecommunications standards and to ensuring that foreign express couriers would not be negatively impacted by new rules in the postal area.  In addition, China committed to commence, by no later than December 31, 2007, formal negotiations to join the WTO's Government Procurement Agreement.  Since the JCCT meeting in April, the United States has been working with China to make sure that it implements all of these commitments.

However, to date, other issues have evaded bilateral consensus, despite extensive dialogue.  Issues like IPR criminal enforcement thresholds, certain market access concerns and WTO prohibited subsidies have resisted resolution in 2006.  Although the United States has been making earnest efforts to resolve these concerns through bilateral discussions, it will have to pursue other options if the bilateral approach is not fruitful.

U.S. preparation for the pursuit of formal WTO dispute settlement has already facilitated resolution of one dispute in 2006, and another Chinese measure is now the subject of formal WTO dispute settlement.  In January 2006, after the United States informed China that it would be filing a formal request for WTO consultations in a challenge to antidumping duties that China had imposed on imports of unbleached kraft linerboard from the United States, China rescinded the antidumping duties.  This result enabled U.S. industry to obtain a faster resolution to this problem than would have been possible if the dispute settlement process had needed to run its course.  In March 2006, the United States, acting in coordination with the European Communities (EC) and Canada, commenced a WTO dispute settlement case challenging Chinese rules that brought back prohibited local content requirements in the auto sector through the imposition of measures that discriminated unfairly against imported auto parts.  More recently, in November 2006, the United States informed China that it would be filing a WTO consultations request with regard to certain IPR enforcement issues, but then agreed to hold off, with the support of U.S. industry, when China asked for further bilateral discussions.

Overall, several areas continue to cause particular concern for the United States and U.S. industry, in terms of China's full adherence to its WTO commitments.  The key concerns in each of these areas are summarized below.

*Page 6*

**Intellectual Property Rights**

Since its accession to the WTO, China has been able to put in place a relatively good set of laws and regulations aimed at protecting the intellectual property rights of domestic and foreign right holders.  However, some critical measures – such as those establishing high thresholds for criminal prosecution – still need to be revised, and China's enforcement of its laws protecting the intellectual property rights covered by the WTO Agreement on Trade-Related Aspects of Intellectual Property Rights (the TRIPS Agreement) has often been ineffective.  With many in U.S. industry reporting no significant reduction in IPR infringement levels again in 2006, counterfeiting and piracy in China remain at unacceptably high levels and cause serious economic harm to U.S. businesses in virtually every sector of the economy.

In 2006, the Administration continued to place the highest priority on improving IPR enforcement in China.  One key focus of the United States' bilateral engagement with China continued to be on working with China to improve its IPR enforcement regime so that significant reductions in IPR violations in China could be realized.  The United States sought to build on its earlier engagement with China at the April 2004 and July 2005 JCCT meetings, and it placed China on the Special 301 "Priority Watch" list in 2005.  Through the JCCT process in 2006, which included a meeting in April, China agreed to take some immediate steps to address particular problems and committed to take additional future actions.  During the run-up to the JCCT meeting, China took enforcement actions against plants that produce pirated optical discs, and it issued new rules that require computers to be pre-installed with licensed operating system software.  At the JCCT meeting itself, China committed to ensure the legalization of software used in Chinese enterprises, to pursue increased cooperation to combat pirated goods displayed at trade fairs in China, and to intensify efforts to eliminate infringing products at major consumer markets in China.  The two sides further agreed that they would increase cooperation between their respective law enforcement and customs authorities and that the United States would provide China with additional technical assistance to assist it in fully implementing the World Intellectual Property Organization (WIPO) Internet treaties, which address the increasingly important area of copyright protection over electronic information networks.

Despite this progress, China continues to deflect calls from the United States and other WTO members for better utilization of criminal remedies to combat rampant IPR infringement in China, claiming that its combination of administrative, civil and criminal enforcement is increasingly effective.  The available statistics on continuing massive IPR infringement in China raise obvious questions about this claim.  The United States and other WTO members have been unable to review details concerning China's administrative, civil and criminal enforcement system because of China's lack of transparency.  In an attempt to better assess this situation, the United States, Japan and Switzerland submitted requests to China under Article 63.3 of the TRIPS Agreement in October 2005, seeking detailed information from China on its IPR enforcement efforts over the prior four years.  China has provided only limited information in response, hampering the United States' ability to evaluate what steps are being taken to try to address the rampant IPR infringement found throughout China.

*Page 7*

The United States remains committed to working constructively with China to significantly reduce IPR infringement levels in China and continues to devote extra staff and resources, both in Washington and in Beijing, to address the many aspects of this issue.  At the same time, when bilateral discussions prove unable to resolve key differences on particular issues, the United States remains prepared to take action, including WTO dispute settlement, where appropriate, to ensure that China develops and implements an effective system of IPR enforcement, as required by the TRIPS Agreement.

**Industrial Policies**

China has continued to resort to industrial policies that limit market access for non-Chinese origin goods and foreign service providers, and that provide substantial government resources to support Chinese industries and increase exports.  In some cases, the objective of these policies seems to be to promote the development of Chinese industries that are higher up the economic value chain than the industries that make up China's current labor-intensive base.  In other cases, China appears simply to be protecting less competitive domestic industries.

In 2006, examples of these industrial policies remain readily evident.  One obvious example is China's regulations on auto parts tariffs, issued last year, which serve to prolong prohibited local content requirements for motor vehicles – a matter that is currently the subject of a WTO dispute brought by the United States, the EC and Canada.  Other examples include the telecommunications regulator's continuing interference in commercial negotiations over royalty payments to intellectual property rights holders in the area of 3G standards, the continuing pursuit of unique national standards in many areas of high technology that could lead to the extraction of technology or intellectual property from foreign right holders, a July 2005 industrial policy that calls for the state's management of nearly every major aspect of China's steel industry, export restrictions on raw materials like coke, and excessive government subsidization benefitting a range of domestic industries in China.   Worrisome new measures over the past year include new requirements for state control of "critical" equipment manufacturers, revised rules for foreign mergers and acquisitions that confer broad and vaguely defined powers on the government to block investments in a range of industries, and plans to steer government purchases to domestic manufacturers to promote innovation in Chinese enterprises.  Some of these policies appear to conflict with China's WTO commitments in the areas of market access, national treatment and technology transfer, among others.

The United States and China made little progress in resolving U.S. concerns regarding these industrial policies in 2006.  China did reaffirm its commitment to technology neutrality for 3G telecommunications standards, but serious disagreements over a number of other industrial policies remain, including China's continued use of prohibited subsidies.  The United States will again press China on these matters in 2007 and will take further appropriate actions seeking elimination of these policies, including WTO dispute settlement, where appropriate.

*Page 8*

**Trading Rights and Distribution Services**

China was scheduled to phase in two key WTO commitments by December 11, 2004. These commitments called for full liberalization of trading rights – the right to import and export – and distribution services, including wholesale and retail services, franchising services and related services. Although delay and confusion initially characterized China's efforts to implement its distribution services commitments, China was able to largely overcome these problems in 2006, prodded by consistent and determined U.S. engagement. U.S. companies and individuals in most sectors are now not only able to import and export goods in China directly without having to use a middleman, but are also able to establish their own distribution networks within China. Many in U.S. industry consider trading rights and distribution services to be "the most important of the WTO commitments China has so far implemented," according to one trade association with broad representation.

Nevertheless, some problems still remain in critical areas. In particular, China continues to maintain import and distribution restrictions on several types of products, including foreign publications such as books, periodicals and audio and video products, in apparent contravention of China's trading rights and distribution services commitments. These restrictions reduce and delay market access for these copyrighted products, creating additional incentives for infringement in China's market. Another key area involves China's commitment to open its market for sales away from a fixed location, also known as "direct selling." Initially delayed, China's implementation of this commitment has since proceeded slowly and has subjected foreign direct sellers to unwarranted restrictions on their business operations. The United States will continue to pursue these important issues in 2007 to ensure that China fully meets its commitments and will take further appropriate actions seeking the revision or elimination of problematic policies, including through WTO dispute settlement, where appropriate.

**Agriculture**

U.S. agricultural exports to China in 2005 totaled $5.2 billion, with China becoming the United States' fourth largest agricultural export market. To date, 2006 has been an even more successful year. U.S. exports of agricultural commodities, particularly cotton and wheat, have continued to increase dramatically in recent years, and U.S. exports of soybeans continued to perform strongly – on target in 2006 to well exceed $2 billion for the fourth year in a row, with China remaining the leading export destination for U.S. soybeans.

While U.S. exports of agricultural commodities largely fulfill the potential envisioned by U.S. negotiators during the years leading up to China's WTO accession, China's WTO implementation in the agricultural sector continues to be plagued by uncertainty, largely because of selective intervention in the market by China's regulatory authorities. As in past years, capricious practices by Chinese customs and quarantine officials can delay or halt shipments of agricultural products into China, while sanitary and phytosanitary (SPS) standards with questionable scientific bases and a generally opaque regulatory regime frequently bedevil traders in agricultural commodities, who require as much predictability and transparency as possible in

order to preserve margins and reduce the already substantial risks involved in agricultural trade. As a result, trade with China in the agricultural sector remains among the least transparent and predictable of the world's major markets.

In 2007, the United States will continue to pursue vigorous bilateral engagement with China in order to obtain progress on its outstanding concerns, particularly with regard to China's ban on the importation of U.S. beef and beef products.  This issue is emblematic of the problems that U.S. exporters face with non-transparent application of SPS measures, many of which appear to lack scientific bases and impeded market access for many U.S. agricultural products in 2006, particularly exports of consumer-ready and value-added products.

**Services**

Overall, the United States enjoyed a substantial surplus in trade in services with China in 2006, as in prior years, and the market for U.S. service providers in China remains promising. However, in some sectors, the expectations of the United States and other WTO members when agreeing to China's commitments to increase market access and remove restrictions have still not been fully realized.  Chinese regulatory authorities continue to frustrate efforts of U.S. providers of banking, insurance, motor vehicle financing, telecommunications, construction and engineering, legal and other services to achieve their full market potential in China through the use of an opaque regulatory process, overly burdensome licensing and operating requirements, and other means.

In 2006, U.S. engagement led to some positive developments.  China's insurance regulators continued to participate in a dialogue on insurance issues, and China made a commitment at the April 2006 JCCT meeting to adjust capital requirements for telecommunications services providers, although it has been slow to follow through on that commitment.  China also reiterated its commitments at the April 2004 and July 2005 JCCT meetings not to negatively affect the regulatory environment for foreign providers of express delivery services via new postal rules being drafted.

At the same time, some new concerns arose in 2006.  Xinhua, the Chinese state news agency, issued rules in September 2006 imposing new restrictions on foreign providers of financial information services, in apparent contravention of China's WTO obligations.  In addition, a variety of problematic proposals were circulated by Chinese regulators as China prepared to implement important financial services commitments scheduled to be phased in by December 11, 2006.  In 2007, the United States will continue to engage China and will closely monitor developments in these areas in an effort to ensure that China fully adheres to its commitments.

*Page 10*

**Transparency**

One of the fundamental principles of the WTO Agreement, reinforced throughout China's WTO accession agreement, is transparency.  Adherence to this principle permits markets to function effectively and reduces opportunities for officials to engage in trade-distorting practices behind closed doors.  While China's transparency commitments in many ways require a profound historical shift, China made important strides to improve transparency across a wide range of national and provincial authorities during the first four years of its WTO membership, although two shortcomings stood out.  By the beginning of 2006, China had still not adopted a single official journal for publishing all trade-related measures, and it had yet to regularize the use of notice-and-comment procedures for new or revised trade-related measures prior to implementation, despite having made commitments to do so.  In March 2006, after the United States elevated this issue to the JCCT level, China finally adopted a single official journal, although much work remains for China to ensure full participation by all relevant government entities.  The United States has also pushed China to adopt a mandatory notice-and-comment practice, but, to date, this practice remains optional in China.  As a result, as 2006 was drawing to a close, many of China's regulatory regimes continued to suffer from systemic opacity, frustrating efforts of foreign – and domestic – businesses to achieve the potential benefits of China's WTO accession.

**Conclusion**

In 2007, the Administration will continue its relentless efforts to ensure China's full implementation of specific WTO commitments and full adherence to China's ongoing obligations as a WTO member, with particular emphasis on reducing IPR infringement levels in China, and on pressing China to make greater efforts to institutionalize market mechanisms and make its trade regime more predictable and transparent.   Throughout this process, the Administration will use a dual-track approach.  The Administration remains committed to working cooperatively and pragmatically with China to ensure that the benefits of China's WTO membership are realized by U.S. workers, businesses, farmers, service providers and consumers and that problems in our trade relationship are appropriately resolved.  The new, high-level U.S.-China Strategic Economic Dialogue, scheduled to begin in December 2006, demonstrates that commitment and promises to provide a useful framework for understanding and supporting, at a broader level, key bilateral problem-solving efforts, such as the JCCT process and other bilateral dialogues.  When bilateral dialogue is not successful, however, the Administration will not hesitate to employ the full range of enforcement tools available as a result of China's accession to the WTO, whether it be the dispute settlement procedures at the WTO or the strict enforcement of U.S. trade laws to ensure that U.S. interests are not harmed by unfair trade practices.

Case 13-4791, Document 160, 07/28/2014, 1280897, Page86 of 315

Case 1:06-md-01738-BMC-JO   Document 691-17   Filed 04/11/13   Page 18 of 110 PageID #: 21003

## BACKGROUND

### China's WTO Accession Negotiations

In July of 1986, China applied for admission to the WTO's predecessor, the General Agreement on Tariffs and Trade (GATT).  The GATT formed a Working Party in March of 1987, composed of all interested GATT contracting parties, to examine China's application and negotiate terms for China's accession.  For the next eight years, negotiations were conducted under the auspices of the GATT Working Party.  Following the formation of the WTO on January 1, 1995, a successor WTO Working Party, composed of all interested WTO members, took over the negotiations.

Like all WTO accession negotiations, the negotiations with China had three basic aspects.  First, China provided information to the Working Party regarding its trade regime.  China also updated this information periodically during the 15 years of negotiations to reflect changes in its trade regime.  Second, each interested WTO member negotiated bilaterally with China regarding market access concessions and commitments in the goods and services areas, including, for example, the tariffs that would apply on industrial and agricultural goods and the commitments that China would make to open up its market to foreign services suppliers.  The most trade liberalizing of the concessions and commitments obtained through these bilateral negotiations were consolidated into China's Goods and Services Schedules and apply to all WTO members.  Third, overlapping in time with these bilateral negotiations, China engaged in multilateral negotiations with Working Party members on the rules that would govern trade with China.  Throughout these multilateral negotiations, U.S. leadership in working with China was critical to removing obstacles to China's WTO accession and achieving a consensus on appropriate rules commitments.  These commitments are set forth in China's Protocol of Accession and an accompanying Report of the Working Party.

WTO members formally approved an agreement on the terms of accession for China on November 10, 2001, at the WTO's Fourth Ministerial Conference, held in Doha, Qatar.  One day later, China signed the agreement and deposited its instrument of ratification with the Director-General of the WTO.  China became the 143rd member of the WTO on December 11, 2001.

China's Protocol of Accession, accompanying Working Party Report and Goods and Services Schedules are available on the WTO's website (www.wto.org).

### Overview of China's WTO Commitments

In order to accede to the WTO, China had to agree to take concrete steps to remove trade barriers and open its markets to foreign companies and their exports from the first day of accession in virtually every product sector and for a wide range of services.  Supporting these steps, China also agreed to undertake important changes to its legal framework, designed to add transparency and predictability to business dealings.

*Page 12*

Like all acceding WTO members, China also agreed to assume the obligations of more than 20 existing multilateral WTO agreements, covering all areas of trade.   Areas of principal concern to the United States and China's other trading partners, as evidenced by the accession negotiations, included the core principles of the WTO, including most-favored nation treatment, national treatment, transparency and the availability of independent review of administrative decisions. Other key concerns could be found in the areas of agriculture, sanitary and phytosanitary measures, technical barriers to trade, trade-related investment measures, customs valuation, rules of origin, import licensing, antidumping, subsidies and countervailing measures, trade-related aspects of intellectual property rights and services.   For some of its obligations in these areas, China was allowed minimal transition periods, where it was considered necessary.

Even though the terms of China's accession agreement are directed at the opening of China's market to WTO members, China's accession agreement also includes several mechanisms designed to prevent or remedy injury that U.S. or other WTO members' industries and workers might experience based on import surges or unfair trade practices.   These include a unique, China-specific safeguard provision allowing a WTO member to restrain increasing Chinese imports that disrupt its market (available for 12 years, running from the date of China's WTO accession), a special textile safeguard (available for 7 years) and the continued ability to utilize a special non-market economy methodology for measuring dumping in anti-dumping cases against Chinese companies (available for 15 years).   The Administration is committed to maintaining the effectiveness of these mechanisms for the benefit of affected U.S. businesses, workers and farmers.

With China's consent, the WTO also created a special multilateral mechanism for reviewing China's compliance on an annual basis.   Known as the Transitional Review Mechanism, this mechanism operates annually for 8 years after China's accession, with a final review by year 10.

Case 13-4791, Document 160, 07/28/2014, 1280897, Page88 of 315

Case 1:06-md-01738-BMC-JO   Document 691-17   Filed 04/11/13   Page 20 of 110 PageID #:
21005

## STATUS OF CHINA'S WTO COMPLIANCE EFFORTS

**Trading Rights and Distribution Services**

Within the context of China's WTO commitments, the concept of "trading rights" includes two elements, i.e., the right to import goods (into China) and the right to export goods (from China). It does not include the right to sell goods within China, as that right is governed by separate commitments principally relating to "distribution services" set forth in China's Services Schedule (see the Distribution Services section below).  In the global business world, trading rights and distribution services are fundamentally interrelated, and often an enterprise will need both of them to carry out its business plan.

China's commitments on trading rights and distribution services are critically important.  They offer the potential to enormously expand the scope of business opportunities available to a wide range of U.S. and other foreign industries doing business, or seeking to do business, in China. These commitments were scheduled to be fully phased in (subject to a few product exceptions) by December 11, 2004, when existing restrictions on companies already invested in China were to be removed, and U.S. companies were to be fully able to import and sell goods in China or export goods from China.  It is envisioned that these changes will enhance the efficiency with which a wide range of U.S. companies can distribute and provide related logistics services for imported or domestically produced goods in China, while also enabling U.S. companies to integrate their China operations more easily with their global networks.

Overall, China remains in basic compliance with its trading rights commitments, although one significant problem area involves the importation of foreign publications such as books, periodicals and audio and video products, which China still reserves for state trading. Meanwhile, China has made substantial progress in implementing its distribution services commitments, although some technical challenges remain, and the distribution of some products, like foreign publications, remains restricted.  In addition, the area of direct selling, or sales away from a fixed location, remains problematic.

*Trading Rights*

In the trading rights area, until shortly before its WTO accession, China severely restricted the number and types of enterprises that could import or export, and it also restricted the products that a particular enterprise could import or export.  For the most part, China confined trading rights to certain state-owned manufacturing and trading enterprises, which could import or export goods falling within their approved scopes of business.  China also granted trading rights to certain foreign-invested enterprises, allowing them to import inputs for their production purposes and export their finished products.

In its accession agreement, responding to concerns raised by members of the WTO working party on China's accession, China committed to substantial liberalization in the area of trading rights. China agreed to eliminate its system of examination and approval of trading rights and make full

*Page 14*

trading rights automatically available for all Chinese enterprises, Chinese-foreign joint ventures, wholly foreign-owned enterprises and foreign individuals, including sole proprietorships, within three years of its accession, or by December 11, 2004, the same deadline for China to eliminate most restrictions in the area of distribution services.  The only exceptions applied to products listed in an annex to China's accession agreement, such as grains, cotton and tobacco, for which China reserved the right to engage in state trading.  China also agreed to take a number of liberalization steps during the years prior to its adoption of an automatic trading rights system, including trading rights for Chinese enterprises immediately upon China's accession, followed by trading rights for joint ventures with minority foreign ownership within one year after China's accession and trading rights for joint ventures with majority foreign ownership within two years after China's accession.

As previously reported, during the phase-in period, China timely implemented its commitments relating to Chinese enterprises, but fell behind in implementing the commitments for joint ventures with minority foreign ownership (scheduled for implementation by December 11, 2002) and joint ventures with majority foreign ownership (scheduled for implementation by December 11, 2003).  It was not until April 2004, after the United States had made trading rights one of its priority issues during the run-up to the April 2004 JCCT meeting, that China finally began to take steps to implement its commitments more fully.  Shortly before that meeting, the National People's Congress issued a revised *Foreign Trade Law*.  It provided for trading rights to be automatically available through a registration process for all domestic and foreign entities and individuals, effective July 1, 2004, almost six months ahead of the scheduled full liberalization required by China's accession agreement.  In June 2004, MOFCOM issued implementing rules setting out the procedures for registering as a foreign trade operator in time for the new registration process to be operational on the July 1 effective date.

In 2006, as in 2005, U.S. companies continued to report few problems with the new trading rights registration process.  For many U.S. companies, however, having trading rights – and, in particular, the right to import – is only meaningful when coupled with the right to distribute goods within China, an area in which China's implementation progress had been slower until MOFCOM began allowing provincial-level authorities to grant distribution licenses earlier this year.

However, China has not yet implemented its trading rights commitments insofar as they relate to the importation of books, newspapers, periodicals, electronic publications and audio and video products.  Under the terms of China's accession agreement, China's trading rights commitments apply fully to these products, as they are not among the products for which China reserved the right to engage in state trading.  As a result, trading rights for these products should have been automatically available to all Chinese enterprises, Chinese-foreign joint ventures, wholly foreign-owned enterprises and foreign individuals as of December 11, 2004.  Nevertheless, China continues to wholly reserve the right to import books, newspapers, periodicals, electronic publications and audio and video products to state trading enterprises, as reflected in the *Procedures for the Examination and Approval of Establishment of Publication Importation Entities*, issued by the General Administration of  Press and Publication (GAPP) in December

2005, the *Several Opinions on Canvassing Foreign Investment into the Cultural Sector*, issued by the State Council in April 2005, the *Catalogue for the Guidance of Foreign Investment* Industries, issued by the National Development and Reform Commission (NDRC) in November 2004, and the *Administrative Regulations on Publishing*, issued by the State Council in December 2001.

In 2005, U.S. publishers began to express concern about China's failure to implement its commitment to allow foreign enterprises to import books, newspapers and periodicals. The United States raised this matter in bilateral meetings with China and at the WTO during the transitional reviews before the Committee on Market Access in October 2005 and before the Council for Trade in Goods in November 2005.

In 2006, U.S. producers and distributors of electronic publications and audio and video products began to express concern about having to continue to use Chinese middlemen to import (and distribute) their products well after China should have implemented its trading rights (and distribution services) commitments. Beginning in May 2006, the United States used a series of high-level and technical-level bilateral meetings in Beijing to raise the profile of its concerns, addressing not only books, newspapers and periodicals, but also electronic publications and audio and video products. The United States also raised its concerns at the WTO, both during China's April 2006 Trade Policy Review and during the transitional reviews before the Committee on Market Access and the Council for Trade in Goods, held in October and November 2006.

To date, China has maintained that it can continue to preclude foreign enterprises from importing books, newspapers, periodicals, electronic publications and audio and video products (and continue to impose various restrictions on foreign enterprises' distribution of these products within China) based on the general exception for the protection of the public morals in Article XX of GATT 1994, despite the fact that these restrictions are not necessary to achieve China's underlying objectives of monitoring and censoring the contents of these products. The United States will continue to press China on these issues and will take further appropriate actions seeking elimination of China's restrictions in 2007.

*Distribution Services*

Prior to its WTO accession, China generally did not permit foreign enterprises to distribute products in China, i.e., to provide wholesaling, commission agents', retailing or franchising services or to provide related services, such as repair and maintenance services. These services were largely reserved to Chinese enterprises, although some foreign-invested enterprises were allowed to engage in distribution services within China under certain circumstances. For example, joint ventures had the right to supply wholesaling and retailing services for the goods they manufacture in China since the issuance of the *Regulations for the Implementation of the Law on Chinese-Foreign Equity Joint Ventures* by MOFCOM's predecessor, the Ministry of Foreign Trade and Economic Cooperation (MOFTEC), in December 1987. Similarly, wholly

**A-1576**

*Page 16*

foreign-owned enterprises had this same right under the *Detailed Rules for the Implementation of the Law on Wholly Foreign-Owned Enterprises*, issued by MOFTEC in April 2001.

In its accession agreement, China committed to eliminate national treatment and market access restrictions on foreign enterprises providing these services through a local presence within three years of China's accession (or by December 11, 2004), subject to limited product exceptions. In the meantime, China agreed to progressively liberalize its treatment of wholesaling services, commission agents' services and direct retailing services (except for sales away from a fixed location), as described below.

Overall, China has made substantial progress in implementing its distribution services commitments. While delays in implementation and confusion over eligibility characterized much of 2005, these problems largely disappeared in 2006 after China's Ministry of Commerce (MOFCOM) began allowing provincial-level authorities to grant distribution licenses, although some technical challenges remain, and the distribution of some products, like foreign publications, remains restricted. In addition, the area of direct selling, or sales away from a fixed location, remains problematic, with limited progress achieved since the issuance of implementing rules in August 2005.

In 2007, the United States will continue to closely monitor how MOFCOM and relevant provincial and municipal authorities exercise their licensing approval authority, particularly in the area of direct selling. The United States will work to ensure that the approval systems operate expeditiously, in a non-discriminatory manner and without creating any new trade barriers.

The United States will also continue to work closely with U.S. companies as they seek to provide the range of distribution services in China. Inevitably, U.S. and other foreign companies will face challenges, particularly with regard to the creation of nationwide distribution networks in China. Currently, distribution networks remain highly fragmented in China, as there are no Chinese distribution companies with nationwide networks and no Chinese distribution company holds a market share greater than two percent, due largely to infrastructure limitations and restrictive provincial and local requirements. Nevertheless, the central government has a strong interest in addressing these impediments and developing nationwide distribution networks, which will foster economic and employment growth and help revitalize rural areas in China.

In addition, the United States will continue to monitor how MOFCOM and relevant provincial and local authorities apply a provision in the April 2004 distribution services regulations requiring wholesaling and retailing enterprises to comply with municipal commercial development rules and will work to ensure that any requirements are applied on a national treatment basis. This provision, which does not appear to apply to domestic enterprises, would seem to reinforce the *Notice on Strengthening the Planning Work for Urban Commercial Networks*, issued by MOFTEC in January 2003. That notice had stipulated that cities without approved commercial development plans could not apply to the central government authorities for approval of foreign-invested projects in the distribution services sector. The United States

*Page 17*

has also begun to monitor a troubling proposal made by MOFCOM with regard to retail distribution in August 2006.  If adopted, this proposal could make it easier for cities to reject applications for approval of new retail outlets on the ground that it would "disrupt" existing local commerce.

The United States will also work closely with U.S. industry in 2007 in evaluating and addressing recently issued regulations intended by China to implement its commitments to open up its wholesale distribution market for crude oil and processed oil by December 11, 2006.  These regulations appear to create high thresholds and other potential impediments to market entry for foreign enterprises.

<u>Wholesaling Services and Commission Agents' Services</u>

China committed that, immediately upon accession, it would permit Chinese-foreign joint ventures and wholly foreign-owned enterprises to distribute at the wholesale level within China any goods that they make in China, without any market access or national treatment limitations. Within one year after accession (or by December 11, 2002), China agreed to permit foreign service suppliers to supply wholesaling services and commission agents' services within China for almost all goods, whether made in China or imported, through joint ventures with minority foreign ownership.  Excepted goods included salt, tobacco, chemical fertilizers, processed oil and crude oil as well as books, newspapers, magazines, pharmaceutical products, pesticides and mulching films.  Within two years after accession (or by December 11, 2003), China agreed to permit foreign service suppliers to supply wholesaling services and commission agents' services within China through majority foreign-owned joint ventures, subject to the same exceptions. Within three years after accession (or by December 11, 2004), China agreed to permit foreign service suppliers to supply wholesaling services and commission agents' services within China through wholly foreign-owned enterprises.  In addition, by this time, the exceptions for books, newspapers, magazines, pharmaceutical products, pesticides and mulching films were to be eliminated.  The exceptions for chemical fertilizers, processed oil and crude oil (but not salt and tobacco) are to be eliminated within five years after accession (or by December 11, 2006).

As previously reported, China fell behind in implementing its commitments regarding wholesaling services and commission agents' services insofar as they related to joint ventures with minority foreign ownership (scheduled for implementation by December 11, 2002) and joint ventures with majority foreign ownership (scheduled for implementation by December 11, 2003).  It was not until April 2004, after the United States had made distribution services – including wholesale services – one of its priority issues during the run-up to the April 2004 JCCT meeting, that China finally began to take steps to implement its commitments more fully. Shortly before that meeting, MOFCOM issued the *Measures on the Management of Foreign Investment in the Commercial Sector*, superseding the *Procedures for Pilot Projects for Commercial Enterprises with Foreign Investment*, which had been in force since June 1999. These regulations belatedly lifted market access and national treatment restrictions on joint ventures engaging in wholesale services effective June 2004.  The regulations also extended this liberalization to wholly foreign-owned enterprises and removed product exceptions for books,

*Page 18*

newspapers, magazines, pharmaceutical products, pesticides and mulching films (but not for
chemical fertilizers, processed oil, crude oil, salt and tobacco) as of the scheduled phase-in date
of December 11, 2004.  The regulations required enterprises to obtain central or provincial-level
MOFCOM approval before providing these services.  In addition, they appeared to set relatively
low qualifying requirements, as enterprises needed only to satisfy the relatively modest capital
requirements of the *Company Law* rather than the high capital requirements found in many other
services sectors.

While these regulations were welcome, MOFCOM was very slow to implement them.  Initially,
MOFCOM did not issue any guidance regarding how its approval system would operate, and the
application process remained opaque.  In most instances, the application process turned into a
protracted negotiation, as the central and local approving authorities were still in the process of
determining the appropriate procedures and documentation requirements.  When approvals were
issued, moreover, the central and local approving authorities imposed a variety of restrictions,
such as limits on the scope of products that could be distributed and limits on the specific
services that could be supplied.  Registered capital requirements also varied, as MOFCOM
regularly demanded that U.S. and other foreign retailers satisfy registered capital requirements
ranging from $1 million to more than $2 million, far in excess of the minimum registered capital
requirement of RMB 300,000 ($37,500) found in the *Company Law*.

Meanwhile, a separate set of problems plagued existing enterprises seeking to expand their
business scope to include wholesale distribution.  The Chinese authorities rarely issued licensing
approvals for these enterprises, in part because the Chinese authorities were sorting our historical
tax treatment and Free Trade Zone (FTZ) issues.  The Chinese authorities did issue some
approvals for the establishment of new wholesale distribution enterprises, but this route did not
make business sense for many enterprises already established in China.

By June 2005, the Chinese authorities had begun to make progress in resolving many of the
problems that had plagued the application and approval process, including how it would handle
the tax and FTZ issues that had stalled many enterprises' applications.  During the run-up to the
July 2005 JCCT meeting, as the United States made full implementation of China's wholesale
(and retail) distribution services commitments an issue of high priority, the Chinese authorities
reduced much of the backlog of distribution license applications.  In addition, in July 2005,
MOFCOM and the General Administration of Customs (Customs Administration) issued the
*Circular on Issues Concerning the Trade Administration of Bonded Zones and Bonded Logistics
Parks*, which clarified the handling of applications from enterprises located in FTZs.  At the July
2005 JCCT meeting, China committed to improve the transparency of the application and
approval process.  Consistent with this commitment, in September 2005, MOFCOM issued the
*Application and Approval Guidelines for Foreign Investments*, which clarified many aspects of
the application and approval process.  Some improvements subsequently took place in the
application and approval process, but it was not until MOFCOM issued the *Notice on Entrusting
National Economic and Technological Development Zones with the Authority to Approve
Foreign-Funded Distribution Firms and International Forwarding Agents* in February 2006 that
the problems with the application and approval process largely disappeared.  With the issuance

Case 13-4791, Document 160, 07/28/2014, 1280897, Page94 of 315

Case 1:06-md-01738-BMC-JO   Document 691-17   Filed 04/11/13   Page 26 of 110 PageID #: 21011

of that measure, MOFCOM devolved the right to grant distribution licenses from the central authorities to provincial-level authorities, making the application and approval process more efficient and less time-consuming, although some technical challenges remain with regard to, for example, manufacturing enterprises seeking to expand the scope of their business to include distribution activities.

These developments have enabled U.S. companies to improve the efficiency of their China supply chain management, and as a result many of them are restructuring their legal entities to integrate their China operations into their global business more fully and efficiently. At the same time, U.S. companies in some industries continue to have concerns with regard to product and services restrictions that China has yet to remove.

U.S. industry remains seriously concerned about continuing restrictions on the rights of foreign enterprises to engage in wholesale (and retail) distribution of books, newspapers, periodicals, electronic publications and audio and video products. Some measures, such as the April 2004 distribution services regulations, purport to allow foreign enterprises to engage in wholesale (and retail) distribution of these products. However, a host of other measures appear to impose market access or national treatment limitations, such as the State Council's April 2005 *Several Opinions on Canvassing Foreign Investment into the Cultural Sector*, NDRC's November 2004 *Catalogue for the Guidance of Foreign Investment* Industries, the *Provisions on the Administration of the Publication Market*, issued by GAPP in June 2004, the *Rule on Management of Foreign-Invested Book, Magazine and Newspaper Distribution Enterprises*, issued by GAPP and MOFTEC in March 2003, and the *Administrative Regulations on Electronic Publications*, issued by GAPP in December 1997. Under these measures, for some of the products at issue, distribution is limited to Chinese state-owned enterprises. For others, only Chinese-foreign joint ventures with minority foreign ownership are permitted to engage in distribution or foreign enterprises face restrictive requirements not imposed on domestic enterprises.

Working with U.S. industry, the United States first sought to clarify the rights of foreign enterprises with regard to books, newspapers and periodicals through bilateral discussions with China in 2005 and in connection with the transitional reviews before the Council for Trade in Services in September 2005 and the Council for Trade in Goods in November 2005. The United States expanded and intensified its engagement beginning in May 2006, using a series of high-level and technical-level bilateral meetings in Beijing to raise the profile of its concerns, addressing the restrictions on not only books, newspapers and periodicals, but also electronic publications and audio and video products. The United States also raised its concerns at the WTO, both during China's April 2006 Trade Policy Review and during the transitional review before the Council for Trade in Services, held in November 2006.

To date, as in the area of trading rights, China has maintained that it can continue to impose restrictions on foreign enterprises' distribution of books, newspapers, periodicals, electronic publications and audio and video products within China based on the general exception for the protection of the public morals in Article XX of GATT 1994, despite the fact that these

*Page 20*

restrictions are not necessary to achieve China's underlying objectives of monitoring and censoring the contents of these products. The United States is continuing to press China on these issues and will take further actions seeking elimination of China's restrictions, including the initiation of WTO dispute settlement if appropriate.

China began to implement several measures governing the distribution of automobiles by foreign enterprises in 2005, including the *Implementing Rules for the Administration of Brand-Specific Automobile Dealerships,* jointly issued by MOFCOM, the NDRC and the State Administration for Industry and Commerce (SAIC) in February 2005. In November 2005 the NDRC followed up with the *Rules for Auto External Marks,* and in January 2006 MOFCOM issued the *Implementing Rules for the Evaluation of Eligibility of Auto General Distributors and Brand-specific Dealers.* While U.S. industry have generally welcomed these measures, they do contain some restrictions on foreign enterprises that may not be applied to domestic enterprises. As in 2006, the United States will closely monitor how China applies these measures in 2007 in an effort to ensure that foreign enterprises are not adversely affected by these restrictions.

China delayed the implementation of its wholesale distribution services commitments with regard to pharmaceuticals, despite the fact that the exception for pharmaceuticals contained in China's accession agreement expired as of December 11, 2004. Although the April 2004 regulations indicated that separate regulations would be issued for the pharmaceuticals sector, China did not issue any further regulations and continued to require foreign pharmaceutical companies to sell their finished products through Chinese wholesalers (after hiring Chinese importers to bring their finished products into the country) through the remainder of 2004 and the first half of 2005. China decided in the last half of 2005 to begin allowing the acceptance of applications from foreign pharmaceutical companies for wholesale distribution licenses under the April 2004 regulations and the State Food and Drug Administration's *Rules on the Management of Drug Business Licenses.* Since then, U.S. and other foreign pharmaceutical companies have been able to obtain wholesale distribution licenses, although it appears that some provincial-level authorities have not yet begun issuing these licenses because of uncertainty generated by the provision in the April 2004 regulations indicating that MOFCOM would be issuing separate regulations covering pharmaceuticals. At the same time, despite overall progress in this area, many other restrictions affecting the pharmaceuticals sector make it difficult for foreign pharmaceutical companies to realize the full benefits of China's wholesale distribution commitments. The United States is continuing to engage the Chinese regulatory authorities in these areas as part of an effort to promote comprehensive reform of China's healthcare system and to reduce the unnecessary – and, in some cases, apparently WTO-inconsistent – trade barriers that they face.

U.S. industry remains concerned about the uncertainty created by the provision in the April 2004 regulations that allows the local approving authorities to withhold wholesale (and retail) distribution license approvals when, as is the case in most cities, urban commercial network plans have not yet been formulated. This provision could operate as a *de facto* restriction on the operations of foreign wholesalers (and retailers). The United States will continue to monitor developments in this area closely in 2007.

Meanwhile, U.S. industry has become concerned about China's implementation of significant market-opening commitments, scheduled for December 11, 2006, designed to permit foreign enterprises to engage in wholesale distribution of crude oil and processed oil, e.g., gasoline. China's full implementation of these commitments would allow U.S. industry to begin to take advantage of China's earlier, partial opening of the retail distribution sector to foreign enterprises (discussed below in the Retailing Services section). However, in early December 2006, China issued regulations – without providing an opportunity for prior public comment – imposing high thresholds and other potential impediments on foreign enterprises seeking to enter the wholesale distribution sector, such as requirements relating to levels of storage capacity, pipelines, rail lines, docks and supply contracts. Based on reports that it received regarding earlier, selectively circulated drafts, the United States had pressed for the issuance of a draft for public comment and had highlighted the importance of full implementation of these commitments in bilateral meetings with China earlier this year and during the transitional review before the Council for Trade in Services, held in November 2006. In close consultation with U.S. industry, the United States will carefully assess the recently issued regulations and will continue to engage China in 2007 in an effort to ensure that U.S. industry realizes the full benefits of China's commitments in this sector.

Retailing Services

In addition to committing to permit Chinese-foreign joint ventures and wholly foreign-owned enterprises to distribute at the retail level within China any goods that they make in China without any market access or national treatment limitations, effective immediately upon China's WTO accession, China agreed to permit foreign service suppliers to supply retailing services for almost all goods, whether made in China or imported, through joint ventures with minority foreign ownership, subject to geographic restrictions (allowing China to limit market access to five Special Economic Zones and eight cities) and quantitative restrictions (allowing China to limit the number of joint ventures that could operate in six of the eight cities). Excepted goods include tobacco, chemical fertilizers, processed oil, pharmaceutical products, pesticides, mulching films, books, newspapers and magazines. The exceptions for the retailing of books, newspapers and magazines were to have been removed within one year after accession (or by December 11, 2002). Within two years after accession (or by December 11, 2003), China agreed to permit foreign service suppliers to supply retailing services through majority foreign-owned joint ventures, subject to the product exceptions set forth above. China also reserved the right to continue to impose the geographic and quantitative restrictions set forth above, although the geographic restrictions were to be eased, with market access being extended to all provincial capitals and two other cities. Within three years after accession (or by December 11, 2004), China agreed to permit foreign service suppliers to supply retailing services through wholly foreign-owned enterprises. In addition, by this time, all geographic and quantitative restrictions were to be eliminated, and the exceptions for pharmaceutical products, pesticides, mulching films and processed oil were also to be eliminated. The exceptions for chemical fertilizers (but not tobacco) are to be eliminated within five years after accession (or by December 11, 2006).

*Page 22*

As previously reported, China fell behind in implementing its retailing services commitments for joint ventures with minority foreign ownership (scheduled for implementation upon China's accession) and joint ventures with majority foreign ownership (scheduled for implementation by December 11, 2003). In April 2004, following repeated bilateral and multilateral U.S. engagement (as described above in the Wholesaling Services and Commission Agents' Services section), MOFCOM issued the *Measures on the Management of Foreign Investment in the Commercial Sector*, which superseded the June 1999 *Procedures for Pilot Projects for Commercial Enterprises with Foreign Investment*. These regulations belatedly lifted market access and national treatment restrictions on joint ventures engaging in retail services effective June 1, 2004, except for allowed geographic and quantitative restrictions and product exceptions for pharmaceuticals, pesticides, mulching films and processed oil. The regulations also extended this liberalization to wholly foreign-owned enterprises and removed all remaining geographic and quantitative restrictions as of the scheduled phase-in date of December 11, 2004. As in the wholesale area, the regulations require enterprises to obtain central or provincial-level MOFCOM approval before providing these services, and they appear to set relatively low qualifying requirements, including relatively modest capital requirements, although in practice foreign (but not domestic) retailers reportedly must meet higher capital requirements.

Many of the same problems that plagued the application and approval process in the wholesale area in 2005 also arose in the area of retailing services, and the United States repeatedly pressed China to accelerate and improve the implementation of its commitments, just as it did in the wholesale area. The changes that took place in the application and approval process in the run-up to and after the July 2005 JCCT meeting helped, but it was MOFCOM's issuance of the *Notice on Entrusting National Economic and Technological Development Zones with the Authority to Approve Foreign-Funded Distribution Firms and International Forwarding Agents* in February 2006 that helped resolve many of the problems with the application and approval process.

Nevertheless, U.S. industry continues to have concerns, particularly with regard to the provision in the April 2004 regulations allowing the approving authorities to withhold retail distribution license approvals when, as is the case in many cities, urban commercial network plans have not yet been formulated. It appears that China may be applying this provision in a discriminatory manner. In April 2006, MOFCOM issued a notice explaining that foreign-invested enterprises would not be granted approvals for projects in cities that had not yet finalized their urban commercial network plans, while it appears that domestic enterprises continue to receive approvals for their projects. The United States is seeking clarification on this issue and will continue to monitor developments in this area closely in 2007 in an effort to ensure that China fully implements its commitments.

Meanwhile, it continues to appear that China is not fully implementing its commitment to allow foreign enterprises to sell processed oil, e.g., gasoline, at the retail level. As explained above, China's retail services commitments initially did not apply to processed oil, as it was one of the excepted goods under China's Services Schedule. However, that exception expired on December 11, 2004, and by that time China committed to permit wholly foreign-owned enterprises to

operate gas stations.  Instead, China insists that gas stations fall under the chain store provision in its Services Schedule, which permits only joint ventures with minority foreign ownership for "those chain stores which sell products of different types and brands from multiple suppliers with more than 30 outlets."  The ability of foreign enterprises to engage in retail distribution of processed oil will become particularly important once China fully implements its commitments to permit foreign enterprises to engage in wholesale distribution of crude oil and processed oil, required by December 11, 2006.  The United States is working with U.S. industry to assess China's recently issued regulations on wholesale distribution of crude oil and processed oil and will engage the Chinese government in 2007 in an effort to ensure that U.S. industry realizes the full benefits to which it is entitled in this sector.

Franchising Services

As part of its distribution services commitments, China committed to permit the cross-border supply of franchising services immediately upon its accession to the WTO.  It also committed to permit foreign enterprises to provide franchising services in China, without any market access or national treatment limitations, by December 11, 2004.

In December 2004, as previously reported, MOFCOM issued new rules governing the supply of franchising services in China, the *Measures for the Administration of Commercial Franchises*, effective February 2005.  These rules raised a number of concerns.  Of particular concern is a requirement that a franchiser own and operate at least two units in China for one year before being eligible to offer franchises in China.  The business models of many U.S. franchising companies, including some large hotel chains, are adversely affected by this requirement because they do not own and operate units, instead relying exclusively on franchisees to distribute goods and services.  The rules also impose high capital requirements and require broad and vague information disclosure by franchisers, with uncertain liability if these disclosure requirements are not met.

Together with U.S. industry, the United States expressed strong concern about these rules and urged China to reconsider them.  The United States understands that the Legislative Affairs Office of the State Council and MOFCOM are now working on revisions to the rules.  The United States will monitor developments in this area closely in 2007.

Sales away from a fixed location

China first permitted direct selling in 1990, and numerous domestic and foreign enterprises soon began to engage in this business.  In the ensuing years, however, serious economic and social problems arose, as so-called "pyramid schemes" and other fraudulent or harmful practices proliferated.  China outlawed direct selling in 1998, although some direct selling companies were permitted to continue operating in China after altering their business models.

*Page 24*

In its WTO accession agreement, China committed to lift market access and national treatment restrictions in the area of sales away from a fixed location, or direct selling, by December 11, 2004.  China did not agree to any liberalization before that date.

As early as 2002, MOFCOM and SAIC began drafting regulations to implement China's direct selling commitment.  Despite U.S. requests and the December 11, 2004 deadline for China to implement its direct selling commitment, the Chinese authorities did not make any drafts of these measures publicly available, instead only providing unofficial drafts to select direct selling enterprises.  The Chinese authorities subsequently issued final versions of these measures – the *Measures for the Administration of Direct Selling* and the *Regulations on the Administration of Anti-Pyramid Sales Scams* – in August 2005, nine months late.  In September 2006, after releasing a draft for public comment, MOFCOM issued the *Administrative Measures on the Establishment of Service Network Points for the Direct Sales Industry*, which clarified some aspects of the earlier measures.

The final versions of the August 2005 direct selling measures made some improvements to provisions apparently included in the earlier drafts, but they also contained several problematic provisions.  For example, one provision essentially outlaws multi-level marketing practices allowed in every country in which the U.S. industry operates – reportedly 170 countries in all – by refusing to allow direct selling enterprises to pay compensation based on team sales, where upstream personnel are compensated based on downstream sales.  The United States has pointed out that China could revise this provision to permit team-based compensation while still addressing its legitimate concerns about pyramid schemes.  Other problematic provisions include a three-year experience requirement that only applies to foreign enterprises, not domestic ones, a cap on single-level compensation, restrictions on the cross-border supply of direct selling services and high capital requirements that may limit smaller direct sellers' access to the market.  The new service center regulations also include vague requirements that could prove excessively burdensome for small and medium-sized direct sellers.

Working closely with U.S. industry, the United States immediately began urging the Chinese authorities to reconsider the problematic provisions in the direct selling measures, both bilaterally and during the transitional review before the Council for Trade in Services, held in September 2005.  After the direct selling measures went into effect in December 2005, moreover, many companies began to apply for direct selling licenses but were confused by the opaque license review process.  Despite MOFCOM's regulatory requirement that direct selling licenses be reviewed within ninety days, many foreign and domestic companies have waited for many months for MOFCOM and SAIC to review their license applications.  Accordingly, the United States urged China to address the slow pace and lack of transparency in the licensing process, along with the problematic restrictions in the direct selling measures, during the run-up to the April 2006 JCCT meeting.  In response, MOFCOM agreed to hold an informal dialogue with U.S. and other foreign industry representatives in the following months to better understand their concerns about the direct selling measures and to facilitate their efforts to navigate the application and approval process for obtaining licenses.  Since then, five U.S. companies had obtained licenses (as of early December 2006), and MOFCOM generally remained slow in

*Page 25*

processing a growing number of license applications from foreign and domestic companies.  The United States, meanwhile, has continued to urge China to revise its direct selling measures and to process direct selling applications in a timely and transparent manner in order to facilitate legitimate commerce and to comply with its WTO commitments, both in bilateral meetings and at the November 2006 transitional review before the Council for Trade in Services.  The United States will continue these efforts in 2007.

**Import Regulation**

*Tariffs*

Through its bilateral negotiations with interested WTO members leading up to its accession, China agreed to greatly increase market access for U.S. and other foreign companies by reducing tariff rates.  The agreed reductions are set forth as tariff "bindings" in China's Goods Schedule, meaning that while China cannot exceed the bound tariff rates, it can decide to apply them at a lower rate, as many members do when trying to attract particular imports.

As in prior years, China implemented its scheduled tariff reductions for 2006 on schedule.  These reductions, made on January 1 and July 1, involved principally motor vehicles and motor vehicle parts.

U.S. exports continued to benefit from China's participation in the Information Technology Agreement (ITA), which requires the elimination of tariffs on computers, semiconductors and other information technology products.  China began reducing and eliminating these tariffs in 2002 and continued to do so in the ensuing years, achieving the elimination of all ITA tariffs on January 1, 2005, as the tariffs dropped to zero from a pre-WTO accession average of 13.3 percent.  U.S. exports of ITA goods continued to perform well in 2006, as they were projected to exceed $6.8 billion by the end of the year, increasing by 68 percent from January through September 2006, when compared to the same time period in 2005.

China completed its timely implementation of another significant tariff initiative, the WTO's Chemical Tariff Harmonization Agreement, in 2005.  U.S. chemical exports covered by this agreement increased by eight percent from January through September 2006 and are on a pace to surpass the healthy total of $5.8 billion in 2005.

Overall, China's tariff changes have increased market access for U.S. exporters in a range of industries, as China continued the process of reducing tariffs on goods of greatest importance to U.S. industry from a base average of 25 percent (in 1997) to 7 percent over a period of five years, running from January 1, 2002, while it made similar reductions throughout the agricultural sector (see the Agriculture section below).   These tariff changes contributed to another significant increase in overall U.S. exports, which rose approximately 35 percent from January through September 2006, when compared to the same time period in 2005.

*Customs and Trade Administration*

*Page 26*

Like other acceding WTO members, China agreed to take on the WTO obligations that address the means by which customs and other trade administration officials check imports and establish and apply relevant trade regulations.  These agreements cover the areas of customs valuation, rules of origin and import licensing.

Customs Valuation

The WTO Agreement on the Implementation of GATT Article VII (Agreement on Customs Valuation) is designed to ensure that determinations of the customs value for the application of duty rates to imported goods are conducted in a neutral and uniform manner, precluding the use of arbitrary or fictitious customs values.  Adherence to the Agreement on Customs Valuation is important for U.S. exporters, particularly to ensure that market access opportunities provided through tariff reductions are not negated by unwarranted and unreasonable "uplifts" in the customs value of goods to which tariffs are applied.  China agreed to implement its obligations under the Agreement on Customs Valuation upon accession, without any transition period.  In addition, China's accession agreement reinforces China's obligation not to use minimum or reference prices as a means for determining customs value.  It also called on China to implement the *Decision on Valuation of Carrier Media Bearing Software for Data Processing Equipment* and the *Decision on Treatment of Interest Charges in Customs Value of Imported Goods* by December 11, 2003.

In January 2002, shortly after acceding to the WTO, China's Customs Administration issued the *Measures for Examining and Determining Customs Valuation of Imported Goods.*  These regulations addressed the inconsistencies that had existed between China's customs valuation methodologies and the Agreement on Customs Valuation. The Customs Administration subsequently issued the *Rules on the Determination of Customs Value of Royalties and License Fees Related to Imported Goods*, effective July 2003.  These rules were intended to clarify provisions of the January 2002 regulations that address the valuation of royalties and license fees.  In addition, by December 11, 2003, China had issued a measure on interest charges and a measure requiring duties on software to be assessed on the basis of the value of the underlying carrier medium, meaning, for example, the CD-ROM or floppy disk itself, rather than based on the imputed value of the content, which includes, for example, the data recorded on a CD-ROM or floppy disk.

More than three years later, China has still not uniformly implemented these various measures.  U.S. exporters continue to report that they are encountering valuation problems at many ports.  According to U.S. exporters, even though the 2002 regulations and 2003 implementing rules provide that imported goods normally should be valued on the basis of their transaction price, meaning the price the importer actually paid, many Chinese customs officials are still improperly using "reference pricing," which usually results in a higher dutiable value.  For example, imports of wood products are often subjected to reference pricing.  In addition, some of China's customs officials are reportedly not applying the provisions in the 2002 regulations and 2003 implementing rules as they relate to software royalties and license fees.  Following their pre-WTO accession practice, these officials are still automatically adding royalties and license fees to

*Page 27*

the dutiable value (for example, when an imported personal computer includes pre-installed software), even though China's 2003 implementing rules expressly direct them to add those fees only if they are import-related and a condition of sale for the goods being valued.

U.S. exporters have also continued to express concerns about the Customs Administration's handling of imports of digital media that contain instructions for the subsequent production of multiple copies of products such as DVDs. The Customs Administration has been inappropriately assessing duties based on the estimated value of the yet-to-be-produced copies.

More generally, U.S. exporters continue to be concerned about inefficient and inconsistent customs clearance procedures in China. These procedures vary from port to port, massive delays are not uncommon, and the fees charged appear to be excessive and are rising rapidly, giving rise to concerns about China's compliance with its obligations under Article VIII of GATT 1994.

When the United States first presented its concerns about the customs valuation problems being encountered by U.S. companies, China indicated that it was working to establish more uniformity in its adherence to WTO customs valuation rules. Since then, the United States has sought to assist in this effort in part by conducting technical assistance programs for Chinese government officials on WTO compliance in the customs area. In addition, in 2006, as in prior years, the United States raised its concerns about particular customs valuation problems during the transitional review before the WTO's Committee on Customs Valuation.

Rules of Origin

Upon its accession to the WTO, China became subject to the WTO Agreement on Rules of Origin, which sets forth rules designed to increase transparency, predictability and consistency in both the establishment and application of rules of origin, which are necessary for import and export purposes, such as determining the applicability of import quotas, determining entitlement to preferential or duty-free treatment and imposing antidumping or countervailing duties or safeguard measures, and for the purpose of confirming that marking requirements have been met. The Agreement on Rules of Origin also provides for a work program leading to the multilateral harmonization of rules of origin. This work program is ongoing, and China specifically agreed to adopt the internationally harmonized rules of origin once they were completed. China also confirmed that it would apply rules of origin equally for all purposes and that it would not use rules of origin as an instrument to pursue trade objectives either directly or indirectly.

In March 2001, shortly after China's accession to the WTO, the State Administration of Quality Supervision and Inspection and Quarantine (AQSIQ) issued regulations and implementing rules intended to bring the rules of origin used by China to check marking requirements into compliance with the Agreement on Rules of Origin. U.S. exporters have not raised concerns with China's implementation of these regulations.

Almost three years after China's WTO accession, in September 2004, China finally issued the *Regulations of the Place of Origin for Imported and Exported Goods*, the important regulations

**A-1588**

*Page 28*

intended to bring China's rules of origin into conformity with WTO rules for import and export purposes. These regulations supersede the *Interim Provisions on the Place of Origin for Imported Goods*, issued by the Customs Administration in 1986, and the *Rules on the Place of Origin for Exported Goods*, issued by the State Council in 1992. The Customs Administration subsequently issued implementing rules addressing the issue of substantial transformation – the *Rules on Substantial Transformation Criteria Under the Non-Preferential Rules of Origin* – in December 2004.

Import Licensing

The Agreement on Import Licensing Procedures (Import Licensing Agreement) establishes rules for WTO members, like China, that use import licensing systems to regulate their trade. Its aim is to ensure that the procedures used by members in operating their import licensing systems do not, in themselves, form barriers to trade. The objective of the Import Licensing Agreement is to increase transparency and predictability and to create disciplines to protect the importer against unreasonable requirements or delays associated with the licensing regime. The Import Licensing Agreement covers both "automatic" licensing systems, which are intended only to monitor imports, not regulate them, and "non-automatic" licensing systems, which are normally used to administer tariff-rate quotas or import restrictions such as quotas or to administer safety or other requirements, e.g., for hazardous goods, armaments or antiquities. While the Import Licensing Agreement's provisions do not directly address the WTO consistency of the underlying measures that licensing systems regulate, they do establish the baseline of what constitutes a fair and non-discriminatory application of import licensing procedures. In addition, China specifically committed not to condition the issuance of import licenses on performance requirements of any kind, such as local content, export performance, offsets, technology transfer or research and development, or on whether competing domestic suppliers exist.

Shortly after China acceded to the WTO, MOFTEC issued regulations revising China's automatic import licensing regime, and it later supplemented these regulations with implementing rules. MOFTEC also issued regulations revising China's non-automatic licensing regime. Following their issuance, the United States raised various concerns with MOFCOM regarding the regulations on automatic and non-automatic licensing in an effort to promote clarity and to ensure that the licensing procedures do not have trade-distorting or restrictive effects. Together with other WTO members, including the EC and Japan, the United States also presented detailed comments on various aspects of these regulations at meetings of the WTO's Import Licensing Committee, including the transitional reviews, in 2002, 2003 and 2004.

In May 2005, after Chinese steel producers negotiated contracts with major foreign iron ore suppliers, the Chinese government began imposing new import licensing procedures for iron ore without prior WTO notification. Even though the WTO's Import Licensing Agreement calls for import licensing procedures that do not have a restrictive effect on trade, China reportedly restricted licenses to 48 traders and 70 steel producers and did not make public a list of the qualified enterprises or the qualifying criteria used. The United States and Australia sought to clarify the operation of the import licensing procedures applicable to iron ore during the

Case 13-4791, Document 160, 07/28/2014, 1280897, Page104 of 315

Case 1:06-md-01738-BMC-JO   Document 691-17   Filed 04/11/13   Page 36 of 110 PageID #: 21021

transitional reviews before the Committee on Import Licensing in October 2005 and the Council for Trade in Goods in November 2005.  While China maintained that the Chinese government did not impose any qualifying criteria, it did acknowledge that two organizations affiliated with the Chinese government, the China Steel Industry Association and the Commercial Chamber for Metals, Minerals and Chemicals Importers and Exporters, had been discussing a set of rules regarding qualifying criteria such as production capacity and trade performance.

In 2006, the United States continued to monitor this situation, which could set a troubling precedent for the handling of imports of other raw materials.  Because China seemed determined to restrict the availability of import licenses, the United States raised its concerns with China bilaterally in October 2006 during a meeting of the U.S.-China Steel Dialogue (Steel Dialogue), created earlier in the year under the auspices of the JCCT.  The United States also addressed this issue during the transitional review before the Committee on Import Licensing, held in October 2006, as did Australia.  The United States will continue these efforts in 2007.

The United States has also focused considerable attention on import licensing issues that have arisen in a variety of other specific contexts since China's WTO accession.  In 2006, these include the administration of tariff-rate quota systems, sanitary and phytosanitary (SPS) measures and inspection-related requirements (discussed below in the sections on Tariff-rate Quotas on Industrial Goods, Tariff-rate Quotas on Bulk Agricultural Commodities, Sanitary and Phytosanitary Issues and Inspection-Related Requirements).

### *Non-tariff Measures*

In its accession agreement, China agreed that it would eliminate numerous trade-distortive non-tariff measures (NTMs), including import quotas, licenses and tendering requirements covering hundreds of products.  Most of these NTMs, including, for example, the NTMs covering chemicals, agricultural equipment, medical and scientific equipment and civil aircraft, had to be eliminated by the time that China acceded to the WTO.  China committed to phase out other NTMs, listed in an annex to the accession agreement, over a transition period ending on January 1, 2005.  These other NTMs included import quotas on industrial goods such as air conditioners, sound and video recording apparatus, color TVs, cameras, watches, crane lorries and chassis, and motorcycles as well as licensing and tendering requirements applicable to a few types of industrial goods, such as machine tools and aerials.

As has been previously reported, China's import quota system was beset with problems.  The State Council was late in issuing necessary regulations, and the authorities charged with implementing this system – MOFTEC for some products and the State Economic and Trade Commission (SETC) for others – were late in allocating quotas.  Because of a lack of transparency, it was also difficult to assess whether the quotas were allocated in accordance with the agreed rules.  Some of the more difficult problems were encountered with the auto import quota system, resulting at times in significant disruption of wholesale and retail operations for imported autos.

*Page 30*

While these problems prevented the United States and other WTO members from realizing the full contemplated benefits of these import quotas, China did fully adhere to the agreed schedule for the elimination of all of its import quotas as well as all of its other NTMs, the last of which China eliminated in January 2005.  In some cases, China even eliminated NTMs ahead of schedule, as it did with the import quotas on crane lorries and chassis, and motorcycles.

### *Tariff-rate Quotas on Industrial Products*

In its WTO accession agreement, China agreed to implement a system of tariff-rate quotas (TRQs) designed to provide significant market access for three industrial products, including fertilizer, a major U.S. export.  Under this TRQ system, a set quantity of imports is allowed at a low tariff rate, while imports above that level are subject to a higher tariff rate.  In addition, the quantity of imports allowed at the low tariff rate increases annually by an agreed amount.  China's accession agreement specifies detailed rules, requiring China to operate its fertilizer TRQ system in a transparent manner and dictating precisely how and when China is obligated to accept quota applications, allocate quotas and reallocate unused quotas.

As previously reported, SETC was slow to implement its TRQ system in 2002, and a lack of transparency made it difficult to assess whether the quota allocations followed the rules set out in China's goods schedule.  U.S. exporters also expressed concern about the Chinese government's issuance of administrative guidance that discouraged some TRQ holders from freely utilizing their quotas.  In July 2002, following repeated bilateral engagement, the United States requested formal consultations with China under the headnotes in China's goods schedule.  During the ensuing consultations, which took place in September 2002 in Geneva, China was forthcoming in its responses and provided the United States with a better understanding of the challenges facing it, but the United States and China were unable to agree on concrete steps to remedy the situation.

In 2003, as the United States continued to engage China, SETC issued the quota allocations on time and apparently in the correct amount, representing a substantial improvement over 2002.  However, U.S. companies continued to express concern about administrative guidance discouraging TRQ holders from freely utilizing their quotas.  According to reports from these companies, administrative guidance may have been used to limit imports of the principal U.S. fertilizer product, diammonium phosphate (DAP), to less than 60 percent of the quota allocations actually issued by SETC.  U.S. fertilizer exports to China declined by 32 percent in 2003, totaling $459 million as compared to $676 million in 2002.

Even after SETC was merged into MOFCOM as part of the mid-2003 government restructuring, the systemic problems did not go away.  Despite continued U.S. engagement, principally through the transitional review before the WTO's Committee on Market Access, China's fertilizer TRQ system was still operating with insufficient transparency in 2004, and administrative guidance still seemed to be affecting how allocated quota was used.  U.S. fertilizer exports to China were down 33 percent in 2004 relative to 2003, totaling $306 million, due in part to the continuing

problems with MOFCOM's administration of the fertilizer TRQ system and in part to increasing subsidization – and resulting overcapacity – of China's domestic fertilizer industry.

In 2005 and 2006, MOFCOM's administration of the fertilizer TRQ system did not noticeably improve, and the United States again raised concerns about how this system was being administered during the annual transitional reviews before the Committee on Market Access. U.S. fertilizer exports to China, meanwhile, increased modestly in 2005, totaling $355 million for the year, but then declined sharply in 2006. The data for January through September 2006 showed a decline of 32 percent, totaling $151 million as compared to $223 million during the same period in 2005.

In October 2006, perhaps in an attempt by the central authorities to reign in provincial and local efforts to build further unneeded capacity, the Tariff Policy Commission of the State Council announced a temporary reduction of the in-quota tariff rate for fertilizer from four percent to one percent, effective November 2006. It is too early to tell what effect this change may have on U.S. fertilizer exports to China. However, U.S. and other foreign fertilizer producers are anticipating increased exports after December 11, 2006, when China is scheduled to begin allowing foreign enterprises to engage in the wholesale and retail distribution of fertilizer within China. The United States will monitor developments in this area closely in 2007.

### Other Import Regulation

<u>Antidumping</u>

In its WTO accession agreement, China committed to revising its regulations and procedures for antidumping (AD) proceedings by the time of its accession, in order to make them consistent with the WTO Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (AD Agreement). That agreement sets forth detailed rules prescribing the manner and basis on which a WTO member may take action to offset the injurious dumping of products imported from another WTO member. China also agreed to provide for judicial review of determinations made in its AD investigations and reviews.

China has become a leading user of AD measures since its accession to the WTO. Currently, China has in place a total of 86 final AD measures affecting imports from 18 countries, with 25 AD investigations in progress. According to U.S. AD experts, the greatest shortcomings in China's AD practice continue to be in the areas of transparency and procedural fairness. The United States continues to press China both bilaterally and multilaterally to clarify and address these concerns.

Five years have passed since China's WTO accession, and much of the legal framework for its AD regime appears to be in place, although key pieces of legislation have not yet been notified to the WTO. Shortly before China's accession to the WTO, the State Council issued new AD regulations that went into effect in January 2002 and charged MOFTEC with making determinations of dumping. In early 2002, MOFTEC issued several sets of provisional rules

*Page 32*

covering initiation of investigations, questionnaires, sampling, verifications, information disclosure, access to non-confidential information, price undertakings, hearings, interim reviews, refunds and new shipper reviews. SETC, which at the time was charged with making determinations of injury, issued rules covering industry injury investigations and public hearings in January 2003. These regulations were updated and notified to the WTO's AD Committee following the consolidation of the AD functions of MOFTEC and SETC into the newly formed MOFCOM in March 2003. A revised version of China's governing statute, the Foreign Trade Law, which included expanded trade remedy language, came into force in July 2004 and was also eventually notified to the AD Committee. More recently, in August 2006, MOFCOM issued the Regulations on Information Accession and Information Disclosure in Industry Injury Investigations, but this measure has not yet been notified to the AD Committee.

China has also issued rules governing judicial review of AD cases. In August 2002, the Supreme People's Court issued the Rules Regarding Supreme People's Court Hearings on Judicial Review of International Trade Disputes, which provide guidance concerning judicial review of administrative agency decisions affecting international trade, including disputes involving AD cases. In September 2002, the Supreme People's Court issued the Provisions of the Supreme People's Court on Certain Issues Concerning the Applicability of Laws in the Hearing and Handling of Antidumping Administrative Cases. As China continues to launch AD investigations and apply AD measures against imports, the opportunity for interested parties to seek judicial review will become more critical. To date, however, neither of these measures has been notified to the AD Committee, preventing effective multilateral review of critical elements of China's judicial review mechanism.

Within MOFCOM, the Bureau of Fair Trade for Imports and Exports (BOFT) is charged with making dumping determinations and the Bureau of Industry Injury Investigation (IBII) is charged with making injury determinations. The State Council Tariff Commission continues to make the final decision on imposing, revoking or retaining AD duties, based on recommendations provided by the BOFT and the IBII, although its authority relative to MOFCOM has not been clearly defined in the regulations and rules since MOFCOM was established.

In practice, China's conduct of AD investigations has not fully observed the fundamental tenets of transparency and procedural fairness embodied in the AD Agreement. For example, respondents from the United States and other WTO members that have been subject to Chinese AD investigations continue to express concerns about the lack of detailed information made available to interested parties. While the BOFT has improved somewhat at making documents from AD investigations reasonably available on demand, the IBII continues to have an uneven record with respect to making available to foreign respondents materials generated and submitted during the course of its injury investigations. In addition, both BOFT and IBII still fail to make available adequate non-confidential summaries of submissions by Chinese producers, precluding interested parties from gaining a full understanding of potentially important facts and data in the record of an investigation. Compounding this problem is the highly limited disclosure by China's AD authorities of the essential facts underlying decisions and calculations made in the course of dumping and injury investigations.

Meanwhile, foreign respondents continue to criticize China's AD authorities for not providing adequate opportunities for interested parties to provide input for their deliberations, particularly with regard to the IBII's injury determinations.  At least one positive development took place in 2006, however, when the IBII held a public hearing at an early stage of an AD investigation, allowing foreign respondents the opportunity to place arguments on the record well in advance of the IBII's preliminary injury determination.  Foreign respondents also continue to criticize the cursory nature of decision making in the IBII's injury investigations, including the analysis regarding the causal link between injury and dumping.  Indeed, in the many investigations initiated by MOFCOM since China's WTO accession, the IBII has not once found that U.S. exports were not causing injury to China's domestic industry, despite compelling arguments raised by U.S. respondents.

At the WTO, the United States continues to address problems with China's AD practice in regular meetings of the AD Committee.  The United States also continues to make vigorous use of the transitional review mechanism to clarify issues and voice concerns regarding China's AD practices.  During the most recent transitional review before the AD Committee in October 2006, the United States and other WTO members, including the EC and Japan, reiterated their longstanding concerns regarding transparency and procedural fairness.

The United States also vigorously engages China bilaterally on these matters.  In April 2004, the United States and China agreed to establish the Trade Remedies Working Group under the auspices of the JCCT.  This working group has given U.S. AD experts a dedicated forum to engage Chinese administrators and decision-makers directly and in detail regarding the problems facing U.S. exporters subject to Chinese AD investigations.  U.S. AD officials also have frequent formal and informal exchanges with China's AD authorities, which help to promote greater transparency and accountability in China's AD regime.  At the same time, the United States continues to work closely with U.S. companies affected by Chinese AD investigations in an effort to help them better understand the Chinese system.  The United States also advocates on their behalf in connection with ongoing AD investigations, with the goal of obtaining fair and objective treatment for them, consistent with the AD Agreement.

In the antidumping investigation of unbleached kraft linerboard (a cardboard-like packaging material) that MOFCOM initiated in March 2004, U.S. respondents raised a variety of substantive and procedural issues, with one of their principal arguments being that Chinese producers had not suffered any material injury.  The United States actively supported many of the positions taken by the U.S. respondents, particularly with regard to the injury issue, which raised WTO concerns.  Nevertheless, in September 2005, MOFCOM issued its final determination, finding both dumping and injury, and began imposing antidumping duties on imports of U.S. kraft linerboard.  Working closely with U.S. industry, the United States pressed MOFCOM to reverse its injury finding and withdraw the antidumping duties, but these efforts were rebuffed.  In early January 2006, the United States notified China as a courtesy that it would be filing a request for WTO consultations the following week.  Over the weekend, MOFCOM issued an "administrative reconsideration" in which it rescinded the antidumping duties on kraft linerboard imports.

*Page 34*

Countervailing Duties

In its WTO accession agreement, China committed to revising its regulations and procedures for conducting countervailing duty (CVD) investigations and reviews by the time of its accession, in order to make them consistent with the WTO Agreement on Subsidies and Countervailing Measures (Subsidies Agreement). The Subsidies Agreement sets forth detailed rules prescribing the manner and basis on which a WTO member may take action to offset the injurious subsidization of products imported from another WTO member. Although China did not separately commit to provide judicial review of determinations made in CVD investigations and reviews, Subsidies Agreement rules require independent review.

As previously reported, shortly before China's accession, the State Council issued new CVD regulations, which came into force in January 2002. Later, MOFTEC, which at that time was charged with making determinations of subsidization under China's CVD regime, issued several sets of ministerial rules on initiation of investigations, questionnaires, verifications and hearings. The SETC, which at that time was charged with making determinations of injury in China's CVD proceedings, issued implementing rules covering industry injury investigations and public hearings in January 2003. In March 2003, a general reorganization of the State Council ministries and commissions consolidated the subsidization and injury investigation functions of MOFTEC and SETC into MOFCOM. Updated regulations were later notified to the WTO, as was the revised *Foreign Trade Law*, as discussed above in the Antidumping section.

As in the AD area, China continues in its efforts to conform its CVD regulations and procedural rules to the provisions and requirements of the Subsidies Agreement and the commitments in its WTO accession agreement. China's regulations and procedural rules generally track those found in the Subsidies Agreement, although there are certain areas where key provisions are omitted or are vaguely worded. Since China's accession to the WTO, the United States and other WTO members have sought clarifications on a variety of issues concerning China's regulatory framework and have pressed China for greater transparency both during regular meetings and the annual transitional reviews before the Subsidies Committee. The United States will continue to seek clarifications as needed in 2007.

China has not initiated a CVD investigation, either pre- or post-WTO accession. Consequently, it is not yet possible to assess whether China applies its regulations and procedural rules in conformity with WTO rules.

Safeguards

In its WTO accession agreement, China committed to revising its regulations and procedures for conducting safeguard investigations by the time of its WTO accession in order to make them consistent with the WTO Agreement on Safeguards (Safeguards Agreement). That agreement articulates rules and procedures governing WTO members' use of safeguard measures.

*Page 35*

As previously reported, shortly before China's WTO accession, the State Council issued the *Regulations on Safeguards*, which became effective in January 2002.  Under these regulations, MOFTEC became responsible for determining whether the volume of imports of a given product has increased and (together with SETC) whether there is a causal link between any such imports and injury to the domestic industry.  Shortly thereafter, MOFTEC issued two sets of provisional procedural rules, one covering initiations and the other hearings.  In 2003, SETC, the agency that was charged with determining injury to the domestic industry, issued the *Rules on Investigations and Determinations of Industry Injury for Safeguards* and the *Rules on Public Hearings with Regard to Investigations of Injury to Industry*.  Later that year, a general reorganization of the State Council ministries and commissions consolidated the safeguard functions of MOFTEC and SETC into MOFCOM.  In 2004, the State Council issued revised *Regulations on Safeguards*, and MOFCOM issued revised implementing rules to reflect this change.

As with the AD and CVD areas, it appears that China has made an effort to establish a WTO-consistent safeguard regime.  While the provisions of China's regulations and procedural rules generally track those of the Safeguards Agreement, there are some potential inconsistencies, and certain omissions and ambiguities remain.  In addition, some provisions do not find a counterpart in the Safeguards Agreement.  In earlier transitional reviews before the WTO's Committee on Safeguards, the United States noted several areas of potential concern, including transparency, determination of developing country status, treatment of non-WTO members, protection of confidential data, access to non-confidential information, refunding of safeguard duties collected pursuant to provisional measures when definitive measures are not imposed, and the conditions governing the extension of a safeguard measure.

To date, China has conducted only one safeguard proceeding.  In May 2002, MOFTEC initiated an investigation addressing imports of certain steel products from various countries, including the United States.  China imposed provisional measures in the form of tariff-rate quotas on nine categories of products the day after initiation, and six months later it rendered a final determination maintaining these measures in place.  Although U.S. companies exported little of the subject merchandise to China, there were complaints from interested parties that China's process for allocating quotas under the safeguard measures was unclear, making it difficult for them to determine the quota available and obtain a fair share.  MOFCOM terminated the safeguard measures in December 2003.

**Export Regulation**

China's WTO accession agreement reinforces China's obligation to only maintain export restrictions allowed under WTO rules.  In this regard, Article XI of the GATT 1994 generally prohibits WTO members from maintaining export restrictions (other than duties, taxes or other charges), although certain limited exceptions are allowed.  China also agreed to eliminate all taxes and charges on exports, except as included in Annex 6 to the Protocol of Accession or applied in conformity with Article VIII of GATT 1994. Article VIII of GATT 1994 only permits fees and charges limited to the approximate cost of services rendered and makes clear that any

*Page 36*

such fees and charges shall not represent an indirect protection to domestic products or a taxation of exports for fiscal purposes.

Nevertheless, since its accession to the WTO, China has continued to impose restrictions on exports of certain raw materials and intermediate products. In an attempt to justify these restrictions, MOFCOM has often cited Article XX(g) of GATT 1994, which permits a WTO member to impose measures relating to the conservation of exhaustible natural resources, provided that such measures are made effective in conjunction with restrictions on domestic production or consumption, and provided they are not applied in a manner that would constitute a means of arbitrary or unjustifiable discrimination between countries where the same conditions prevail or a disguised restriction on international trade.

In 2004, China's longstanding export restrictions on blast furnace coke, a key steel input, began to have a significant, adverse effect on U.S. integrated steel producers and their customers. China was (and is) the world's largest producer of coke as well as the world's most significant exporter of coke, supplying more than one-half of the world's traded coke. Even though its total production was projected to (and did) rise to nearly 210 million metric tons (MT) in 2004, China initially imposed an export quota of 8.3 million MT, down from the 2003 level of 14.3 million MT. In the first six months of 2004, China's export quota, combined with the illegal sale of export quota certificates, caused the export price for Chinese coke to rise to the vicinity of $500 per MT, more than three times the price in 2003. This price rise triggered a similar rise in world coke prices, while Chinese domestic prices ranged between $150 and $200 per MT, giving Chinese steel producers a significant competitive advantage over their foreign competitors and helping to fuel the rapid expansion of China's steel sector.

The United States began to raise its concerns with China's coke export restrictions during high-level meetings in Washington in April 2004. The United States urged China to put the practice of using export restrictions behind it, not just for coke but also for other products. The United States also began to coordinate with other concerned WTO members, particularly the EC and Japan, which had become active in addressing this issue. In late July 2004, following sustained engagement by the United States, which included both high-level contacts and a series of meetings with MOFCOM officials in Beijing, the Chinese government raised the 2004 quota allotment to 12.3 million MT and indicated that it would eventually be raising the quota to the 2003 level of 14.3 million MT. Shortly thereafter, MOFCOM also issued an urgent notice reiterating that the sale of export licenses was illegal and called for investigations and expedited reports on this practice by provincial MOFCOM authorities. In the ensuing months, with the increased supply of Chinese coke and the crackdown on the sale of export licenses, the export prices for Chinese coke declined significantly, reaching nearly $200 per MT. U.S. industry was also able to obtain a substantially larger quantity of Chinese coke in 2004 than it had in 2003.

In 2005, the United States continued to press China for complete elimination of the annual export quota on coke, as did other WTO members. The United States raised its concerns in bilateral meetings with China and at the WTO during the transitional reviews before the Committee on Market Access and the Council for Trade in Goods, but made no progress.

*Page 37*

In 2006, the United States continued to press China to eliminate the export quota on coke, both bilaterally during Steel Dialogue meetings in March and October and at the transitional reviews before the Committee on Market Access and the Council for Trade in Goods, held in October and November.  Even though the export price for Chinese coke remained relatively low compared to the $500 per MT price of mid-2004, the export quota still kept world coke prices artificially high in 2006, and a significant differential still existed between China's domestic coke prices and world coke prices.  However, the Chinese government continued its efforts to direct market outcomes by maintaining the export quota on coke.  Indeed, in October 2006, China took the additional step of imposing a five percent duty on exports of coke.

Fluorspar is another example of a raw material subject to export restrictions, as China imposes both quotas and license fees on fluorspar exports.  The objective of these export restrictions appears to be to support China's downstream producers of the numerous products derived from fluorspar, such as non-ozone depleting hydrofluorocarbon refrigerants and foam blowing agents.  While their foreign competitors pay higher world market prices for fluorspar, China's downstream producers benefit from the artificially low domestic prices for fluorspar and are able to export their products around the world at prices well below those of their foreign competitors.

Since shortly after China's WTO accession, the United States has raised its concerns about the export restrictions on fluorspar bilaterally with China.  The United States has also worked with other WTO members with an interest in this issue, including Japan, and raised this issue during the annual transitional reviews before the Committee on Market Access and the Council for Trade in Goods.  To date, however, China has refused to modify its practices in this area.  In fact, China has increased the protection afforded to its downstream producers by lowering the export quota on fluorspar each year and, in October 2006, by imposing a 10 percent duty on exports of fluorspar.

In 2007, the United States will continue to work with interested trading partners on these issues.  In coordination with those trading partners, the United States will urge China to act as a responsible stakeholder in the international trading system and eliminate the export restrictions that it maintains on raw materials such as coke and fluorspar.

**Internal Policies Affecting Trade**

***Non-discrimination***

In its WTO accession agreement, China agreed to assume the obligations of GATT 1994, the WTO agreement that establishes the core principles that constrain and guide WTO members' policies relating to trade in goods.  The two most fundamental of these core principles are the Most-Favored Nation (MFN), or non-discrimination, rule – referred to in the United States as "normal trade relations" – and the rule of national treatment.

The MFN rule (set forth in Article I of GATT 1994) attempts to put the goods of all of an importing WTO member's trading partners on equal terms with one another by requiring the

*Page 38*

same treatment to be applied to goods of any origin.  It generally provides that if a WTO member grants another country's goods a benefit or advantage, it must immediately and unconditionally grant the same treatment to imported goods from all WTO members.  This rule applies to customs duties and charges of any kind connected with importing and exporting.  It also applies to internal taxes and charges, among other internal measures.

The national treatment rule (set forth in Article III of GATT 1994) complements the MFN rule.  It attempts to put the goods of an importing WTO member's trading partners on equal terms with the importing member's own goods by requiring, among other things, that a WTO member accord no less favorable treatment to imported goods than it does for like domestic goods.  Generally, once imported goods have passed across the national border and import duties have been paid, the importing WTO member may not subject those goods to internal taxes or charges in excess of those applied to domestic goods.  Similarly, with regard to measures affecting the internal sale, purchase, transportation, distribution or use of goods, the importing WTO member may not treat imported goods less favorably than domestic goods.

In its WTO accession agreement, China agreed to repeal or revise all laws, regulations and other measures that were inconsistent with the MFN rule upon accession.  China also confirmed that it would observe this rule with regard to all WTO members, including separate customs territories, such as Hong Kong, Macau and Taiwan.  In addition, China undertook to observe this rule when providing preferential arrangements to foreign-invested enterprises within special economic areas.

With regard to the national treatment rule, China similarly agreed to repeal or revise all inconsistent laws, regulations and other measures.  China also specifically acknowledged that its national treatment obligation extended to the price and availability of goods or services supplied by government authorities or state-owned enterprises, as well as to the provision of inputs and services necessary for the production, marketing or sale of finished products.  Among other things, this latter commitment precludes dual pricing, i.e., the practice of charging foreign or foreign-invested enterprises more for inputs and related services than Chinese enterprises.  China also agreed to ensure national treatment in respect of certain specified goods and services that had traditionally received discriminatory treatment in China, such as boilers and pressure vessels (upon accession), after sales service (upon accession), and pharmaceuticals, chemicals and spirits (one year after accession).

As previously reported, China reviewed its pre-WTO accession laws and regulations and revised many of those which conflicted with its WTO MFN and national treatment obligations in 2002.  Most of these revisions were made to secure national treatment, including with regard to boilers and pressure vessels, after sales service, and the pricing of pharmaceutical products, among other areas.  In 2003, China made further revisions covering registration requirements for foreign chemical products and the regulation of spirits.

China also undertook a major restructuring of its trade and investment-related ministries in mid-2003, following significant changes in the leadership of China's Communist Party and the

*Page 39*

national government.  One principal component of this restructuring was combining domestic and foreign trade-related functions into one agency (as SETC and parts of the State Development and Planning Commission, or SDPC, were folded into MOFTEC, which became known as the Ministry of Commerce, or MOFCOM), in part to foster better adherence to the WTO's national treatment principle.  In addition, NDRC, the successor to SDPC, has become much more open to discussing the policy concerns of foreign businesses, which contrasts sharply with its prior reputation.

However, China still does not appear to observe MFN and national treatment requirements in all areas.  For example, several U.S. industries reported that China continued to apply the value-added tax in a manner that unfairly discriminates between imported and domestic goods, both through official measures and on an *ad hoc* basis, as discussed below in the Taxation section.  It also appears that China has applied sanitary and phytosanitary measures in a discriminatory manner continually since it acceded to the WTO, as discussed below in the Agriculture section.  In addition, China's industrial policies on automobiles and steel appear to discriminate against foreign producers as well as imported goods, as discussed below in the Investment section.

The United States continued to address these and other MFN and national treatment issues with China in 2006, both bilaterally and in WTO meetings, such as the transitional reviews before the Committee on Market Access, the Committee on Trade-Related Investment Measures (TRIMS Committee), the Committee on Sanitary and Phytosanitary Measures (SPS Committee), the Council for Trade in Goods, the Committee on Trade in Financial Services and the Council for Trade in Services.  The United States will continue to pursue these issues vigorously in 2007.

*Page 40*

***Taxation***

China committed to ensure that its laws and regulations relating to taxes and charges levied on imports and exports would be in full conformity with WTO rules upon accession, including, in particular, the MFN and national treatment provisions of Articles I and III of GATT 1994.

<u>Value-Added Tax Policies</u>

Since China's WTO accession, certain aspects of China's VAT system have raised serious national treatment concerns. One of these issues – the discriminatory tax rates applied to imports versus domestically produced semiconductors – was resolved in 2004, although other issues remain.

As previously reported, in an effort to develop its domestic integrated circuit (IC) industry, China began announcing discriminatory VAT policies in late 2001, although they did not become operational until 2004. Pursuant to a series of measures, China provided for the rebate of a substantial portion of the 17 percent VAT paid by domestic manufacturers on their locally produced ICs. A similar VAT rebate was available to imported ICs, but only if they had been designed in China. China charged the full 17 percent VAT on all other imported ICs. These policies disadvantaged U.S. exports of ICs to China, which totaled approximately $2 billion in 2003, and put pressure on foreign enterprises to shift investment in IC manufacturing to China. Following extensive but unsuccessful bilateral engagement, the United States initiated dispute settlement by requesting formal WTO consultations with China in March 2004. In the ensuing consultations, which took place in April 2004 in Geneva, with third party participation by Japan, the EC and Mexico, the United States laid out its claims under Article III of GATT 1994, which sets forth the WTO's national treatment principle. Through these consultations and a series of bilateral meetings in Washington and Beijing, a settlement was reached in July 2004, pursuant to which China agreed to withdraw the challenged measures.

China has also used VAT policies to benefit domestic fertilizer production. In July 2001, the Ministry of Finance (MOF) and the State Administration of Taxation (SAT) issued a circular exempting all phosphate fertilizers except DAP from a 13 percent VAT. DAP, a product that the United States exports to China, competes with similar phosphate fertilizers produced in China, particularly monoammonium phosphate. The circular also allowed a partial VAT rebate for domestic producers of urea, a nitrogen fertilizer, through the end of 2002. The United States raised this issue bilaterally with China soon after it acceded to the WTO and in many subsequent bilateral meetings, including high-level meetings. The United States has also raised this issue at the WTO, both in regular meetings of the Committee on Market Access and during the annual transitional reviews, including in 2006. So far, however, China has refused to make any changes, although it did allow the special tax treatment for domestic urea to expire at the end of 2002. The United States will continue to press its concerns regarding this issue in 2007.

Meanwhile, several U.S. industries have continued to express concerns more generally about the unfair operation of China's VAT system. Often, Chinese producers are able to avoid payment of

the VAT on their products, either as a result of poor collection procedures, special deals or even fraud, while the full VAT still must be paid on competing imports.  In discussions with Chinese government officials on this issue, the United States has raised its serious concerns about the discriminatory treatment effectively accorded to foreign products.  The United States has also emphasized the value to China of a properly functioning VAT system as a revenue source.

Finally, China's border trade policy continues to generate MFN and other concerns.  China provides preferential import duty and VAT treatment to certain products, often from Russia, apparently even when those products are not confined to frontier traffic as envisioned by Article XXIV of GATT 1994.  In June 2003, China began to address these concerns when it eliminated preferential treatment for boric acid and 19 other products.  However, several other products continue to benefit from preferential treatment.  During the transitional reviews before the WTO's Council for Trade in Goods, including most recently in November 2006, the United States has continued to urge China to eliminate the preferential treatment for these remaining products.

<u>Consumption Taxes</u>

National treatment concerns also continue to arise in connection with China's consumption tax regulations, which first went into effect in 1993 and apply to a range of consumer products, including spirits and alcoholic beverages, tobacco, cosmetics and skin and hair care preparations, jewelry, fireworks, rubber, motorcycles and automobiles.  Under these regulations, China uses different tax bases to compute consumption taxes for domestic and imported products, with the apparent result that the effective consumption tax rate for imported products is substantially higher than for domestic products.  Since China's accession to the WTO, the United States has raised this issue with China, both bilaterally and during the annual transitional reviews conducted by the WTO Committee on Market Access and the Council for Trade in Goods.  To date, China has not revised these regulations.  The United States will continue to pursue appropriate revisions of these regulations in 2007.

*Subsidies*

Upon its accession to the WTO, China agreed to assume the obligations of the WTO Subsidies Agreement, which addresses not only the use of CVD measures by individual WTO members (see the section above on Import Regulation, under the heading of Countervailing Duties), but also a government's use of subsidies and the application of remedies through enforcement proceedings at the WTO.  As part of its accession agreement, China committed that it would eliminate, by the time of its accession, all subsidies prohibited under Article 3 of the Subsidies Agreement, i.e., subsidies contingent on export performance (export subsidies) and subsidies contingent on the use of domestic over imported goods (import substitution subsidies).  This commitment expressly extended throughout China's customs territory, including in special economic zones and other special economic areas.

*Page 42*

China also agreed to various special rules that apply when other WTO members seek to enforce the disciplines of the Subsidies Agreement against Chinese subsidies (either in individual WTO members' CVD proceedings or in WTO enforcement proceedings). Under these rules, in certain circumstances, WTO members can identify and measure Chinese subsidies using alternative methods in order to account for the special characteristics of China's economy. For example, in certain circumstances, when determining whether preferential government benefits have been provided to a Chinese enterprise via, e.g., a loan, WTO members can use foreign or other market-based criteria rather than Chinese benchmarks to ascertain the benefit of that loan and its terms. Special rules also govern the actionability of subsidies provided to state-owned enterprises.

Following increasing pressure from the United States and other WTO members, China finally submitted its long-overdue subsidies notification to the WTO's Subsidies Committee in April 2006. Although the notification is lengthy, with over 70 subsidy programs reported, it is also notably incomplete, as it failed to notify any subsidies provided by China's state-owned banks or by provincial and local government authorities. In addition, while China notified several subsidies that appear to be prohibited, it did so without making any commitment to withdraw them, and it failed to notify other subsidies that appear to be prohibited. The United States has devoted significant time and resources to monitoring and analyzing China's subsidy practices, and these efforts helped to identify significant omissions in China's subsidy notification. In accordance with Subsidies Committee procedures, the United States submitted extensive written questions and comments on China's subsidies notification in July 2006, as did several other WTO Members, including the EC, Japan, Canada, Mexico, Australia and Turkey. China has not yet responded to those submissions. During the annual transitional review before the Subsidies Committee, held in October 2006, the United States reiterated its concerns about China's subsidies notifications and urged China to withdraw its prohibited subsidies immediately.

A number of U.S. industries, including the steel, paper and textiles industries, among others, expressed increasing concern in 2006 about the injurious effects of China's subsidies in the U.S. market as well as in China and third-country markets. In addition, in October 2006, the U.S. paper industry filed a petition with the Commerce Department requesting the initiation of a CVD investigation based on allegations of subsidized imports of coated free sheet paper from China causing injury in the U.S. market. The petition acknowledges that the Commerce Department currently does not apply U.S. CVD law to China, but requests a change in that policy. In November 2006, the Commerce Department initiated an investigation, noting that it would decide on the applicability of U.S. CVD law to China during the course of its investigation.

The United States began seeking changes to China's subsidies practices immediately after China submitted its subsidies notification in April 2006. Through a series of bilateral meetings in Beijing, including high-level meetings, the United States made clear that China needed to withdraw both the prohibited subsidies that it had notified and several additional prohibited subsidies that it had not notified. The subsidies at issue benefit a wide range of industries in China and include both export subsidies, which make it more difficult for U.S. manufacturers to compete against Chinese manufacturers in the U.S. market and third-country markets, and import

Case 13-4791, Document 160, 07/28/2014, 1280897, Page118 of 315

Case 1:06-md-01738-BMC-JO   Document 691-17   Filed 04/11/13   Page 50 of 110 PageID #: 21035

substitution subsidies, which make it more difficult for U.S. manufacturers to export their products to China.  To date, although the negotiations have made some progress, China has been unwilling to commit to the immediate withdrawal of the subsidies in question.  The United States is continuing to press China on this issue and will take further actions seeking the withdrawal of these subsidies, including the initiation of WTO dispute settlement if appropriate.

In 2007, the United States will also continue to pursue its own research and analysis of possible Chinese subsidy programs.  It will also continue to raise its concerns at the WTO and in bilateral meetings with China, as necessary, including through future meetings of the Structural Issues Working Group, which was created at the April 2004 JCCT meeting.

*Price Controls*

In its WTO accession agreement, China agreed that it would not use price controls to restrict the level of imports of goods or services.  In addition, in an annex to the agreement, China listed the limited number of products and services remaining subject to price control or government guidance pricing, and it provided detailed information on the procedures used for establishing prices.  China agreed that it would try to reduce the number of products and services on this list and that it would not add any products or services to the list, except in extraordinary circumstances.

In 2006, China continued to maintain price controls on several products and services provided by both state-owned enterprises and private enterprises.  Published through the China Economic Herald and NDRC's website, these price controls may be in the form of either absolute mandated prices or specific pricing policy guidelines as directed by the government.  Products and services subject to government-set prices include pharmaceuticals, tobacco, natural gas and certain telecommunications services.  Products and services subject to government guidance prices include gasoline, kerosene, diesel fuel, fertilizer, cotton, various grains, various forms of transportation services, professional services such as engineering and architectural services, and certain telecommunications services.

The United States obtained additional information about China's use of price controls from the WTO Secretariat's Trade Policy Review report on China, issued in February 2006.  The United States also sought clarifications from China in connection with China's Trade Policy Review, which took place in April 2006.  In addition, as in prior years, the United States sought updated information from China on its use of price controls and future plans during the transitional review before the Subsidies Committee, held in October 2006.  The United States will continue to monitor China's progress in eliminating price controls in 2007, and it will also work closely with U.S. industry in engaging China as it considers proposals for the imposition of price controls for medical devices.

*Standards, Technical Regulations and Conformity Assessment Procedures*

*Page 44*

With its accession to the WTO, China assumed obligations under the Agreement on Technical Barriers to Trade (TBT Agreement), which establishes rules and procedures regarding the development, adoption and application of voluntary product standards, mandatory technical regulations, and the procedures (such as testing or certification) used to determine whether a particular product meets such standards or regulations. Its aim is to prevent the use of technical requirements as unnecessary barriers to trade. The TBT Agreement applies to a broad range of industrial and agricultural products. It establishes rules that help to distinguish legitimate standards and technical regulations from protectionist measures. Among other things, standards, technical regulations and conformity assessment procedures are to be developed and applied transparently and on a non-discriminatory basis and should be based on relevant international standards and guidelines, when appropriate.

In its WTO accession agreement, China also specifically committed that it would ensure that its conformity assessment bodies operate with transparency, apply the same technical regulations, standards and conformity assessment procedures to both imported and domestic goods and use the same fees, processing periods and complaint procedures for both imported and domestic goods. In addition, China agreed to ensure that all of its conformity assessment bodies are authorized to handle both imported and domestic goods within one year of accession. China also consented to accept the Code of Good Practice (set forth in an annex to the TBT Agreement) within four months after accession, which it has done, and to speed up its process of reviewing existing technical regulations, standards and conformity assessment procedures and harmonizing them with international norms.

In addition, in the Services Schedule accompanying its WTO accession agreement, China committed to permit foreign service suppliers that have been engaged in inspection services in their home countries for more than three years to establish minority foreign-owned joint venture technical testing, analysis and freight inspection companies upon China's accession to the WTO, with majority foreign ownership no later than two years after accession and wholly foreign-owned subsidiaries four years after accession. China further agreed that qualifying joint venture and wholly foreign-owned enterprises would be eligible for accreditation in China and accorded national treatment.

Restructuring of Regulators

As previously reported, in anticipation of its WTO accession, China made significant progress in the areas of standards and technical regulations. China addressed problems that foreign companies had encountered in locating relevant regulations and how they would be implemented, and it took steps to overcome poor coordination among the numerous regulators in China. In October 2001, China announced the creation of the Standardization Administration of China (SAC) under AQSIQ. SAC is charged with unifying China's administration of product standards and aligning its standards and technical regulations with international practices and China's commitments under the TBT Agreement. SAC is the Chinese member of the International Organization for Standardization and the International Electro-technical Commission.

*Page 45*

China also began to take steps in 2001 to address problems associated with its multiplicity of conformity assessment bodies, whose task it is to determine if standards and technical regulations are being observed. AQSIQ was established as a new ministry-level agency in April 2001. It is the result of a merger of the State Administration for Quality and Technical Supervision and the State Administration for Entry-Exit Inspection and Quarantine. China's officials explained that this merger was designed to eliminate discriminatory treatment of imports and requirements for multiple testing simply because a product was imported rather than domestically produced. China also formed the quasi-independent National Certification and Accreditation Administration (CNCA), which is attached to AQSIQ and is charged with the task of unifying the country's conformity assessment regime.

Despite these changes, U.S. industry still has concerns about significant conformity assessment and testing-related issues in China. For example, U.S. exporters representing several sectors have reported that China's regulatory requirements are not enforced as strictly or uniformly against domestic producers as opposed to foreign producers. In addition, in some cases, China's regulations provide only that products will be inspected or tested upon entry into China's customs territory, without any indication as to whether or how the regulations will be applied to domestic producers.

<u>Transparency</u>

In the area of transparency, AQSIQ's TBT inquiry point, established shortly after China acceded to the WTO, has continued to be helpful to U.S. companies as they try to navigate China's system of standards, technical regulations and conformity assessment procedures. In addition, China's designated notification authority, MOFCOM, has been notifying proposed technical regulations and conformity assessment procedures to WTO members, as required by the TBT Agreement. However, in 2006, as in prior years, almost all of the notified measures have emanated from AQSIQ or SAC and have rarely included measures from other agencies that appear to require notification, such as the Ministry of Health, the Ministry of Information Industry (MII), the State Environmental Protection Administration (SEPA) and the State Food and Drug Administration. Three years ago, in part to address this problem, China had reportedly formed a new inter-agency committee, with representatives from approximately 20 ministries and agencies and chaired by AQSIQ, to achieve better coordination on TBT (and sanitary and phytosanitary) matters, but progress has been inconsistent in this area.

As a result, some of China's TBT measures continue to enter into force without having first been notified to the TBT Committee, and without foreign companies having had the opportunity to comment on them or even being given a transition period during which to make necessary adjustments. One significant example from 2006 is SEPA's *Registration of Initial Imports of Chemical Products and System for Environmental Management of Imported and Exported Toxic Chemicals*, which entered into force in January.

Meanwhile, as the United States has consistently highlighted during regular meetings and the annual transitional reviews before the TBT Committee, the comment periods established by

*Page 46*

China for the TBT measures actually notified continue to be unacceptably brief in some cases. In other cases, some U.S. companies reported that even when sufficient time was provided, written comments submitted by U.S. and other foreign interested parties seemed to be wholly disregarded.  In still other cases, insufficient time was provided for Chinese regulatory authorities to consider interested parties' comments before a regulation was adopted.

One significant example of the transparency problems encountered by U.S. and other foreign industries is provided by MII's efforts to adopt the *Administrative Measures for Controlling Pollution Caused by Electronic Information Products*.  This regulation, issued earlier this year, is modeled after an existing European Union regulation and is known as "China RoHS."  While both regulations seek to ban lead and other hazardous substances from a wide range of electrical and electronic products, there are significant differences between the two regulatory approaches. Throughout the process of MII's developing the China RoHS regulation, there was no formal process for interested parties to provide comments or consult with MII, and as a result foreign stakeholders had only limited opportunity to comment on proposals or to clarify MII's implementation intentions.  China did eventually notify the regulation to the TBT Committee, but the regulation does not answer questions regarding such basic information as the specific products that will be covered, labeling and marking requirements, maximum limits of hazardous substances and acceptable testing methodologies.  MII reportedly finalized standards in some of these areas in November 2006, but they reportedly will not be available until some time in December 2006 and then only upon payment of an unspecified fee.  U.S. and other foreign companies are very concerned that they will have insufficient time to adapt their products to China's requirements.

Standards and Technical Regulations

Shortly after its accession to the WTO, China began the task of bringing its standards regime more in line with international practice.  One of its first steps was AQSIQ's issuance of rules designed to facilitate China's adoption of international standards.  China subsequently embarked on the task of reviewing all of China's existing 21,000 standards and technical regulations to determine their continuing relevance and consistency with international standards.  During the transitional review before the TBT Committee in October 2005, China reported that it had nullified 1,416 national standards.  China continued its review of existing standards and technical regulations in 2006, but did not provide an update on its progress.

The United States continues to make efforts to assist China as it improves its standards regime through bilateral exchanges, education and training.  For example, in May 2005, a new U.S. private sector standards office, using funding from the U.S. Department of Commerce, opened in Beijing.  Its goals are to strengthen ties with Chinese government regulatory authorities, Chinese industry associations and Chinese standards developers and, in particular, to ensure that close communication exists between U.S. and Chinese standards developers.  The United States also continued to provide technical assistance to China.  Since 2004, this technical assistance has focused on broad standards-development issues, such as the relationship between intellectual property rights and standards, and specific standards in a number of industries, including

*Page 47*

information and telecommunications technology, chemicals, steel, petroleum, water
conservation, energy efficiency, hydrogen infrastructure, elevators, electrical safety, gas
appliances, distilled spirits, heating, ventilation and air conditioning, and building fire safety.
The United States has also conducted programs addressing China RoHS and China's new
chemical management system.

This year, the U.S. Trade and Development Agency (TDA) launched the U.S.-China Standards
and Conformity Assessment Cooperation Project in Beijing.  This project, with funding from
TDA and U.S. industry, provides education and training to Chinese policy makers and regulators
with regard to U.S. standards and conformity assessment procedures.  In addition, the American
National Standards Institute, with funding and participation from the U.S. Department of
Commerce, announced the launching of a Standards Portal in cooperation with SAC.  The
Standards Portal contains dual language educational materials on the structure, history and
operation of the U.S. and Chinese standards systems, a database of U.S. and Chinese standards
and access to other standards from around the world.

At the same time, concern has grown over the past few years as China is actively pursuing the
development of unique requirements, despite the existence of well-established international
standards, as a means for protecting domestic companies from competing foreign standards and
technologies.  Indeed, China has already adopted unique standards for digital televisions, and it
is trying to develop unique standards and technical regulations in a number of other sectors,
including, for example, autos, telecommunications equipment, Internet protocols, wireless local
area networks, radio frequency identification tag technology, audio and video coding, and
fertilizer.  This strategy has the potential to create significant barriers to entry into China's
market, as the cost of compliance will be high for foreign companies, while China will also be
placing its own companies at a disadvantage in its export markets, where international standards
prevail.

As previously reported, a particularly troubling example of China's pursuit of unique
requirements arose in May 2003, when China issued two mandatory standards for encryption
over Wireless Local Area Networks (WLANs), applicable to domestic and imported equipment
containing WLAN (also known as Wi-Fi) technologies.  These standards, which were originally
scheduled to go into effect in December 2003 and were never notified to the TBT Committee,
incorporated the WLAN Authentication and Privacy Infrastructure (WAPI) encryption technique
for secure communications.  This component of the standards differed significantly from the
internationally recognized standard that U.S. companies have adopted for global production, and
China was set to enforce it by providing the necessary algorithms only to eleven Chinese
companies.  U.S. and other foreign manufacturers would have had to work with and through
these companies, some of which were their competitors, and provide them with technical product
specifications, if their products were to continue to enter China's market.  Focusing on the WTO
compatibility of China's implementation of the standards, the United States repeatedly raised its
concerns with China throughout the remainder of 2003 and made WAPI one of the United
States' priority issues during the run-up to the April 2004 JCCT meeting.  The United States was
particularly concerned about the precedent that could be established if China were allowed to

*Page 48*

enforce unique mandatory standards in the fast-developing information technology sector.  The United States and China were ultimately able to resolve the issue at the JCCT meeting, as China agreed to an indefinite delay in the implementation of the WAPI standards.  China has since submitted a voluntary WAPI standard for consideration by the International Organization for Standardization (ISO).  The technical merits of the WAPI standard were considered by the ISO in 2005, and its adoption as an international standard was rejected by an ISO vote in March 2006.  Separately, China announced in December 2005 that products incorporating the WAPI standards should be given preference in government procurement, although the trade effects of this policy appear to be limited.

The United States also elevated another standards issue to the JCCT level beginning in 2004.  The U.S. telecommunications industry was very concerned about increasing interference from Chinese regulators, both with regard to the selection of 3G telecommunications standards and in the negotiation of contracts between foreign telecommunications service providers and their Chinese counterparts.  The United States urged China to take a market-based and technology neutral approach to the development of next generation wireless standards for computers and mobile telephones.  At the April 2004 JCCT meeting, China announced that it would support technology neutrality with regard to the adoption of 3G telecommunications standards and that telecommunications service providers in China would be allowed to make their own choices about which standard to adopt, depending on their individual needs.  China also announced that Chinese regulators would not be involved in negotiating royalty payment terms with relevant intellectual property rights holders.  However, by the end of 2004, it had become evident that there was still pressure from within the Chinese government to ensure a place for China's home-grown 3G telecommunications standard.

In 2005, China's regulators continued to take steps to promote that standard, and it also became evident that they had not ceased their attempts to influence negotiations on royalty payments.  More recently, in February 2006, China declared TD-SCDMA to be the "national standard" for 3G telecommunications, raising concerns among U.S. and other foreign telecommunications service providers that Chinese mobile telecommunications operators will face Chinese government pressure when deciding what technology to employ in their networks.  As a result, the United States again raised the issue of technology neutrality in connection with the April 2006 JCCT meeting.  At that meeting, China restated its April 2004 JCCT commitment to technology neutrality for 3G standards, agreeing to ensure that mobile telecommunications operators would be allowed to make their own choices as to which standard to adopt.  China also agreed to issue licenses for all 3G standards in a technologically neutral manner that does not advantage one standard over others.  The United States will carefully monitor developments in this area in 2007 and re-engage China as necessary to ensure that China's regulators adhere to China's JCCT commitments.

In late 2004, new concerns arose following SAC's issuance of a draft measure – the *Interim Regulations for National Standards Relating to Patents* – and public statements by key Chinese government officials that appeared to call for compulsory licensing of patented technologies that are used for national standards in China.  Standards organizations normally require enterprises

*Page 49*

that contribute patented technology to a standard to license their patents on "reasonable and non-discriminatory" terms, which entitles them to set reasonable limits on the use of their technology and to receive reasonable compensation.  Although the initial draft of this measure did not expressly call for compulsory licensing and subsequent drafts have not been released for public comment, public statements by key Chinese government officials have generated U.S. industry concern that the final version of the measure may require foreign enterprises to share their patented technologies on a royalty-free basis in exchange for the opportunity to participate in developing standards, which is the approach that has been followed by some Chinese standards organizations on an *ad hoc* basis.  While the current status of this measure is unclear, the United States has urged China to circulate an updated draft for public comment and will closely monitor developments in this area in 2007.  The United States will also closely monitor China's efforts to develop a new *Standardization Law* in 2007.  A draft of that law is reportedly circulating among China's ministries.

One trade association with broad representation among technology companies aptly summarized the problematic aspects of the Chinese government's approach to standards as follows: "Technology mandates or promotion of unique national standards are some of the ways China seeks to foster the domestic development of innovative technologies and [intellectual property rights].  This policy is also implemented through direct or indirect interference by Chinese authorities in licensing negotiations between Chinese and foreign technology companies."  The United States agrees with this assessment and will continue to urge China, as a responsible stakeholder in the international trading system, to move away from government intervention and toward greater reliance on private initiative and market mechanisms.

One positive development occurred in August 2006.  After several years of bilateral engagement and discussions at the WTO during meetings of the TBT Committee, China notified a proposed revision of its distilled spirits standard and indicated that it was accepting public comment.  According to China's notification, the proposed revision would eliminate the requirement for tolerance levels of superior alcohols, or fusel oil.  If adopted, it would bring China's standard in line with international norms.

*Page 50*

<u>Conformity Assessment Procedures</u>

As previously reported, CNCA regulations establishing a new Compulsory Product Certification System, issued in December 2001, took full effect in August 2003.  Under this system, there is now one safety mark, called the "China Compulsory Certification" or "CCC" mark, issued to both Chinese and foreign products.  Under the old system, domestic products were only required to obtain the "Great Wall" mark, while imported products needed both the "Great Wall" mark and the "CCIB" mark.  In 2006, as in prior years, U.S. companies continued to express concerns that the regulations lack clarity regarding the products that require a CCC mark.  They have also reported that China is applying the CCC mark requirements inconsistently and that many domestic products required by CNCA's regulations to have the CCC mark are still being sold without the mark.  In addition, despite the changes made by the regulations, U.S. companies in some sectors continued to express concerns in 2006 about duplication in certification requirements, particularly for radio and telecommunications equipment, medical equipment and automobiles.

Meanwhile, to date, China has granted well over one hundred Chinese enterprises accreditation to test and certify for purposes of the CCC mark.  Despite China's commitment that qualifying minority foreign-owned (upon China's accession to the WTO) and majority foreign-owned (two years later) joint venture conformity assessment bodies would be eligible for accreditation and would be accorded national treatment, China so far has not granted accreditation to any foreign-invested conformity assessment bodies.  China has also not developed any alternative, less trade-restrictive approaches to third-party certification, such as recognition of a supplier's declaration of conformity.  As a result, U.S. exporters to China are often required to submit their products to Chinese laboratories for tests that may be unwarranted or have already been performed abroad, resulting in greater expense and a longer time to market.  One U.S.-based conformity assessment body has entered into a Memorandum of Understanding (MOU) with China allowing it to conduct follow-up inspections (but not primary inspections) of manufacturing facilities that make products for export to China requiring the CCC mark.  However, China has not been willing to grant similar rights to other U.S.-based conformity assessment bodies, explaining that it is only allowing one MOU per country.  Reportedly, Japan has MOUs allowing two conformity assessment bodies to conduct follow-up inspections, as does Germany.

In 2006, as in prior years, the United States raised its concerns about the CCC mark system and China's failure to allow foreign-invested conformity assessment bodies with China bilaterally and during meetings of the WTO's TBT Committee, including the transitional review held in November 2006, where it received support from the EC and Japan.  The United States will continue to be in close contact with the relevant Chinese authorities in these areas in 2007.

The United States also sought to address one of the more significant problem areas – duplicative certification requirements for imported medical equipment – through the April 2006 JCCT meeting.  The United States was able to obtain China's commitment to eliminate the redundancies to which imported medical equipment has been subjected.  To date, however, China has only taken steps to address duplicative product testing.  China has not yet addressed

the more burdensome duplicative factory audits and certification requirements applicable to imported electro-medical equipment or additional product-specific concerns, such as redundancies on border inspections for imported pacemakers. The United States raised its concerns in a series of subsequent bilateral meetings in the second half of 2006 as well as during the transitional review before the TBT Committee, held in November 2006. The United States will continue to pursue China's full implementation of this JCCT commitment in 2007.

### *Other Internal Policies*

<u>State-Owned and State-Invested Enterprises</u>

While many provisions in China's WTO accession agreement indirectly discipline the activities of state-owned and state-invested enterprises, China also agreed to some specific disciplines. In particular, it agreed that laws, regulations and other measures relating to the purchase of goods or services for commercial sale by state-owned and state-invested enterprises, or relating to the production of goods or supply of services for commercial sale or for non-governmental purposes by state-owned and state-invested enterprises, would be subject to WTO rules. China also affirmatively agreed that state-owned and state-invested enterprises would have to make purchases and sales based solely on commercial considerations, such as price, quality, marketability and availability, and that the government would not influence the commercial decisions of state-owned and state-invested enterprises. Since China's accession to the WTO, U.S. officials have not heard many complaints from U.S. companies regarding WTO compliance problems in this area, although a lack of available information continues to make it a difficult area to assess. In 2005, however, some U.S. companies began to raise questions about the role of China's government in the decisions of state-owned enterprises contemplating foreign acquisitions, particularly in the oil and gas sector. In addition, in 2006, China issued a number of measures restricting the ability of state-owned and state-invested enterprises to accept foreign investment, as discussed below in the Investment section.

<u>State Trading Enterprises</u>

In its WTO accession agreement, China agreed to disciplines on the importing and exporting activities of state trading enterprises. China committed to provide full information on the pricing mechanisms of state trading enterprises and to ensure that their import purchasing procedures are transparent and fully in compliance with WTO rules. China also agreed that state trading enterprises would limit the mark-up on goods that they import in order to avoid trade distortions. Since China's WTO accession, the United States and other WTO members have sought information from China on the pricing and purchasing practices of state trading enterprises, principally through the transitional reviews at the WTO. So far, however, China has only provided general information, which does not allow a meaningful assessment of China's compliance efforts.

<u>Government Procurement</u>

*Page 52*

The WTO Agreement on Government Procurement (GPA) is a plurilateral agreement and currently covers the United States and 37 other WTO members that have joined it. The GPA applies to the procurement of goods and services by central and sub-central government entities listed by each party, subject to thresholds and certain exceptions. It requires GPA parties to provide MFN and national treatment to the goods, services and suppliers of other GPA parties and to apply detailed procedures designed to ensure fairness and predictability in the procurement process.

At present, China is not a party to the GPA. It committed to become an observer to the GPA upon its WTO accession, and in February 2002 it became an observer to the WTO Committee on Government Procurement. China also committed, in its WTO accession agreement, to initiate negotiations for accession to the GPA "as soon as possible." In late 2003, MOF established a working group to study the possibility of initiating negotiations for accession to the GPA. In response to questions from the United States, the EC and Japan during the transitional review before the Council for Trade in Goods in November 2004, China stated that the working group was still studying the issue. In 2005, the United States placed more focus on this issue in a series of bilateral meetings leading up to the July 2005 JCCT meeting. At that meeting, China agreed to commence "technical discussions" with the United States and other WTO members in preparation for the initiation of negotiations to join the GPA. The first round of technical discussions between China and the United States took place in February 2006. The United States also supplemented these discussions by pursuing capacity building designed to further educate Chinese policy makers about the GPA and government procurement issues generally. The United States again pressed China to commit to the initiation of negotiations for accession to the GPA by a date certain during the run-up to the April 2006 JCCT meeting. At that meeting, the two sides agreed that China would continue participating in preparatory technical discussions and that China would initiate GPA negotiations by no later than December 2007.

Until it joins the GPA, China has committed in its WTO accession agreement that all of its central and local government entities will conduct their procurements in a transparent manner. China also agreed that, if it opened a procurement to foreign suppliers, it would provide MFN treatment by allowing all foreign suppliers an equal opportunity to participate in the bidding process.

In June 2002, China adopted its *Government Procurement Law*, which became effective in January 2003. This law attempts to follow the spirit of the GPA and incorporates provisions from the United Nations Model Law on Procurement of Goods. The law also directs central and sub-central government entities to give priority to "local" goods and services, with limited exceptions, as China is permitted to do, because it is not yet a party to the GPA. China envisions that this law will improve transparency, reduce corruption and lower government costs. This law is also seen as a necessary step toward reforming China's government procurement system in preparation for China eventually becoming a party to the GPA. It is notable, however, that the *Government Procurement Law* does not cover tendering and bidding for public works projects, which represent at least one-half of China's government procurement market. Those projects are

*Page 53*

subject to a different regulatory regime, which will have to be harmonized with the regime established by the *Government Procurement Law* before China accedes to the GPA.

China began the process of drafting regulations implementing the *Government Procurement Law* soon after its issuance in June 2002. MOF circulated a draft of these regulations – the *Measures on the Administration of Bidding for Government-Procured Goods and Services* – for public comment in December 2002. The United States submitted written comments and then followed up on them during bilateral meetings with MOF officials. The final regulations, issued in August 2004, set out detailed procedures for the solicitation, submission and evaluation of bids for government contracts relating to goods and services and help to clarify the scope and coverage of the *Government Procurement Law*. MOF also issued several sets of implementing rules, including measures relating to the announcement of government procurements and the handling of complaints by suppliers relating to government procurement.

Meanwhile, as previously reported, beginning in 2003, U.S. companies expressed concerns about implementing rules on government software procurement being drafted by MOF. At a time when China's already large software market was projected to grow by more than 50 percent annually, the initial draft of these rules reportedly contained guidelines mandating that central and local governments – the largest purchasers of software in China – purchase only software developed in China to the extent possible. In response, the United States organized an industry roundtable to inform the relevant Chinese ministries of the views and concerns of interested U.S. trade associations. U.S. industry officials explained that the creation of a domestic software industry cut off from global standards would lead to inefficiencies and would limit, rather than promote, the development of China's software industry. Working closely with U.S. industry, the United States also submitted written comments on the software procurement proposal and followed up by strongly reiterating its concerns with China during a series of bilateral meetings. The United States subsequently made it one of its priority issues during the run-up to the July 2005 JCCT meeting. The United States was concerned not only about U.S. software exporters continuing access to China's large and growing market for packaged and custom software – $7.5 billion in 2004 – but also about the precedent that could be established for other sectors if China proceeded with MOF's proposed restrictions on the purchase of foreign software by central and local governments. At the JCCT meeting, China took note of the United States' strong concerns and indicated that it would indefinitely suspend the drafting of implementing rules on government software procurement.

Soon afterwards, however, the issue of preferences for the purchase of domestic goods again appeared, when the State Council issued China's *Medium to Long-term Science and Technology Master Plan* in early 2006. The NDRC and several other ministries and agencies are in charge of developing regulations to implement this strategy, which includes preferences for the purchase of domestic goods as an important industrial policy tool. The United States is concerned that these regulations may unfairly discriminate against U.S. firms and is therefore closely monitoring developments in this area.

*Page 54*

A similar issue arose in December 2005, when China announced that products incorporating the WAPI standards should be given preference in government procurement, as discussed above (in the Standards and Technical Regulations section). The United States has been monitoring this development, but so far the trade effects of this policy appear to be limited.

As in prior years, the United States will continue to monitor the treatment accorded to U.S. suppliers under the *Government Procurement Law* in 2007 and will continue to urge China to apply its new regulations and implementing rules in a transparent, non-discriminatory manner. In addition, looking ahead to China's accession to the GPA, China's government procurement market is significant in size, and U.S. firms have made cleat that China's timely GPA accession is a top priority for them. The United States will therefore continue to encourage China to develop its government procurement system in a manner that will facilitate its accession to the GPA and will seek opportunities to assist China as it undertakes the necessary preparations for that accession.

**Investment**

Upon its accession to the WTO, China assumed the obligations of the Agreement on Trade-Related Investment Measures (TRIMS Agreement), which prohibits investment measures that violate GATT Article III obligations to treat imports no less favorably than domestic products or the GATT Article XI obligation not to impose quantitative restrictions on imports. The TRIMS Agreement thus expressly requires elimination of measures such as those that require or provide benefits for the incorporation of local inputs (known as local content requirements) in the manufacturing process, or measures that restrict a firm's imports to an amount related to its exports or related to the amount of foreign exchange a firm earns (known as trade balancing requirements). In its WTO accession agreement, China also specifically agreed to eliminate export performance, local content and foreign exchange balancing requirements from its laws, regulations and other measures, and not to enforce the terms of any contracts imposing these requirements. In addition, China agreed that it would no longer condition importation or investment approvals on these requirements or on requirements such as technology transfer and offsets.

Before its accession to the WTO, China began revising its laws and regulations on foreign-invested enterprises to eliminate WTO-inconsistent requirements relating to export performance, local content, foreign exchange balancing and technology transfer. However, some of the revised laws and regulations continue to "encourage" technology transfer, without formally requiring it. U.S. companies remain concerned that this "encouragement" in practice can amount to a "requirement" in many cases, particularly in light of the high degree of discretion provided to Chinese government officials when reviewing investment applications. Similarly, some laws and regulations "encourage" exportation or the use of local content. Moreover, according to U.S. companies, some Chinese government officials in 2006 – even in the absence of encouraging language in a law or regulation – still consider factors such as export performance and local content when deciding whether to approve an investment or to recommend approval of a loan from a Chinese policy bank, which is often essential to the success of an investment project. The

*Page 55*

United States and other WTO members, including the EC and Japan, have raised concerns in this area during the annual transitional reviews conducted by the TRIMS Committee. The United States will continue to follow this situation closely in 2007.

In a separate commitment, as previously reported, China agreed to revise its Industrial Policy for the Automotive Sector to make it compatible with WTO rules and principles by the time of its accession. However, China missed this deadline, and U.S. industry reported that some local officials were continuing to enforce the WTO-incompatible provisions of the policy. In mid-2003, China began circulating a draft of a new automobile industrial policy for review by select domestic enterprises, and some of these enterprises forwarded the draft to their foreign joint venture partners. It was the United States' understanding that this draft, among other things, discouraged the importation of auto parts, sought to restrict imports of complete knocked-down auto kits, and set targets encouraging the use of domestic technology. China was also reportedly considering a requirement that separate distribution channels be used for domestic and imported autos.

In 2003, working closely with U.S. industry, the United States pressed China for full implementation of its commitment to make its automobile industrial policy compatible with WTO rules as well as related commitments scheduled to be phased in over time. In a series of bilateral meetings with China, including the Trade Dialogue meetings held in Beijing in November 2003, the United States made clear that discriminatory industrial policies, whether for the automotive or other sectors, are not in keeping with China's WTO commitments and create unacceptable distortions in China's economy. In addition, the United States and other WTO members, including the EC and Japan, presented their concerns about the types of provisions being considered by China during the transitional reviews before the TRIMS Committee, the Market Access Committee and the Council for Trade in Services in 2003. They also urged China to circulate a draft of the new automobile industrial policy more widely, in accordance with its commitment to provide an opportunity for public comment on new or revised trade-related laws and regulations.

The United States continued to press China bilaterally on this issue in 2004. In May 2004, China issued the final version of its new automobile industrial policy. This policy was revised to eliminate any requirement that separate distribution channels be used for domestic and imported autos, although it continued to include provisions discouraging the importation of auto parts and encouraging the use of domestic technology. This policy also required new automobile and automobile engine plants to include substantial investment in research and development facilities, even though China expressly committed in its WTO accession agreement not to condition the right of investment on the conduct of research and development. The United States, the EC and Japan raised concerns and sought clarifications about various aspects of this policy during the transitional reviews before the Committee on Market Access, the TRIMS Committee and the Council for Trade in Goods in September, October and November 2004.

In 2005, China began to issue measures implementing the new automobile industrial policy. One measure that generated strong criticism from the United States, the EC, Japan and Canada was

*Page 56*

the *Measures on the Importation of Parts for Entire Automobiles*, which was issued by the NDRC in February 2005 and became effective in April 2005.  These rules impose charges that unfairly discriminate against imported auto parts and discourage automobile manufacturers in China from using imported auto parts in the assembly of vehicles.  Specifically, the rules require all vehicle manufacturers in China that use imported parts to register with China's Customs Administration and provide specific information about each vehicle they assemble, including a list of the imported and domestic parts to be used, and the value and supplier of each part.  If the number or value of imported parts in an assembled vehicle exceeds specified thresholds, the regulations assess each of the imported parts a charge equal to the tariff on complete automobiles (typically 25 percent) rather than the tariff applicable to auto parts (typically 10 percent).  These rules appear to be inconsistent with several WTO provisions, including Article III of GATT 1994 and Article 2 of the Agreement on Trade-Related Investment Measures, as well as the commitment in China's accession agreement to eliminate all local content requirements relating to importation.

At the July 2005 JCCT, China agreed to review its auto parts rules in light of the United States' concerns.  The United States subsequently raised its concerns multilaterally through the transitional review before the WTO Committee on Market Access, held in October 2005, as did other WTO Members.  In November 2005, the United States again pressed China for action during high-level meetings in Beijing, but China indicated that it was still reviewing the rules.

Further bilateral engagement in early 2006 made clear that China was not prepared to address the United States' concerns and revise the rules on auto parts.  Similar efforts by the EC, Japan and Canada were also unsuccessful.  In late March and early April 2006, the United States, the EC and Canada initiated dispute settlement against China by filing formal WTO consultations requests.  Joint consultations were held in May 2006.  However, these consultations did not lead to any serious discussion of possible agreed resolutions.  In September 2006, the United States, the EC and Canada filed requests for the establishment of a panel to hear the dispute.  A panel was established at the October 2006 meeting of the WTO's Dispute Settlement Body.

China issued another major industrial policy – the Steel and Iron Industry Development Policy – in July 2005.  Although many aspects of this new policy have not yet been implemented, it still includes a host of objectives and guidelines that raise serious concerns.  As previously reported, this policy restricts foreign investment in a number of ways.  For example, it requires that foreign investors possess proprietary technology or intellectual property in the processing of steel.  Given that foreign investors are not allowed to have a controlling share in steel and iron enterprises in China, this requirement would seem to constitute a *de facto* technology transfer requirement, in conflict with the commitment in China's accession agreement not to condition investment on the transfer of technology.  This policy also appears to discriminate against foreign equipment and technology imports.  Like other measures, this policy encourages the use of local content by calling for a variety of government financial support for steel and iron projects utilizing newly developed domestic equipment.  Even more troubling, however, it calls for the use of domestically produced steel-manufacturing equipment and domestic technologies whenever domestic suppliers exist, apparently in contravention of the commitment in China's accession

*Page 57*

agreement not to condition the right of investment or importation on whether competing domestic suppliers exist.

This policy is troubling because it attempts to dictate industry outcomes and involves the government in making decisions that should be made by the marketplace.  It prescribes the number and size of steel producers in China, where they will be located, the types of products that will and will not be produced, and the technology that will be used.  This high degree of government direction and decision-making regarding the allocation of resources into and out of China's steel industry raises concerns not only because of the commitment that China made in its WTO accession agreement that the government would not influence, directly or indirectly, commercial decisions on the part of state-owned or state-invested enterprises, but also more generally because it represents another significant example of China reverting to a reliance on government management of market outcomes instead of moving toward a reliance on market mechanisms.  Indeed, it is precisely that type of regressive approach that is at the root of many of the WTO compliance problems encountered by U.S. industry.

To date, the United States has raised its various concerns with China's new steel policy, both bilaterally and at the WTO.  In March 2006, the United States and China held the inaugural meeting of a new JCCT dialogue on the steel industry, made critical by the continuing rapid expansion of China's steel capacity and production and the sharp increase in steel exports from China that began in 2005.  The two sides held a second Steel Dialogue meeting in October 2006, with participation from U.S. and Chinese steel industry officials, with the objectives of increasing mutual understanding of the challenges faced by each industry and discussing strategies for addressing trade imbalances, including the benefits of increased reliance on market mechanisms.   At the WTO, the United States continued to press its concerns, in regular meetings and through the transitional reviews before the Committee on Import Licensing, the TRIMS Committee and the Subsidies Committee in 2005 and 2006, with support from other WTO members, including Canada, Mexico, the EC and Japan.  The United States also focused on China's steel policy in connection with China's first Trade Policy Review at the WTO, held in April 2006.  The United States will continue to closely scrutinize China's steel policy and its implementation in 2007.

Meanwhile, in January 2005, as previously reported, the State Council issued a revised *Sectoral Guidelines Catalogue for Foreign Investment*.  Like the prior version of this catalogue, issued in March 2002, the revised catalogue generally reflects China's decision to adhere to its commitments to open up certain sectors to foreign investment, although one notable exception involved the importation of books, newspapers, periodicals, electronic publications and audio and video products (as discussed above in the Trading Rights and Distribution Services sections).  In addition, while China continued to allow foreign investment in a number of sectors not covered by its WTO accession agreement, one notable exception to this progress continues to be the area of production and development of genetically modified plant seeds, which China still places in the "prohibited" category.

*Page 58*

Over the past year, the United States and U.S. industry have become concerned about new restrictions on investment being proposed and implemented by China.  Often, these restrictions are accompanied by other problematic industrial policies, such as the increased use of subsidies, preferences for using domestic rather than imported goods, and the development of China-specific standards.

One example can be found in the *State Council Opinions on the Revitalization of the Industrial Machinery Manufacturing Industries*, issued in June 2006.  This measure identifies 16 types of equipment manufacturing as the focus of a new initiative, including large equipment for clean and efficient power generation, critical semiconductor manufacturing equipment, civilian aircraft and aircraft engines, pollution control equipment, textiles machinery and large excavators.  The new initiative calls for a variety of policy supports designed to promote, develop and expand the market share of domestic companies in these sectors, including preferential import duties on parts and material needed for research and development, encouragement for procuring domestically manufactured new major technical equipment, a dedicated fund to facilitate capital market financing for domestic firms, and strict review of imports.  At the same time, the measure indicates that new controls on foreign investment are being contemplated for these sectors, including new approval requirements when foreign entities seek majority ownership or control and the strengthening of the management of equipment and machinery imports.

In August 2006, China made a further move toward a more restrictive investment regime when it issued – without advance notice or an opportunity for public comment – new regulations on mergers and acquisitions (M&A regulations) involving foreign investors.  These regulations were the joint effort of MOFCOM, SAT, SAIC, the State-owned Assets Supervision and Administration Commission, the China Securities Regulatory Commission and the State Administration of Foreign Exchange.   The regulations strengthen MOFCOM's supervisory role over foreign investment, in part by requiring MOFCOM's approval of M&A transactions that it believes impact "national economic security" or involve famous Chinese brands.  The regulations also place MOFCOM in the role of determining if the domestic acquisition target has been appropriately valued.

One trade association with broad representation expressed U.S. industry's concerns succinctly:

> In a range of sectors, . . . China appears to be accelerating the implementation of barriers to investment by foreign entities . . . .  We are concerned that these restrictions, which will only retard the growth and development of the Chinese economy, are increasingly seen as protectionist tools by industrial planners to shield inefficient or monopolistic enterprises from competition.  While we recognize that certain sectors may have particular sensitivity in China due to security or other concerns, the broad application of investment barriers under such auspices – including increasing restrictions on foreign acquisitions of Chinese companies – is a deeply worrisome trend and stands counter to the market-oriented principles that have been the basis for much of China's economic success over the past few decades.

*Page 59*

The United States agrees with this assessment and has raised its concerns, both bilaterally with China and at the WTO during the transitional reviews before the TRIMS Committee and the Council for Trade in Goods, held in October and November 2006. The United States will continue to monitor developments in this area closely in 2007.

**Agriculture**

Upon its accession to the WTO, China assumed the obligations of the WTO Agreement on Agriculture, which contains commitments in three main policy areas for agricultural products: market access, domestic support and export subsidies. In some instances, China also made further commitments, as specified in its accession agreement.

In the area of market access, WTO members committed to the establishment of a tariff-only regime, tariff reduction and the binding of all tariffs. As a result of its accession negotiations, China agreed to significant reductions in tariff rates on a wide range of agricultural products. China also agreed to eliminate quotas and implement a system of TRQs designed to provide significant market access for certain bulk commodities upon accession. This TRQ system is very similar to the one governing fertilizers (discussed above in the Import Regulation section). China's goods schedule sets forth detailed rules intended to limit the discretion of the agriculture TRQ administrator – originally the State Development and Planning Commission (SDPC), which is now called the NDRC – and to require it to operate with transparency and according to precise procedures for accepting quota applications, allocating quotas and reallocating unused quotas.

In the area of domestic support, the basic objective is to encourage a shift in policy to the use of measures that minimize the distortion of production and trade. Essentially, WTO members committed to reduce over time the types of domestic subsidies and other support measures that distort production and trade, while WTO members remain free to maintain or even increase support measures that have little or no distorting effect, such as agricultural research or training by the government. China committed to a cap for trade- and production-distorting domestic subsidies that is lower than the cap permitted for developing countries and that includes the same elements that developed countries use in determining whether the cap has been reached.

In the area of export subsidies, WTO members committed to ban the use of these subsidies unless they fall within one of four categories of exceptions, the principal one of which allows export subsidies subject to certain reduction commitments. However, like many other WTO members, China agreed to eliminate all export subsidies upon its accession to the WTO and did not take any exceptions.

Another important agricultural area is covered by the WTO Agreement on the Application of Sanitary and Phytosanitary Measures (SPS Agreement), under which China also became obligated. The SPS Agreement establishes rules and procedures regarding the formulation and application of sanitary and phytosanitary measures, i.e., measures taken to protect against risks associated with plant or animal borne pests and diseases, additives, contaminants, toxins and disease-causing organisms in foods, beverages or feedstuffs. The rules and procedures in the

*Page 60*

SPS Agreement require that sanitary and phytosanitary measures address legitimate human, animal and plant health concerns, do not arbitrarily or unjustifiably discriminate between WTO members' agricultural and food products, and are not disguised restrictions on international trade. The SPS Agreement requires that the measures in question be based on scientific grounds and developed through risk assessment procedures, while at the same time it preserves each member's right to choose the level of protection it considers appropriate with regard to sanitary and phytosanitary risks.

Other WTO agreements also place significant obligations on China in the area of agriculture. Three of the most important ones are GATT 1994, the Import Licensing Agreement and the TBT Agreement, which are discussed above (in the sections on Import Regulation and Internal Policies Affecting Trade).

China also made several additional commitments intended to rectify other problematic agricultural policies, either upon accession or after limited transition periods. For example, China agreed to permit non-state trading enterprises to import specified TRQ shares of wheat, corn, rice, cotton, wool and vegetable oil, although these products had been subject to import monopolies by state trading enterprises.

While tariff reductions have certainly encouraged U.S. exports to China, which continued to reach record highs in 2006, the increases continued to be largely the result of greater demand. At the same time, a variety of non-tariff barriers continued to impede agricultural trade with China, particularly in the area of sanitary and phytosanitary measures, where China's actions often have not appeared to be guided by scientific principles. As in prior years, the United States and China have been able to resolve some of these issues through protracted negotiations, but others appear to have reached an impasse.

On the positive side, U.S. agricultural products continued to experience strong sales to China. China is now the United States' fourth largest agricultural export market, as U.S. exports to China totaled $4.8 billion from January through September 2006, a significant increase (42 percent) over the same period in 2005, another very successful year. In fact, in 2005, U.S. agricultural exports exceeded $5.2 billion, more than twice the level in 2002 and more than five times the level in 1999.

Meanwhile, commitments announced at the April 2004, July 2005 and April 2006 JCCT meetings on the issue of U.S. beef market access to China following the discovery of bovine spongiform encephalopathy (BSE) in two U.S. cows and one cow imported to the United States from Canada resulted only in limited and sporadic progress. This issue is emblematic of the continuing problems U.S. exporters face with non-transparent application of sanitary and phytosanitary measures, many of which have appeared to lack scientific bases and have impeded market access for many U.S. agricultural products.

China's unnecessary and seemingly arbitrary inspection-related import requirements also continued to impose burdens and regulatory uncertainty on U.S. agricultural producers exporting

to China in 2006.  In addition, registration requirements for animal feeds were unnecessarily burdensome and limited the ability of U.S. exporters to access China's market, while China's administration of TRQs on bulk agricultural commodities was still not functioning entirely as envisioned in China's WTO accession agreement, as it continued to be impaired by inadequate transparency.

In 2007, as in prior years, the United States will continue to pursue vigorous bilateral engagement with China in order to obtain progress on its outstanding concerns.  As part of this effort, the United States will continue to use the high-level U.S.-China agricultural working group, created at the April 2004 JCCT meeting, as a vehicle to address each side's concerns in the agriculture area.

*Tariffs*

China implemented the required tariff changes on agricultural goods for 2006 on schedule on January 1, 2006, just as it did for industrial goods.  These changes increased market access for many U.S. agricultural exporters, as China continued the scheduled reduction of tariffs on agricultural goods.  As previously reported, tariffs of greatest importance to U.S. farmers and ranchers are being lowered from a 1997 average of 31 percent to 14 percent, in almost all cases over a period of five years running from January 1, 2002, or by January 1, 2006.

The tariff reductions made by China, coupled with increased demand, contributed to a marked increase in certain U.S. exports to China.  Exports of some bulk agricultural commodities have increased dramatically in recent years, and continue to perform strongly, including soybeans and cotton.  Exports of forest products such as lumber continued to perform strongly, increasing by 15 percent for the first nine months of 2006, with a projected year-end total of $550 million. Fish and seafood exports, after having increased from $119 million in 2001 to $135 million in 2002, and then to $176 million in 2003 and $258 million in 2004, rose to $351 million in 2005 and by another 25 percent in the first nine months of 2006 and were projected to reach $450 million by the end of the year.  Meanwhile, exports of consumer-oriented agricultural products increased by 32 percent from January through September 2006, when compared to the same period in 2005, and were projected to exceed $650 million by the end of they year.

However, the full market access potential of China's tariff cuts was not realized for some products.  As discussed below, a variety of non-tariff barriers continue to impede market access for U.S. agricultural exports to China, particularly exports of consumer-ready and value-added products.

*China's Biotechnology Regulations*

As previously reported, one of the most contentious agriculture issues that arose during China's first year of WTO membership involved new rules implementing June 2001 regulations relating to biotechnology safety, testing and labeling.  The implementing rules, issued by China's Ministry of Agriculture (MOA) shortly before China's WTO accession, did not provide adequate

*Page 62*

time for scientific assessment and the issuance of formal safety certificates for biotechnology products. As the March 2002 effective date for these implementing rules approached, trade in biotechnology products began to be disrupted. The U.S. products most affected were soybeans, which had seen exports to China grow to more than $1 billion in 2001, while corn and other products, such as consumer products made from biotech commodities, remained at risk. Following concerted, high-level pressure from the United States, China agreed to a temporary solution in March 2002, which provided for a nine-month delay, effected through the issuance of temporary safety certificates, good through December 20, 2002. When it became apparent that this extension would not be sufficient, further high-level engagement produced another agreed extension until September 2003 and later an extension until April 2004. China finally issued a formal safety certificate for a U.S. biotechnology soybean variety known as Roundup Ready soybeans in February 2004. In addition, by the time of the April 2004 JCCT meeting, China had also issued formal safety certificates for six corn events, seven canola events and two cotton events. China issued a formal safety certificate for another corn event a few months later, leaving only one corn event still awaiting formal approval. China issued a formal safety certificate for this last corn event at the time of the July 2005 JCCT meeting.

With some stability added to the China soybean market through the extensions in 2003 and the issuance of the formal safety certificate for Roundup Ready soybeans in February 2004, U.S. exports of soybeans performed strongly. In 2003, U.S. soybean exports reached a record level of $2.9 billion, representing an increase of 190 percent over 2002. In 2004, U.S. soybean exports declined to $2.3 billion, although this figure was still twice the level of any year prior to 2003. In 2005, U.S. soybean exports remained approximately steady at $2.2 billion. In the first nine months of 2006, U.S. soybean exports totaled $1.3 billion, an increase of 12 percent over the same period in 2005, and China remained the leading export destination for U.S. soybeans.

Meanwhile, other U.S. concerns with China's biotechnology regulations and implementing rules remain. For example, China requires a product to be approved in the United States before it can be submitted in China for approval, and China allows only two new product applications each year. Both of these practices present significant and unnecessary delays for bringing U.S. goods into the China market. China's lack of clarity on the requirements applicable to products stacked with multiple traits is a cause for additional concern, as are China's sometimes duplicative and unprecedented testing requirements.

In November 2006, MOA finally issued an announcement about the renewal requirements for safety certificates covering biotechnology crops imported for processing purposes. Because safety certificates for cotton, soybeans, corn and canola are due to expire beginning in February 2007, it is possible that trade in these products may be disrupted, depending on how the approval process works. Indeed, even if the approval process proceeds quickly, trade may still be disrupted, as importers need time to apply for vessel-based safety certificates and Quarantine Inspection Permits, both of which require valid safety certificates for biotechnology products and can take up to 30 working days.

*Page 63*

A high-level U.S.-China biotechnology working group that was formed in July 2002 is discussing these and other issues.  In addition, a newly created subgroup of experts focuses on specific, technical issues.  Together, these two groups have made substantial progress, and they will continue to work through the range of issues in 2007.

### *Tariff-rate Quotas on Bulk Agricultural Commodities*

Another issue of particular concern involves China's commitments relating to TRQs on bulk agricultural commodities, which include several commodities of particular importance to U.S. farmers, such as wheat, corn, cotton and vegetable oils.  Since SDPC (and later NDRC) began implementing these commitments following China's accession, a series of problems have undermined the market access envisioned by WTO members.  Although progress has been made on some of these issues, NDRC's lack of transparency continues to create significant concern.

As previously reported, in 2002, the first year of this TRQ system, it appeared that SDPC had decided to allocate TRQs in a manner that would protect domestic farm interests and maintain the monopoly enjoyed by state trading enterprises.  SDPC operated with only limited transparency, refusing to provide specific details on the amounts and the recipients of the allocations.  At the same time, SDPC reserved a significant portion of the TRQs for the processing and re-export trade, despite China's commitment to provide market access and national treatment for imported products.  SDPC also allocated a portion of the TRQs for some commodities in smaller than commercially viable quantities, and it employed burdensome licensing requirements.  As these problems became apparent, the United States repeatedly engaged China bilaterally, at all levels of government, and it also raised its concerns at the WTO during meetings of the Committee on Agriculture.  In July 2002, the United States requested formal consultations with China under the headnotes contained in China's WTO goods schedule, and those consultations took place in September 2002 in Geneva.

Following the 2003 TRQ allocations, it became clear that the most serious first-year problems – lack of transparency, sub-division of the TRQ, small allocation sizes and burdensome licensing – persisted.  The United States again engaged China bilaterally on several occasions, culminating with high-level meetings in Beijing in June 2003.  At these meetings, China agreed to take steps to address most of the United States' concerns.  China followed through on its June 2003 commitments in part in October 2003, when NDRC issued new regulations for shipments beginning January 1, 2004.  Key changes made by these regulations include the elimination of separate allocations for general trade and processing trade, the elimination of certain unnecessary licensing requirements, and the creation of a new mechanism for identifying allocation recipients.

In 2004, as the United States focused on how NDRC was enforcing its new regulations in a series of bilateral meetings during the run-up to the April 2004 JCCT meeting, improvements in NDRC's TRQ administration became evident.  NDRC implemented the regulatory provision calling for the elimination of separate allocations for general trade and processing trade, increased the size of quota allocations, and improved its handling of reallocations.  At the same

*Page 64*

time, transparency continues to be problematic, although some improvement did take place for some of the commodities subject to TRQs.

While these systemic changes were taking place, exports of some bulk agricultural commodities from the United States continued to show substantial increases, largely due to market conditions. In particular, despite some continuing problems with NDRC's handling of the cotton TRQs, U.S. cotton exports totaled a record $1.4 billion in 2004 and $1.4 billion again in 2005.  U.S. wheat exports totaled an unusually high amount of $495 million in 2004, as the TRQ allocations for wheat did not appear to act as a limiting factor, and then $79 million for  2005, still substantially above the years prior to 2004.

Throughout 2006, the United States continued to raise transparency and other concerns, both in bilateral meetings and during the transitional review before the WTO's Committee on Agriculture in October 2006.  In 2007, the United States will continue to work to ensure that NDRC administers TRQs transparently and in a manner that is consistent with China's commitments and that does not impede market access or commercial decisions.

### Sanitary and Phytosanitary Issues

In 2006, China's SPS measures continued to pose a serious problem for U.S. agricultural producers exporting to China.  As in prior years, the United States repeatedly engaged China on a number of SPS issues, both in bilateral meetings, including high-level meetings, and during meetings of the WTO's SPS Committee, including the transitional review held in October 2006.  The United States also continued to provide training to China's regulatory authorities.  As discussed below, however, little progress has been achieved to date, except in the case of the Avian Influenza (AI) bans and, to a limited extent, the BSE-related ban on low-risk bovine products.  In many instances, progress was made difficult by China's inability to provide relevant risk assessments or the science-based rationale for maintaining its import restrictions against U.S.-origin products.  For example, in 2006, China was unable to provide a science-based rationale for maintaining import restrictions on U.S. beef products and some U.S. poultry and pork products, as described below.   The United States will continue to press for resolution of these and other outstanding issues in 2007.

<u>BSE-Related Bans on Beef and Low-Risk Bovine Products</u>

In December 2003, China and other countries imposed a ban on imports of U.S. cattle, beef and processed beef products in response to a case of BSE found in the United States.  Since that time, the United States has repeatedly provided China with extensive technical information on all aspects of its BSE-related surveillance and mitigation measures, internationally recognized by the Office International des Epizooties (OIE) as effective and appropriate, for both food safety and animal health.  After three years, China still has not provided any scientific justification for continuing to maintain its ban.

*Page 65*

At the July 2005 JCCT meeting, China did finally agree to send a technical team to the United States to gather information on the United States' surveillance and mitigation measures and to follow a transparent, science-based process leading to the eventual lifting of the ban.  The technical team's visit took place in late October 2005, but no further progress was evident until the April 2006 JCCT meeting, when China agreed to conditionally reopen the Chinese market to U.S. beef, subject to the negotiation and finalization of a protocol by technical experts on an expedited basis.  Jointly negotiated protocols, and accompanying export certificates, are normal measures necessary for the export of any livestock products from the United States to China or other trading partners.

At the end of June 2006, after three inconclusive rounds of negotiations in May and June 2006, China's food safety regulators unilaterally announced a limited market opening, restricted to the entry of U.S. boneless beef thirty months of age or less, and one month later they followed up that announcement with an announcement of 22 onerous entry conditions.  These unilateral announcements had no practical effect, because, as with any trading partners seeking to engage in livestock trade, the United States and China would have had to agree on language for actual export safety certificates before the trade could resume.  Since the June and July 2006 announcements by China, the United States has asked China to review its position on this issue in light of OIE guidelines and to re-engage with U.S. officials, as China's ongoing restrictions raise serious questions with regard to China's obligations under the SPS Agreement, taking into account the relevant international standards governing beef trade.  U.S. and Chinese officials are scheduled to meet in Beijing in December 2006 to discuss this issue.

At the same time that it banned U.S. cattle, beef and processed beef products, China also banned bovine-origin products (i.e., bovine semen, bovine embryos, and protein-free tallow) that are listed in OIE guidelines as safe to trade regardless of a country's BSE status.  Additionally, China banned imports of U.S.-origin non-ruminant feeds and fats (such as pet food, rendered products and porcine proteins) even though these products were of non-bovine-origin and presented absolutely no BSE-related risk.  After numerous bilateral meetings and technical discussions in 2004, including a visit to U.S. bovine facilities by Chinese food safety officials, China announced a lifting of its BSE-related ban for these "low-risk" products in late September 2004.  However, China conditioned the lifting of the ban on the negotiation of protocol agreements setting technical and certification parameters for incoming low-risk products.  In November 2004, U.S. and Chinese officials finalized and signed amended protocols that would enable the resumption of exports of U.S.-origin bovine semen and bovine embryos, contingent on facility-by-facility certification by China's regulatory authorities in accordance with the original protocols that were signed more than 10 years prior.  Additionally, U.S. and Chinese authorities signed a new protocol which authorized a resumption of exports of U.S.-origin non-ruminant feeds and fats.  In July 2005, during the run-up to the JCCT meeting, China finally announced the resumption of trade in bovine semen and bovine embryos, following facility certifications completed in June 2005.  However, it was not until early 2006 that imports of U.S.-origin bovine semen and bovine embryos actually resumed.  Additionally, in June 2005, China agreed to accept a systems approach audit (as opposed to facility-by-facility certification) to approve U.S. facilities to export U.S.-origin non-ruminant feeds and fats (pet food, rendered

*Page 66*

products, porcine proteins, etc.) to China.  The initial shipment of U.S.-origin non-ruminant pet food occurred in September 2005.  By January 2006, trade in the full range U.S.-origin non-ruminant feed and fat  products had also resumed, after negotiation and resolution of a series of onerous, detailed and unnecessary non-BSE related information requirements proposed by China that are not consistent with OIE guidelines and contrast sharply with U.S. requirements.  To date, trade in protein-free tallow (a product listed by the OIE as safe to trade regardless of a country's BSE status) has still not resumed, as U.S. and Chinese officials continue to be unable to reach agreement on provisions of a protocol.

Pathogen Standards and Residue Standards for Raw Meat and Poultry Products

Since 2002, as previously reported, China has applied SPS-related requirements on imported raw meat and poultry that do not appear to be consistent with Codex Alimentarius (Codex) guidelines or current scientific testing practices.  One requirement establishes a zero tolerance limit for the presence of Salmonella bacteria.  Similar zero tolerance standards exist for E. Coli and Listeria pathogens.  Meanwhile, the complete elimination of these enteropathogenic bacteria is generally considered unachievable without first subjecting raw meat and poultry to a process of irradiation.  Moreover, China apparently does not apply this same standard to domestic raw poultry and meat, raising national treatment concerns.

In late 2005 and early 2006, 14 U.S. pork and poultry plants were de-listed by China for alleged violations of zero tolerance standards for pathogens or detection of certain chemical residues.  Despite positive results from USDA Food Safety and Inspection Service investigations of the plants, the majority of the plants were not re-listed as approved to ship product to China until April 2006, following extensive engagement between U.S. and Chinese regulatory officials because of differences between Codex guidelines and China's SPS-related requirements on imported raw meat and poultry.  Two U.S. plants remain de-listed while U.S. regulatory officials continue to press Chinese regulatory officials to re-list the plants or provide scientific justification.

Meanwhile, China continues to maintain maximum residue levels (MRLs) for certain heavy metals, veterinary drugs and other residues that are inconsistent with Codex and other international standards.  China also enforces a "zero tolerance" for some residues, even where Codex has adopted guidelines that many of China's major trading partners have adopted.  U.S. regulatory officials have encouraged their Chinese counterparts to adopt MRLs that are scientifically based, safe and minimally trade-disrupting.  This effort will continue in 2007.

Avian Influenza

In February 2004, as previously reported, China imposed a nationwide ban on U.S. poultry in response to cases of low-pathogenic AI found in Delaware.  Throughout 2004, the U.S. provided technical information to China on the U.S. AI situation, and in August a high-level Chinese delegation conducted a review of the status of AI eradication efforts in the United States.  In

*Page 67*

December 2004, China lifted its nationwide ban on U.S. poultry, leaving in place a ban only for the states of Connecticut and Rhode Island.

In early 2005, following the announcement of low-pathogenic AI found in the state of New York, China did not impose a nationwide ban. Instead, demonstrating progress in following OIE guidelines, China imposed a ban limited to poultry from the state of New York.

In 2006, China imposed an import ban for poultry and poultry products originating from the state of Pennsylvania, based on incidents of low-pathogenic AI. China also suspended the importation of heat-treated and cooked poultry and poultry products at the same time, even though the OIE's AI chapter makes clear that products that have been heat-treated in a manner to inactivate the virus should not be subject to an AI-related import ban. The United States is attempting to work with China's regulators to address this situation.

<u>Wheat</u>

As previously reported, the 1999 U.S.-China Agricultural Cooperation Agreement established an agreed level of TCK fungus tolerance in U.S. wheat, and China no longer routinely blocks U.S. wheat exports from the Pacific Northwest on the basis of the TCK fungus. Nevertheless, China has imposed an MRL for selenium that is below the international standard and threatens all U.S. wheat exports to China. In addition, China has imposed an MRL for vomitoxin in wheat in the absence of any international standard. Although these measures are problematic, U.S. exports of wheat to China in 2006 do not appear to have been impacted by these measures, as China still appears not to be enforcing them.

<u>Food Additive Standards</u>

Another problematic area involves China's overly restrictive food additive standards. China continues to block many U.S. processed food products from entering the Chinese market by banning certain food additives that are widely used in other countries and have been approved by the World Health Organization. One recent example is China's proposed *Hygienic Standard for Uses of Food Additives*, notified to the WTO's TBT Committee in July 2005 so that WTO members could comment on it. This proposed technical regulation is 237 pages long and covers dozens of residues and additives for nearly 1,000 commodities. In some cases, it employs domestic nomenclature rather than internationally recognized technical terms, making it difficult to assess the impact that it would have on specific products. The United States submitted detailed comments on the proposed technical regulation and asked China to delay adoption of it until a thorough review could take place. To date, China has not issued its *Hygienic Standard for Uses of Food Additives* in final form.

<u>Fire Blight</u>

Beginning before its accession to the WTO, China had imposed quarantine restrictions on all but two varieties of U.S. apples and all U.S. plum varieties as well as other U.S. stone fruit, allegedly

*Page 68*

due to phytosanitary concerns regarding fire blight.  However, the WTO Appellate Body report in *Japan - Measures Affecting the Importation of Apples* (*Japan-Apples*), issued in November 2003, determined that these concerns are unwarranted for imports of mature symptomless fruit. Throughout 2004 and 2005, the United States urged China to allow U.S. exports of mature symptomless fruit, consistent with *Japan-Apples*, both in bilateral meetings and at the WTO during regular meetings and the annual transitional reviews before the SPS Committee.  In December 2005, China agreed no longer to impose fire blight-related restrictions on imports of U.S. plum varieties, as U.S. and Chinese regulatory officials reached agreement on import conditions.

### Inspection-related Requirements

Through two measures – the *Administrative Measures for the Entry-Exit Inspection and Quarantine for Grains and Feed Stuff*, which became effective on March 1, 2002, and the *Administrative Measures for Entry Animal and Plant Quarantine*, which became effective September 1, 2002 – AQSIQ requires importers to obtain a Quarantine Inspection Permit, or QIP, prior to signing purchase contracts for nearly all traded agricultural commodities.  QIPs are one of the most important trade policy issues affecting the United States and China's other agricultural trading partners.

AQSIQ sometimes slows down or even suspends issuance of QIPs at its discretion, without notifying traders in advance or explaining its reasons, resulting in significant commercial uncertainty.  Because of the commercial necessity to contract for commodity shipments when prices are low, combined with the inherent delays in having QIPs issued, many cargoes of products such as soybeans, meat and poultry arrive in Chinese ports without QIPs, creating delays in discharge and resulting in demurrage bills for Chinese purchasers.  In addition, traders report that shipment quantities are often closely scrutinized and are at risk for disapproval if considered too large.

Some improvements were made to the QIP system in 2004 following repeated engagement bilaterally and through interventions made by the United States and other WTO members during the transitional reviews before the SPS Committee and the Committee on Import Licensing in 2002 and 2003.  In June 2004, fulfilling a Chinese commitment made in connection with the April 2004 JCCT meeting, AQSIQ issued Decree 73, the *Items on Handling the Review and Approval for Entry Animal and Plant Quarantine*, which extended the period of validity for QIPs from three months to six months.  AQSIQ also began issuing QIPs more frequently within the established time lines.  Nevertheless, a great deal of uncertainty remains even with the extended period of validity, because a QIP still locks purchasers into a very narrow period to purchase, transport and discharge cargoes or containers before the QIP's expiration, and because AQSIQ continues to administer the QIP system in a seemingly arbitrary manner.

Traders continue to be hesitant to press AQSIQ for change because they would risk falling out of favor.  Many traders would at least like AQSIQ to eliminate the quantity requirements that it unofficially places on QIPs.  These quantity requirements have been used often by AQSIQ

*Page 69*

during peak harvest periods to limit the flow of commodity imports.  In 2006, traders reported that MOFCOM not only limited QIP quantities, but also required some companies to use up the majority of a QIP before being issued another one and required other companies to use up their QIPs or risk being "de-listed."  Eliminating these requirements would make the QIP system more dependent on market forecast.

Little improvement in the QIP system has taken place over the last two years.  AQSIQ officials continue to insist that the QIP system ensures that an adequate number of examiners are on duty at ports when shipments arrive to certify and inspect them for quality and quantity, while the United States and other WTO members argue that there does not appear to be any scientific basis for the QIP system and that it serves as an unjust and overly restrictive barrier to trade.  The United States will continue to press China on this important issue in 2007.

Meanwhile, MOFCOM administers a separate import permit system for commodities such as poultry products.  Through its issuance of Automatic Registration Forms (ARFs) to importers, MOFCOM allocates a volume amount to an importer for imports of particular commodities each year.  During 2005 and 2006, U.S. officials continued to encourage MOFCOM to issue these ARFs in a more transparent, flexible manner so that trade is not disrupted.

### Export Subsidies

Since shortly after China's accession to the WTO, U.S. industry has been concerned that China provides export subsidies on corn, despite China's WTO commitment to eliminate all export subsidies upon accession to the WTO.  In past years, it appeared that significant quantities of corn had been exported from China, including corn from Chinese government stocks, at prices that may have been 15 to 20 percent below domestic prices in China.  As a result, U.S. corn exporters were losing market share for corn in their traditional Asian markets, such as South Korea and Malaysia, while China was exporting record amounts of corn.

Since 2002, the United States has pressed its concerns about possible export subsidies on corn with China bilaterally, including in high-level meetings.  The United States has also raised its concerns and has sought additional information about China's corn policies – including the use of potentially excessive VAT rebates – during meetings before the Committee on Agriculture, including the transitional reviews.

In 2004, trade analysts began to conclude that, because of several economic factors, primarily falling stock levels and burgeoning domestic demand, China was trending toward eventually becoming a net importer of corn.  One result appears to be that China's exports are largely being made on a commercial basis, although concern remains regarding the operation of China's VAT rebate system for corn.

The United States will continue to investigate China's subsidization practices and VAT rebate system for the agricultural sector in 2007.  The United States will make every effort to ensure that any use of export subsidies is eliminated.

*Page 70*

**Intellectual Property Rights**

With its acceptance of the TRIPS Agreement, China took on obligations to adhere to generally accepted international norms to protect and enforce the intellectual property rights held by U.S. and other foreign companies and individuals in China.  Specifically, the TRIPS Agreement sets minimum standards of protection for copyrights and neighboring rights, trademarks, geographical indications, industrial designs, patents, integrated-circuit layout designs and undisclosed information.  Minimum standards are also established by the TRIPS Agreement for IPR enforcement in administrative and civil actions and, in regard to copyright piracy and trademark counterfeiting, in criminal actions and actions at the border.  The TRIPS Agreement requires as well that, with very limited exceptions, WTO members provide national and most-favored-nation treatment to the nationals of other WTO members with regard to the protection and enforcement of intellectual property rights.

Since its accession to the WTO, China has overhauled its legal regime and put in place a comprehensive set of laws and regulations aimed at protecting the intellectual property rights of domestic and foreign entities in China.  At the same time, some key improvements in China's legal framework are still needed, and China has continued to demonstrate little success in actually enforcing its laws and regulations in the face of the challenges created by widespread counterfeiting, piracy and other forms of infringement.  Indeed, USTR's April 2006 report under the Special 301 provisions of U.S. trade law cited inadequate IPR enforcement as one of China's greatest shortcomings as a trading partner.  As a result, in 2006, the United States' bilateral engagement with China continued to focus on obtaining improvements to multiple aspects of China's system of IPR protection and enforcement so that significant reductions in IPR infringement in China could be realized and sustained over time.

Several factors contribute to China's poor IPR enforcement record.  One major factor is China's chronic underutilization of deterrent criminal remedies.  Legal measures in China that establish high thresholds for criminal investigation, prosecution and conviction preclude criminal remedies in many instances of commercial-scale counterfeiting and piracy, creating a "safe harbor" for infringers and raising concerns among the United States and some of its major trading partners that China may not be complying with its obligations under Article 61 of the TRIPS Agreement.  With criminal remedies circumscribed, China's enforcement authorities rely instead on toothless administrative enforcement, which primarily results in small fines, administrative injunctions and other minor inconveniences for infringers.  As discussed above in the sections on Trading Rights and Distribution Services, another exacerbating factor – which also raises specific WTO concerns –  is China's continued maintenance of import restrictions and restrictions on wholesale and retail distribution that reduce and delay market access for certain types of legitimate foreign products, such as movies, video games and books, inadvertently helping to ensure that infringing products continue to dominate those sectors within China.

China's leaders began to demonstrate a willingness to address U.S. concerns in October 2003, when a new IPR Leading Group was formed, signaling a more focused and sustained effort by

China to tackle the IPR enforcement problem.  Many officials in China, led by President Hu Jintao, Premier Wen Jiabao and Vice Premier Wu Yi, continued to give voice to China's commitment to protecting intellectual property rights in 2006 and worked hard to make it a reality, as they allocated substantial resources to the effort and attempted to improve not only public awareness but also training and coordination among the numerous Chinese government entities involved in IPR enforcement while simultaneously fighting local protectionism and corruption.  Sustained involvement by China's leaders is critical if China is to deliver on the IPR commitments that it made at the April 2004, July 2005 and April 2006 JCCT meetings, including China's core commitment to significantly reduce IPR infringement levels across the country.

As previously reported, building on earlier engagement with China, the United States conducted an out-of-cycle review under the Special 301 provisions of U.S. trade law in 2004 and 2005.  This review involved a systematic evaluation of China's entire IPR enforcement regime and concluded in April 2005 with the Administration's elevation of China to the Special 301 "Priority Watch" list and the creation of a comprehensive strategy for addressing China's ineffective IPR enforcement regime, which included the possible use of WTO mechanisms, as appropriate.

Pursuing this new strategy at the July 2005 JCCT meeting, the United States sought and obtained China's agreement to take a series of specific actions designed to (1) increase criminal prosecutions of IPR violators, (2) improve enforcement at the border, (3) counter piracy of movies, audio-visual products and software, (4) address Internet-related piracy and (5) assist small and medium-sized U.S. companies experiencing China-related IPR problems, among other things.  To date, China has taken steps to fulfill many of these commitments.  It adopted amended rules governing the transfer of administrative and customs cases to criminal authorities, and it took some steps to pursue administrative actions against end-user software piracy.  China posted an IPR Ombudsman to its Embassy in Washington, who has facilitated contacts between U.S. government officials and their counterparts in Beijing, and has been a source of information for U.S. businesses, including small and medium-size companies.  China has also sought to expand enforcement cooperation.

Meanwhile, in October 2005, the United States submitted a request to China under Article 63.3 of the TRIPS Agreement, as did both Japan and Switzerland, seeking more transparency on IPR infringement levels and enforcement activities in China, with the objective of obtaining a better basis for assessing the effectiveness of China's efforts to improve IPR enforcement since China's accession to the WTO.  However, despite the United States' extensive efforts to follow up on its Article 63.3 request bilaterally, China has since provided only limited information in response, hampering the United States' ability to evaluate whether China is taking all necessary steps to address the rampant IPR infringement found throughout China.

In 2006, the United States again used the JCCT process, including the IPR Working Group created at the April 2004 JCCT meeting, to secure new IPR commitments and, in a few instances, specific actions to implement past commitments.  During the run-up to the April 2006 JCCT meeting, China took enforcement actions against plants that produce pirated optical discs,

*Page 72*

and it also issued new rules that require computers to be pre-installed with licensed operating system software.  At the meeting itself, China further committed to ensure the legalization of software used in Chinese enterprises and to take up issues of government and enterprise software asset management in the JCCT IPR Working Group.  China also agreed to work on cooperation to combat infringing goods displayed at trade fairs in China and to intensify efforts to eliminate infringing products at major consumer markets in China, such as the Silk Street Market in Beijing.  The two sides further agreed that they would increase cooperation between their respective law enforcement authorities and customs authorities and that the United States would provide China with additional technical assistance to aid China in fully implementing the WIPO Internet treaties, i.e., the WIPO Copyright Treaty and the WIPO Performance and Phonograms Treaty.  In addition, China reaffirmed its prior commitments to continue efforts to ensure use of legalized software at all levels of government and to adopt procedures to ensure that enterprises use legal software, beginning with state-owned enterprises and other large enterprises.

To date, China has made some progress in implementing its April 2006 JCCT commitments, but it has been slower than in the past.  One bright spot appears to be China's implementation of the new rules requiring computers to be pre-installed with licensed operating system software, as U.S. industry has been pleased with the initial results of that effort.

### Legal Framework

In most respects, China's framework of laws, regulations and implementing rules remains largely satisfactory.  However, reforms are needed in a few key areas, including certain aspects of the *Criminal Law* and rapidly emerging fields, such as Internet copyright protection.  In particular, right holders have pointed to a number of continuing deficiencies in China's criminal measures.  Most notably, it appears that China needs to eliminate thresholds for criminal prosecution that provide a legal "safe harbor" for many commercial infringers if it is to bring its legal framework into compliance with its TRIPS Agreement obligations.  In addition, while China introduced new regulations in 2006 that represent a positive step toward meeting the requirements of the WIPO Internet treaties, more work is needed at both the national level and the provincial level to meet the challenges of Internet piracy and fully implement the WIPO Internet treaties.

As previously reported, at the time of its accession to the WTO, China was in the process of modifying the full range of IPR laws, regulations and implementing rules, including those relating to patents, trademarks and copyrights.  China had completed amendments to its *Patent Law*, *Trademark Law* and *Copyright Law*, along with regulations for the *Patent Law*.  Within several months after its accession, China issued regulations for the *Trademark Law* and the *Copyright Law*, followed by implementing rules.  China also issued regulations and implementing rules covering specific subject areas, such as integrated circuits, computer software and pharmaceuticals.  U.S. experts carefully reviewed these measures after their issuance and, together with other WTO members, participated in a comprehensive review of them as part of the first transitional review of China before the TRIPS Council in 2002.

Since 2003, China has periodically issued new IPR measures.  The U.S. Government has reviewed these measures through bilateral discussions and subsequent TRIPS Council reviews.  Encouragingly, China has also become more willing to circulate proposed measures for public comment and to discuss proposed measures with interested trading partners and stakeholders.  For example, the United States and U.S. right holders provided written comments to China on several drafts of regulations for the protection of copyrights on information networks.

In 2006, China announced a new Action Plan for revising its legal regime in order to better protect intellectual property rights.  Among other things, this Action Plan sets out China's intentions for revising the *Patent Law*, the *Trademark Law* and related measures, and China subsequently did release new versions of both the *Patent Law* and the *Trademark Law* for public comment.  Since then, the United States has been assessing the potential ramifications of the contemplated revisions for U.S. right holders.  The U.S. Government and U.S. industry groups have also submitted written comments, along with invitations to continue dialogue on these important pieces of legislation.

China has also been working on other proposed legal measures that could have significant implications for the intellectual property rights of foreign right holders.  In particular, China is drafting an *Anti-Monopoly Law* and is considering rules relating to the treatment of IPR by standards-setting organizations.  The United States is carefully monitoring both of these efforts and has raised concerns with particular aspects of these proposals, both in bilateral meetings and at the WTO during the annual transitional reviews before the TRIPS Council and the TBT Committee.

The United States, meanwhile, has repeatedly urged China to pursue additional legislative and regulatory changes, using both bilateral meetings and the annual transitional reviews before the WTO's TRIPS Council.  The focus of the United States efforts is to persuade China to improve its legal regime in certain critical areas, such as criminal IPR enforcement and legislative and regulatory reform, especially with regard to China's high criminal thresholds and other obstacles to effective enforcement.  Other obstacles in the area of criminal enforcement include, for example, the lack of criminal liability for certain acts of copyright infringement, the profit motive requirement in copyright cases, the requirement of identical trademarks in counterfeiting cases, and the absence of minimum, proportional sentences and clear standards for initiation of police investigations in cases where there is a reasonable suspicion of criminal activity.  At the same time, the United States has also been pressing China for a variety of changes to its administrative and civil enforcement regimes.  While some of these issues do not raise specific WTO concerns, all of them will continue to detract from China's enforcement efforts until addressed.

In its 2006 Action Plan, China did not embrace reform of the *Criminal Law*, although it did undertake to "improve" its December 2004 judicial interpretation on the handling of criminal IPR cases.  Improvement of that measure could include clarification of some issues related to China's problematic thresholds, but Chinese government officials have given no indication that this process will lead to the reduction or elimination of these thresholds – a key concern for U.S. right holders, particularly in light of China's obligations under Article 61 of the TRIPS

*Page 74*

Agreement.  In fact, in a series of bilateral meetings that took place in Beijing in 2006, Chinese government officials indicated that any further lowering of the thresholds below the levels set in the December 2004 judicial interpretation would require legislative action by the National People's Congress, which is not contemplated.  In the United States' view, China's high thresholds for criminal prosecution help to explain why criminal remedies are so underutilized in China, as these thresholds create a substantial "safe harbor" for commercial-scale infringers.  The United States is determined to resolve this problem and, in November 2006, informed China that it would be filing a formal request for WTO consultations on this issue and certain other IPR enforcement issues.  However, China asked the United States to hold off on that filing so that further bilateral discussions could take place.  With the support of U.S. industry, the United States agreed to hold further bilateral discussions, with the objective of seeking a resolution in the near term.

The United States has also sought improvements in China's copyright protection in the context of electronic information networks since the April 2004 JCCT meeting.  China took an important step at the time of that meeting when the National Copyright Administration (NCA) issued the *Measures for Administrative Protection of Copyright on the Internet*.  That measure requires Internet service providers to take remedial actions to delete contents that infringe on copyrights upon receipt of a complaint from the right holder, or face administrative penalties ranging from confiscation of illegal gains to fines of up to RMB 100,000 ($12,500).

During the run-up to the July 2005 JCCT meeting, the United States also urged China to accede to the WIPO Internet treaties and to fully harmonize its regulations and implementing rules with them.  Compliance with these treaties is not required under WTO rules, but they still reflect important international norms for providing copyright protection over the Internet.  These treaties have been ratified by many developed and developing countries since they entered into force in 2002.  In the case of China, this type of copyright protection is especially important in light of its rapidly increasing number of Internet users, many of whom have broadband access.  At the July 2005 JCCT meeting, the United States obtained China's commitment to submit the legislative package necessary for China's accession to the WIPO Internet treaties to the National People's Congress by June 2006.  Although China's fulfillment of this commitment has been delayed for technical reasons relating to coordination with Hong Kong and Macau, China did move forward with the harmonization of some of its regulations and implementing rules in 2005 and 2006.  In May 2006, for example, the State Council adopted an important Internet-related measure, the *Regulations on the Protection of Copyright Over Information Networks*, which went into effect in July 2006.  Overall, this measure represents a welcome step, demonstrating China's determination to improve protection of electronic data while China continues its preparations for accession to the WIPO Internet treaties.  This measure is not comprehensive, however.  A number of gaps remain to be filled for China to meet the challenges of Internet piracy and fully implement the WIPO Internet treaties.

With respect to software piracy, China issued new rules during the run-up to the 2006 JCCT meeting that require computers to be pre-installed with licensed operating system software and government agencies to purchase only computers satisfying this requirement.  Combined with

ongoing implementation of previous JCCT commitments on software piracy, it is hoped that these rules will contribute to significant further reductions in industry losses due to software piracy, which were estimated to have declined from $1.48 billion in 2004 to $1.27 billion in 2005.  Achieving sustained reductions in end-user software piracy will require more enforcement by China's authorities, followed by high profile publicity of fines and other remedies imposed.

In the customs area, the United States is encouraged by the Customs Administration's increased efforts to provide effective enforcement against counterfeit and pirated goods destined for export.  Nevertheless, the United States remains concerned about various aspects of the *Regulations on the Customs Protection of Intellectual Property Rights*, issued by the State Council in December 2003, and the Customs Administration's May 2004 implementing rules, which were intended to improve border enforcement, make it easier for right holders to secure effective enforcement at the border and strengthen fines and punishments.  Disposal of confiscated goods remains a problem under the implementing rules, which appear to mandate auction following removal of infringing features, rather than destruction of infringing goods not purchased by the right holder or used for public welfare.  Allowing goods to re-enter the channels of commerce under these circumstances raises questions of consistency with provisions of the TRIPS Agreement.  These rules are also problematic because they impose an unreasonably short deadline for a right holder to apply for seizure of suspected infringing goods held by the Chinese customs authorities.  The United States raised these issues with China bilaterally in 2006 as well as at the WTO during the transitional review before the TRIPS Council, held in October 2006, but so far China has not indicated that it will be addressing them.

The United States also remains concerned about a variety of weaknesses in China's legal framework that do not effectively deter, and may even encourage, certain types of infringing activity, such as the "squatting" of foreign company names, designs and trademarks, the theft of trade secrets, the registration of other companies' trademarks as design patents and vice versa, the use of falsified or misleading license documents or company documentation to create the appearance of legitimacy in counterfeiting operations, and false indications of geographic origin of products.  In 2006, the United States continued to discuss these and other problems with China and seek solutions for them.

In the pharmaceuticals sector, the United States continues to have a range of concerns.  The United States has urged China to provide greater protection against unfair commercial use of undisclosed test and other data submitted by foreign pharmaceuticals companies seeking marketing approval for their products.  The United States has also encouraged China to undertake a more robust system of patent linkage and to consider the adoption of a system of patent term restoration.  In addition, built-in delays in China's marketing approval system for pharmaceuticals continues to create incentives for counterfeiting, as does China's inadequate regulatory oversight for the production of active pharmaceutical ingredients by domestic chemical manufacturers.  In 2006, as in prior years, the United States sought to address all of these issues as part of its broader effort to work with China to improve China's regulatory regime for the pharmaceuticals sector.

*Page 76*

*Enforcement*

The TRIPS Agreement requires China to ensure that enforcement procedures are available so as to permit effective action against any act of infringement of intellectual property rights covered by the TRIPS Agreement, including expeditious remedies to prevent infringement and remedies that constitute a deterrent to further infringement.  Although the central government displayed strong leadership in modifying the full range of China's IPR laws and regulations in an effort to bring them into line with China's WTO commitments, effective IPR enforcement has not been achieved, and IPR infringement remains a serious problem throughout China.  IPR enforcement is hampered by lack of coordination among Chinese government ministries and agencies, lack of training, resource constraints, lack of transparency in the enforcement process and its outcomes, and  local protectionism and corruption.

Despite repeated anti-piracy campaigns in China and an increasing number of civil IPR cases in Chinese courts, overall piracy and counterfeiting levels in China remained unacceptably high in 2006.  IPR infringement continued to affect products, brands and technologies from a wide range of industries, including films, music and sound recordings, publishing, business and entertainment software, pharmaceuticals, chemicals, information technology, apparel, athletic footwear, textile fabrics and floor coverings, consumer goods, food and beverages, electrical equipment, automotive parts and industrial products, among many others.

U.S. industry in 2006 continued to estimate that levels of piracy in China across all lines of copyright business range between 85 and 93 percent, indicating little or no improvement over 2005.  Trade in pirated optical discs continues to thrive, supplied by both licensed and unlicensed factories and by smugglers.  Small retail shops continue to be the major commercial outlets for pirated movies and music (and a variety of counterfeit goods), and roaming vendors offering cheap pirated discs continue to be visible in major cities across China.  Piracy of books and journals and end-user piracy of business software also remain key concerns.  In addition, Internet piracy is increasing, as is piracy over enclosed networks such as universities.

Although China made a commitment at the July 2005 JCCT meeting to take aggressive action against movie piracy, including enhanced enforcement for titles not yet authorized for distribution, right holders have monitored China's efforts and report little meaningful improvement in piracy of pre-release titles in several major cities.  Meanwhile, with the assistance of the Ministry of Education, NCA took initial steps to address text book piracy on university campuses in late 2006.  NCA also began to undertake campaigns to combat Internet piracy.

China's widespread counterfeiting not only harms the business interests of foreign right holders, but also includes many products that pose a direct threat to the health and safety of consumers in the United States, China and elsewhere, such as pharmaceuticals, food and beverages, batteries, auto parts, industrial equipment and toys, among many other products.  At the same time, the harm from counterfeiting is not limited to right holders and consumers.  China estimated its own

annual tax losses due to counterfeiting at more than $3.2 billion back in 2002, and this figure could only have grown in the ensuing years.

The United States places the highest priority on addressing the IPR protection and enforcement problems in China, and since 2004 it has devoted significant additional staff and resources, both in Washington and in Beijing, to address these problems. A domestic Chinese business constituency is also increasingly active in promoting IPR protection and enforcement. In fact, Chinese right holders own the vast majority of design patents, utility models, trademarks and plant varieties in China and have become the principal filers of invention patents. In addition, most of the IPR enforcement efforts in China are now undertaken at the behest of Chinese right holders seeking to protect their interests. Nevertheless, it is clear that there will continue to be a need for sustained efforts from the United States and other WTO members and their industries, along with the devotion of considerable resources and political will to IPR protection and enforcement by the Chinese government, if significant improvements are to be achieved.

As in prior years, the United States worked with central and local government officials in China in 2006 in a determined and sustained effort to improve China's IPR enforcement, with a particular emphasis on the need for dramatically increased utilization of criminal remedies. A variety of U.S. agencies held regular bilateral discussions with their Chinese counterparts and have conducted numerous technical assistance programs for central and local government officials on TRIPS Agreement rules, enforcement methods and rule of law issues. In addition, the United States organized another annual roundtable meeting in China designed to bring together U.S. and Chinese government and industry officials. The United States also continued to use the IPR Working Group created at the April 2004 JCCT meeting and the JCCT process itself to press China for needed changes.

The United States' efforts have also benefitted from cooperation with other WTO members in seeking improvements in China's IPR enforcement, both on the ground in China and at the WTO during meetings of the TRIPS Council. For example, the United States, Japan and Switzerland made coordinated requests under Article 63.3 of the TRIPS Agreement in order to obtain more information about IPR infringement levels and enforcement activities in China and provide a better basis for assessing the effectiveness of China's efforts to improve IPR enforcement since China's accession to the WTO. In addition, the United States and the EC have increased coordination and information-sharing on a range of China IPR issues over the last year. China's membership in the Asia-Pacific Economic Cooperation Forum (APEC) also brings increased importance to APEC's work to develop regional IPR best practices.

The United States has also continued to pursue a comprehensive initiative to combat the enormous global trade in counterfeit and pirated goods, including exports of infringing goods from China to the United States and the rest of the world. That initiative, the Strategy Targeting Organized Piracy (STOP!), was announced in October 2004 and is a U.S. government-wide effort to stop fakes at the U.S. border, to empower U.S. businesses to secure and enforce their intellectual property rights in overseas markets, to expose international counterfeiters and pirates, to keep global supply chains free of infringing goods, to dismantle criminal enterprises that steal

*Page 78*

U.S. intellectual property and to reach out to like-minded U.S. trading partners in order to build an international coalition to stop counterfeiting and piracy worldwide. China's share of infringing goods seized at the U.S. border increased from 63 percent in 2004 to 69 percent in 2005, with the total value of infringing goods from China totaling $87.2 million. China's share of infringing goods seized at the border is more than ten times greater than that of any other U.S. trading partner.

China is making genuine efforts to improve IPR enforcement. U.S. industry has confirmed that some of China's special campaigns, such as the continuing "Mountain Eagle" campaign against trademark infringement crimes, have in fact resulted in increased arrests and seizures of infringing materials, although the disposition of seized goods and the outcomes of criminal cases remain largely obscured by lack of transparency. The 2006 Action Plan announced that China will launch more of these "special crackdown efforts" with respect to various IPR infringement problems. The United States has urged China to use its implementation of the 2006 Action Plan as an opportunity to tackle emerging enforcement challenges, particularly the sale of pirated and counterfeit goods on the Internet. In addition, the United States has suggested that China use this opportunity to examine the potential benefits of specialized national IPR courts and prosecutors, providing faster trademark examination, and ensuring that the resources available to local administrative, police, and judicial authorities charged with protecting and enforcing intellectual property rights are adequate to the task. The United States will continue to pursue these efforts in 2007.

Nevertheless, despite its many positive efforts to improve IPR enforcement, China pursues other policies that continue to impede effective enforcement. As discussed above, China refuses to make needed changes to its legal framework that would facilitate the utilization of criminal remedies. These changes should be an important objective for China, given the lack of deterrence clearly evident in China's current enforcement regime, which relies too heavily on administrative enforcement. But, China continues to maintain counter-productive measures such as its high thresholds for criminal prosecution, which continue to constrain China's enforcement authorities while creating a "safe harbor" for substantial commercial-scale infringement. At the same time, China maintains market access barriers, such as import restrictions and restrictions on wholesale and retail distribution, which discourage and delay the introduction of a number of legitimate foreign products into China's market. These barriers create additional incentives for infringement of products like movies, video games and books and inevitably lead consumers to the black market, again compounding the severe problems already faced by China's enforcement authorities.

**Services**

The commitments that China made in the services area begin with the General Agreement on Trade in Services (GATS). The GATS provides a legal framework for addressing market access and national treatment limitations affecting trade and investment in services. It includes specific commitments by WTO members to restrict their use of those limitations and provides a forum for

further negotiations to open services markets around the world.  These commitments are contained in national services schedules, similar to the national schedules for tariffs.

In its services schedule, China committed to the substantial opening of a broad range of services sectors through the elimination of many existing limitations on market access, at all levels of government, particularly in sectors of importance to the United States, such as banking, insurance, telecommunications and professional services.  These commitments are far-reaching, particularly when compared to the services commitments of many other WTO members.

China also made certain "horizontal" commitments, which are commitments that apply to all sectors listed in its services schedule.  The two most important of these cross-cutting commitments involve acquired rights and the licensing process.  Under the acquired rights commitment, China agreed that the conditions of ownership, operation and scope of activities for a foreign company, as set out in the respective contractual or shareholder agreement or in a license establishing or authorizing the operation or supply of services by an existing foreign service supplier, will not be made more restrictive than they were on the date of China's accession to the WTO.  In other words, if a foreign company had pre-WTO accession rights that went beyond the commitments made by China in its services schedule, that company could continue to operate with those rights.

In the licensing area, prior to China's WTO accession, foreign companies in many service sectors did not have an unqualified right to apply for a license to establish or otherwise provide services in China.  They could only apply for a license if they first received an invitation from the relevant Chinese regulatory authorities, and even then the decision-making process lacked transparency and was subject to inordinate delay and discretion.  In its accession agreement, China committed to licensing procedures that were streamlined, transparent and more predictable.

After five years of China's membership in the WTO, challenges remain in securing the benefits of many of these commitments.  According to a trade association with broad representation among U.S. service suppliers,

> U.S. service providers have shown remarkable patience as the market opens along lines contemplated by China's WTO accession, but slow and capricious regulatory decisions, capital requirements that far exceed prudential or other global norms, structural operating rules that encourage inefficiencies, and an incomplete separation of regulatory oversight from commercial activities make services sectors particularly troublesome from the perspective of U.S. businesses.

As in prior years, China continued to keep pace nominally with the openings required by its WTO accession agreement.  It implemented market opening commitments in the banking, insurance, advertising and hospitality sectors on time or ahead of their scheduled implementation date of December 11, 2005.  However, China also continued to maintain or erect terms of entry in some sectors that were so high or cumbersome as to prevent or discourage foreign suppliers

*Page 80*

from gaining market access.  For example, excessive and often discriminatory capital requirements continued to restrict market entry for foreign suppliers in many sectors, such as insurance, banking, motor vehicle financing, securities, asset management, telecommunications, construction and freight forwarding, among others.  In addition, in sectors such as insurance and legal services, branching restrictions have been put into effect that call into question commitments made by China in its Services Schedule.  In other sectors, particularly construction services, problematic measures appear to be taking away previously acquired market access rights.

Meanwhile, the *Administrative Licensing Law*, which took effect in July 2004, has increased transparency in the licensing process, while reducing procedural obstacles and strengthening the legal environment for domestic and foreign enterprises.  As a result, the licensing process in many sectors continued to proceed in a workman-like fashion in 2006, although national treatment concerns remained, particularly in the banking and insurance sectors.  In addition, in some sectors, such as direct selling and telecommunications, the licensing process was characterized by inordinate delays.

Looking forward to 2007, China is scheduled to implement several significant market-opening commitments on December 11, 2006, including in the areas of financial services, engineering and architectural services, and telecommunications services.  The United States will monitor developments in these areas closely in 2007, while continuing its efforts to obtain China's full compliance with previously matured commitments.

### *Financial Services*

<u>Banking</u>

Prior to its accession to the WTO, China had allowed foreign banks to conduct foreign currency business in selected cities.  Although China had also permitted foreign banks, on an experimental basis, to conduct domestic currency business, the experiment was limited to foreign customers in two cities.

In its WTO accession agreement, China committed to a five-year phase-in for banking services by foreign banks.  Specifically, China agreed that, immediately upon its accession, it would allow U.S. and other foreign banks to conduct foreign currency business without any market access or national treatment limitations and conduct domestic currency business with foreign-invested enterprises and foreign individuals, subject to certain geographic restrictions.  The ability of U.S. and other foreign banks to conduct domestic currency business with Chinese enterprises and individuals was to be phased in.  Within two years after accession, foreign banks were also to be able to conduct domestic currency business with Chinese enterprises, subject to certain geographic restrictions, which were to be lifted gradually over the following three years.  Within five years after accession, foreign banks are to be able to conduct domestic currency business with Chinese individuals, and all geographic restrictions will be lifted.  Foreign banks

will also be permitted to provide financial leasing services at the same time that Chinese banks are permitted to do so.

As previously reported, shortly after China's accession to the WTO, the People's Bank of China (PBOC) issued regulations governing foreign-funded banks, along with implementing rules, which became effective February 1, 2002.  The PBOC also issued several other related measures.  Although these measures kept pace with the WTO commitments that China made, it became clear that the PBOC had decided to exercise extreme caution in opening up the banking sector.  In particular, it imposed working capital requirements and other prudential rules that far exceeded international norms, both for the foreign banks' headquarters and branches, which made it more difficult for foreign banks to establish and expand their market presence in China.  Many of these requirements, moreover, did not apply equally to foreign and domestic banks.  For example, a foreign bank branch licensed to conduct business in all currencies for both corporate and individual clients had to satisfy an operating capital requirement of RMB 500 million ($62.5 million), while a domestic bank branch with the same business scope needed only RMB 300 million ($37.5 million) in operating capital.  In addition, the PBOC allowed foreign-funded banks to open only one branch every 12 months.

In several bilateral meetings following China's WTO accession, the United States urged the PBOC to reconsider its prudential requirements and to bring them in line with international norms.  Together with other WTO members, the United States also raised these same concerns during meetings of the WTO's Committee on Trade in Financial Services, including the transitional reviews held in 2002 and 2003.  In December 2003 and July 2004, some progress took place, as the PBOC reduced working capital requirements for various categories of foreign banks.  With the issuance of the *Implementing Rules for the Administrative Regulations on Foreign-Invested Financial Institutions* in July 2004, the China Banking Regulatory Commission (CBRC) also removed the restriction that had limited foreign-funded banks to opening only one new branch every 12 months.  Nevertheless, the United States, along with Australia, Canada, the EC and Japan, continued to urge China to make its banking sector more accessible to foreign banks, as reflected in the transitional review before the Committee on Trade in Financial Services, held in 2004, 2005 and 2006.

Meanwhile, China kept up with its commitments regarding the lifting of geographic restrictions on foreign banks conducting domestic currency business with foreign enterprises and individuals and Chinese enterprises.  In December 2004, CBRC opened up five additional cities to foreign banks, including two cities (Xian and Shenyang) one year ahead of the commitment in China's Services Schedule.  In December 2005, CBRC announced the opening of seven additional cities, five more than the two cities (Shantou and Ningbo) scheduled to be phased in by that time, bringing the total to 25 Chinese cities in which foreign banks were able to conduct business.

One area in which China fell behind in its WTO commitments involves the establishment of Chinese-foreign joint banks.  In the Services Schedule accompanying its WTO accession agreement, China agreed that qualified foreign financial institutions would be permitted to establish Chinese-foreign joint banks immediately after China acceded, and it did not schedule

*Page 82*

any limitation on the percentage of foreign ownership in these banks. To date, however, China has limited the sale of equity stakes in existing state-owned banks to a single foreign investor to 20 percent, while the total equity share of all foreign investors is limited to 25 percent. The United States and other WTO members have urged China to relax these limitations during the annual transitional reviews before the Committee on Trade in Financial Services.

By September 2006, despite high capital requirements and other impediments, 191 foreign banks, including a number of U.S. banks, had branches or representative offices in China, although only major banks have been large enough to satisfy the application requirements. In addition, the business that foreign banks were most eager to pursue in China – domestic currency business – had expanded tremendously, although China's regulatory authorities continued to shield domestic banks from foreign competition in some areas, such as by limiting product innovation by foreign banks. According to the PBOC and CBRC, the domestic currency business of U.S. and other foreign banks grew rapidly in the first two years after China's WTO accession, even though the banks' clients were then limited to foreign-invested enterprises and foreign individuals. Following the PBOC's December 2003 announcement that foreign banks would be permitted to conduct domestic currency business with Chinese enterprises subject to geographic restrictions allowed by China's WTO commitments, the growth in U.S. and other foreign banks' domestic currency business accelerated. By September 2006, the total assets of foreign banks in China reportedly had reached $105 billion, representing approximately 2 percent of the total banking assets in China. In some coastal cities, the amount was higher. For example, in Shanghai, foreign banks' assets reportedly represented 12.4 percent of total banking assets in October 2005.

Notably, the five-year phase-in period for banking services by foreign banks ends on December 11, 2006. By that time, China has committed to remove remaining geographic limitations and to allow foreign banks to conduct domestic currency business with Chinese individuals. If China fully implements these commitments, as the United States has been urging China to do, U.S. and other foreign banks should benefit tremendously from new business opportunities, and China should realize important benefits from having greater access to world-class banking services.

In November 2006, however, the State Council issued the *Regulations for the Administration of Foreign-Funded Banks*. While the United States continues to work closely with U.S. banks to assess these regulations, which are intended to implement China's December 11, 2006 commitments, these regulations have generated some immediate concerns. For example, the regulations mandate that only foreign-funded banks that have had a representative office in China for two years and that have total assets exceeding $10 billion can apply to incorporate in China. After incorporating, moreover, these banks only become eligible to offer full domestic currency services to Chinese individuals if they can demonstrate that they have operated in China for three years and have had two consecutive years of profits. The regulations also restrict the scope of activities that can be conducted by foreign banks seeking to operate in China through branches instead of through subsidiaries. In particular, the regulations restrict the domestic currency business of foreign bank branches. While foreign bank branches can continue to take deposits from and make loans to Chinese enterprises in domestic currency, they can only take domestic

currency deposits of RMB 1 million ($125,000) or more from Chinese individuals and cannot make any domestic currency loans to Chinese individuals.  Foreign bank branches also cannot issue domestic currency credit cards to Chinese enterprises or Chinese individuals.  Working closely with U.S. banks, the United States has been pressing China for changes to the regulations and will make every effort to ensure that China fully implements its commitments and that U.S. banks realize the full benefits to which they are entitled.

<u>Insurance</u>

Prior to its accession to the WTO, China allowed selected foreign insurers to operate in China on a limited basis and in only two cities.  Three U.S. insurers had licenses to operate, and several more were either waiting for approval of their licenses or were qualified to operate but had not yet been invited to apply for a license by China's insurance regulator, the China Insurance Regulatory Commission (CIRC).

In its WTO accession agreement, China agreed to phase out existing geographic restrictions on all types of insurance operations during the first three years after accession.  It also agreed to expand the ownership rights of foreign companies.  Upon accession, foreign life insurers were to be permitted to hold 50 percent equity share in a joint venture.  Foreign property, casualty and other non-life insurers were to be permitted to establish as a branch or as a joint venture with 51 percent foreign equity share upon accession, and they also had to be able to establish as a wholly foreign-owned subsidiary two years after accession.  In addition, foreign insurers handling large scale commercial risks, marine, aviation and transport insurance, and reinsurance were to be permitted 50 percent foreign equity share in a joint venture upon accession, while they had to be able to own 51 percent three years after accession and establish as a wholly foreign-owned subsidiary five years after accession.  China further agreed that all foreign insurers were to be permitted to expand the scope of their activities to include health, group and pension/annuities lines of insurance within three years after accession.

China also made additional significant commitments relating specifically to branching.  China scheduled a commitment to allow non-life insurance firms to establish as a branch in China upon accession and to permit internal branching in accordance with the lifting of China's geographic restrictions.  China further agreed that foreign insurers already established in China that were seeking authorization to establish branches or sub-branches would not have to satisfy the requirements applicable to foreign insurers seeking a license to enter China's market.

As previously reported, CIRC issued several new insurance regulations shortly after acceding to the WTO, including ones directed at the regulation of foreign insurance companies.  These regulations implemented many of China's commitments, but they also created problems in three critical areas – capitalization requirements, transparency and branching.  In particular, the capitalization requirements imposed by the regulations were significantly more exacting than those of other populous countries with no less an interest in preserving a healthy insurance market, and they limited the ability of foreign insurers to make necessary joint venture arrangements.  The regulations also lacked adequate transparency, as they continued to permit

*Page 84*

considerable bureaucratic discretion and to offer limited predictability to foreign insurers seeking to operate in China's market.  Meanwhile, notwithstanding several important commitments on branching, the regulations are vague on foreign insurers' branching rights, and CIRC has often been reluctant to provide clarifications.

In close consultation with U.S. insurers, the United States first raised these issues in 2002 in several bilateral meetings with CIRC, MOFTEC and the State Council and at WTO meetings, with support from Canada, the EC, Japan and Switzerland.  Following high-level bilateral meetings during the run-up to the October 2002 Summit between Presidents Bush and Jiang, China began to show some flexibility.  CIRC agreed to establish a working group, composed of U.S. regulators and insurers, to discuss insurance issues, with a particular focus on appropriate capitalization requirements and other prudential standards.  The first meeting of the working group took place in December 2002.

Following further bilateral meetings, China issued draft implementing rules in August 2003.  Although this draft demonstrated some progress with regard to capitalization requirements and transparency, more progress was needed.  The United States also continued to press its concerns, particularly with regard to branching, in high-level meetings in September, October and November 2003, and at the transitional review before the Committee on Trade in Financial Services in December 2003.  In May 2004, CIRC issued final implementing rules, the *Detailed Rules on the Regulations for the Administration of Foreign-Invested Insurance Companies*.  These rules lowered capital requirements for national licenses from RMB 500 million ($62.5 million) to RMB 200 million ($25 million) and for branch offices from RMB 50 million ($6.25 million) to RMB 20 million ($2.5 million).  These changes were welcomed by some U.S. insurers, but others still considered the capital requirements to be too high.  The rules also streamlined licensing application procedures and shortened approval times, although some procedures remained unclear.  Meanwhile, the rules did not adequately address branching rights, as many aspects of this area remained vague.  The rules also did not address another issue that U.S. and other foreign insurers had begun to complain about – in practice, it appeared that established Chinese insurers were being granted new branch approvals on a concurrent basis, meaning more than one branch at a time, while foreign insurers had only received approvals on a consecutive basis, meaning one branch at a time.  In addition, while the rules provide some guidance regarding foreign insurers wishing to apply for approval to convert from a branch to a subsidiary, CIRC has continued to have difficulty adhering to its own regulatory requirement that it act on applications within 60 days, as long delays are routine.

At the April 2004 JCCT meeting, the United States had sought and obtained a commitment from China to re-start the CIRC working group, so that U.S. regulators and insurers could discuss the range of insurance issues with CIRC officials.  The United States attempted to schedule these discussions shortly after the May 2004 implementing rules were issued, but without success.  Later in the year, the United States raised its concerns in the insurance area during the transitional review before the Committee on Trade in Financial Services, held in November 2004, with support from Canada and Japan.  At about the same time, CIRC agreed to schedule the next working group meeting in early 2005.  The CIRC working group meeting finally took

place in April 2005.  It provided a useful forum for U.S. and Chinese industry experts to join U.S. and Chinese government representatives in a discussion of a broad range of concerns.  Not long thereafter, at the July 2005 JCCT meeting, China agreed to make CIRC available for another working group meeting by the end of 2005.  That meeting took place in December 2005, and another meeting took place in November 2006.  Through those meetings and additional bilateral engagement, the United States obtained assurances from CIRC that it was China's policy to grant foreign insurers new branch approvals on a concurrent basis, as has been done for domestic insurers, but in practice it has not been happening.  The United States has also obtained useful clarifications regarding the status of China's draft Insurance Law.  In addition, CIRC has provided useful information regarding the *Regulations on the Administration of the Reinsurance Business*, which were issued in late 2005 without prior notice or the opportunity for public comment.  However, there continues to be uncertainty about these regulations, including with regard to the issue of whether they require insurers in China to offer cessions to domestic reinsurers that would be inconsistent with China's WTO commitments.

In 2006, with all geographic restrictions having been removed by December 2004 and most business scope restrictions lifted, the operations of foreign insurers in China continued to grow. As of October 2006, 44 foreign insurers were operating in China, including a large number of U.S. insurers.  Foreign insurers had only a six percent share of the national market, but they continued to capture encouraging market shares in major coastal municipalities and were working to broaden their presence in China.

In 2007, as in prior years, the United States will continue to use CIRC working group meetings and the annual transitional reviews before the Committee on Trade in Financial Services to address and resolve issues of concern to U.S. insurers, especially in the area of branching.  The United States is committed to seek market access for U.S. insurers on a fair and equitable basis.

<u>Credit Cards</u>

In the Services Schedule accompanying its Protocol of Accession, China committed to remove market access limitations and provide national treatment for foreign suppliers providing "payment and money transmission services, including credit, charge, and debit cards," with this commitment becoming effective with regard to the RMB business of retail clients no later than December 11, 2006.  China also extended this commitment to cover the provision and transfer of financial information, financial data processing and advisory, intermediation and other financial services auxiliary to payments and money transmission services.

Under its existing rules, China restricts access to its market by foreign credit card companies. The rules only permit a bank in China to issue a credit card with a foreign logo on it if the card is co-branded with the logo of China Union Pay (CUP), an entity created by the PBOC and owned by participating Chinese banks.  In addition, all RMB transactions must be processed through CUP's network, while the network of the foreign credit card company is used only to process foreign currency transactions.

*Page 86*

In the second half of 2006, a number of troubling proposals were attributed to CUP and apparently supported by the PBOC. The common theme of these proposals was that CUP would be designated as a monopoly provider of payment and money transmission services for Chinese consumers for RMB processing, and that no other providers would be able to enter this market. Through a series of bilateral meetings beginning in September 2006, the United States cautioned China that none of the proposals being attributed to CUP would satisfy China's commitment to open up its market to foreign credit card companies. The United States reinforced this message during the transitional review before the Committee on Trade in Financial Services, held in November 2006. The United States will continue to engage China on this issue through the end of this year and, if necessary, take further appropriate actions in 2007 in an effort to ensure that U.S. credit card companies enjoy the full benefits of the market-opening commitment that China made in its WTO accession agreement.

Motor Vehicle Financing

In its WTO accession agreement, China agreed to open up the motor vehicle financing sector to foreign non-bank financial institutions for the first time, and it did so without any limitations on market access or national treatment. These commitments became effective immediately upon China's accession to the WTO.

As previously reported, China did not open up this sector to foreign financial institutions upon its accession, leaving China's commercial banks as the only financial institutions able to offer auto loans. Despite extensive engagement by the United States and other WTO Members, it was not until October 2004, nearly three years after its accession to the WTO, that China finally implemented the measures necessary to allow foreign financial institutions to obtain licenses and begin offering auto loans.

Financial Information Services

In its WTO accession agreement, as noted above, China committed that, for the services included in its Services Schedule, the relevant regulatory authorities would be separate from, and not accountable to, any service suppliers they regulated, with two specified exceptions. One of the services included in China's Services Schedule – and not listed as an exception – is the "provision and transfer of financial information, and financial data processing and related software by suppliers of other financial services."

Nevertheless, China has still not established an independent regulator in the financial information services sector. Xinhua, the Chinese state news agency, is both a major market competitor of, and the regulator of, foreign financial information service providers in China. As problems with Xinhua's regulation of this sector mounted following China's WTO accession, U.S. and other foreign financial information service providers began to call for the establishment of an independent regulator. The United States and the EC both raised concerns about this issue during the transitional review before the WTO's Committee on Trade in Financial Services, held

*Page 87*

in September 2005.  The United States continued to press China on this issue bilaterally in 2006, as did the EC.

In September 2006, a major problem developed when Xinhua issued, without an opportunity for prior public comment, the *Administrative Measures on News and Information Release by Foreign News Agencies within China*.  These rules abolished the *Measures for Administering the Release of Economic Information in China by Foreign News Agencies and Their Information Subsidiaries*, which had been issued in 1996.  Among other things, under the 2006 rules, Xinhua now precludes foreign providers of financial information services from contracting directly with or providing financial information services directly to domestic Chinese clients.  Instead, foreign financial information service providers must operate through a Xinhua-designated agent, and the one agent designated to date is a Xinhua affiliate.  These new restrictions do not apply to domestic financial information service providers and, in addition, contrast with the rights previously enjoyed by foreign information service providers since the issuance of the 1996 rules, well before China's accession to the WTO in December 2001.  The United States immediately raised strong concerns with the new rules during a series of bilateral meetings in Beijing, as did the EC, as a number of potential WTO issues were implicated, including China's national treatment obligation, commitments that China made in its GATS Schedule and China's commitment to establish an independent regulator.  In response to these complaints, Premier Wen publicly promised that the new rules would not change how foreign financial information service providers did business in China.  Shortly thereafter, Xinhua told foreign financial information service providers that the new rules would not be applied to them until after an implementing measure was issued.  The United States reiterated its concerns about these rules during the transitional review before the WTO's Committee on Trade in Financial Services in November 2006 and will continue to monitor this situation closely in 2007 in an effort to ensure that foreign financial information service providers do not face discriminatory treatment and are not subjected to new restrictions on their access to the China market.

### Legal Services

Prior to its WTO accession, China had imposed various restrictions in the area of legal services.  It maintained a prohibition against representative offices of foreign law firms practicing Chinese law or engaging in profit-making activities of any kind.  It also imposed restrictions on foreign law firms' formal affiliation with Chinese law firms, limited foreign law firms to one representative office and maintained geographic restrictions.

China's WTO accession agreement provides that, upon China's accession to the WTO, foreign law firms may provide legal services through one profit-making representative office, which must be located in one of several designated cities in China.  The foreign representative offices may act as "foreign legal consultants" who advise clients on foreign legal matters and may provide information on the impact of the Chinese legal environment, among other things.  They may also maintain long-term "entrustment" relationships with Chinese law firms and instruct lawyers in the Chinese law firm as agreed between the two law firms.  In addition, all quantitative and geographic limitations were to have been phased out within one year of China's

*Page 88*

accession to the WTO, which means that foreign law firms should have been able to open more than one office anywhere in China beginning on December 11, 2002.

As previously reported, the State Council issued the *Regulations on the Administration of Foreign Law Firm Representative Offices* in December 2001, and the Ministry of Justice issued implementing rules in July 2002. While these new measures removed some market access barriers, they also generated concern among foreign law firms doing business in China. In many areas, these measures were ambiguous. For example, it appeared that these measures created an economic needs test for foreign law firms that want to establish offices in China, contrary to China's GATS commitments. These measures also seemed to take an overly restrictive view of the types of legal services that foreign law firms may provide. In addition, the procedures for establishing a new office or an additional office were unnecessarily time-consuming.

The United States has raised its concerns both bilaterally and at the WTO during the annual transitional reviews before the Council for Trade in Services, with support from the EC and Japan. To date, although a number of U.S. and other foreign law firms have been able to open a second office in China, little progress has been made on the problematic aspects of the new measures, particularly the economic needs test, the unreasonable restrictions on the types of legal services that can be provided and the unnecessary delays that must be endured when seeking to establish new offices. These obstacles continue to prevent foreign law firms from participating fully in China's legal market. The United States will continue to engage China in 2007 in an attempt to resolve these outstanding concerns.

### Telecommunications

In the Services Schedule accompanying its WTO accession agreement, China committed to permit foreign suppliers to provide a broad range of telecommunications services through joint ventures with Chinese companies, including domestic and international wired services, mobile voice and data services, value-added services (such as electronic mail, voice mail and on-line information and database retrieval) and paging services. The foreign stake permitted in the joint ventures is to increase over time, reaching a maximum of 49 percent for most types of services. In addition, all geographical restrictions are to be eliminated within two to six years after China's WTO accession, depending on the particular services sector.

Importantly, China also accepted key principles from the WTO Reference Paper on regulatory principles. As a result, China became obligated to separate the regulatory and operating functions of MII (which had been both the telecommunications regulatory agency in China and the operator of China Telecom) upon its accession. China also became obligated to adopt pro-competitive regulatory principles, such as cost-based pricing and the right of interconnection, which are necessary for foreign-invested joint ventures to compete with incumbent suppliers such as China Telecom, China Netcom and China Unicom.

Five years after its accession to the WTO, China has not yet established a truly independent regulator in the telecommunications sector. The current regulator, MII, while nominally separate

*Page 89*

from the current telecommunications operators, maintains extensive influence and control over their operations and continues to use its regulatory authority to disadvantage foreign firms.

As previously reported, the State Council issued regulations on the administration of foreign-invested telecommunications enterprises in December 2001.  These regulations implemented China's commitments by providing for the establishment of foreign-invested joint ventures, and they set forth relatively clear procedures and requirements for the joint ventures when applying for approval to commence operations, although, as in several other services sectors, they also established high capital requirements (particularly for basic telecommunications services) that pose a significant barrier to entry for many potential foreign suppliers.

Another problem area developed in April 2003, when MII issued its Catalogue of Telecommunications Services.  MII reclassified several telecommunications services from the value-added category to the basic category, without notice or a public comment period and contrary to widely accepted international practice.  MII also placed restrictions on what new services could be classified under the value-added category.  These moves have limited the ability of U.S. firms to access China's telecommunications market because, under China's Services Schedule, basic services are on a slower liberalization schedule, and MII subjects them to higher capitalization requirements.  Indeed, MII requires suppliers of basic services to satisfy an excessive registered capital requirement of RMB 2 billion ($250 million).  A review of capital requirements around the world shows essentially no capital requirements in many WTO member markets, including, for example, Argentina, Australia, Brazil, Chile, the member States of the European Union, Japan and the United States.  Where capital-related requirements do exist, they typically take the form of guarantees.  For example, Korea requires a $2.5 million bank guarantee or performance bond, while India requires a bank guarantee ranging from $5 million to $80 million, depending on geographic scope.

Overall, no meaningful progress took place in 2006 in the telecommunications services sector.  Even though China has nominally kept to the agreed schedule for phasing in its WTO commitments, MII's imposition of excessive capital requirements and MII's reclassification of value-added services as basic services, together with MII's lengthy license application process, have continued to present formidable barriers to market entry for foreign enterprises.  Indeed, as China nears the end of its fifth year of WTO membership, the United States is unaware of any domestic or foreign application for a license to provide basic services that has completed the MII licensing process.   As a result, the number of suppliers of basic services appears to be frozen, limiting the opportunities for new joint ventures and  reflecting a level of competition that is extraordinarily low given the size of China's market.

A draft of the long-awaited *Telecommunications Law* began to circulate among Chinese ministries and agencies in 2004.  If China takes the initiative, this law could be a vehicle for addressing existing market access barriers and other problematic aspects of China's current telecommunications regime.  In 2006, as in prior years, the United States and other WTO members have urged China to circulate the draft law for public comment, although to date China has not done so.

*Page 90*

Over the years, the United States has raised its many concerns with China using both bilateral engagement and WTO meetings, including the annual transitional reviews before the Council for Trade in Services, where it has received support from the EC and Japan. In 2005, the United States elevated its concerns to the level of the JCCT. At the July 2005 JCCT meeting, the United States was able to persuade China to commit its telecommunications regulator, MII, to a bilateral working group to discuss capitalization requirements, resale services and other issues agreed to by the two sides. The first meeting of this working group took place in January 2006. Subsequently, the United States focused on making progress on the issue of high capital requirements during the run-up to the April 2006 JCCT meeting. At that meeting, China committed to make appropriate adjustments to its registered capital requirements for telecommunications service providers, and it was agreed by the two sides that a working group would meet to discuss China's implementation of this commitment. Since then, the United States has followed up on this commitment in the working group and in bilateral meetings with MII and MOFCOM, but China so far has made no progress toward fulfillment of this commitment. The United States will continue to press China to implement this overdue commitment through the end of this year and in 2007 as necessary.

### Construction and Related Engineering Services

Upon its WTO accession, China committed to permit foreign service suppliers to supply construction and related engineering services through joint ventures with foreign majority ownership, subject to the requirement that those services only be undertaken in connection with foreign-invested construction projects and subject to registered capital requirements that were slightly different from those of Chinese enterprises. Within three years of accession, China agreed to remove those conditions, and it also agreed to allow wholly foreign-owned enterprises to supply construction and related engineering services for four specified types of construction projects.

As previously reported, in September 2002, the Ministry of Construction and MOFTEC jointly issued the *Rules on the Administration of Foreign-Invested Construction Enterprises* (known as Decree 113) and the *Rules on the Administration of Foreign-Invested Construction Engineering Design Enterprises* (known as Decree 114). These decrees provide schedules for the opening up of construction services and related construction engineering design services to joint ventures with majority foreign ownership and wholly foreign-owned enterprises. The necessary implementing rules for Decree 113 were issued in April 2003, but Decree 114 implementing rules were delayed until late 2006.

Decrees 113 and 114 created concerns for U.S. and other foreign firms by imposing new and more restrictive conditions than existed prior to China's WTO accession, when they were permitted to work in China on a project-by-project basis pursuant to Ministry of Construction rules. In particular, these decrees for the first time require foreign firms to obtain qualification certificates, effective October 2003. In addition, these decrees for the first time require foreign-invested enterprises to incorporate in China, and they impose high minimum registered capital requirements and technical personnel staff requirements that are difficult for many foreign-

invested enterprises to satisfy.  In consultation with U.S. industry, the United States, in a high-level intervention, pressed its concerns about Decrees 113 and 114 and sought a delay before the decrees' problematic requirements would become effective.  While Decree 114 still had no implementation date because implementing rules had not been issued, the Ministry of Construction agreed to extend the Decree 113 implementation date from October 2003 until April 2004.  The United States and U.S. industry used this extension to pursue these issues further with the Ministry of Construction and MOFCOM.

In April 2004, Decree 113 went into effect.  However, in September 2004, the Ministry of Construction and MOFCOM issued Circular 159, which permitted foreign providers of construction services and related construction engineering design services to continue operating on a project by-project basis until July 2005, effectively extending the effective date of the incorporation-related requirements.  Since the expiration of Circular 159 in July 2005, however, U.S. and other foreign companies have faced a great deal of uncertainty when contemplating participation in projects in China.

Even though the United States and U.S. industry had sought the opportunity to comment on a draft of the implementing rules for Decree 114 for nearly four years, no draft was circulated until late October 2006, with six days being given for the submission of written comments.  These implementing rules are generally positive, as they temporarily lift foreign personnel residency and staffing requirements imposed by Decree 114, and recognize the foreign qualifications of technical experts when considering initial licensing.  However, they also contain restrictions that may limit market access by U.S. and other foreign companies, as they, for example, only "temporarily" lift foreign residency and personnel requirements and require two years of domestic experience for foreign companies applying for higher-level licenses.  The United States has since submitted written comments on the implementing rules, which are scheduled to become effective in December 2006, and will continue to press China in 2007 to more fully open this sector to foreign competition.

Meanwhile, in November 2004, the Ministry of Construction issued a measure – the *Provisional Measures for Construction Project Management* – that restricts the provision of project management services.  This measure, known as Decree 200, became effective in December 2004 and appears to preclude the same company from providing construction services and project management services on a single project.  This aspect of Decree 200 raises concerns because U.S. companies often provide integrated construction services packages – combining management, design, and construction services – in project delivery systems in overseas markets.  No implementing rules for Decree 200 have been issued to date.

In 2004, 2005 and 2006, the United States engaged China, both bilaterally and at the annual transitional reviews before the Council on Trade in Services, in an effort to obtain improvements in Decrees 113, 114 and 200.  In addition, in November 2006, the United States was able to obtain China's agreement to hold an exchange on international best practices in the construction sector.  That dialogue is tentatively scheduled to take place in May 2007.  It will allow U.S. Government officials and U.S. industry representatives to explore with Ministry of Construction

*Page 92*

officials, officials from other relevant ministries and agencies and representatives of China's construction industry how China's regulatory regime could be improved to the benefit of both the United States and China.

### *Express Delivery Services*

The specific commitments that China made in the area of express delivery services did not require China to take implementation action upon its accession to the WTO.  Basically, China agreed to increase the stake allowed by foreign express delivery companies in joint ventures over a period of years, with wholly foreign-owned subsidiaries allowed within four years of accession.

Nevertheless, as previously reported, shortly after becoming a WTO member, China issued two problematic measures.  These measures required Chinese and foreign-invested international express delivery companies, including those that were already licensed by MOFTEC to provide international express delivery services (except for the delivery of private letters), to apply for and obtain so-called "entrustment" authority from China's postal authorities, China Post, their direct competitor, if they wanted to continue to provide express delivery services.   The measures also placed new weight and rate restrictions on the letters that the companies could handle, in apparent contravention of China's horizontal "acquired rights" commitment (discussed at the beginning of the Services section).  Working closely with U.S. express delivery companies and other affected WTO members, particularly the EC and Japan, the United States led a sustained effort that eventually convinced China to revise these measures in September and October 2002.  While a streamlined entrustment application process remained in place, U.S.-invested express delivery companies were able to continue to operate without disruption, while expanding their business operations in China.

In July 2003, China began circulating draft amendments to its *Postal Law*, which generated immediate concerns among U.S. companies.  Despite subsequent revisions in response to numerous interventions by the United States and other WTO members, the draft amendments circulated remained problematic on several fronts.  First, the draft amendments purported to give China Post a monopoly over the delivery of letters under 500 grams, which would have constituted a new restriction on the scope of activities of existing foreign-invested express delivery companies, contrary to China's horizontal "acquired rights" commitment.  Second, the draft amendments did not address the need for an independent regulator.  Third, the draft amendments appeared to create a new, more burdensome licensing process to replace the existing entrustment process, and they also seemed to require express couriers to pay four percent of their revenue from the delivery of letters into a fund for universal mail service in China.

In 2004, the United States made express delivery services one of its priority issues during the run-up to the April JCCT.  The United States focused its engagement with China on the weight restriction, which would cut back on the scope of activities that foreign-invested express delivery companies had been licensed to provide prior to China's WTO accession.  At the JCCT meeting, Vice Premier Wu committed that old problems, like the weight restriction, would not resurface as

new problems.  Three months later, in July 2004, the State Council circulated another set of draft amendments to the *Postal Law*.  Despite Vice Premier Wu's commitment, these draft amendments continued to include a weight restriction, now reduced from 500 grams to 350 grams, and did little to address other U.S. concerns.

Through the remainder of 2004 and into 2005, China worked less publicly on the *Postal Law*, while the United States continued to raise its concerns in bilateral meetings and during the annual transitional reviews before the WTO's Council for Trade in Services, with support from the EC.  In 2006, as more reports began to surface of problematic provisions in subsequent drafts of the *Postal Law*, the United States raised its concerns during the run-up to the April 2006 JCCT meeting.  At that meeting, China reiterated its commitment that the regulatory environment for express delivery services by foreign companies would not be negatively impacted by the issuance of new rules, including the *Postal Law*.  Later that year, however, China began to circulate an "eighth" draft of the *Postal Law* among some Chinese stakeholders, and this draft continued to generate serious concerns.  This draft reportedly would impose a minimum weight restriction on domestic and international addressed letters weighing less than 150 grams, completely exclude foreign service providers from the domestic express delivery market and impose a tax to fund universal mail service in China.   During bilateral meetings in Beijing in October 2006, the United States expressed continuing concerns and disappointment with this draft and urged China to circulate the draft for public comment.  China indicated that the *Postal Law* was undergoing further revisions.

Meanwhile, in August 2006, the State Council finalized its July 2005 plan to separate China's postal operations from the administrative function of regulating China's postal system, with the State Postal Administration (SPA) to serve as the regulator and a new state-owned enterprise – the China Post Group Corporation – to be set up to conduct postal business.  In September 2006, SPA announced the establishment of 31 provincial-level Postal Management Bureaus to assist in the regulatory effort, while the China Post Group Corporation is scheduled to be established in December 2006.  The United States is disappointed that the State Council has not made public its July 2005 Postal Reform Plan and that the September 2006 announcement launching the provincial-level regulatory bureaus did not clarify certain of the outstanding issues, such as whether providers of express delivery services will be asked to pay into a fund to support universal mail service in China.

In 2007, the United States will continue to work closely with U.S. express delivery companies.  The United States will seek to clarify China's plans for postal reform and will continue to urge China to issue a sensible and WTO-consistent set of amendments to the *Postal Law*.

*Aviation Services*

As previously reported, China took a significant step in July 2004 to increase market access for U.S. service providers of air transport services, an area that for the most part falls outside the scope of the GATS and is normally the subject of bilateral agreements.  At that time, China signed a landmark aviation agreement with the United States that will more than double the

*Page 94*

number of U.S. airlines operating in China and that will increase by five times the number of flights providing passenger and cargo services between the two countries over the next six years. The agreement also allows each countries' carriers to serve any city in the other country, provides for unlimited code-sharing between them, expands opportunities for charter operators, grants cargo carriers the right to provide door-to-door delivery services, and eliminates government regulation of pricing as of 2008. U.S. airlines and U.S. express delivery companies have since obtained additional routes and increased flight frequencies, as envisioned by the agreement.

Meanwhile, an important commitment enshrined in the July 2004 agreement calls for the commencement of negotiations toward further liberalization through a bilateral Open Skies Agreement. The first round of these negotiations took place in April 2006. The United States and China exchanged views and agreed to hold a second round of negotiations during the second half of 2006. However, China subsequently postponed the second round of negotiations, citing the designation of a Chinese company under Executive Order 13382, which addresses the proliferation of weapons of mass destruction. The United States will seek a resumption of these negotiations in 2007.

### *Maritime Services*

As previously reported, even though China made no WTO commitments to open up its maritime services sector, it took a significant step in December 2003 to increase market access for U.S. service providers. The United States and China signed a far-reaching, five-year bilateral maritime agreement, which gives U.S.-registered companies the legal flexibility to perform an extensive range of additional shipping and logistics activities in China. U.S. shipping and container transport services companies, along with their subsidiaries, affiliates and joint ventures, are also able to establish branch offices in China without geographic limitation.

### *Other Services*

In its accession agreement, China agreed to give foreign service suppliers increased access in several other sectors, including several types of professional services, tourism and travel-related services, educational services and environmental services. In each of these sectors, China committed to the phased elimination or reduction of various market access and national treatment limitations. To date, the United States has not discovered significant problems with China's implementation of the commitments made in these sectors, and U.S. companies confirm that the relevant laws and regulations are generally in compliance with China's WTO commitments.

In some sectors, China has actually gone beyond its commitments. For example, even though China had only committed to permit majority foreign-owned joint ventures in the convention services sector, MOFCOM opened this sector to wholly foreign-owned enterprises in February 2004.

*Page 95*

In other sectors, however, such as audio-visual services, China has been less willing to increase market access for foreign service providers.  Despite the fact that its restrictive approach encourages the illegal copying and sale of foreign films in China, China continues to treat its commitment to allow the importation of 20 foreign films per year for theatrical release on a revenue-sharing basis as a ceiling rather than a floor and further constrains the timely release of these films through distribution and marketing restrictions and lengthy film approval requirements.  The United States raised these concerns with China at high levels in 2004, 2005 and 2006, including through the July 2005 and April 2006 JCCT meetings, in an attempt to obtain better, and more useful, market access for U.S. service providers.  However, little progress has been made in this area.

*Page 96*

**Legal Framework**

In order to address major concerns raised by WTO members during its lengthy WTO accession negotiations, China committed to broad legal reforms in the areas of transparency, uniform application of laws and judicial review. Each of these reforms, if fully implemented, will strengthen the rule of law in China's economy and help to address pre-WTO accession practices that made it difficult for U.S. and other foreign companies to do business in China.

*Transparency*

Official Journal

In its WTO accession agreement, China committed to establish or designate an official journal dedicated to the publication of all laws, regulations and other measures pertaining to or affecting trade in goods, services, TRIPS or the control of foreign exchange. China also committed to publish this journal on a regular basis and to make copies of all issues of this journal readily available to enterprises and individuals.

Following its accession to the WTO, China did not establish or designate an official journal. Rather, China relied on multiple channels, including ministry websites, newspapers and a variety of journals, to provide information on trade-related measures. In bilateral meetings and at the WTO, the United States urged China to adopt a single official journal, explaining that the establishment or designation of a single journal would greatly enhance the ability of WTO members to track the drafting, issuance and implementation of trade-related measures. The United States also noted that the use of a single journal to request comments on proposed trade-related measures, as envisioned in China's WTO accession agreement, would facilitate the timely notification of comment periods and submission of comments.

In early 2006, the United States elevated this issue to the level of the JCCT, pressing its concerns during the run-up to the JCCT's April 2006 meeting. In March 2006, the State Council issued a notice directing all central, provincial and local government entities to begin sending copies of all of their trade-related measures to MOFCOM for immediate publication in the *MOFCOM Gazette*. The United States has been monitoring the effectiveness of this notice, both to assess whether all government entities regularly publish their trade-related measures in the *MOFCOM Gazette* and whether all types of measures are being published. So far, adherence to the State Council's notice is far from complete.

Public Comment

China made a number of transparency commitments in its accession agreement. One of the most important of these commitments concerned the procedures for adopting or revising laws and regulations affecting trade in goods, services, TRIPS or the control of foreign exchange, given that China's accession to the WTO became effective while China was still in the process of revising its trade-related laws and regulations to become WTO-consistent. China agreed to

provide a reasonable period for public comment on these new or modified laws and regulations before implementing them, except in certain specific instances, enumerated in China's accession agreement.  China also agreed to translate all of its trade-related laws and regulations into one or more of the WTO languages (English, French and Spanish) and to publish them in an official journal.

The principal focus of China's first year of WTO membership was on its framework of laws and regulations governing trade in goods, trade in services, IPR and trade remedies.  Most of this work took place at the central government level, with more than 2,500 trade-related laws and regulations reportedly being reviewed for WTO consistency.  As a result of this initial review, China reportedly repealed more than 800 laws and regulations, while it issued almost 450 new or revised ones.  In 2003, the central government continued this work, issuing more than 100 new or revised laws and regulations in an effort to meet China's WTO obligations.  China's 31 provinces and autonomous regions and 49 major cities also reportedly made progress, as they repealed nearly 500 trade-related measures and amended almost 200 more.

Despite the tremendous amount of work that China put into overhauling its framework of trade-related laws and regulations in 2002 and 2003, China's ministries and agencies still had a poor record of providing an opportunity for public comment *before* new or modified laws and regulations were implemented.  Although the State Council issued regulations in December 2001 addressing the procedures for the formulation of administrative regulations and rules and expressly allowing public comment, many of China's ministries and agencies in 2002 continued to follow the practice prior to China's accession to the WTO, and no notable progress took place in 2003.  Typically, the ministry or agency drafting a new or revised law or regulation consulted with and submitted drafts to other ministries and agencies, Chinese experts and affected Chinese companies.  At times, it also consulted with select foreign companies, although it would not necessarily share drafts with them.  As a result, only a small proportion of new or revised laws and regulations were issued after a period for public comment, and even in those cases the amount of time provided for public comment was generally too short.

In 2004, some improvements took place, particularly on the part of MOFCOM, which began following the rules set forth in its *Provisional Regulations on Administrative Transparency*, issued in November 2003.  Those rules could potentially serve as a model for other ministries and agencies seeking to improve their transparency.  Nevertheless, basic compliance with China's notice-and-comment commitment continued to be uneven, in 2004, 2005 and 2006.  In the area of intellectual property rights, for example, several ministries and agencies circulated proposed measures for public comment in 2005 and 2006.  The National People's Congress also circulated a proposed *Labor Contract Law* for public comment in March 2006.  However, China did not provide for public comment on major trade-related laws and regulations, such as the April 2005 *Measures on the Importation of Parts for Entire Automobiles*, which has since given rise to a WTO dispute brought by the United States, the EC and Canada, CIRC's December 2005 *Regulations on the Administration of the Reinsurance Business*, the August 2006 M&A regulations, or Xinhua's September 2006 *Administrative Measures on News and Information Release by Foreign News Agencies within China*.  In addition, China did not seek public input on

*Page 98*

new rules on telecommunications value-added services issued by MII in July 2006, or new rules on qualification requirements for senior managers of insurance companies issued by CIRC in July 2006.  The United States and other WTO members have also been seeking the opportunity to comment on a number of significant new measures, such as the draft *Postal Law* and the draft *Telecommunications Law*, so far without success.

Meanwhile, China's ministries and agencies continue to have a much better record when it comes to making new or revised laws and regulations available to the public.  In accordance with State Council regulations issued in December 2001, which require the publication of new or amended regulations thirty days before their implementation, almost all new or revised laws and regulations have been available (in Chinese) soon after issuance and prior to their effective date, an improvement over pre-WTO accession practice.  Indeed, these laws and regulations are often published not only in official journals, but also on the Internet.  At the same time, however, China continues to lag behind in its obligation to provide translations of these laws and regulations.

In numerous bilateral meetings with the State Council, MOFCOM and other Chinese ministries since China's WTO accession, including high-level meetings, the United States has emphasized the importance of China's adherence to the notice-and-comment commitment in China's accession agreement, both in terms of fairness to WTO members and the benefits that would accrue to China.  Together with other WTO members, the United States has also raised this issue during regular WTO meetings and as part of the annual transitional reviews conducted before various WTO councils and committees.  Recently, at the April 2006 JCCT meeting, with China finally having adopted a single official journal, the United States put China on notice that the next step China needs to take is to use that journal to implement a mandatory notice-and-comment practice for all agencies proposing new or modified trade-related laws and regulations.  At the same time, the United States continues to provide technical assistance to facilitate Chinese government officials' understanding of the workings, and benefits, of an open and transparent rulemaking process.  In July 2006, for example, the United States put on a seminar for Chinese government officials on the operations of the Federal Register.  The United States will continue to work to secure China's full compliance with this fundamental commitment in 2007.

<u>Enquiry Points</u>

Another important transparency commitment requires China to establish enquiry points, where any WTO member or foreign company or individual may obtain information.  As previously reported, China complied with this obligation by establishing a WTO Enquiry and Notification Center, now operated by MOFCOM's Department of WTO Affairs, in January 2002.  Other ministries and agencies have also established formal or informal, subject-specific enquiry points. Since the creation of these various enquiry points, U.S. companies have generally found these various enquiry points to be responsive and helpful, and they have generally received timely replies.  In addition, some ministries and agencies have created websites to provide answers to frequently asked questions as well as further guidance and information.

*Page 99*

### Uniform Application of Laws

In its WTO accession agreement, China committed, at all levels of government, to apply, implement and administer its laws, regulations and other measures relating to trade in goods and services in a uniform and impartial manner throughout China, including in special economic areas.  In support of this commitment, China agreed to establish an internal review mechanism to investigate and address cases of non-uniform application of laws based on information provided by companies or individuals.

As previously reported, in China's first year of WTO membership, the central government launched an extensive campaign to inform and educate both central and local government officials and State-owned enterprise managers about WTO rules and their benefits.  In addition, several provinces and municipalities established their own WTO centers, designed to supplement the central government's efforts and to position themselves so that they would be able to take full advantage of the benefits of China's WTO membership.  In 2002, China also established an internal review mechanism, now overseen by MOFCOM's Department of WTO Affairs, to handle cases of non-uniform application of laws, although the actual workings of this mechanism remain unclear.

During 2006, as in prior years, some problems with uniformity persisted.  These problems are discussed above in the sections on Customs and Trade Administration, Taxation, Investment and Intellectual Property Rights.

### Judicial Review

In its WTO accession agreement, China agreed to establish tribunals for the review of all administrative actions relating to the implementation of laws, regulations, judicial decisions and administrative rulings on trade-related matters.  These tribunals must be impartial and independent of the government authorities entrusted with the administrative enforcement in question, and their review procedures must include the right of appeal.

Beginning before China's accession to the WTO, China had taken steps to improve the quality of its judges.  For example, in 1999, the Supreme People's Court began requiring judges to be appointed based on merit and educational background and experience, rather than through politics or favoritism.  However, existing judges, many of whom have had no legal training, were grandfathered in.  In part because of this situation, many U.S. companies in 2006 continued to express serious concern about the independence of China's judiciary.  In their experience and observation, Chinese judges are often influenced by political, government or business pressures, particularly outside of China's big cities.

Meanwhile, in 2006, the United States continued to monitor how the courts designated by the Supreme People's Court's *Rules on Certain Issues Related to Hearings of International Trade Administrative Cases*, which went into effect in October 2002, have handled cases involving administrative agency decisions relating to international trade in goods or services or intellectual

**A-1660**

*Page 100*

property rights.  So far, however, there continues to be little data, as few foreign companies have had experience with these courts.

**A-1661**

# APPENDIX 1

**List of Written Submissions
Received in Response to Request for Public Comment
by the Trade Policy Staff Committee
on China WTO Compliance**

1. U.S.-China Business Council

2. U.S. Chamber of Commerce

3. International Intellectual Property Alliance

4. Coalition of Service Industries

5. National Association of Manufacturers

6. American Foundry Society

7. U.S. Council for International Business

8. United States Information Technology Office

9. American Seed Trade Association

10. American Iron and Steel Institute

11. Electronic Industries Alliance

12. International AntiCounterfeiting Coalition

13. American Forest & Paper Association

14. American Chemistry Council

15. Underwriters Laboratories

16. Nucor Corporation

17. U.S. Grains Council

18. ASTM International

**A-1662**

19.      Biotechnology Industry Organization

20.      Committee on Pipe and Tube Imports

21.      Distilled Spirits Council of the United States

22.      Kason Industries

23.      North American Die Casting Association

24.      National Tooling & Machinery Association

25.      Society of Plastics

26.      Universal Electric Company

27.      U.S. Wheat Associates

**A-1663**

## <u>APPENDIX 2</u>

**List of Witnesses**
**Testifying at the Public Hearing**
**before the Trade Policy Staff Committee**
**on China WTO Compliance**
Washington, D.C.
September 28, 2006

1.   John Frisbie
     President
     U.S.-China Business Council

2.   Myron Brilliant
     Vice President, East Asia
     U.S. Chamber of Commerce

3.   Eric H. Smith
     President
     International Intellectual Property Alliance

4.   Robert Vastine
     President
     Coalition of Service Industries

5.   Alan Price
     On Behalf of American Iron and Steel Institute,
     Steel Manufacturers Association and
     Specialty Steel Industry of North America

6.   Bill Primosch
     Senior Director, International Business Policy
     National Association of Manufacturers

A-1664

# EXHIBIT Q



# US vitamin fine "unfair and inappropriate" says Mofcom

Katy Oglethorpe • Thursday, 21 March 2013 *(4 hours ago)*

Officials from China's Ministry of Commerce (Mofcom) have criticised the decision of a US federal jury to fine two Chinese vitamin manufacturers, warning that it could harm relations with US businesses.



Vitamins made by Aland, the first company to settle

The District Court in Brooklyn last week ordered Hebei Welcome Pharmaceutical and a related company, North China Pharmaceutical Group, to pay a class of Vitamin C buyers US$162 million for allegedly conspiring with other Chinese rivals to fix prices on vitamins sold to US consumers.

The vitamin makers say they were legally required to set price standards or face government-sanctioned penalties limiting their export capabilities. During the trial, a former Mofcom official testified that, indeed, the government set prices in the Chinese Vitamin C market and expected all of the companies in the industry to abide with them.

But the jury rejected the defence, known as the foreign sovereign compulsion doctrine.

Mofcom is now urging the court to reverse its decision, which a spokesperson this week called "unfair and inappropriate".

"The behaviour of Chinese enterprises was in full compliance with China's laws and regulations," says the spokesperson. "The relevant Chinese enterprises implemented the mandatory requirements of the government departments and behaved appropriately.

"We hope the US court fully takes into account the special nature of the facts of the case [and] fully respects the sovereignty of the Chinese government, as well as fully safeguards the proper international order."

Mofcom says the ruling was "clearly contrary to the principles of international comity".

"This erroneous decision, if not corrected, will cause problems for the international community and international enterprises, and will eventually harm the interests of the United States due to the increase of international disputes," says Mofcom.

Ranis, a food company based in Elizabeth, New Jersey, led a group of plaintiffs that gained class certification in January. The company claimed that from 2001 to 2006, four Chinese vitamin makers participated "in a conspiracy to fix prices and limit supply" to increase prices in the US.

Jiangsu Nutraceutical and Northeast Pharmaceutical Group settled their alleged parts in the conspiracy for US$10.5 million and US$1 million respectively.

John Terzaken, partner at Allen & Overy and the former director of criminal enforcement at the US Department of Justice's antitrust division, says China should expect to adapt to non-domestic antitrust laws.

"It is axiomatic that if a multinational wants to reap the benefits of selling in a particular jurisdiction, it must also be ready to accept responsibility for following the laws of that jurisdiction," he says. "A competition regulator like Mofcom, whose responsibility is to protect businesses and consumers from anti-competitive acts, can hardly be surprised that companies proven to have fixed prices would be held accountable to pay damages to victims harmed by that conduct."

Terzaken says this is "particularly true" given recent prosecutions in the liquid crystal display (LCD) case, where China's National Development and Reform Commission (NDRC) fined a cartel 353 million renminbi (US$56.7 million) – by far the agency's first global cartel decision.

# EXHIBIT R

Case 13-4791, Document 160, 07/28/2014, 1280897, Page183 of 315

**A-1668**
China Objects to U.S. Court Finding on Vitamin C Price-Fixing - WSJ.com#printMode?KEYWOR...    Page 1 of 1
Case 1:06-md-01738-BMC-JO   Document 691-19   Filed 04/11/13   Page 2 of 2 PageID #: 21100

**Don't Run Out of Money in Retirement**
If you have a $500,000 portfolio, download the guide by *Forbes* columnist Ken Fisher's firm. Even if you're not sure how to start rebuilding your portfolio or who to turn to for help, this must-read guide includes research and analysis you can use right now. Don't miss it!    Click Here to Download Your Guide!    FISHER INVESTMENTS®

Dow Jones Reprints: This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit www.djreprints.com
See a sample reprint in PDF format.    Order a reprint of this article now

**THE WALL STREET JOURNAL**
WSJ.com

ASIA BUSINESS    |    Updated March 19, 2013, 11:57 a.m. ET

## China Criticizes U.S. Ruling on Vitamin C Makers

By LAURIE BURKITT

BEIJING—Beijing lashed out Tuesday at a U.S. court decision finding Chinese manufacturers of vitamin C liable for price fixing, saying the ruling would have negative global repercussions.

Officials from China's Ministry of Commerce urged the U.S. court to reverse its decision, saying the ruling was unfair to the Chinese companies, Hebei Welcome Pharmaceutical Co. and affiliated company North China Pharmaceutical Group Corp.

The two companies were ordered last week to pay $162 million in damages for the antitrust claims in a civil trial in federal court in Brooklyn.

"If they don't correct the mistake, it will bother the global society and global companies, which eventually harms U.S. interests by increasing national disputes," a government spokesman said at a news briefing Tuesday.

Experts say that strong language from China's government raises the possibility of a tit-for-tat response. "This is a not-too-subtle hint that we can expect retaliation against American companies doing business in China," said James Zimmerman, partner with the Beijing office of the international law firm of Sheppard Mullin Richter & Hampton LLP.

The U.S. and China are tussling over trade issues on a number of fronts, including China's dominance in the production of "rare earth" minerals, used in manufacturing, and state support in the ailing solar-panel industry.

North China Pharmaceutical plans to appeal the fine, the state-run Xinhua news agency said Sunday.

Plaintiffs, including a Texas animal-feed company and a New Jersey vitamin distributor, alleged the Chinese vitamin C makers voluntarily formed an illegal price-fixing cartel that increased prices significantly and resulted in tens of millions of dollars of added costs for U.S. consumers since late 2001.

The vitamin C makers argued that Beijing forced them to coordinate pricing and output.

Attempts to blame the price fixing on directives from the Chinese government ran counter to China's declarations to U.S. government agencies and the World Trade Organization that it doesn't compel price fixing for any exported product, the plaintiffs argued.

The raw vitamins from the Chinese companies were used as food and beverage ingredients, consumer vitamin supplements and animal products, the plaintiffs said.

China's Commerce Ministry said it would continue to support the Chinese companies. It previously filed papers supporting the companies' position and urged that the case be thrown out, saying it couldn't be resolved without interfering with China's affairs.

Copyright 2012 Dow Jones & Company, Inc. All Rights Reserved
This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit
www.djreprints.com

.

A-1669

# EXHIBIT S

## MOFCOM's Shang says US judgment in vitamin C case shows 'disrespect'

MOFCOM to support Chinese company's appeal in case

Case's reversal at appellate court level seen possible

---

A key Chinese antitrust regulator said he is "very dissatisfied" with the judgment from a US district court against Chinese vitamin C manufacturers following a recent high-profile antitrust jury trial, saying the decision indicates "disrespect" for the Chinese government.

Shang Ming, director general of the Anti-Monopoly Bureau under the Ministry of Commerce (MOFCOM), said the Chinese government should have the last say on the interpretation of Chinese law, not a US court judge. He also said MOFCOM, which has the responsibility to give guidance to Chinese companies on antitrust matters overseas, will support the Chinese company's decision to appeal the judgment.

Shang made the comments at a symposium held by the China Institute of International Antitrust and Investment in Beijing Friday (22 March).

"In this case, MOFCOM and myself, during the course of the case had submitted amicus curiae briefs more than three times to the court, representing the Chinese government," Shang said. "There is one situation where the companies in a monopoly agreement may be exempted: that is if they are bound by the local law or act under the administrative order of the government. That is precisely what we wanted to prove."

Shang said MOFCOM's previous requirement that export companies must be disciplined by trade associations under the "export pre-examination and approving system" was a product of China's structural reform in trade. That system was scrapped in 2008.

"[The vitamin C companies' price] agreement was reached under this circumstance," Shang said. "But unfortunately, the judge did not accept this argument."

"Here I would like to express my deep dissatisfaction toward the US judge, because Chinese law should be interpreted by China's administrative body, or the agency that has the right to do so, not by a [foreign] judge," Shang said. "The fact that he did not accept our interpretation, I believe, shows disrespect, to say the least."

The vitamin C antitrust case generated much discussion at the symposium, attended by antitrust attorneys, as well as Chinese and foreign antitrust regulators, with some questioning whether the judgment was reasonable.

Willard Tom, a partner at Morgan Lewis and a former general counsel of the US Federal Trade Commission (FTC), said the US court system has generally moved away from "deferring to vague expressions" of foreign intent as a defence in cartel cases. And the judge had to take into consideration not only MOFCOM's amicus brief, but also the plaintiff's argument that the vitamin C manufacturers acted voluntarily, and MOFCOM's position that it no longer practices export licensing.

"I'm not sure why one would expect to succeed simply on the basis of an amicus filing by a foreign government," Tom said. "These foreign sovereignty compulsion defenses are very very difficult to succeed on. … Was this district court judge unreasonable? We will see if the appellate court reverses [the judgment]."

Chen Huanzhong, vice chairman of the anti-monopoly law committee of the All China Lawyers Association (ACLA), China's bar association, said the vitamin C case has gone beyond a legal question to the level of diplomacy and the China-US bilateral relationship.

He said he believes the Chinese company may have a chance to reverse the judgment at a higher level US court, which will have more authority to consider foreign sovereign defenses.

The US District Court, Eastern District of New York, on 14 March entered judgment for USD 153.3m after trebling a jury's USD 54.1m verdict in favor of a direct purchaser class on its allegations that Chinese corporations participated in an illegal cartel to fix prices and limit supply for export of vitamin C to the US.

The jury concluded that Hebei Welcome Pharmaceutical and its parent North China Pharmaceutical Group Corp. (NCPGC) "knowingly entered into an agreement or conspiracy with the purpose of or predictable effect of fixing the price or limiting the supply of Vitamin C."

The jury rejected the defendants' argument that they were compelled by the Chinese government to enter into the agreements from 1 December, 2001 to 30 June, 2006 and that they "faced the prospect of penalties or sanctions for not complying with the directives or commands of the Chinese Government."

Shang's comments Friday echoed MOFCOM spokesman Shen Danyang's stern words 19 March, when he called the vitamin C trial judgment "unfair" and "inappropriate."

Shen said that the heavy penalties for these Chinese companies were inappropriate, as they violated the "doctrine of international comity", the principle of "foreign sovereign compulsion defense" and the "act of state doctrine", and that they also went against the spirit of the rule of law that the US has been claiming.

He said the US should give full respect to China's sovereignty. He also called the judgment a "wrong decision," which, if not corrected, could promote international disputes and harm American interests.

A-1672

by Joy C. Shaw and Eliot Gao in Beijing

A-1673

# EXHIBIT A

# MINISTRY OF COMMERCE
# PEOPLE'S REPUBLIC OF CHINA

Home
News
Policies
Topics
Statistics
Services
Photo Gallery

Search

中文
Other languages

Mon.13/5/2013

Home > News > Press Conference

**Regular Press Conference of the Ministry of Commerce on March, 19 2013**

March 28, 2013 - 14:57 BJT (18:57 GMT)   MOFCOM

**News**

Significant News

Spokesperson's Remarks

Press Conference

From Counselor's Office

**Policies**

Annoucement

Policy Interpretation

Gazette

**Statistics**

Brief Statistics

Foreign Investment

Foreign Trade Cooperation

Regional Trade Statistics

Import and Export Indicators

**Services**

Int'l Labor Cooperation Companies

Supply & Demand

Inquiry & Answer

Dear friends from the Press,

Welcome to the press conference today. I'm ShenDanyang, spokesman of the Ministry of Commerce. I am very glad to meet you all again and make a briefing on China's business performance in January - February this year, and answer your questions.

I. Domestic Market Operation

Retail sales of consumer goods in January and February amounted to 3.781 trillion Yuan with anominal increase of 12.3% year-on-year and 2.4 percentage point lower as compared with that of the same period of previous year. The actual growth was 10.4% year-on-year, when price fluctuation excluded, 0.4 percentage point lower as compared with that of the same period of previous year.

1. Consumptionin rural areas grew faster than that of urban areas.Urban consumptionin urban areas was up by 12.1%, while rural consumption saw an increase of 13.4%. The growth rate of rural consumption exceeded that of urban areas again, 1.3 percentage points higher as compared with that of urban consumption.

2. Sales of housing and leisure goods increased. Affected by the soon-to-expired policy of "Appliances to the Countryside" and promotion during Chinese New Year by lunar calender, sales value of home appliances, furniture and building and decorating materials in 3,000 key retailersmonitored by MOFCOM rose 20.1%, 4.2% and 0.2% respectively as compared with that of previous year. The growth rate of household appliances and audiovisual equipment, and sports and entertainment products in enterprises above designated size was 19.6 and 8.4 percentage points faster than that of the same period over previous year. Sales of furniture and building materials rose 20.9% and 17.7%, which significantly higher than the average level of sales of enterprises above designated size.

3. Demands for automobiles and communication commodities slowed down. Sales of communication commodities in 3,000 key retailersmonitored by MOFCOM rose 4%, dropped 8.6 percentage points as compared with that of previous year. The growth rate of automobiles, petroleum and petroleum products, and communication equipment in enterprises above designated size were down by 5.8%, 9.2% and 32.7% respectively as compared with that of previous year.

4. Sales by medium and large sized circulation enterprises saw a slight slowdown. Sales of 3,000 key retailers monitored by MOFCOM was up by 7.9% year-on-year, 0.4 percentage point lower than that of the same period of previous year. Retail sale of consumer goods in enterprises above designated size rose 10.2% yet the growth rate was lower than the average level of national consumption growth.

5. Consumption in catering dropped significantly. Catering revenue grew 8.4%, 4.9 percentage points lower as compared with that of previous year and was the lowest since July, 2003. Large sized and high-end catering consumption dropped significantly. Revenue of catering enterprises above designated size was down by 3.3% year-on-year. Sales of key catering enterprises monitored by MOFCOM dropped 2.3% as compared with that of previous year.

6. Consumer prices maintained steadily. The consumer price in January and February rose 2.6%. Among that, February saw an increase of 3.2%, 1.2 percentage points higher than that of January, setting the record high in eight months. In February, CPI rose 1.9% year-on-year driven by foodstuff, and foodstuff accounted for 73% of CPI increase. The wholesale price of beef, eggs, peanut oil and mutton monitored by

MOFCOM rose by the largest margin of 31.7%, 18.3%, 17.8% and 14.2 respectively, while that of pork and fruit dropped 4.1% and 5.1% respectively.

II. Foreign Trade

According to Customs statistics, total value of our import and export in January and February were of 3.83 trillion Yuan (US$609.31 billion), up by 14.2%year-on-year, exchange rate fluctuation excluded (same as below). Among that, exports amounted to 2.05 trillion Yuan (US$326.73 billion), up by 23.6%; and imports amounted to 1.78 trillion Yuan (US$282.58 billion), up by 5%. Trade surplus was 277.82 billion Yuan (US$44.15 billion). Trade deficit last year was US$4.78 billion. The main features of foreign trade are as follows:

1. Trade with U.S. and ASEAN was steadily up and with HK and South Africa increased rapidly. China-U.S. trade in January and February rose 14.8%, and China-ASEAN trade was up by 23.4%. Mainland China-HK and China-South Africarose 58.7% and 70.1% respectively, 44.5 and 55.9 percentage points higher than the overall growth rate of our foreign trade. Besides, China-EU trade rose 3.2%, and China-Japan trade dropped 8.2%.

2. Export by the central and western Chinaremained robust; export by Guangdong and Fujian province in eastern China increased significantly and export growth in other provinces remained steady. In January and February, growth rate of exports of Sichuan,Chongqing, Jiangxi and Anhui was 72.7%, 54.8%, 140.7% and 138.1% respectively; growth rate of export of Guangzhou was 34.2%, still ranking first, and the growth rate of Fujian was 32%.

3. Export by general trade and import by processing trade grow significantly. Total value by general trade in January and February was US$316.62 billion, up by 11.5%. Among that, exports amounted to US$159.79 billion, up by 29.9%; imports registered US$156.84 billion, dropped by 2.6%. Import and exportby processing trade was US$202.58 billion, with an increase of 7.6%, among that, export registeredUS$128.30 billion, up by 5.9% while import amounted to US$74.28 billion, up by 10.5%.

4. Private enterprises become the main driving force in export and import; exports of state-owned enterprises and foreign-invested enterprises grew slowly, while imports showed negative growth. In January and February, export by private enterprises was US$134.82 billion, up by 61.1%, 37.5 percentage points higher overall growth rate of export, whileimport by private enterprises registered US$81.84 billion, up by 35.3%, 30.3 percentage points higher overall growth rate of import. Export bySOEs was up by 3.6%, while import dropped 6.8%. Export by foreign-invested enterprises rose 7.0%, while import was down by 1.9% over the previous year.

5. Exports of mechanic and electronic products grew steadily,and expot of labor-intensive products grew significantly. Exports of mechanic and electronic products in January and February registered US$187.81 billion, up by 20%, accounting for 57.5% of total exports; while imports was US$117.63 billion with an increase of 9.1%, 4.1 percentage points higher than that of the total imports.Total export of high-tech productswas US$99.18 billion and rose by 26.2%, 2.6 percentage points higher than that of the total exports.Import ofhigh-tech products registered US$79.83 billion and rose by 20.1%, 15.1 percentage points higher than that of total imports. Total export ofclothing, textiles, footwear,furniture, plastic products, bags and suitcases and toys was US$69.57 billion and rose by 40.3%. Import of iron ore, crude oil, soybean and copper dropped 1.5%, 2.4%, 9.0% and 27.8% respectively, while import of coal and refined oil rose 34.3% and 6.1% respectively.

III. Foreign investment

From January to February of 2013, 2,915 foreign-invested enterprises were newly established, down by 3.00% year on year; realized FDI reached US$17.484 billion, down by 1.35% year on year. Among that, in February, 1,032 foreign-invested enterprises were newly approved, down by 35.62% year on year; realized FDI amounted to US$8.214 billion, up by 6.32% year on year, turning positive for the first time after eight consecutive months of negative growth. The main features of foreign investment during January-February period are as follows:

1. Foreign investment in service sector saw a certain amount of growth. From January to February, realized FDI in service sector reached US$8.449 billion, up by 5.49% year on year, accounting for 48.32% of the total national amount over the same period. Realized FDI in agriculture, forestry, animal husbandry, and fishery amounted to US$177 million, down by 43.22% year and year, taking up 1.01% of the national total in foreign investment absorption. Realized FDI in manufacturing sector registered US$7.472 billion, down by 10.64% year on year, accounting for 42.74% of the national total over the same period.

2. Investments from the EU countries grew relatively faster. From January to February, realized FDI from EU 27 countries reached US$1.214 billion, up by 34.01% year on year. Realized FDI from the US registered US$497 million, down by 5.37% year on year. Realized FDI from ten countries/regions in Asia (Hong Kong, Macao, Taiwan, Japan, the Philippines, Thailand, Malaysia, Singapore, Indonesia and South Korea) amounted to US$15.178 billion, down by 1.31% year on year. Among that, realized FDI from Japan reached US$1.269 billion, down by 6.70% year on year.

3. Realized FDI in the central China continued to maintain a good momentum. From January to February, realized FDI in the central China was US$1.496 billion, up by 4.76% year on year, accounting for 8.56% of the total national amount; the figure in the eastern China was US$14.912 billion, down 1.58% year on year, accounting for 85.29% of the national total; the figure in the western China was US$1.075 billion, down 5.95% year on year, taking up 6.15% of the national total.

IV. Investment and economic cooperation overseas

Direct investment overseas. From January to February of 2013, Chinese investors had directly invested in 1,187 overseas companies in 133 countries and regions, and total direct investments in non-financial sectors reached US$18.388 billion, up by 147.3% year on year. From January to February, investments by mainland China in the seven economies including Hong Kong, ASEAN, EU, Australia, the US, Russia and Japan reached US$15.893 billion, accounting for 86.4% of the total national direct investment overseas over the same period. Among that, the investments in Hong Kong, ASEAN, EU, Australia and the US were up by 155.8%, 114%, 81.9%, 281.8% and 145.7% respectively while that in Russia and Japan were down by 46% and 31% respectively. From January to February, direct investment overseas by provinces reached US$3.4 billion, accounting for 18.5% of the total investment overseas over the same period.

Contracted projects overseas. From January to February of 2013, turnover of China's contracted projects overseas amounted to US$13.04 billion, up by 13.4% year on year, and value of newly-signed contracts was US$20.23 billion, up by 39.8% year on year. The projects each with a contract value above US$50 million were 91 (52 over the same period of last year), with a total value of US$14.92 billion, accounting for 73.8% of the total value of newly-signed contracts. Among that, the projects each with a contract value above US$100 million were 49, an increase of 15 over the same period of last year. By the end of February 2013, total contract value of the projects overseas reached US$1.0184 trillion with the realized turnover of US$668.6 billion.

Labor service cooperation overseas. From January to February of 2013, laborers sent abroad reached 57 thousand, an increase of one thousand over the same period of last year. Among that, laborers sent abroad for contracted projects were 30 thousand and that for labor cooperation projects were 27 thousand. By the end of February, all laborers sent overseas totaled 819 thousand, an increase of 20 thousand over the same period of last year.

21st Century Business Herald: What's your comment on strong exports and weak imports in first two months of 2013 and the huge trade surplus? Will there be any policies to promote imports? How do you view the foreign trade situation for the whole year, and will the goal of 10% trade growth be realized? Thank you.

ShenDanyang: According to Customs statistics, export growth was indeed strong in the first two months, while there was a relatively slow import growth. As you said, we have strong exports and weak imports. This has caused some concerns, and we are studying the reasons behind it.

A number of factors contributed to the fast export growth in January-February. There were three main causes according to our preliminary analysis: Firstly, the policies to stabilize trade growth continue to exert its effects. For example, we have policies on tax reduction, speeding up the export refund process and financial supports, which will still remain stable and effective this year. These policies have notably promoted export growth.

Second, foreign trade enterprises are taking active steps to transform their development mode, engage in restructuring, and foster innovation and competitive advantages. Such efforts have led to a rapid growth of exports of machinery and electronic products and high-tech products. High-tech exports rose by 26.2% in the first two months, and exports of machinery and electronic products rose by 20.1%, of which integrated circuits, mobile phones and parts, automatic data processing equipment and parts, motorcycles, power assisted bicycles, bicycles, watches, lamps and lighting devices were up by over 15%.

Case 13-4791, Document 160, 07/28/2014, 1280897, Page192 of 315

Case 1:06-md-01738-BMC-JO   Document 764-1   Filed 05/31/13   Page 5 of 10 PageID #: 26283

Third, some external markets have shown signs of recovery. Of course, there were some other factors, such as seasonal factors, and the relatively small export volume in the same period of 2012. Another factor is that there was a trade deficit in January and February 2012, with imports growth outpacing export growth, while the situation reversed in 2013.

Besides, we are also looking at other possible factors. It is difficult to make an accurate judgment for the whole year based only on the statistics of the first two months. We will have to wait and see.

ShenDanyang: Accordig to Customs statistics, China's imports fell by 15.2% year-on-year in February, mainly due to seasonal factors including the Chinese Lunar New Year. According to seasonally adjusted Customs statistics, imports growth in February saw a slight rise of 6.5%. According to MOFCOM analysis, import growth rate in first two months was down as compared with that of 2012, mainly due to weak domestic demand and falling commodity prices in international market. For example, prices of several types of bulk commodities fell sharply in the first two months. Billet, cotton and natural rubber fell by 26.9%, 20.1% and 13% respectively, and steel, iron ore and crude oil were down by 12.2%, 11.2% and 4.1% respectively. China imports these commodities in large quantities, so falling import prices are not necessarily a bad thing.

As proposed in this year's government work report, we need to pursue at the same time stable exports and increasing imports. Guided by such a principle, MOFCOM will continue to take measures to promote the growth of imports and at the same time stabilize exports. We will take three measures. First, we will improve the structure of import tariffs, and adjust the Catalogue of Encouraged of Imports, and promote import growth through fiscal and financial measures. Macroeconomic policies and import growth are connected, and we need to use fiscal, taxation, financial and other policy measures in tandem.

Second, we will strengthen the building of an import promotion system, give support to theAfrican Commodities Exhibition and the South Asian Merchandise Show, and organize enterprises to carry out imports promotion overseas. Some countries that have a trade deficit with China are asking whether China could expand imports. We would say that we will make efforts to encourage enterprises to expand imports. However, the decisions have to be made by enterprises of the two sides. China cannot act alone and the other country should also take measures to promote trade. For example, we often say to our American friends that they should also make efforts to promote exports to China. All countries including the US can cooperate with China's trade promotion agencies to do more trade promotions. Trade promotion measures will bring positive impacts.

Third, we will increase the number of innovation demonstration areas for increasing imports at a stable pace, and give play to the role of import trade clustersin increasing imports in the neighboring areas. Thank you.

CCTV: According to the statistics you just released, foreign capital utilization posted a negative growth in January-February 2013, but there was a growth of about 6% in February. Does that mean China's foreign capital utilization has turned toward the better? And what's your view on the situation for the whole year? Thank you.

ShenDanyang: China's foreign investment utilization posted small amplitude fluctuations recently due to slow global economic recovery and less than abundant global investment. Our actualized foreign investment declined for a few successive months in 2012. However, against the global backdrop, we believe that the overall situation of China's foreign investment utilization maintained stable development. In 2012, global cross-border direct investment fell by 18% and foreign investment inflows into Asia decreased by 9.5%. Although foreign investment inflow into China declined by 3.7%, we still had the best performance among major foreign investment host countries. In February 2013, China's actualized foreign investment saw a slight rebound, with a growth of 6.32%, which was the first positive growth after eight consecutive months of negative growth. It proved, to a certain extent, the competitiveness of China's economy and recognition by international investors of China's investment environment and development prospects.

As for foreign investment utilization prospects for the whole year, it is difficult to predict whether the situation will improve for the whole year based on the statistics of in January and February alone. Generally speaking, foreign investment utilization in 2013 will be steady, and is unlikely to have big fluctuations. Thank you for your question.

China Business News: You just said that total retail sales of consumer goods had a nominal increase of only 12.3% in January-February 2013, and an actual increase of 10.4%, a pace much slower than before. What are the main causes for the slowdown of consumption growth? And what's your comment on the domestic consumption situation in 2013? Will MOFCO take any specific measures to expand consumption? Thank

Case 13-4791, Document 160, 07/28/2014, 1280897, Page193 of 315
A-1678
Regular Press Conference of the Ministry of Commerce on March, 19 2013 - Page 5 of 9
Case 1:06-md-01738-BMC-JO Document 764-1 Filed 05/31/13 Page 6 of 10 PageID #: 26284

you.

ShenDanyang: As I just shared with you, nominalgrowth rate and actual growth rate of the total retail sales of consumer goods in January-February were down by 2.4 percentage points and 0.4 percentage points respectively. There were several underlying factors, including thecurbing of extravagantconsumption. The catering sector had a revenue increase of only 8.4% in the first two months, a growth rate of 4.9 percentage points lower. Especially, the revenue of catering enterprises above the designated size declined by 3.3%.So this is one factor.

Another factor is the growth of oversees travelling during such time as the Spring Festival of 2013. As a result, some consumption moved abroad. This might be another factor. Of course, some believe that there are other factors such as the policies of certain cities on limiting car purchase and usage, high oil prices, parking difficulties, which slowed the consumption of automobiles and fuels. There could be more, and we are still making analysis. However, consumption did not trend notably downward, and the growth rate was only down by 0.4 percentage points.

Generally speaking, we are optimistic, for a good reason, on the situation of consumption in 2013. For example, in recent years, China's policies to promote consumption growth have been changed from short-term stimulus to cope with the international financial crisis into a long term fundamental mechanism. The government has released a number of policies conducive to stimulating consumption in the long run. Recently, the State Council approved and issued documents on deepening the reform of the income distribution system and promoting employment. The purpose is to increase the income of residents and increase employment, which will be conducive to expanding consumption. The State Council also issued documents on carrying out pilot programs on the new type of social pension insurance in rural areas and on improving the mechanism of essential drugs, announced policies for ensuring the basic livelihood of the low-income people, and reducingmedical costs, which will also help to enhance people's consumption capability and improve their consumption expectation. What's more, the State Council has issued the 12th Five-Year Plan Program for the Development of the Service Sector and the Outline for National Tourism and Leisure. These documents give priority to the development of domestic services such as housekeeping services, care for the aged and community-based care, in order to meet the basic needs of Chinese families, require that the paid-vacation system be truly effective, and suggest exploring the feasibility of having Spring Break and Autumn Break for the students. Such initiatives will be conducive to release the consumption potential of domestic services and travel and leisure and increase total consumption.

In addition, many friends here may be interested to know that we will continue the "Subsidy Scheme on Energy-conserving Products" to subsidize consumers who purchase energy efficient products such as lightings, cars, air-conditioners, refrigerators, flat-panel TVs, washing machines, water heaters and desk computers, which will speed up the upgrading of electrical household appliances and promote green consumption. These policies will help solve such frequently discussed problems as "having no money to spend" or "being afraid to spend". Therefore, as long as the economy goes well, the consumption trend in 2013 should be promising. Of course, though there is great potential for expanding consumer spending, many difficulties exist. We must make efforts at all four fronts, namely increasing consumption capability, stabilizing consumption expectation, enhancing consumption willingness and improving consumption environment, in order to secure a steady growth of consumption.

Among these four aspects, MOFCOM is mainly responsible for improving consumption environment. Last year, the State Council promulgated Several Opinions on Deepening Circulation System Reform and Speeding up Development of Circulation Industry, or NO. 39 Document of the State Council; and issued the Comprehensive Work Plan on Lowering Circulation Cost and Enhancing Circulation Efficiency, which unveiled favorable policies covering planning, tax, fiscal aspects, finance, land and fee reduction. These policies are conducive to lowering circulation cost and improving consumption environment. This year, MOFCOM will endeavor to do a good job in this aspect. Thank you for your question.

International Business Daily: My question is about the price-fixing case of Vitamin C. As we know, recently, media reported that a federal court in New York ruled over the price-fixing case involving North China Pharmaceutical Group Corp (NCPC) and its affiliated company, found that the two companies were engaged in price-fixing of vitamin C in the US in recent years. The report also said the Chinese Ministry of Commerce issued judicial document to support the position of the two companies and urged the withdrawal of the case. Could you please confirm if the above information is accurate? And what is the comment of MOFCOM? Thank you.

ShenDanyang: MOFCOM has learnt about the ruling of the US Federal Court on the antitrust case on vitamin C against Chinese companies, and we consider it to be unfair and improper. According to our understanding, the conduct of relevant Chinese companies totally conformed to the Chinese laws and regulations of the time. The companies concerned took the actionsin order to comply withthe compulsory requirements of the Chinese government. MOFCOM filed official written statements for three times in the form of amicus brief, and explicitly notified the US

court that the charged Chinese enterprises acted on the government's requirement. It is totally improperfor the US court to impose heavy fine against Chinese enterprises for their lawful conducts. To take jurisdiction over Chinese enterprises' conducts resulting from compulsory government requirements is obviously against the Comity principle and the Foreign Sovereign Compulsion Doctrine and Act of State Doctrine, and is inconsistent with the spirit of governance by law as always advocated by the US government. If such mistakes are not corrected, it will be worrisome forthe global society and companies, which will lead to increasinginternational disputes and eventually harm US interests.

We hope the US court can fully consider the facts of the case and the particularity of the Chinese economic reform being in the transition period, fully respect the sovereignty of the Chinese government, and maintain the order of the international community. We will continue to firmly support Chinese companies who comply with the laws to actively protect their legal rights and interests. Thank you.

Asahi Shimbun: President Xi Jinping is going to visit Russia. Would you brief us on the latest development in China-Russia trade and economic relations? In addition, recently, the Japanese government announced that it will take part in the TPP negotiations. How does China look at the relationship between TPP and China-Japan-ROK FTA? Are they complementary or competing? Thank you.

ShenDanyang: President Xi Jinping's visit to Russia will play a positive role inpromoting the development of China-Russia trade and economic cooperation. Currently, the momentum of China-Russia trade and economic cooperation is good. The bilateral trade volume in 2012 hit the record high of US\$ 88.16 billion, up by 11.2% year on year. China has been Russia's largest trade partner for three consecutive years. If the bilateral trade continues to grow at the current speed, the goal set up by the leaders of our two nations to increase bilateral tradeto US\$ 100 billion in 2015 and US\$ 200 billion in 2020 can certainly be achieved.

Investment cooperation betweenthe two countries is also speeding up, and has three characteristics: first, China's investment to Russia has been growing rapidly. According to Chinese statistics, by the end of 2012, the accumulated non-financial direct investment from China to Russia was US\$ 4.42 billion, registering an average increase of over 40% over the past ten years. In 2012, China's investment to Russia was US\$ 656 million, up by 116.2% year on year. Second, our cooperation on major projects goes smoothly. A number of large-scale cooperation projects in such fields as energy, nuclear energy, aerospace &aviation, science and technology and transportation, represented by such projects as China-Russia oil pipeline, Tianjin Oil Refinery, Tianwan Nuclear Power Station, R&D inlong-range wide-body aircraft and heavy-duty helicopter, and Tongjiang Railway bridge, have strongly supported the sustainable development of the bilateral trade and economic cooperation. Third, bilateral cooperation in the financial sector and cooperation between local regions and entrepreneurs of the two countries have also made new progress. We believe that the visit of President Xi will promote the speeding up of investment cooperation between the two sides.

As to Japan's taking part in the TPP negotiation as you just mentioned, we always hold the view that all economies in the world have the right to choose the path towards economic integration that suits their own national conditions and development level, and we have an open and inclusive attitude toward all cooperation that aims at realizing regional economic integration. We also believe that the multilateral trading system that the vast majority of the countries in the world are parties to remains the main channel for promoting international trade liberalization, and that any regional and bilateral trade arrangements should be a useful complement to rather than a substitute for the multilateral trading system. We will keep contacts and communications with other parties, and carry out in-depth analysis of the potential impact of the above-mentioned negotiations. Meanwhile, as we all know, China will step up efforts on our own FTA strategy. Thanks for your question.

China News Service: According to media reports from Korea, at the end of March, Chinese, Japanese and Korean governments will meet for three days and hold the firstround of negotiations on China-Japan-ROK FTA. Could you please confirm? Can you share some specifics? Thank you.

ShenDanyang: Having consulted among the three sides, China, Japan and ROK will hold the firstround of China-Japan-ROK FTA negotiationsin Seoul, South Koreaon March 26-28, 2013. The representatives of the three nations will discuss the mechanism arrangement, negotiation fields and negotiation mode of the FTA negotiation. The three sides have agreed to hold three rounds of negotiations this year, first in Korea, then in China and finally in Japan. China, Japan and ROK are important economies in East Asia and have close trade and economic cooperation.To establish the FTA as soon as possible accords to the common interests of the three nations and is conducive to regional peace and development. We are of the view that, followingthe launch of the China-Japan-ROK FTA negotiation, the stability of the relations among the three sides will be the political basis for smooth future negotiations. We would like to join efforts with Japan and ROK to promote China-Japan-ROK FTA negotiation to make positive achievements as soon as possible. Thank you.

Case 1:06-md-01738-BMC-JO   Document 764-1   Filed 05/31/13   Page 8 of 10 PageID #: 26286

Economic Daily: Judging from past experiences, springis often a season of sluggish market for agro-products. Based on information available to MOFCOM so far, will it happen this year, and what kind of measures will MOFCOM adopt? Thank you.

ShenDanyang: Thanks for your keen observation. Indeed, according to past experiences, the sales of agro-products such as fruits and vegetables will decline after the Spring Festival, the price will drop and the market will become sluggish. Therefore, after this Spring Festival, MOFCOM has taken some target measures to strengthen market monitoring. We hope to provide guidance to farmers and to nip the problems in the bud.

We have noticed that recently lettuces from Pengzhou, Sichuan and Honghu, Hubei, apples from Yongjing, Gansu, and peppers and chayote from Hainan are difficult to sell. MOFCOM responded quickly, and launched the working mechanism for addressing difficulties in selling agricultural products. We also urged and guided local commerce authorities to work with relevant departments to intensify marketing efforts, make available better sales channels, strengthen the direct links between markets and farmers, and encourage enterprises to purchase and store. Such efforts have effectively mitigated the selling difficulties.

Similar situations may occur in some individual places and to some individual agricultural products. MOFCOM and local commercial departments have already established a set of plans to response to such problems. I briefed you on our working mechanisms several times atlast year's press conferences and these working mechanisms have been further improved. Going forward, we will continue to pay close attention to the production andsales of agricultural products, and, in the principle of making "product based responses at different levels", build and improve the SOS system for the sales of agricultural products, and provide assistance to local governments intaking contingency measures to address those more prominent selling difficulties.

With regard to how to solve the root of reoccurring issues such as selling difficulties and rising prices, or in other words how to establish a lasting mechanism, a topic that is of much interest to the media, MOFCOM will make greater efforts to ensurebalanced supply and demand of agricultural products. The goal is to solve selling difficulties and ensure sufficient market supply at the same time. We are taking a three-part approach, targeting issues at the producing areas, distribution centers and destination markets, to find fundamental solutions. First, atdistribution centers, we will strengthen the building of wholesale markets there, and give a full play to the role of wholesale markets in connecting producingareas and destination markets. The goal is to build a stable and efficient cross-region production and sales chain. Second, at producing areas, we will strengthen the building of logistics centers to enhancethe preservation, storage and transportation capabilities, and work for better coordinated peak marketing times. For example, we will enhance the storage capabilities at distribution centers, and in the event of excessive supply of a certain agricultural product, we can put these products in storage and market them later when there is a change in the supply-demand dynamics. Third, at destination markets, we will improve such infrastructure as comprehensive processing and distribution centers at wholesale markets of agricultural products and promote promoting the building of urban convenience food markets.

Currently, the overall supply and demand of China's agricultural market is basically balanced now. Of course, individual cases of selling difficulties may occurat some locations due to regional, structural, and temporary imbalances.However, in the medium and long run, the overall agricultural prices will trend upward due to rising costs of agricultural production. We need to focus more on how to build better channels of commerce, reduce costs and ensure supply in order to have a stable market and stable prices. Thank you for your questions.

Agence France-Presse: We know that President Xi Jinping is soon to visit a number of countries, including countries in Africa. However, thegovernor of the Nigerian Central Bank governor recently saidthat it was a typical practice of colonialism thatChina importsprimary products from African countries and sells finished products back to those countries. What's your comment? Could you share with us the latest China-Africa bilateral trade data?

ShenDanyang: We have noticed the article you mentioned, but we do not agree with the governor's opinion. I would recommend that the governor take a good look at the history of colonialism by Western countries. People with some basic knowledge of the history of colonialism all know that there is a fundamental difference between China-Africa economic and trade cooperation and colonialism. In the past, Western countries plundered Africa's resources, trafficked African people, occupied the land of Africa and destroyed African culture by force and deception, which is the nature of colonialism. For years, China has been providing a variety of assistance to African countries to the best of its capabilities and supporting the economic and social development in Africa, which is obvious to the majority of African people.

China's importing of primary products from African countries is entirely in accordance with international practices and market rules. It can help

to break the monopoly by Western countries and promoteAfrica's export diversification so thatAfrica can gain more benefits. In fact, China not only imports primary products but also more and more finished products from African countries. For example, it's reported by CCTV that there is African Commodities Trade Center in theYiwuChina Commodity City in Zhejiang Province where many African friends sell their characteristic finished products. The Chinese government has always attached importance to encouraging Chinese enterprises to use more local equipment and labor in their economic and trade cooperation with African countries. In recent years, increasing Chinese investment in African countries has contributed to the economic growth of the host countries, and increased the tax revenue, created a lot of jobs, and trained a large number of people for African countries. By the end of 2012, The total stock of Chinese direct investment had reached nearly US$ 20 billion, and in 2012 alone, China's FDI in Africa was nearly US$ 3 billion. There are more than 2,000 Chinese enterprises investing and building factories in Africa and the areas of cooperation have expanded gradually from such traditional sectors as agriculture, mining, and construction to mineral processing, manufacturing, finance, commerce, real estate, and tourism. Some people say that Chinese companies are only developing mines and growing agricultural produce in Africa. The fact speaks differently. Chinese enterprises have expended their investment to manufacturing as well as various kinds of industries. In 2012, Chinese tourists went to Africatotaled at 870,000 person/times. In order to encourage and support Chinese enterprises to invest in Africa, China has established the China-Africa Development Fund. In the past five years, the China-Africa Development Fund has invested $ 1.84 billion in 61 projects. China has also built six economic and trade cooperation zones in five African countries, where the experiences of the Chinese Development Zone are applied to host large numbers of Chinese companies. The focus is on the processing industry. The six economic and trade cooperation zones in African countries have provided more than 10,000 jobs.

China remains committed to developing trade and economic cooperation with Africa in the principle of equality, mutual benefit and common development. China always matches its words with its deeds.As China-Africa trade and economic cooperation continues its sound development, we believe thatmore and more African friends will come to a clearer and more objective understanding of the positive effects and contributions to Africa made by Sino-African cooperation. Thank you for your question.

CRI: According to some media reports, MOFCOM is the world's youngest mergers and acquisitions regulatory authority, and a regulator that is very easily influenced by political decisions, and that investors find it difficult to understand MOFCOM's positions.Uncertainties resulted from such non-transparency has led to windfall profits for some hedge funds. What's your view on this? Could you please brief us on MOFCOM's antimonopoly review work? Thank you.

ShenDanyang: We havenoticed such reports and comments. I think that these comments are totally groundless and are not fact-based. Since Anti-monopoly Law was formally put into effect in August, 2008, MOFCOM has worked for the promulgation of a serious of supporting laws and regulations covering both procedural aspects such as case filing and review and substantive aspects such as competition review in order to increase enforcement transparency and facilitateimplementation. Those laws and regulations, which provide guidance and convenience, are well known and well spoken of by enterprises and their counsels.

Meanwhile, when conducting anti-monopoly reviews on businessconcentration, MOFCOM strictly complies with the Anti-monopoly Law and other related laws and regulations in terms of both procedure and substance, assesses the impact on competition in accordance with the laws and then makes a decision. During the whole review process, MOFCOM always maintainsgood communications with the enterprises and their counsels. From when the Anti-monopoly Law took effect in 2008 to the end of 2012, MOFCOM received a total of 642 filings for concentration review. Among them, 585 reviews were initiated, and 540 reviews were concluded. Among the concluded cases, 523 were unconditional approvals, accounting for 96.9% of the total, 16 were conditional approvals, and only one case was disapproved.

In 2012，MOFCOM received 207 filings for concentration reviews, initiated review on 188 cases, and concluded 164 cases. The numbers are at the same level as in 2011. Among the concluded cases, 6 were approved with conditions, 158 were unconditionally approved, accounting for 96.3% of the total, and there was no disapproval. In fact, MOFCOM's decisions on the cases are accepted and respected by the filing enterprises, and its enforcement efforts have been widely acknowledged and received positive comments. MOFCOM is now one of the world's most important law enforcement agencies in the field of concentration review. Thank you for your question.

China Daily: We noticed that China hasn't benefited much from exports according to UNCTAD's new calculation method based on global value chain. Previously, OECD and WTO also reached a similar conclusion using value added estimates. We'd like to hear MOFCOM′ s comments on it. How shall China's trade imbalance with major economies be viewed from such a perspective? Thank you.

ShenDanyang: WTO, OECD and UNCTAD have put forward in recent years a new concept called "global value chain", which is designed to

use value-added trade statistics to measure global trade, and aims to demonstrate the actual international trade pattern in the context of economic globalization and international labordivision, and reflect more accurately the benefits different countries gainfrom global trade. China has been actively participating in and promoting such studies. In September last year, we co-organized a symposium on this topic in Beijingwith these three organizations.

The current statistical method of international trade calculates the total export value of a product into the export value of the country where the final stage of processing takes place. China has a bigprocessing trade. Based on such a method, the values of semi-finished products and raw materials, regardless of where they come from, are all calculated as part of China's total export value simply because the final processing takes place in China. Such a method doesn't exclude the value added by other countries, and results in overestimates by a large margin of the export value of the final exporting country.

Generally speaking, the export value of a country engaged in product assembly and at the lower end of the global value chain is often vastly overestimated, while that of the country providing parts and components and at the middle of the global value chain is often severely underestimated. According to the studies done by China, China's trade surplus with the US in 2011 was US$202.4 billion when calculated using traditional gross trade value statistics. However, that figure would dropto US$92.6 billion when calculated using added value statistics, down by 54.2%. According to the studiesby OECD and WTO, China's trade surplus with the U.S. in 2009 would drop 25% from US$176 billion to US$132 billiononly switching from the traditional method to the new method.

Chinese and international experts tend to agree that advancing the studies on global value chain and added value can help to objectively reflect a nation's real trade relations with its major trading partners, as well as the actual scale of its foreign trade, the impact of foreign trade on domestic economic development and employment, the international competitiveness of its industries and where the industries stand in the global value chains. It can also help to point out the right direction for industrial restructuring and upgrading.

There are still on-going studies on global value chain and added value, and no uniform standards and rules have been established. MOFCOM will continue to cooperate with international organizations and China's major trading partners, and promote the further development of relevant studies. Thank you for your question.

ShenDanyang: That concludes today's press conference. Thank you.

All information published in this website is authentic in Chinese. English is provided for reference only.

【Big Medium-sized Small】【Print】

---

**Ministry of Commerce Website Copyright and Disclaimer Statement**

All articles marked with "Article type: Original" posted on the website of the Ministry of Commerce and its sub-sites are copyrighted by this Website and its sub-sites. Any reproduction or use by any other websites, media or individuals must be attached with a clear indication of "Source: Ministry of Commerce Website".

All articles posted on this website or its sub-sites marked with "Article type: reproduced" or "Article type: translated" and "Article type: redistributed" come from other media, and are provided solely for the user's information, which does not mean this Website or its sub-sites endorse the ideas thereof or assume any legal liability or responsibility for their authenticity. Any other media, websites or individuals must maintain the source of information indication on this Website or its sub-sites when using the information, and shall assume legal liability for the use.

---



Add: No.2 Dong Chang'an Avenue,Beijing China(100731)           Approved by: MINISTRY OF COMMERCE,PRC

Tel: +86-10-51651200-612/613/623 Fax: +86-10-65677512              Jing ICP Bei No.05004093

E-mail: MOFCOM Mailbox                                            Supported by: Cofortune Information Technology Co., Ltd

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - X
 3                                     :
     IN RE
 4   VITAMIN C ANTITRUST LITIGATION,
                                           06-MD-1738
 5       Plaintiff,

 6          -against-          :
                                      United States
 7                               Courthouse
                                      Brooklyn, New York
 8   HEBEI WELCOME
     PHARMACEUTICAL CO. LTD., ET AL.
 9
         Defendant.            :
10                                 February 26, 2013
     - - - - - - - - - - - - - - X     9:30 o'clock a.m.
11
                    TRANSCRIPT OF TRIAL
12            BEFORE THE HONORABLE BRIAN M. COGAN
              MAGISTRATE JUDGE JAMES ORENSTEIN
13            UNITED STATES DISTRICT JUDGE , and a jury.

14   APPEARANCES:

15   For the Plaintiff:      HAUSFELD, LLP
                             1700 K. Street, NW Suite 650
16                           Washington, DC 20006
                             BY:  BRIAN A. RATNER, ESQ.
17                                BRENT W. LANDAU ESQ.
                                  MELINDA R. COOLIDGE, ESQ.
18
                             SUSMAN GODFREY LLP
19                           1000 Louisiana Street, Suite 5100
                             Houston, Texas 510
20                           BY:  JAMES T. SOUTHWICK, ESQ.
                                  SHAWN L. RAYMOND, ESQ.
21                                KATHERINE H. KUNZ, ESQ.

22                           BOIES, SCHILLER & FLEXNER, LLP
                             5301 Wisconsin Avenue, N.W.
23                           Washington, D.C. 20015
                             BY;  WILLIAM A. ISAACSON, ESQ.
24                                TANYA CHUTKAN, ESQ.

25
```

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

**A-1684**

Wang Qi - direct/ Isaacson

1    hotel?

2    A     Yes, it was inside the Beijing.  Inside a hotel in

3    Beijing.

4    Q     And you recorded who attended the meeting?

5    A     Yeah, on the memo I wrote down who attended the meeting.

6    Q     CCMHPIE, that is the Chamber of Commerce Chemist Medical

7    Health product was represented by Qiao Hali and another

8    individual; is that right?

9    A     Yes, Qiao Hali participated, yes, he did.

10   Q     And no one from the Ministry of Commerce attended that

11   meeting, did they?

12   A      Ministry of Commerce, no, not according to the records.

13   Q     You wrote this memo after the lawsuit was filed?

14   A     You mean after the lawsuit happened?

15   Q     Yes, after it was initially brought.

16   A     This memo recorded what happened at the meeting from the

17   dates of the memo.  It must have happened after the lawsuit

18   was filed.

19   Q     If I can ask you to look at item three at the end of the

20   memo, sub one, and there you recorded there should be no

21   written record for this meeting. Was there a discussion that

22   your meetings should be more confidential after the lawsuit

23   was filed?

24   A     That is one of the suggestions at the meetings that was

25   noted down by us.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

**A-1685**

Wang Qi - direct/ Isaacson

1   Q    After the lawsuit it was discussed at your meeting that

2   you should be more careful about what you wrote down; is that

3   right?

4              MR. MASON:  Objection.

5              THE COURT: Overruled.

6   A    According to what the request of the meeting, there

7   should have been no record.  That's why it is noted here.

8   There's no record for this meeting.

9   Q    But in addition to that, didn't you discuss that you were

10  supposed to be careful about what you wrote down?

11  A    Perhaps it was discussed. I don't remember clearly what

12  exactly took place at the meeting.

13  Q    Now, I want to ask you about the different types of

14  document. At your company one your responsibilities was to

15  complete a monthly work summary for the import-export division

16  while you were its manager; is that right?

17  A    That is one of the duties of the manager.

18  Q    The monthly report was a customary report prepared by

19  your department at the company?

20  A    I don't understand. Can you repeat that?

21  Q    The monthly record was a customary report prepared for

22  your department; is that correct?

23  A    Yes, that's one of the duties of the manager. I said

24  that.

25  Q    You were the main person preparing the monthly report?

Wang Qi - direct/ Isaacson

```
 1              (Exhibit 273A so marked)

 2              MR. ISAACSON: If we could display 273A for the jury,

 3   Trevor.

 4   Q    And you recorded the attendees at the meeting, did anyone

 5   from the Ministry of Commerce attend this meeting?

 6   A    According to my record, there was nobody from the

 7   Ministry of Commerce.

 8   Q    And at the meeting a draft was passed of Vitamin C

 9   Chapter bylaw; is that correct?

10   A    Yes, that was such an item.

11   Q    Do you recall any discussion -- I'm sorry.  That would be

12   a reference to the Vitamin C subcommittee; is that correct?

13   A    Yes, that's what's written here.

14   Q    Do you recall any discussion about those bylaws or

15   charter at the meeting, other than what you recorded in your

16   meeting minutes?

17   A    I don't remember the discussions at the time.

18   Q    All right. If I can ask you then to move to Exhibit 74.

19   That was May 2002. Now this is August 2002.

20   A    Did you say 72?

21   Q    74.

22              THE COURT:  Are you sure it's in the witness' book?

23   It's not in mine. I skipped from 273C to 318.

24              Mr. Interpreter, do you have it?

25              THE INTERPRETER: Yes, we have 74.
```

**A-1687**

Wang Qi - direct/ Isaacson

1   quotations; isn't that right?

2   A    Yes, that's what is recorded here.

3   Q    And no one from the Ministry of Commerce was part of the

4   these conversations you had; is that right?

5   A    I don't remember the circumstances at the time but these

6   kinds of meeting -- this kind of meeting was part of the

7   requirement of the association.

8           MR. ISAACSON: Move to strike; lack of foundation.

9           MR. MASON:  No, Your Honor.  Object to the motion.

10          THE COURT:  I am going to strike everything after I

11  don't remember the circumstances at the time. The jury is to

12  disregard the remainder of the answer.

13  Q    Now, after July 2002 you many times communicated with

14  other Chinese Vitamin C companies about increasing Vitamin C

15  prices; isn't that right?

16  A    There will be communication regarding the market with

17  other competitors and factories but part of the discussion

18  would be about pricing.

19  Q    Part of the discussion would be about increasing the

20  pricing, correct?

21  A    Yes, we did discuss that.

22  Q    You would discuss that by telephone?

23  A    Discussions, communications sometimes by phone, sometimes

24  just chit chat.

25  Q    Did you have chit chat in person and at meals about

**A-1688**

Wang Qi - direct/ Isaacson

1          Did you have -- did you have phone calls with

2   Weisheng about increasing prices for Vitamin C for export?

3          Answer: We have a lot of phone calls back and forth

4   and we might have talked about this, yes.

5   A    When you say many times back and forth, it's hard to

6   determine. I don't know what you meant conceptually.

7          THE COURT:  The question now is simply was he asked

8   that question and did he give that answer.

9          THE WITNESS:  I don't remember my answer at the time

10  either.

11  Q    All right. When you were talking to Mr. Wang on the

12  telephone was anybody from the Ministry of Commerce on those

13  telephone calls with you?

14  A    No.

15  Q    Let me move to a meeting in September 2002, sir. Exhibit

16  76. Is Exhibit 76 one of your work summaries that you prepared

17  and submitted October 8, 2002 for the month September 2002?

18  A    Yes, I wrote this report.

19         MR. ISAACSON: I move to admit Exhibit 76.

20         THE COURT:  Same objection?

21         MR. MASON:  No objection.

22         THE COURT:  No objection.  It is received.

23         (So marked Exhibit 76)

24         MR. ISAACSON: If we can display this item as

25  specifically item 4-A.

Wang Qi - direct - Isaacson

1    conditions and sometimes we would share our views regarding

2    the pricing with each other as well.

3    Q    And sometimes you would share your views about whether to

4    raise prices, is that right?

5    A    Yeah, I, we would have.

6    Q    And Mr. Zhang Yingren of Hebei Welcome is one of the

7    individuals that you discussed vitamin C prices with by

8    telephone with, is that right?

9    A    Yes, here it says with somebody, people from Welcome, but

10   I don't remember exactly whom I communicated with.

11   Q    Do your job duties today still involve vitamin C and

12   vitamin C pricing?

13   A    Yes, I am responsible for that.

14   Q    Are you still, as part of your work, talking to your

15   competitors by telephone about vitamin C prices?

16           MR. MASON:  Objection, Your Honor.

17           THE COURT:  Overruled.

18           MR. MASON:  It's beyond the scope of the time.

19           THE COURT:  I'll allow it.

20   A    Now, I don't anymore.

21   Q    When did you stop?

22   A    I don't remember that either.  A few years ago but I

23   don't remember how many years ago.

24   Q    Let's move to June 2003.

25           Exhibit 136 -- no.  I'm sorry.  Exhibit 78.

**A-1690**

Wang Qi - direct - Isaacson

```
 1            Is Exhibit, Exhibit 78 a monthly report for

 2   June 2003 that you delivered on July 6, 2003?

 3            THE INTERPRETER:  Did you say July 6th?

 4            MR. ISAACSON:  Yes, July 6th at the end of the memo.

 5            THE INTERPRETER:  78, right?

 6            MR. ISAACSON:  Yes.  June summary.

 7            THE INTERPRETER:  Yes, but the date is August 7th.

 8            MR. ISAACSON:  On page three at the bottom?  He

 9   should be looking at the Chinese, in any event.  I see 7/6.

10            THE INTERPRETER:  Oh, yes.  Two reports stuck

11   together.

12            MR. ISAACSON:  I'm sorry.  I apologize for that.

13   We're just going to look at the first one.

14   A    Yes, I must have written this one myself.

15            MR. ISAACSON:  All right.  I would move to admit

16   Exhibit 78, the June work summary, into evidence.

17            MR. MASON:  Fine.

18            THE COURT:  78 is admitted.

19            (So marked.)

20            (Exhibit published.)

21   Q    Now, in item five, you discussed a Chamber of Commerce

22   meeting, correct?

23   A    Yes.

24   Q    And you recorded on June 11th your company organized a

25   meeting on market analysis among six domestic manufacturers
```

Wang Qi - direct - Isaacson

1   and the Chamber, is that right?

2   A    That's what's written here.

3   Q    And you also recorded that we all agree, meaning the

4   participants, to set the floor price at $9.20 USD per

5   kilogram.

6   A    Yes, that's what's written here.

7   Q    And your hope, you recorded, was to slow down the speed

8   of the market price of vitamin C falling, is that right?

9   A    Yes, that's what's written here.

10  Q    No one from the ministry -- did you attend this meeting?

11  A    I did participate in the meeting in Ging Dao, but whether

12  it was this one, I don't remember.

13  Q    And you recorded that the agreement to set the floor

14  price at $9.20 per kilogram, the effect of that was very

15  limited, is that right?

16  A    Yes.  It is what is written here.

17  Q    While -- and you recorded that while there was agreement

18  at the meeting, every manufacturer was quoting prices lower

19  than the floor price that was agreed?

20  A    That's what's written here.

21  Q    All right.  The vitamin C companies felt free to quote

22  prices lower than the agreed floor price, is that right?

23  A    Whether it's allowed to report under the price, limit

24  price is not related to this record.

25              (Continued on next page.)

Wang - direct/ Isaacson

1   DIRECT EXAMINATION CONTINUED

2   BY MR. ISAACSON:

3   Q    My question was Vitamin C company felt free to quote

4   prices lower than the $9.20 agreed for by --

5   A    There was still a lot of limitations.

6   Q    My question was the companies felt free to quote less

7   than $9.20 per kilogram, didn't they?

8   A    From what I understand from the record and what is

9   written here, my understanding is there was some actions taken

10  by the manufacturers of doing that, but whether there was an

11  agreement there that they were allowed to do that, that is

12  different.

13  Q    You don't recall anyone being punished for quoting prices

14  less than $9.20 per kilogram, do you?

15  A    I don't remember clearly.

16  Q    And other than what you wrote here, you don't remember

17  what was discussed at the June 2003 meeting?

18  A    I cannot remember clearly.

19  Q    Let me ask you to go to the next one, July 2003

20  Exhibit 53. Exhibit 53, this is a memo you prepared of Vitamin

21  C subcommittee meeting -- excuse me -- that you dated

22  August 8, 2003 for meeting on July 26th; is that correct?

23  A    What exhibit is that?

24  Q    Fifty-three.

25  A    Oh, 53 (perusing). Yes, I did write that.

# A-1693

**Wang - direct/ Isaacson**

```
 1              MR. ISAACSON:  Move to admit Exhibit 53.

 2              MR. MASON: No objection.

 3              THE COURT:  Received.

 4              (Exhibit 53 so marked)

 5    Q    Now, you attended this meeting correct, sir?

 6    A    I did attend.

 7    Q    Let me ask you about your meeting summary.  There were

 8    some remarks about item three about what Mr. Chow Hili had to

 9    say?

10    A    That is what I recorded.

11    Q    And in the third bullet you recorded a question:  Did he

12    ask the companies can each producer take turns to stop

13    production for maintenance and repairs question mark.

14    A    Just what is recorded here.

15    Q    In the next bulletin he discussed a targeted price level;

16    is that right, and you recorded that he said it shall neither

17    incur an anti-dumping lawsuit, nor give profit room for

18    western producers, nor cause additional domestic investment;

19    is that correct?

20    A    This is what was recorded was what he said at the time.

21    Q    Do you recall that he suggested that prices should --

22    that the target price level should not be so low as to incur

23    an anti-dumping lawsuit?

24    A    If that is what is written.

25    Q    And do you recall that he also said prices should not be
```

A-1694

Wang - direct/ Isaacson

1    too high as to provide profits for European producers or cause

2    additional domestic investments?

3    A    That's what's written.

4    Q    And the targeted price level, that's the discussion of

5    the minimum price for verification and chop; is that correct?

6    A    I'm not sure whether what is said here, the target

7    pricing level, it is the same as the minimum price level that

8    you stated.

9    Q    Now, you also recorded some remarks by general manager

10   Kong; is that right?  That's your general manager?

11   A    Correct.

12   Q    And general manager Kong said at the meeting you recorded

13   with regards to the export restricted price of U.S. dollars

14   $9.20 per kilogram, it is cancelled as of today?

15   A    That's what's recorded here.

16   Q    He, Mr. Kong, announced the cancellation?

17   A    No, that's not what I meant.  I think that is a

18   misunderstanding. This record only indicated  Qaoi Hili made

19   this one, two, three, four comments, and then the general

20   manager Kong also made the following two points.

21   Q    Yes.

22   A    This only recorded the contents of what they stated.

23   Q    Thank you, sir.

24          Do you remember anything they stated at the meeting

25   other than what you recorded?

**A-1695**

Wang - direct/ Isaacson

1  A    I don't recall what they stated at the meeting but as far

2  as I know, this is what he stated, but it was not confirmed.

3  Q    Mr. Kong also suggested that the chamber communicate with

4  the chairman of each producer's board to hold a summit

5  meeting; is that right?

6  A    Yes, it is written.

7  Q    And a summit meet is where the top company officials

8  attend; is that right?

9  A    Yes, that's what summit meeting means.

10  Q    So let me ask you about the summit meeting

11  September 2003. Exhibit 79. Exhibit 79, a monthly work report

12  you prepared, submitted on October 5th was of September 2003.

13  A    I did write that.

14         MR. ISAACSON: I move to admit Exhibit 79.

15         MR. MASON:  No objection.

16         THE COURT: Received.

17         (Exhibit 79  so marked)

18  Q    Item five is a reference to a chamber of meeting on

19  September 3rd, 2003; do you see that?

20  A    Yes.

21  Q    And this was the summit meeting that Mr. Kong had

22  suggested?

23  A    Let me take a look. The last record?

24  Q    The last record was?

25  A    Sixty-nine?

A-1696

Wang - direct/ Isaacson

1    the prior meeting, probably this is a meeting attended by the

2    people on a level of chamber of the board of high person in

3    charge.

4    Q    All right. Let's move to December of 2003. Exhibit 137.

5    This is a monthly report for December 2003 that you delivered

6    on January 3rd, 2004; is that correct?

7    A    I did write that.

8              MR. ISAACSON:  I move to admit Exhibit 137.

9              THE COURT:  It is received.

10             (Exhibit 137  so marked)

11   Q    I want to ask you about item four.  In item four you

12   discussed the market situation, do you see that?

13   A    Yes.

14   Q    You recorded that during the first month of December with

15   all the manufacturers quoting around U.S. dollars, $9 per

16   kilogram, but as Christmas approached purchasing activity

17   decreased and Vitamin C prices dropped somewhat; is that

18   correct?

19   A    That's what is written here.

20   Q    And after those prices started to fall there was meeting

21   in Beijing on December 26th; is that correct?

22   A    That's what's recorded here.

23   Q    You attended the December 26th meeting, didn't you, sir?

24   A    I'm not certain about this meeting because, generally,

25   whatever meeting I attended, I will write a memo about it.  So

**A-1697**

Wang - direct/ Isaacson

1    if there's a memo about it, then I attended, but I'm not sure.

2    Q    But many of the memos you wrote were on the laptop that

3    was thrown away, right?

4    A    I lost the computer in 05 and then most of the memos

5    before that time probably were kept, because what I meant was

6    with these kinds of materials, I would have forwarded it to my

7    colleagues so -- or my superiors, so they must have been

8    collected in total within all our materials.

9    Q    You believe that most of them were probably kept?

10   A    Yes.

11   Q    But you don't know if they all were, do you, sir?

12   A    I am not certain absolutely.

13   Q    What you recorded in this monthly report is that your

14   company expected after the Beijing meeting that price quotes

15   would be maintained at U.S. dollars, $9 per kilogram or

16   higher?

17   A    That's what's recorded here.

18   Q    And that was your expectation at this time?

19   A    Expectations not correct. Maybe guesstimate.

20   Q    But you didn't write about a guesstimate, sir, you wrote

21   about your company's expectations?

22   A    It says here, you know, the inferences.

23   Q    So your inference coming out of the Beijing meeting on

24   December 26th is the Vitamin C companies in China would be

25   making price quotes for exports of $9 or higher?

**A-1698**

Wang - direct/ Isaacson

1    A    Yes, that is the inference.

2    Q    And item five, you discussed the December 26th meeting,

3    you see that?

4    A    Yes.

5    Q    And you say you recorded that at the end of the meeting

6    representatives from all four agreed to limit production

7    during the first half of 2004 in order to stabilize the

8    market?

9    A    That's what's written.

10   Q    And by all four, you are referring to Vitamin C companies

11   in China?

12   A    Yes.

13   Q    You can look at Exhibit 138. Now, this is the

14   January 2004 board summary you prepared and submitted on

15   February 2nd, 2004; is that correct?

16   A    I did write that in.

17            MR. ISAACSON:  I move to admit 138.

18            THE COURT:  138 is received.

19            (Exhibit 138  so marked)

20   Q    I'm going to ask you about item five in your report. Do

21   you see where after -- there's a discussion of local prices of

22   $8.50 at European and American markets?

23   A    It is written.

24   Q    All right. And next you say:  Because primary domestic

25   Vitamin C manufacturers uniformly and seriously implemented

Wang - direct/ Isaacson

1   Q    And the purpose was to take some inventory off the

2   market?

3   A    The purpose but they are still in the market.

4   Q    The purpose for establishing the warehouse and putting

5   inventory there was to hold back some inventory from the

6   market, right?

7   A    The purpose of placing the inventory at the time I don't

8   remember clearly today. There were many considerations.

9   Q    To put inventory there to get Vitamin C prices up, right?

10  A    But one of the purposes is to maintain that the

11  implementation of the decision at the Beijing meeting.

12  Q    You wanted to get Vitamin C prices up; isn't that right?

13  A    Yes that was probably the aim.

14  Q    Let me ask you to look at Exhibit 81.  Is that your work

15  summary from the next month, February?  This is a work summary

16  judgment summary for February 2004 that you drafted and

17  submitted on March 2nd, 2004; is that correct?

18  A    Yes.

19            MR. ISAACSON:  I move to admit Exhibit 81.

20            THE COURT:  Received.

21            (Exhibit 82 so marked)

22  Q    All right.  If I can ask you to look at item -- under the

23  -- oh (perusing) -- there's an item four on page two. Vitamin

24  C Chamber of Commerce meeting, do you see that?

25  A    I see it.

Wang - direct/ Isaacson

1  Q    There was a meeting on February 7th, 2004 which included

2  six manufacturers; is that right that?

3  A    That's what's written here.

4  Q    And what you recorded was a concern with the price drop

5  in the market, all participating manufacturers agreed to

6  increase stock in the Shanghai warehouse starting from

7  February, correct?

8  A    Yes, it is written so.

9  Q    And there were six Chinese companies that were part of

10  that agreement, correct?

11  A    Yes, there was six participants in the meeting.

12  Q    And all of them agreed to increase stock at the

13  warehouse?

14  A    That's what's written.

15  Q    They also all agreed that each one was sent a

16  representative to examine the stock already in the Shanghai

17  warehouse, to inspect it, right?

18  A    That was recorded.

19  Q    All right. And you attended this meeting?

20  A    I do not remember.

21  Q    You didn't record that anyone instructed the companies to

22  enter that agreement?

23  A    There's no -- that's not written here, instruction.

24  Q    Do you recall ever writing in your monthly reports that

25  the chamber ordered you to do something?

**A-1701**

1    A    There's lot of instructions and request from the chamber

2    as to what was recorded, I'm not sure.

3    Q    Which company leads the warehouse in Shanghai?

4    A    Our company.

5    Q    Now, moving to March, if I can ask you to look at

6    Exhibit 57. Exhibit 57, this is a memo that you prepared, a

7    meeting on March 19th, 2004; is that right?

8    A    I did write that.

9              MR. ISAACSON:  I move to admit Exhibit 57.

10             MR. CRITCHLOW:  No objection.

11             THE COURT: Received.

12             (Exhibit 57  so marked)

13             MR. MASON:  We had previously --

14             THE COURT:  The prior objection is preserved.

15             Admitted over objection.

16   Q    In item five there's a reference to decisions made at the

17   meeting?

18   A    Correct.

19   Q    And you referenced all the agreements reached and signed

20   by representatives of all the companies during the Vitamin C

21   coordination meeting at the end of December 2003; do you see

22   that?

23   A    That's what is recorded here.

24   Q    And that's a reference to the Beijing meeting we talked

25   about earlier, you recall there was a Beijing meeting on

Wang - direct/ Isaacson

1    December 26, 2003 that we looked at?

2              MR. MASON:  Your Honor --

3              THE COURT:  I'm sorry.  One second.

4    A    There was such a memo regarding that meeting that this

5    would be a corresponding meeting.

6              THE COURT:  Hang on one second Mr. Mason what is

7    your --

8              MR. MASON:  I just need to find the reference.

9              THE COURT:  Let's just take a moment.

10             (Pause)

11             We will break soon for lunch.

12   Q    This said that the agreements reached were signed by

13   representatives you have of all the companies?

14   A    That's what's written here.

15   Q    Sir, we have not seen any signed agreements from that

16   meeting, have you seen them?

17   A    Did I see it, I cannot remember.

18   Q    Do you know what happened to the signed agreements?

19   A    Usually this kind of signatures would happen in a written

20   copy of what -- of the resolutions of the meeting and

21   indicating they agreed to it and who should execute what.

22   That's what usually happened.

23   Q    What happened to your company's copy of that agreement?

24   A    I don't know either. I definitely did not have the

25   qualification to sign such an agreement.

**A-1703**

Wang - direct/ Isaacson

1    Q    You did have the qualification to see copies of it?

2    A    Not necessarily. This such document would be like a

3    confirmation of this prior meeting. They used this process of

4    signatures to make the content of the prior agreement more

5    realistic. As far as I'm concerned, I would not be one of the

6    parties signing on it. So that's not really the necessity to

7    give me a copy of that agreement either.

8    Q    All right. I will ask you to look at Plaintiff's

9    Exhibit 139. Exhibit 139, this is -- is this e-mail -- I'm

10   sorry. Below the header is there an e-mail that you wrote

11   there to a customer on April 9, 2004?

12   A    Yes.

13   Q    And to a customer in India?

14   A    Yes, I believe so.

15   Q    And you wrote this e-mail in English?

16   A    Yes.

17          MR. ISAACSON:  I move to admit Exhibit 139.

18          THE COURT:  That is admitted over defendant's

19   previously raised objection.

20          (Exhibit 139 so marked)

21   Q    What you told this customer in India in item two is:  We

22   plan to close for the whole month in June and all the

23   producers in China will do the same because we had an

24   agreement among all the producers.

25   A    That's what's written here.

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

A-1704

Wang - direct/ Isaacson

```
1   Q    And that agreement you refer to included Weisheng and

2   Hebei Welcome, correct, and you wrote in English that the

3   production shut down in June is part of this agreement?

4   A    That's what's written here.

5   Q    And I understand that you have difficulties with the

6   English language, sir, and it's perfectly fair that you need

7   an interpreter, but you know what the word agreement in

8   English means?

9   A    I understand.

10  Q    And were you being honest with this customer when you

11  told this customer that -- about this agreement?

12  A    This is a certain strategy and technique in marketing

13  because by sharing some of these market situations with our

14  users, or distributors it could increase or accelerate their

15  purchasing activities.

16  Q    It would also allow you to charge them higher prices,

17  wouldn't it?

18  A    Not necessarily, but generally it would increase the

19  confidence of the buyers.

20  Q    And if you are having problems with your agreements, if

21  you are having a lack of consensus in your meetings you didn't

22  tell this to your customers, did you?

23  A    Not necessarily. Not necessarily.

24       MR. ISAACSON:  This would be a good time to break,

25  if you want, Your Honor.
```

Wang Qi - direct - Isaacson

1    board and all the directors.

2    Q    Based on your experience at your company, would you be

3    able to identify an individual or individuals who would write

4    this report?

5    A    Usually it would be drafted by the secretary.

6    Q    The secretary to who?

7    A    Would be the general manager's secretary.

8              MR. ISAACSON:  I would move to admit Exhibit 320.

9              THE COURT:  All right.  That's received over

10   objection.

11             MR. MASON:  We'll withdraw.  Sorry.  We'll withdraw

12   the objection, Your Honor.

13             THE COURT:  It's received without objection.

14             (So marked.)

15             (Exhibit published.)

16   Q    While the document is not dated, it does refer to in the

17   first paragraph to the tumultuous year of 2004.  And I want to

18   address your attention to, it's page four of the English but

19   page at the bottom of page two and the top of page three of

20   the Chinese -- let me see.  There's a discussion of a

21   March 19th Chamber meeting.

22   A    It is stated here.

23   Q    Yes.  I think I got that about right.  And it says there

24   was a meeting on July 19th where Weisheng unilaterally pulled

25   out of the commitment originally made by the big four

**A-1706**

Wang Qi - direct - Isaacson

1    producers in which each producer put 200 tons into its

2    warehouse in February.

3            Do you recall Weisheng pulling out of that

4    commitment?

5    A    I don't recall the exact figures, but there was such an

6    arrangement with respect to amounts and what month.

7    Q    All right.  And do you recall Weisheng pulling out of

8    that arrangement Weisheng?

9    A    Yes, I don't remember what that revoked means, but

10   whatever is stated here, that's what it is.

11   Q    If I can -- now let's move toward the end of 2004.

12           MR. MASON:  Objection, Your Honor.

13           THE COURT:  What's the objection?

14           MR. MASON:  The document is in evidence but he

15   didn't see the document.

16           THE COURT:  Well, he didn't really answer what it

17   means.  He said he really doesn't know.

18           MR. MASON:  Well, I think, I think he said more than

19   that.

20           THE COURT:  Hang on.

21           (Pause.)

22           THE COURT:  He said, yes, I don't remember what that

23   revoked means, but whatever is stated here, that's what it is.

24           MR. MASON:  I don't --

25           THE COURT:  I don't think it has much prejudicial

**A-1707**

Wang - direct/ Isaacson

1    A    Exactly what happened, I don't recall.

2    Q    But these are your observations from the time?

3    A    Correct.

4    Q    Due to the damage the agreement caused by Weisheng last

5    year you wrote, it is still an open question as to what extent

6    the consensus made at that meeting will be implemented, right?

7    A    That's what I wrote here.

8    Q    You didn't know at the time whether the consensus amongst

9    the manufacturers the agreement would work?

10   A    But there's no agreement here. Which agreement are you

11   referring to?

12   Q    I'm sorry. The consensus at the meeting, you didn't know

13   at the time whether the consensus amongst the manufacturers

14   would work?

15   A    But like I said, I asked him before that's no agreements

16   described here.

17   Q    My question is about the consensus.

18          You didn't know at the time whether the consensus

19   amongst the manufacturers would work?

20   A    I see here is like mutual understanding.

21   Q    Fine.

22          You did not know at the time whether the mutual

23   understanding amongst the manufacturers would work?

24   A    That's what is stated here.

25   Q    And you didn't write in your observations that anybody

1  was going to make the manufacturers go along with the common

2  understanding?

3  A    Nobody's going to force them.

4  Q    You didn't write that anybody would force them to go

5  along with the common understanding?

6  A    Is not written here. Yes, I misunderstood the word.

7  Q    Thank you.

8         We talked a couple times about the verification in

9  chop price. Now, after you became department manager for,

10  approximately, the next six years wasn't $3.35 the price for

11  verification and chop?

12         THE INTERPRETER:  I didn't hear the first part of

13  the question counsel.

14  Q    After you became the department manager for import-export

15  for, approximately, the next six years wasn't $3.35 the

16  verification and chop price?

17  A    There ought to be some variation.

18  Q    Well, you don't recall any time during the six years

19  after you became a department manager where the minimum price

20  was any higher than $3.35 per kilogram, do you?

21  A    Yes.

22  Q    You do.  Maybe we have a double --

23  A    Yes, there was higher price.

24         MR. ISAACSON: I want -- page 220 of this deposition.

25  Now, I'm talking now to counsel.

**A-1709**

Wang - direct/ Isaacson

```
 1              THE COURT:  Before you do that, let me try to

 2      clarify. Are you saying there was a verification and chop

 3      price higher than $3.35?

 4              THE WITNESS:  From what I recall, yes.

 5              THE COURT:  All right.

 6              MR. ISAACSON: Page 220 at the bottom line 24

 7      continuing to the top of the next page.  Are you all set?

 8      Q    Sir, at your deposition did you answer the following

 9      question and give the following answer:

10              Question --

11              THE COURT:  I mean were you asked the following

12      question and did you give following answer.

13              MR. ISAACSON:  That is works as well.

14      Q    (Reading): Question: You don't recall any time where the

15      minimum price was higher than 3.35 per kilogram?

16              Answer: It seems to me, no.

17              THE COURT:  Ask him were you asked that question --

18      Q    Were you asked that question and did you give that

19      answer?

20      A    I don't remember what happened when I was questioned.

21      Q    And when the minimum price for verification and chop was

22      $3.35, the Chamber of Commerce did not care if your company

23      sold Vitamin C at a price higher than $3.35; isn't that right?

24      A    Correct. That is like a minimum price.

25      Q    You were free to decide about prices above $3.35 when
```

**A-1710**

Wang - direct/ Isaacson

1    that was the minimum price?

2    A    Yes, when it's over they don't care.

3    Q    When you charge prices higher than $3.35 no one ordered

4    you to do that -- let me say no one outside your company

5    ordered you to do that?

6    A    We make the price quote according to the market

7    conditions.

8    Q    And no one ordered you outside of your company to charge

9    prices higher than $3.35 when that was the minimum price?

10   A    Let me figure out what you're trying to say about your

11   question. You're talking about anybody outside the persons in

12   charge of the company?

13   Q    Yes.

14   A    Meaning whether anybody outside of my company who would

15   request my company to charge over -- more than $3.35?

16   Q    Not request, order you, direct you to.

17   A    No.

18   Q    Now, there were times after -- after you had been in

19   charge of the Import-Export Department or the manager for some

20   years, there came a time when you and the Chinese

21   manufacturers were charging less than the minimum price of

22   $3.35 for export?

23   A    It did happen like that.

24            THE COURT:  Mr. Isaacson, at a convenient point, it

25   doesn't have to be this minute, we would like to take an

A-1711

Wang - direct/ Isaacson

1    afternoon break.

2              MR. ISAACSON:  I will wrap this up.

3    Q    And when your company charged less than $3.35 you don't

4    recall being punished for that?

5    A    Punishment, no, but we did encounter a lot of

6    difficulties because the export price has to be exported

7    according to the $3.35 price; otherwise, we will not be able

8    to get the export permit.

9    Q    So what you would do to deal with those difficulties is

10   you would give rebates or refunds to customers to bring the

11   price below $3.35; isn't that right?

12   A    It did happen, but not often.

13   Q    When it happened you would charge -- you would create a

14   document saying the customer was being charged $3.00  or 35

15   cents or above and you would rebate or refund some of that

16   money, correct?

17   A    It did happen like that.

18             MR. ISAACSON:  This is a good time to break.

19             THE COURT: Ladies and gentlemen, we will come back

20   here at 3/17 on this clock. You are free to walk around the

21   courthouse, stretch your legs.  Please do not talk to anyone

22   about the case at all. Keep an open mind.  We will see you

23   back here at 3:17.  Thank you.

24             (Whereupon, the jury exited the courtroom)

25             THE COURT: All right.  You may sit down.  I am

MARSHA DIAMOND, CSR
OFFICIAL COURT REPORTER

A-1712

Wang Qi - direct - Isaacson

1  BY MR. ISAACSON:

2  Q    Since your deposition, to your knowledge, is your company

3  still meeting with the other vitamin C companies in China and

4  discussing prices?

5  A    I don't believe so.

6  Q    And are you -- would you know if those meetings were

7  taking place?

8  A    I -- yes.

9  Q    I want to ask you about another document you wrote -- or

10  I'm sorry.

11         After the lawsuit was filed, you contacted customers

12  in the United States to discuss their response to the lawsuit,

13  didn't you?

14  A    I did.

15  Q    You did not want them to participate in the lawsuit?

16  A    I don't remember the exact content.

17  Q    You called them specifically to discuss their attitude

18  towards the lawsuit, correct?

19         MR. MASON:  Your Honor --

20         THE COURT:  Do try to keep this part short, all

21  right?

22         MR. ISAACSON:  Yes.

23         MR. MASON:  Your Honor, this has --

24         THE COURT:  No.  Is it the same objection we

25  discussed at side bar?  You want to have another side bar?

402

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X
                                :
IN RE
VITAMIN C ANTITRUST LITIGATION,
                                        06-MD-1738
     Plaintiff,

        -against-           :
                                    United States Courthouse

                                    Brooklyn, New York

HEBEI WELCOME
PHARMACEUTICAL CO. LTD., ET AL.

     Defendant.          :
                                    February 27, 2013
- - - - - - - - - - - - - - X     9:30 o'clock a.m.

                TRANSCRIPT OF TRIAL
                BEFORE THE HONORABLE BRIAN M. COGAN
                MAGISTRATE JUDGE JAMES ORENSTEIN
                UNITED STATES DISTRICT JUDGE , and a jury.

APPEARANCES:

For the Plaintiff:      HAUSFELD, LLP
                        1700 K. Street, NW Suite 650
                        Washington, DC 20006
                        BY:  BRIAN A. RATNER, ESQ.
                             BRENT W. LANDAU ESQ.
                             MELINDA R. COOLIDGE, ESQ.

                        SUSMAN GODFREY LLP
                        1000 Louisiana Street, Suite 5100
                        Houston, Texas 510
                        BY:  JAMES T. SOUTHWICK, ESQ.
                             SHAWN L. RAYMOND, ESQ.
                             KATHERINE H. KUNZ, ESQ.

                        BOIES, SCHILLER & FLEXNER, LLP
                        5301 Wisconsin Avenue, N.W.
                        Washington, D.C. 20015
                        BY;  WILLIAM A. ISAACSON, ESQ.
                             TANYA CHUTKAN, ESQ.

*Wang Qu - cross/ Mason*

1          (The following took place in open court).

2    BY MR. MASON:

3    Q    Sir, do you recall being asked about a memorandum that

4    you wrote in August 2002 where you made reference in the

5    memorandum to the fact that there had been some contacts from

6    sales department of the various Vitamin C manufacturers on the

7    topic of exchanging information, discuss possible raising of

8    prices?

9    A    Yes, that happened yesterday.  That did happen.

10   Q    And isn't it a fact, sir, that you were not -- let me ask

11   a preliminary question. These were internal memos that you

12   gave to your boss or people within your own company?

13   A    You are talking about the records?

14   Q    Yes.

15   A    That is for internal consumption.

16   Q    You will not state in a memo necessarily that the Chamber

17   told us to have these communications, you would just say the

18   fact that you had them; isn't that correct?

19   A    In most memos people just express the plain points, the

20   expressions.

21   Q    Right, but you didn't tell them that the Chamber had told

22   me to have these conversations because you didn't think it was

23   necessary to say that?

24   A    It was not mentioned in the memos.

25   Q    But the reason it was not mentioned, I take it, was

*Wang Qu - cross/ Mason*                                    416

1          MR. MASON:  That is for redirect.

2          THE COURT:  I agree. Overruled.

3   A    I haven't finished what I was saying about the two

4   meanings. The second thing was regarding pricing, especially

5   towards the request for minimum export price. I think the

6   meanings for quota refers to those main issues.

7   Q    Okay. Let me ask you, Mr. Wang, with regard to the amount

8   -- the quantum of quota, with regard to the amount of quota

9   each of the Vitamin C companies in China had, those amounts

10  were told to the companies by the Chamber of Commerce; isn't

11  that correct?

12  A    Each manufacturer could participate in a discussion. They

13  could present their viewpoints and their requests but the

14  final decision was up to the Chamber.

15  Q    And so it was the Chamber that determined at the end of

16  the day the quota for each of the companies, right?

17  A    The final decision and approval was by them.

18  Q    So although there could be a discussion about the amount

19  of the quotas, and oftentimes there was a discussion about the

20  amount of the quotas?

21  A    There would be one of the main subjects of the agenda.

22  Q    Was it was the Chamber who at the end decided what the

23  quotas would be?

24  A    The convening of the meeting, and the final decision of

25  the meeting was by the Chamber.

*Wang Qu - cross/ Mason*                                    417

1    Q    And in fact, isn't it true, sir, that sometimes the

2    Chamber might take away a quota from a company if they -- if

3    the Chamber determined that the company had done something

4    wrong, if the Vitamin C manufacturer had not followed a

5    particular instruction?

6    A    Yes, they did have authority to do that.

7    Q    And the companies knew that if they didn't follow the

8    instructions of the Chamber the Chamber had the power to

9    restrict or limit quotas?

10   A    The Chamber did have that authority.

11   Q    And the Vitamin C manufacturers were well aware that the

12   Chamber had the authority to penalize the Vitamin C

13   manufactures if the Chamber decided they were going to do

14   that?

15             MR. ISAACSON:  Objection; foundation.

16             THE COURT: Sustained.

17             MR. MASON:  I am not understanding the objection,

18   Your Honor. Limit.

19             THE COURT:  Let's go to the side bar.

20             MR. MASON:  Well, I don't want to mean to prolong

21   it.  I will do it again.  I just want to know --

22             THE COURT:  Let's go to the side bar.

23

24             (Continued on next page)

25

A-1717

Wang Qi - redirect - Isaacson                    450

1          THE INTERPRETER:  51?
2          MR. ISAACSON:  Yes, I'm sorry.  51.
3          THE INTERPRETER:  We were on the wrong page.
4    Q    What you wrote there was, keep the verification and chop
5    requirement but impose no volume limit.
6    A    That's what's stated.
7    Q    And that includes export quotas, correct?
8    A    That means the export quantity.
9    Q    Right.  In fact, what we covered yesterday was that in
10   your memos before the lawsuit was filed, you wrote down the
11   main important key items.
12   A    I would.
13   Q    And that's all you actually remember of these meetings,
14   is what you wrote down?
15   A    Because there had been too many meetings.  A lot of them
16   are confused together.  Some people I would know at meetings.
17   There were new people.  Old people.  I really cannot remember
18   specific and that was the reason I needed to write a memo as
19   well.
20   Q    And when you -- before the lawsuit was filed, you didn't
21   write about possible punishment by the Chamber, did you?
22   A    You have to look in my memo documents.  I just don't
23   remember.  If yes, yes.  If no, no.
24   Q    You don't remember writing down that the Chamber was
25   making decisions, do you?

CMH      OCR      RMR      CRR      FCRR

A-1718

Wang Qi - redirect - Isaacson                    451

1   A    Generally, I would have not written it in that way.

2   Q    And you don't even remember writing that the Chamber was

3   putting any pressure on anybody?

4   A    I may have written it about that once.  I just don't

5   remember which one.

6   Q    You do remember that we went through the documents

7   yesterday, you did write down when the Chamber asked

8   questions?

9   A    What do you mean?  I didn't understand the translation.

10  Q    Do you recall yesterday that when we went through memos,

11  when Mr. Qiao asked questions, you wrote those down?

12  A    It's on my memo.  Yes, I did write them.  If yes, yes.

13  Q    Mr. Qiao's questions were important enough to write down?

14  A    Not just, you know, particularly with Mr. Qiao himself

15  but regarding the matter.  In principle, whatever I felt was

16  significant, I noted them now.

17  Q    All right.  Mr. Mason also discussed with you, my

18  colleague over there, Mr. Mason also asked you about your

19  telephone conversations with the other companies about prices.

20        Do you remember that?

21  A    In the morning, yes.

22  Q    And you were asked whether you made those contacts

23  because of a request or a direction by the Chamber.  Do you

24  remember that?

25  A    Yes, that's so.

Case 13-4791, Document 160, 07/28/2014, 1280897, Page234 of 315

1   reporter.

2        THE INTERPRETER:  My name is Nancy Wu, last name

3   spelled W-U.  Good afternoon, Your Honor.

4        THE COURT:  Good afternoon.

5        THE CLERK:  For the witness, please raise your right

6   hand.

7        (Witness sworn.)

8        THE CLERK:  Please state and spell your name for the

9   reporter.

10       THE WITNESS:  My name is Huang Pinqi.  P-I-N-Q-I,

11  H-U-A-N-G.

12       THE CLERK:  All right.  You may be seated.

13  HUANG  PINQI   ,

14      called as a witness, having been first duly sworn,

15      was examined and testified as follows:

16  DIRECT EXAMINATION

17  BY MR. ISAACSON:

18  Q    Good afternoon, sir.  From 1999 to early 2005, you were

19  the general manager for Hebei Welcome, is that right?

20  A    Yes.

21  Q    If you don't mind, just to help everybody, I'm going to

22  make a few notes here.  It's risky because I have terrible

23  handwriting.

24       Do you recall when in early 2005?

25  A    Around February or March.

**A-1720**

Huang Pinqi - direct - Isaacson                    473

1  Q    And as general manager, you were in charge of the overall

2  coordination of the Hebei Welcome employees, is that right?

3  A    Correct.

4  Q    And Mr. Zhang Yingren was your assistant manager while

5  you were the general manager at Hebei Welcome?

6  A    Correct.

7  Q    And you reported to Mr. Liu, the chairman of Hebei

8  Welcome?

9         THE INTERPRETER:  The name of the president?

10        MR. ISAACSON:  L-I-U.

11  A    He's the president of the company.

12  Q    Okay.  And you reported to the president?

13  A    Correct.

14  Q    Now, before 2005, Mr. Liu, the president, was also the

15  general manager of North China Pharmaceutical Group

16  Corporation, is that right?

17  A    He was the president of North China Pharmaceutical

18  Company.

19  Q    That's the group corporation?

20  A    He was the general manager, he was the general manager of

21  the group company.

22  Q    Thank you.  Now, in 2005, you became the chairman of

23  Hebei Welcome, is that right?

24  A    Correct.

25  Q    And you were chairman when we met at your deposition.

A-1721

Huang Pinqi - direct - Isaacson                474

1   Are you still chairman today?

2   A    I have left that post.  Let me think about it.  I have

3   left the chairmanship for quite some time.  When I recall left

4   that company in '08.  Since I left the company, I am no longer

5   the chairman of that company.

6   Q    Thank you.

7             Now, beginning in November 2003, you became the

8   deputy general manager of North China Pharmaceutical Group

9   Corporation, is that right?

10  A    Correct.

11  Q    Instead of writing out the whole name of the group

12  corporation, I'm using NCPC.

13            And when did you -- are you still a part of the

14  group corporation?

15  A    No, I'm no longer a member.  I have left that company in

16  2010.

17  Q    Right.  How long were you deputy general manager of the

18  group corporation?

19  A    From the time I mentioned earlier, November 2003 until

20  January 2010.

21  Q    Thank you.

22            Now, North China Pharmaceutical Group Corporation is

23  the indirect parent company of Hebei Welcome, is that correct?

24  A    It's not a direct investor, however, they invested in

25  other companies that make investment in that company.  That's

Huang Pinqi - direct - Isaacson                    475

1   the Hebei, that's the North China Pharmaceutical Corporation

2   Limited.

3   Q    All right.  And by virtue of its ownership in North China

4   Pharmaceutical Group Limited is North China Pharmaceutical

5   Group Corporation, the indirect owner of Hebei Welcome?

6   A    Public traded company invested in the Welcome company

7   directly.  And North China Pharmaceutical Corporation Limited

8   is the direct investor into the Hebei Welcome.  In other

9   words, the group corporation invested in the shareholder

10  company.  The shareholder company invested in the Welcome

11  company.

12  Q    North China Pharmaceutical Group Corporation is an

13  indirect investor in Hebei Welcome, is that fair?

14  A    I, I'm not in the finance so I do not know whether it's

15  called indirect investor.  I only know that the direct

16  investor is the shareholder company.

17  Q    I'd like to show you what's been marked as a defense

18  trial exhibit, number 97.

19        DX 97 which is listed as an exhibit by your counsel

20  is from the website of NCPC.com.  And do you recognize this

21  page as being a page from North China Pharmaceutical Group

22  Corporation's website?

23  A    I recognize the Chinese version.  I do not recognize the

24  English version.

25  Q    When I ask you about documents, sir, I will only be

Huang Pinqi - direct - Isaacson                    480

1    BY MR. ISAACSON:

2    Q    Would you agree with me, sir, that the document, the

3    website lists Hebei Welcome as a controlled domestic or

4    foreign subsidiary or joint venture?

5    A    I do not know what yet is the content the page is from.

6    What year is it from?

7              MR. ISAACSON:  It's a defense exhibit.

8              Do you care to answer the question?

9              MR. MASON:  I don't understand.

10   Q    Counsel won't tell me, sir.

11             THE COURT:  All right.  Let me try to simplify.

12             Is it correct, sir, that this document says that

13   Hebei Welcome is a controlled domestic foreign subsidiary or

14   joint venture in the amount of 62.5 percent?

15             Does this document say that?

16             THE WITNESS:  Yes, that's what it said in this

17   document, however, the situation I am aware of is a little

18   different than what is said here.

19             THE COURT:  Okay.

20   Q    Sir, let me ask you about November 2003.  All right.  At

21   that point, did you stop keeping an office at Hebei Welcome?

22   A    That's incorrect.  I did keep an office there.

23   Q    Did you have a physical presence at Hebei Welcome during

24   your working days after November 2003?

25   A    Basically not, and I seldom show up there, however, I

A-1724

Huang Pinqi - direct - Isaacson                481

1  still keep an office there.  There's an area that belongs to

2  me but I seldom show up there.

3  Q    And at that point, you had an office at North China, the

4  group corporation?

5  A    Yes.

6  Q    Thank you.  And the two companies are about a bus ride

7  apart?

8  A    By bus?  Twenty minutes ride.

9  Q    Thank you.

10        Now, for North China, as deputy general manager, you

11  were in charge of, among other things, technology, research

12  and R&D?

13  A    Not R&D.  Only, only technologies.

14  Q    You were, for North China, the group corporation as

15  deputy general manager, you were also in charge of

16  engineering?

17  A    Yes.

18  Q    You were also in charge of energy conservation?

19  A    Yes.

20  Q    You were in charge of a multi-year project to relocate

21  the company?

22  A    Yes.

23  Q    All right.  Now, I want to ask you about your duties as

24  chairman of Hebei Welcome.

25        Your responsibilities as chairman of Hebei Welcome

Huang Pinqi - direct - Isaacson                    482

1   were to go to Welcome approximately once a year to attend a

2   board meeting and listen to a report and also once or twice a

3   year to go to the company and look around?

4   A    Yes.

5   Q    And by 2005, you would only receive a report about Hebei

6   Welcome you say about once a year?

7   A    As for the work, you can say I only received one report a

8   year.  I have received more than one reports, multiple reports

9   a year.  There are two forms of reports.  Of the one, they are

10  written form of reports regarding to conferences and records.

11  There's a different form of report, that's, that went through

12  telephones.

13  Q    Okay.  Thank you, sir.

14       In terms of written reports, were you receiving

15  about one report a year?

16  A    I don't understand your question.  I don't know what

17  you're referring to.  You're talking about a once a year

18  report.  I don't know what specific report you were referring

19  to.  During my work, I received reports from time to time.

20  Q    I'm referring to reports about Hebei Welcome in 2005 and

21  afterwards.

22       How often did you receive written reports about

23  Hebei Welcome?

24  A    Every few months when the Welcome company need to inform

25  me something with regard to their work, sometimes they will

Huang Pinqi - direct - Isaacson                483

1   submit me a few pieces of paper.  Things like that.

2   Q    So in 2005 and 2006, every few months, Hebei Welcome

3   would provide you a written report about that company?

4   A    Based on their needs.  If they needed to submit the

5   reports to me, they would do that, but I did not make the

6   specific request.

7   Q    And the reports would discuss vitamin C, wouldn't they?

8   A    Not only talk about vitamin C.  Those reports talk about

9   Welcome company's operation, business operation.

10  Q    And Hebei Welcome's business operations principally

11  involved the sale of vitamin C, is that right?

12  A    Yes, that's the main product.

13  Q    And Hebei Welcome would report to you in writing, as part

14  of those reports, issues about markets for vitamin C, is that

15  right?

16  A    The part you're referring to is only a very small area in

17  the report and my main concern of the company is that whether

18  they wrote things about personnel, finance, production,

19  safety, quality of the products.  I'm very concerned of those

20  issues in overall situation.

21  Q    Also profits, right?

22  A    Yes.

23  Q    And that was -- you were getting those reports in 2005

24  and 2006?

25  A    I suppose so but I have left that company for a long

**A-1727**

1  time, almost ten years, but I suppose I have gotten them in

2  the past.

3  Q    And you would receive those reports while you were at

4  your offices at North China, the group corporation?

5  A    Correct.

6  Q    And you would keep those in your files at that office?

7  A    No, basically not.

8  Q    Would you throw out those reports?

9  A    I have to review the request first.  If there is

10  something significant and if there's something that I need to

11  talk to the operators of the company about, I need to have

12  exchanges, I will follow up on those reports.  If those

13  reports really about the daily events and they were

14  insignificant, I would just throw them away.

15  Q    The reports that you kept for follow up, after you did

16  the follow up, did you throw the reports away?

17  A    In any case, there is no use for me to have them anymore.

18  Q    Does that mean you did throw them out?

19  A    Yes.

20  Q    Is North China Pharmaceutical Group Corporation a

21  manufacturer of vitamin C to your understanding?

22           THE INTERPRETER:  Can you repeat the name of the

23  company?  The group company?

24           MR. ISAACSON:  The group company.

25  A    No.  No.  The North, the group company, the North China

Huang Pinqi - direct - Isaacson                485

1    Pharmaceutical Group company do not produce vitamin C.  It's

2    only the Hebei Welcome company does the production.

3    Q    To your understanding, is the group corporation a

4    manufacturer of any pharmaceuticals?

5    A    Based on my experience, group company basically is a

6    company for investment, an investment company.

7    Q    So would you consider North China, the group corporation,

8    to be a seller of vitamin C?

9    A    No.  The Welcome, Welcome company sell the products on

10   our own.  Has nothing do with the group company.

11   Q    You are familiar with a Dutch company named DSM that

12   manufactures vitamins including vitamin C?

13            THE INTERPRETER:  Did you say Dutch?

14            MR. ISAACSON:  Yes.

15            THE INTERPRETER:  Can you kindly repeat the name of

16   it?

17            MR. ISAACSON:  DSM.

18   A    Yes.

19   Q    And DSM bought its vitamin business from the Swiss

20   company, Hoffman LaRoche.  You know that, don't you?

21   A    I am aware of DSM being the leader of the vitamin C

22   manufacture, however, where is that company acquire from or

23   buy, I have no idea.

24   Q    DSM is a competitor for the sale of, for sales of

25   vitamin C, right?

**A-1729**

*Pinqi Huang - direct/ Isaacson*                    493

1  Q    Does that help you remember that the signed agreement in

2  2005 called for the establishment of two joint ventures, one

3  of which would include vitamin C?

4  A    I heard of the negotiation regarding those contents.

5  However, I am not sure whether they sign an agreement or not.

6        THE COURT: Why don't we move on, Mr. Isaacson.

7        MR. ISAACSON:  That's what I'm doing.

8  Q    If I can ask you about Plaintiff's Exhibit 300 which I'll

9  hand you.  Plaintiff's Exhibit 300 is gotten from the North

10 China West Side, it is the company profile and history?

11       MR. ISAACSON: I move to admit Exhibit 300.

12       THE COURT:  Any objection.

13       MR. PRESCOTT: Relevance.

14       THE COURT:  Overruled.  Admitted.

15       (Exhibit 300  so marked)

16 Q    (Cont'd): First line of the company profile says:

17       North China Pharmaceutical Group Corporation is a

18 leading pharmaceutical manufacturer in China.

19       Is that statement true, sir?

20 A    When I was young, yes, this company was the leading

21 company in the field in the industry, but when I had grown up

22 it is no longer the leading -- it was no longer the leader in

23 the industry.

24 Q    This was printed out on August 2012, was this statement

25 from the website -- was this statement true 2012?

*Pinqi Huang - direct/ Isaacson*                    494

1  A    Personally I think it's incorrect.

2  Q    I'm going to ask you about Plaintiff's Exhibit 301.  This

3  is also from the website.

4         MR. ISAACSON:  I move to admit Plaintiff's

5  Exhibit 301.

6         THE COURT:  Any objection?

7         MR. PRESCOTT: Same objection; relevance.

8         It's outside the time period.

9         THE COURT: Overruled.  Admitted.

10        (Exhibit 301 so marked)

11        MR. ISAACSON:  I'm not sure I displayed -- good.

12 Q    Plaintiff's Exhibit 301 is from the printout from the

13 page about North China Pharmaceutical Group Corporation's

14 products, and do you see that North China NCPC's main

15 businesses cover over 590 varieties, ranging from antibiotics,

16 bulk formulations, vitamins and nutrition products, biotech

17 products, immunosuppressant and pesticide and veterinary (ph)

18 drugs.  The annual sale the from antibiotic up to 80,000 tons.

19 The  vitamins is 23 tons.

20        THE COURT:  Twenty-three thousand.

21        MR. ISAACSON:  Twenty-three thousand tons.

22        Thank you, Your Honor.

23 Q    Is that statement correct in again as of August 2012 that

24 NCPC's annual sales volume for vitamins is 23,000 tons?

25 A    Statement is incorrect.

*Pinqi Huang - direct/ Isaacson*                     495

1  Q    I want to show you Exhibit 302 which is also from the

2  website and I would move to admit Plaintiff's Exhibit 302.

3            THE COURT:  Same objection?

4            MR. PRESCOTT: Same objection.

5            THE COURT:  All right.

6            (Exhibit 302  so marked)

7  Q    This is from the Group Corporation's web page, it is

8  under the tab called products. It is a list of products and

9  the first one is Vitamin C ascorbic acid.

10           Is it correct to describe, as this website does,

11 Vitamin C ascorbic acid is a product of North China

12 Pharmaceutical Group Corporation.

13 A    Incorrect.

14 Q    Now, while you were working for North China Group

15 Corporation most of the Hebei Welcome board members were also

16 North China Group Employees; is that right?

17 A    Can you ask the question again?

18 Q    Sure.

19           While you were at North China Group Corporation most

20 of the Hebei Welcome board members were also North China Group

21 Corporation employees?

22 A    You mean most of the board members?

23 Q    Yes.

24 A    Well, whether they belonged to the North China Group

25 Corporation or the North China Shareholders Company, I don't

501

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3      - - - - - - - - - - - - - - X
                                            06 MO 1738
4      IN RE                         :
       VITAMIN C ANTITRUST LITIGATION,
5
            Plaintiff,                      :    U.S.   Courthouse
6
                                            Brooklyn, New York
7                    v.                      :

8      HEBEI WELCOME                   :
       PHARMACEUTICAL CO. LTD., et al.,
9                                      :
                     Defendants.            February 28, 2013
10                                     :    9:30 o'clock p.m.
       - - - - - - - - - - - - - - - - - - X
11

12                    TRANSCRIPT OF TRIAL
                      BEFORE THE HONORABLE BRIAN M. COGAN
13                    UNITED STATES DISTRICT JUDGE, and a jury.

14
       APPEARANCES:
15
       For the Plaintiff:         HAUSFELD, LLP
16                                1700 K Street, Suite 650
                                  Washington, D.C. 20006
17                                By:   BRIAN A. RATNER, ESQ.
                                        BRENT W. LANDAU, ESQ.
18                                      MELINDA R. COOLIDGE, ESQ.

19                                SUSMAN GODFREY LLP
                                  1000 Louisiana Street, Suite 5100
20                                     Houston, Texas
                                  BY: JAMES T. SOUTHWICK, ESQ.
21                                     SHAWN L. RAYMOND, ESQ.
                                       KATHERINE H. KUNZ, ESQ.
22
                                  BOIES, SCHILLER & FLEXNER, LLP
23                                5301 Wisconsin Avenue, N.W.
                                  Washington, D.C.   20015
24                                By:   WILLIAM A. ISAACSON, ESQ.
                                        TANYA CHUTKAN, ESQ.
25


                ANTHONY M. MANCUSO,   CSR  OFFICIAL COURT REPORTER

1  Q    North China Pharmaceutical Group Corporation.  This was a

2  report made by Hebei Welcome to North China Pharmaceutical

3  Group Corporation, wasn't it?

4           THE INTERPRETER:  I didn't get it.

5  Q    This was a report made by Hebei Welcome to North China

6  Pharmaceutical Group Corporation, wasn't it?

7  A    That was sent to the general manager of NCPC, who was our

8  chairman of the board, for him.

9  Q    Chairman of the board of North China Pharmaceutical Group

10 Corporation; right?

11 A    No.  He was the chairman of the board of the Welcome

12 Company.

13 Q    But when this report was addressed, it was addressed to

14 North China Pharmaceutical Group Corporation; right?

15 A    In court, I have to explain the things as is.  The report

16 was sent to our chairman of the board for the Welcome Company,

17 but he was also the general manager of the NCPC.  In our

18 cultural context, we also always address to the higher entity.

19 Q    You didn't mention the chairman, the general manager,

20 when you sent this report?  You just said North China

21 Pharmaceutical Group Corporation; right?

22 A    That's our cultural habit.  Whenever a lower entity

23 addresses a higher entity, we use the higher entity name.

24 Because there was nobody in the NCPC who was really

25 responsible to look at the contents of the Welcome report

**A-1734**

1   Commerce?

2   Q     The Ministry of Commerce had its authority during that

3   price war; right?

4   A     What power?

5   Q     The Ministry of Commerce existed during that price war,

6   didn't it?

7   A     It existed.

8   Q     The chamber existed?

9   A     Yes, it existed.

10  Q     The next page of the English -- but at the bottom of your

11  page, the paragraph that begins "2002" and it continues onto

12  the next page in the Chinese.  All right.  Do you see there it

13  says "At the end of 2002, in order to turn around the cruel

14  situation of the Vitamin C market"?  There was another price

15  war in 2001, wasn't there?  There was another price war in

16  2001, wasn't there?

17  A     It is not stated here.

18  Q     Okay.  Do you recall that there was another price war in

19  2001?

20  A     That's over ten years ago, and I'm not even in this

21  business anymore.

22  Q     All right.  It continues:  "In order to turn the cruel

23  situation of Vitamin C market, the four main domestic

24  companies reached the common understanding of production

25  limitation and price retention under the coordination of the

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   China chamber about the commerce of medicine and health
2   commerce importers and exporters?  That's what happened, sir,
3   isn't it, the four domestic companies reached a common
4   understanding and they had coordination with the chamber?
5           MR. PRESCOTT:  Objection.
6           THE COURT:  Overruled.
7   Q    That's what happened, isn't it?
8   A    It is not written correctly.
9   Q    You're saying the document is factually inaccurate; is
10  that right?
11  A    This is something written by our sales manager, sales
12  department people.  But on the knowledge regarding who is
13  responsible for what, they do not have that level of
14  knowledge.  The way that it is written, the chamber let it be
15  written this way, but actually they were in charge of
16  everybody's quota.  If there's no quota, nobody gets to import
17  -- gets to export.
18  Q    Sir, are you saying that this report that you sent to
19  your highest entities was false?
20  A    I'm not saying that the way you asked the question is
21  false.  We just have different understanding of the wording.
22  Q    I'm asking you about this report that you sent to your
23  highest entity.  Was it a false report?
24  A    It is not false.  It is not false, but the chamber let it
25  be written this way.  It is not false.

Pinqi Huang - direct - Isaacson                529

1   Q    That's referring to the European cost for manufacturing

2   Vitamin C were more than $5; right?

3   A    Yes.  That's what's written.

4   Q    And then shortly after that, after discussing the tons

5   that are consumed or exported, do you see where it

6   says "Chinese VC companies dominate the global market"?

7   A    It is written so in script that I cannot read very

8   clearly.  I guess so.

9   Q    Was that an accurate statement at the time?  Did that

10  agree with your view?

11  A    My understanding is, at the time, it is incorrect,

12  because for the capital cost of all the competitors outside of

13  the country, we could only have guessed.  It was only a

14  guesstimate of the capital costs.

15  Q    I'm referring now to "The Chinese Vitamin C companies

16  dominate the global market."

17  A    Not accurate.

18  Q    That's another not-accurate statement?

19  A    My personal view is that it was not accurate.

20  Q    Let me ask about another statement.  Do you see, as you

21  go down, there's a discussion of prices falling in the year

22  2000?

23  A    I see it.

24  Q    Below that, there's discussions of some more tons, and

25  then a reference to a quota of 3400 tons.  Do you see that?

Huang Pinqi - direct - Isaacson                    531

1          MR. ISAACSON:  If you can just interpret the

2   question at this point.

3          THE WITNESS:  Okay.

4          MR. ISAACSON:  I'm talking to you, the interpreter,

5   sir.

6   BY MR. ISAACSON:  (Continuing)

7   Q    If President Zhang said that the industry exercised

8   self-restraint and each export enterprise determined its own

9   export amount, would that be a false statement?

10          MR. CRITCHLOW:  Objection.

11          THE COURT:  Overruled.

12   A    Did President Zhang say that?

13   Q    If he did say that, was it false?

14   A    I didn't, I didn't hear clearly what, what you said

15   Mr. President Zhang say, but I can't see that it came from

16   President Zhang.  How did this come about, President Zhang

17   gave it to you?

18   Q    Sir, set aside the document for a moment.

19          If President Zhang said the industry exercised

20   self-restraint and each export enterprise determined its own

21   export amount, would that be a false statement?

22   A    I feel that it is false because we could not possibly

23   determine our own export quota.

24   Q    Exhibit 52, please.  Do you recognize this, sir, as a

25   document that came from the Chamber?

1    Pharmaceutical Group Corporation.

2            Was this another report to you, sir?

3    A    Yes, this was written to me.

4    Q    All right.  And this was -- and this was when you were

5    general manager of NCPC?

6    A    Correct, but simultaneously I was the board chairman of

7    the Welcome company.

8            MR. ISAACSON:  All right.  And I move to admit

9    Exhibit 306.

10           THE COURT:  It is received.

11           (So marked.)

12   Q    And sir, if I can ask you to look at, on the Chinese,

13   there's a section on summary on main tasks on page four of the

14   Chinese document?  Do you see that page, sir?  Page four of

15   the Chinese.  And this would be page four of the English as

16   well.  And at the bottom of the page, the second half of the

17   page, there's a discussion in 2004, VC market showed the

18   following features.

19           Do you see that?

20           (Exhibit published.)

21   A    I see it.

22   Q    All right.  And listed there are several features and it

23   includes, VC Sector Strengthen Self-Regulation.

24           Do you see that?

25   A    I see it.

1   Q    That was a report made to you in 2004 while you were

2   deputy general manager of North China?

3   A    Correct.

4   Q    You consider that statement to be inaccurate?

5   A    I feel that it is in inaccurate.

6   Q    Thank you, sir.

7        If I can ask you to turn to Plaintiff's Exhibit 124.

8        THE INTERPRETER:   134?

9        MR. ISAACSON:   124.

10  Q    Now, this is a document from the Chamber and it lists

11  several items and the second page of the Chinese towards the

12  top, there's a reference to November 23rd and hopefully you

13  will see your name.

14  A    I do not see my name.

15  Q    So there's two, there's two items for November 23rd so

16  look at the second one.

17  A    I see it.

18  Q    All right.  And you see where it's --

19       MR. ISAACSON:  I move to admit Exhibit 124.

20       THE COURT:   Any objection?

21       MR. CRITCHLOW:   Objection.

22       MR. ISAACSON:   This was the subject of a previous

23  ruling.

24       THE COURT:  Was it?

25       MR. ISAACSON:   Yes.

**A-1740**

Side Bar                                                    550

1          (Continued on next page.)

2          MR. ISAACSON:  All right.  So if we can put

3   Plaintiff's Exhibit 124 on the screen, the November 23rd

4   portion.

5          (Exhibit published.)

6   BY MR. ISAACSON:

7   Q    The second November 23rd.  All right.  So this will run

8   onto the next page.  The vitamin C subcommittee held extended

9   council meeting in Beijing.  And refers to top executives were

10  there, including from Hebei Welcome and continuing on to the

11  next page of the English, during the meeting it was decided

12  that you, sir, deputy general manager of North China

13  Pharmaceutical Group, would be the rotating chair of the

14  council of the subcommittee for the year 2005.

15          And the Chamber referred to you as the deputy

16  general manager of North China Pharmaceutical Group.  That was

17  your highest title, right?

18  A    Yes.

19  Q    And you were the chair of the council of the vitamin C

20  subcommittee for the year 2005, weren't you?

21  A    '05, yes.

22  Q    Okay.  Plaintiff's Exhibit 142, please.  This has been

23  previously admitted.  This is another memorandum about Wang

24  Qi, sir.  It references a meeting in April 19, 2005, at a

25  Beijing hotel and it indicates you were present.

CMH        OCR        RMR        CRR        FCRR

**A-1741**

Side Bar                                                    551

1          Do you recall this meeting?

2          (Exhibit published.)

3    A    Yes, I remember.

4    Q    And at this point, you were chair of the council?

5    A    I suppose so.

6    Q    And do you recall at the end, item three at the very end

7    of the document, several items that are pretty much agreed

8    upon by attendees, no written record for this meeting, there

9    was that agreement because the lawsuit had been filed, right,

10   sir?

11   A    Correct.  This record is totally inaccurate.

12   Q    Can you turn to tab Exhibit 87 in your book:  These are

13   also -- this is also a meeting memo prepared by Wang Qi and

14   it's for a meeting on May 19, 2005.  You are recorded as

15   having attended.

16   A    Correct.

17   Q    And do you remember -- there are remarks attributed to

18   you, sir, at the top.  Okay.  It's -- there's your name.

19   A    I see, I see my name.

20   Q    Right.  And you discussed the export quantities for

21   March.  Do you see that?

22   A    Yes.

23   Q    That's the type of report you would make at meetings,

24   right?

25   A    The record is not complete.  What is recorded here is

CMH        OCR        RMR        CRR        FCRR

Side Bar                                    552

1   mostly said by my sales manager Zhang Yingren.  There's no,

2   there's no way for me to remember what quantities was, this

3   one or that one, a sales manager, but they recorded as if it

4   was spoken by me.

5            All I can say is Wang Qi did not record accurately.

6   The VC quantity reach whatever tonnage did not come from my

7   mouth.  It came from Zhang's mouth.  So the way he recorded it

8   came from me, that is inaccurate.

9   Q    This is another inaccurate document, is that right?

10  A    He did not record accurately.

11  Q    And he also recorded -- you see your name down towards

12  the bottom by number two?  Proposals made and there's a

13  reference to proposals you made and there are two proposals

14  discussed:  Using the current prices for obtaining the current

15  preauthorization stamp as the floor prices to export VC for

16  each manufacturer; and, two, During July and August, each

17  manufacturer will stop fermentation for about 20 days so as to

18  reduce the production volume appropriately and ultimately

19  relieve the situation that supply surpasses demand.

20           Do you recall making those proposals, sir?

21  A    Objectively speaking, now that I see these sentences, and

22  at the time I was the board chairman of Welcome, whatever they

23  discuss about the verification and chop price or stop the

24  fermentation, the "daguan," D-A-G-U-A-N, for 20 days, I don't

25  even understand it.  I think these were said by people

CMH        OCR        RMR        CRR        FCRR

**A-1743**

Side Bar                                               553

1    underneath me or some, the technical person.

2          More importantly, what is written here.  Mr. Wang

3    Qi, W-A-N-G, Q-I, said these, the summary conclusion proposed

4    by me and since Mr. Qiao attended this meeting, he was the top

5    person, there's no way for me to make any concluding

6    proposals.  So I don't really understand this document that

7    was written by Wang Qi.

8    Q    It's another inaccurate document, is that right?

9    A    I feel it is inaccurate.

10   Q    There were times when your company, you were familiar

11   with the verification and chop price, right?

12   A    I don't but my sales manager knew.  As far as the

13   company's concerned, this is a technical matter for the sales

14   department.  I don't quite understand it.

15   Q    You never knew what the verification and chop price was?

16   A    I just know that without a chop, we couldn't export.

17   Q    Did you ever hear that it was $3.35?

18   A    I have heard it.

19   Q    And during the period that there was a verification and

20   chop price of $3.35, did your company sometimes sell vitamin C

21   at a lower price?

22   A    Right now, I have no recollection.

23   Q    Okay.  Well, let me ask you to look at -- I'm sorry.

24          Did you ever hear of other companies, other Chinese

25   vitamin C companies selling below $3.35?

1   EXAMINATION CONTINUES

2   BY MR. ISAACSON:

3   Q    All right.  If I can -- we can put on the screen and

4   there is a reference to a price in the third -- actually, in

5   the third paragraph, sir.  If you can look at that?  At the

6   bottom there is a reference to 2.80 to 2.90 US dollars.

7           It says, even though the chamber has adopted --

8   A    I see it.

9   Q    All right.  It says:  Even though the chamber has adopted

10  the measure of preverification signature and stamp to limit

11  the price, each company is still selling actively at $2.80 and

12  $2.90 US dollars.

13          Do you see that?

14          The first paragraph refers to providing quotes for

15  3.35 or above.

16          Do you see that?

17  A    I see them.

18  Q    All right.  Does that assist your memory, that the

19  companies were able to sell vitamin C for less than the

20  verification and chop price of 3.35?

21  A     Now I recall that during that period of time, because

22  the high and lows of the pricing, such situations did occur.

23  Q    Let me show you some of your contracts.  I will approach

24  you with 426 A, which is a stack of contracts.  I am not going

25  to ask you to look at all of them.

**A-1745**

Huang Pinqi - cross - Prescott                    562

1   CROSS-EXAMINATION

2   BY MR. PRESCOTT:

3   Q    Mr. Huang, you will be happy to hear that I have only two

4   questions.

5            During the years 2001 to 2006, approximately what

6   proportion of Hebei Welcome's production was for export sales?

7   A    For what I remember in our enterprise, we rely mainly on

8   exports.  From what I recall, each year our export quantity

9   will reach between 70 to 80 percent.

10  Q    Between 70 to 80 percent of your output was for the

11  export markets, sir?

12  A    Exports.

13  Q    And that's your exports of vitamin C from China, correct?

14           THE INTERPRETER:  Say again.

15  Q    That is referring to your exports of vitamin C from

16  China, correct?

17  A    Correct.  It is for the VC item.

18  Q    Second question --

19           THE COURT:  That was three questions.

20           MR. PRESCOTT:  I'm sorry.  Two topics.

21           THE COURT:  I see.

22           MR. PRESCOTT:  I apologize.

23  Q    Who was Mr. Zhang Yingren?

24  A    Zhang Yingren was the deputy general manager in Welcome

25  in charge of sales, deputy general manager in charge of sales

Feng Zhenying - direct - Isaacson                 621

1   A     Yes.

2   Q     And then at meetings later that year, the four

3   manufacturers were able to reach a common understanding about

4   shutting down the new production line, is that right?

5   A     Because, because of interference from the Chamber, we

6   were forced to stop everything.

7   Q     Sir, is it right that the four manufacturers were able to

8   reach a common understanding about shutting down the new

9   production line?

10  A     Yes, starting in July, starting in July.  Because of the

11  disagreement from Weisheng, the stoppage was delayed for one

12  month.

13  Q     And then what actually happened was you agreed to, you

14  agreed to the stoppage in July because you found out your new

15  production line was having tech, was having problems

16  functioning?

17  A     No.

18  Q     You never --

19  A     The stoppage occurred because of Mr. Qiao from the

20  Chamber who said we must do the stoppage.

21        (Continued on next page.)

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

F. Zhenying - direct - Isaacson                622

1    DIRECT EXAMINATION

2    BY MR. ISAACSON:  (Continued)

3    Q    All right, you never heard that your production line had

4    problems?

5    A    During the testing operation process of the new

6    production line, no problems arose.

7    Q    No problems arose?

8    A    No problems.

9    Q    And the four manufacturers of vitamin C did reach a

10   common understanding about shutting down the new production

11   line; right?  That's what happened.

12   A    It was Mr. Qiao who forced -- who stressed that the four

13   enterprises must stop.

14   Q    All right.

15        MR. ISAACSON:  Trevor, I would like to play a

16   section of deposition.

17        I'm going to show you two questions you were asked

18   and answers you gave at your deposition, sir.  8911220.

19        (Video played for jury.)

20        (Video stopped.)

21   Q    You were asked those questions and you gave those answers

22   at your deposition, sir; right?

23   A    It could be a matter of understanding.  The new

24   production line was only on the testing stage, it was -- no

25   production was started yet.  I was not even allowed to test

VB        OCR        CRR

632

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
in re:                          :  06-MD-1738 (BMC)
VITAMIN C ANTITRUST             :
LITIGATION,                     :
                                :
        Plaintiff,              :  United States Courthouse
                                :  Brooklyn, New York
    -against-                   :
                                :
                                :
                                :  Monday, March 4, 2013
 HEBEI WELCOME PHARMACEUTICAL   :  10:30 a.m.
CO. LTD., et al,                :
                                :
    Defendants.                 :
                                :
- - - - - - - - - - - - - - - - X

        TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
          BEFORE THE HONORABLE BRIAN M. COGAN
          UNITED STATES DISTRICT COURT JUDGE

            A P P E A R A N C E S :

 For the Plaintiff:       SUSMAN GODFREY, LLP
                          BY: **JAMES T. SOUTHWICK, ESQ.**

                          BOIES SCHILLER & FLEXNER, LLP
                          BY:  **WILLIAM A. ISAACSON, ESQ.**
                             **TANYA S. CHUTKAN, ESQ.**
                             **JENNIFER MILICI, ESQ.**
 For the Defendants:      ZELLE HOFMANN VOELBEL & MASON, LLP
                          BY: **ERIC BUETZOW, ESQ.**
                             **JIANGXIAO HOU, ESQ.**
                             **DANIEL MASON, ESQ.**
                          BAKER & MCKENZIE, LLP
                          BY: **CHARLES HOWARD CRITCHLOW, ESQ.**
                             **DARRELL PRESCOTT, ESQ.**
                             **CATHERINE YUNIE STILLMAN, ESQ.**

 Court Reporter:  Mary Agnes Drury, RPR
                  Official Court Reporter
                  Telephone: (718) 613-2615
                  E-mail: Mad78910@yahoo.com

 Proceedings recorded by computerized stenography.  Transcript
 produced by Computer-aided Transcription.

F. Zhenying - Direct - Mr. Isaacson                    662

1  Q    And you were doing that -- when you sold vitamin C into
2  the United States for less than $3.35, were you doing that
3  after getting your contracts chopped?
4  A    Because by that time $3.35 was not the market price
5  already.  And the enterprise was facing difficulties.  We
6  would not be able to export in accordance with that price.
7  But if we do not go with that price, the Chamber will not
8  give us the chop.  The enterprises were in a hot place.
9  Q    Sir, my question was:  When you sold vitamin C into the
10  United States below the minimum price of $3.35, did you get
11  your contracts chopped or approved by the Chamber?
12  A    It happened very rarely with Weisheng, but it did
13  happen.  It was signed another contract which is lower than
14  3.35.
15  Q    So did you sell into the United States with contracts
16  that were not chopped?
17  A    When they exported in customs, is all chopped as 3.35.
18  But the contract implemented with the customer was lower
19  than 3.35.
20  Q    Are you --
21  A    But what was written with the customs was always 3.35.
22  Q    Are you saying that when you wanted to sell below 3.35,
23  you could submit false documents to the Chamber and to
24  customs.
25  A    Yeah, I gave them the 3.35 document.  He would not

F. Zhenying - Cross - Mr. Mason                663

1   lower than that, they would not have given us the chop.

2   Q    My question, sir, is were you able to give customs and

3   the Chamber false documents in order to sell vitamin C at

4   prices below $3.35?

5   A    Yes.

6   Q    All right.  Your company is still selling to customers

7   in the United States, vitamin C, correct?

8   A    We were still selling VC to the United States.

9            MR. ISAACSON:  I have no further questions.

10           THE COURT:  All right.  Cross-examination.

11  CROSS-EXAMINATION

12  BY MR. MASON:

13  Q    Mr. Feng, good afternoon.  Sir, have you testified in

14  any jury trials before today?

15  A    Before this testimony, no.

16  Q    Is the concept of jury trials known in China?

17  A    Concept of jury trial?

18  Q    Is it familiar?

19  A    I'm not very familiar.

20  Q    So is the proceedings that we have here today with

21  lawyers and judges and juries, is this something that's new

22  to you?

23  A    I never seen it.

24  Q    All right.  Sir, I'd like to go back to the testimony

25  that we talked about at the conclusion of Thursday

A-1751

F. Zhenying - Cross - Mr. Mason                683

1   Q    And Mr. Qiao gave directions as to the quotas or the

2   allocation of products that the vitamin C subcommittee

3   members could have?

4   A    Yes.

5   Q    And he gave you instructions with regard on occasion to

6   being directed to stop production of vitamin C?

7   A    Yes.

8   Q    And on occasion he gave you directions with regard to

9   having to put certain vitamin C inventory in a warehouse?

10  A    Yes.

11  Q    And he told you that if his directions were not

12  followed, then the government would impose penalties on the

13  companies who did not follow his direction?

14  A    Yes.

15  Q    And those penalties included a refusal to allow the

16  vitamin C subcommittees to export product?

17  A    Yes.

18  Q    And these policies were in effect, as far as you know,

19  at least from 2001 when you first attended a vitamin C

20  subcommittee?

21  A    Yes.

22  Q    You know the term, sir, malicious competition, as used

23  by Mr. Qiao?

24  A    I don't.  I don't.

25  Q    And that has a special meaning in China, the term

Mary Agnes Drury, RPR
Official Court Reporter

F. Zhenying - Cross - Mr. Mason                 699

Q    What information is submitted by the manufacturers to
the chamber on the verification of the chop form?

A    Quantity, pricing.  And then the chamber put the chop
on it.

Q    What does the chamber have to verify before the chop is
placed on the document?

A    Whether it complies with the minimum -- complies with
the requirement of the quantity as well as the minimum
pricing requirement.

Q    Is that the requirement imposed by Mr. Qiao?

        MR. ISAACSON:  Objection, leading.

        THE COURT:  I'll allow it.

A    The instructions of the chamber, yes.

Q    Okay.

        By the way, with regard to the quantity, were
instructions given with respect to the quantity to the
companies?

A    There's a fixed quantity that is split up into the
different companies; and if you exceed that quantity, then
he will not get the chop.

Q    Who decides what the quantity should be?

A    And it was by the chamber, but it was -- it evolved
from the ministry of commerce export quota into this
verification and chop process.

Q    Were the companies allocated certain quotas or

F. Zhenying - Cross - Mr. Mason          700

1   quantities?

2   A    Yes.

3   Q    Did the quotas that Weisheng received while you were

4   general manager, did you consider them to be satisfactory?

5   A    Not satisfactory.

6   Q    Why?

7   A    Because whatever quota they assigned to us came to

8   about 50 to 60 percent of our production capabilities.

9   Q    So during the time that you were the general manager of

10  Weisheng, what was the production capability of the Weisheng

11  line?

12  A    The production capacities depended on the periods.

13  Before 2003, it was 15,000 tons.  After 2004, it became

14  30,000 tons.

15  Q    And the quotas that you were given by the chamber, how

16  did they compare with your production capacity?

17  A    It was reduced to about 50 to 60 percent of the

18  capacity.

19  Q    Why didn't Weisheng object to that quota?

20  A    I -- my objection was useless because it was government

21  instructives.  Useless.

22  Q    Okay.

23       MR. ISAACSON:  Objection.  Move to strike the

24  latter comment.

25       MR. MASON:  No, Your Honor.  I asked him why.

**A-1754**

F. Zhenying - Cross - Mr. Mason               711

1   Q    Is the Ministry of Foreign Trade and Economic

2   Cooperation, that's MOFTEC?

3   A    Yes.

4   Q    And then there are copies identified to various

5   agencies.  Do you see in the Chinese there's a line that

6   says CC, and it says copies of this to the Ministry of

7   Foreign Trade and Economic Cooperation, which is MOFTEC,

8   right?

9   A    Yes.

10  Q    Then it says Trade Administration, the Bureau of Quotas

11  and License, Dalian Special Office.

12           And are those all Chinese government agencies,

13  sir?

14  A    Yes.

15  Q    And then a copy of this was sent to the Tianjin Special

16  Office.  Is that a government agency?

17  A    Yes.

18  Q    And then to the Qingdao Special Office?

19  A    Yes.

20  Q    Is that a government agency?

21  A    They're all government agencies.

22  Q    So to cut this short -- if I can just lead this -- all

23  of the recipients of a copy of these documents were agencies

24  of the Chinese government, correct?

25  A    Yes.

765

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
in re:                           : 06-MD-1738 (BMC)
VITAMIN C ANTITRUST              :
LITIGATION,                      :
                                 :
        Plaintiff,               : United States Courthouse
                                 : Brooklyn, New York
        -against-                :
                                 :
                                 :
                                 : Tuesday, March 5, 2013
HEBEI WELCOME PHARMACEUTICAL     : 9:30 a.m.
CO. LTD., et al,                 :
                                 :
        Defendants.              :
                                 :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Plaintiff:      SUSMAN GODFREY, LLP
                        BY: **JAMES T. SOUTHWICK, ESQ.**

                        BOIES SCHILLER & FLEXNER, LLP
                        BY:  **WILLIAM A. ISAACSON, ESQ.**
                            **TANYA S. CHUTKAN, ESQ.**
                            **JENNIFER MILICI, ESQ.**
For the Defendants:     ZELLE HOFMANN VOELBEL & MASON, LLP
                        BY: **ERIC BUETZOW, ESQ.**
                            **JIANGXIAO HOU, ESQ.**
                            **DANIEL MASON, ESQ.**
                        BAKER & MCKENZIE, LLP
                        BY: **CHARLES HOWARD CRITCHLOW, ESQ.**
                            **DARRELL PRESCOTT, ESQ.**
                            **CATHERINE YUNIE STILLMAN, ESQ.**

Court Reporter:  Mary Agnes Drury, RPR
                 Official Court Reporter
                 Telephone: (718) 613-2615
                 E-mail: Mad78910@yahoo.com

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

BERNHEIM - DIRECT - SOUTHWICK                843

1  correspond to the red line.  The difference between those

2  two lines is the extent to which class members were

3  overpaying for Vitamin C.  There's a big overcharge there.

4  That means that class members were indeed harmed.

5  Q    Okay.  And the third question, what were the total

6  damages suffered by the class members?

7  A    Yes.  So to determine the total damages suffered by the

8  class members, what I do is I take the size of the

9  overcharge at each given point in time there's some

10  overcharge, and I will figure out -- and I use data on the

11  quantity that was sold at each of those points in time to

12  members of the class for delivery in the United States.

13  Q    Where did you get this information about quantities,

14  the kilograms of Vitamin C sold in the United States?

15  A    That comes from two sources.  One is the ITC data, the

16  International -- U.S. International Trade Commission data

17  which tracks imports in the United States.  The other is

18  defendant documents.

19  Q    Are those types of data that you would typically use

20  when doing this kind of analysis?

21  A    Yes, absolutely.

22  Q    You're not using some bizarre kind of information about

23  quantities that economists wouldn't otherwise use, right?

24  A    No, no, not at all.

25  Q    Okay.  Is the quantity of information limited to the

BERNHEIM - DIRECT - SOUTHWICK                    844

1    four manufacturing names we've heard a lot of in this case

2    or are there other Chinese manufacturers of Vitamin C?

3    A    No.  There are other Chinese manufacturers of Vitamin

4    C.  There's Shandong Long (phonetic) appears in the data I

5    think.  And Tiger (phonetic).  I think there are a few

6    others.  They're smaller generally.  The four major ones

7    account for about 86 percent -- a little over 86 percent of

8    the volume.  And then the others, the figure I think is 13.8

9    percent for the others in the data that I have.

10   Q    Okay.  So when you take your price overcharge and the

11   quantities, what do you come up with for what were the total

12   damages?

13   A    Well, the total damages as I said were $54.1 million.

14   Q    I think we have a slide that shows that somehow.  What

15   does this slide show about damages?

16   A    Well, this is tabulating the damages by year in

17   absolute amounts rather than percentages.  I can give you

18   them in percentages, but this is absolute amounts.  And it's

19   showing you that the damages were to a large extent

20   concentrated in 2003 and 2004 where we're a little bit over

21   and a little bit under $20 million.  But there were also

22   some damages in 2002.  And it kind of tapered off in 2005

23   and 2006.

24   Q    Did the percent of overcharge change from year to year?

25   A    Yes, it did.  The overall average for the percentage

A-1758

HAILI - DIRECT - MASON                    904

1   Vitamin C?

2   A    Yes.

3   Q    How long did you stay at the Chamber?

4   A    I started working there in May of '92 until January

5   21st of 2011 when I retired.

6   Q    And why did you retire?

7   A    Because I reached the government designated legal

8   retirement age, 60.

9   Q    Okay.  Could you briefly tell us what the Chamber was,

10  the Western Medicine Chamber that you mentioned.

11  A    The Chamber, in short, it was set up by the MOFTEC.  It

12  is the government type of organization to assist in the

13  industry coordination.  And the Western Medicine Department

14  was a department inside the Chamber.  They were in charge of

15  western medicine and medical equipment and to coordinate

16  import and export of them.

17  Q    Did you have a title at the Western Medicine Department

18  of the Chamber?

19  A    I am the supervisor, head of the Western Medicine

20  Department.

21  Q    Well, you were until you retired?

22  A    Until March of 2007.

23  Q    Okay.  So you held that position until March 2007 --

24  from what period of time did you first hold that title?

25  A    1993.

```
                  HAILI - DIRECT - MASON                905
```

1          MR. MASON:  Your Honor, may I show the witness

2     what's been marked as Exhibit 105?

3          THE COURT:  Yes.

4          MR. MASON:  Can I show him the actual original

5     card?

6          THE COURT:  Sure.

7     Q    Do you recognize that, sir?

8     A    I do.

9     Q    Are you familiar with it?

10    A    I do.

11    Q    Please tell us what it is.

12    A    That's my work permit.

13    Q    And how did you get it?

14    A    It was issued to me by the Chamber.

15         MR. MASON:  Okay.  Your Honor, I move that that be

16    admitted.  There's no objection.

17         THE COURT:  All right.  It's received without

18    objection.

19         (Defendants' Exhibit 105 received in evidence.)

20         MR. MASON:  May I put it on the screen?

21    A    My correction.  It was issued to me by the Ministry of

22    Commerce.  My fault.  Ministry of Commerce.

23    Q    MOFTEC?

24    A    No, MOFCOM.

25    Q    It was called MOFCOM at the time?

HAILI - DIRECT - MASON                           906

1   A     Yes.

2          MR. MASON:  Your Honor, is it permissible to hand

3   this card to the jury?

4          THE COURT:  You can do that.  You know, we have

5   all these fancy machines.  You can put it up on the screen.

6          MR. MASON:  It's a real thing.

7          THE COURT:  Okay.  I would like to think all of

8   our exhibits are real.  You can pass it around to the jury.

9   Q     Sir, I direct your attention to what's on the screen,

10  the left-hand portion.  There's a symbol there in red.  What

11  is that symbol?

12  A     That is the national seal for PRC.

13  Q     The national seal of the government of China?

14  A     For China, the entire country.

15  Q     Okay.  And in the lower right-hand -- sorry.

16         In the lower left-hand corner in Chinese under the

17  seal?

18  A     Ministry of Commerce of the People's Republic of China.

19  Q     Okay.  Could you tell us, please, what your

20  responsibilities were as serving as a director of the

21  Western Medicine Department and particularly focusing on

22  Vitamin C.

23  A     I was in charge of the exportation of western medicine

24  as well as western medicine equipment and to coordinate

25  within the industry itself and deal with any kind of

HAILI - DIRECT - MASON                          907

1   anti-dumping issues outside of the country.

2   Q     And were you involved in export pricing?

3   A     Yes.

4   Q     And did you have responsibilities in terms of quotas

5   that might have been issued?

6   A     Correct.

7   Q     And were you in charge of on occasion production

8   stoppages of Vitamin C in China?

9   A     Yes.

10  Q     And were you sometimes involved in directions to put

11  Vitamin C products in warehouses?

12  A     Yes.

13  Q     Okay.  Were you involved during the time you were with

14  the Western Medicine Department in what's been referred to

15  as a Vitamin C subcommittee?

16  A     Yes.

17  Q     Please explain what the Vitamin C subcommittee is.

18  A     This subcommittee is a subsidiary organization within

19  the Chamber.

20  Q     And were you a part of the Vitamin C subcommittee?

21  A     Yes.

22  Q     What was your position?

23  A     I acted as the secretary of the VC subcommittee, deputy

24  director and director.

25  Q     Deputy director and director of the Vitamin C

Case 13-4791, Document 160, 07/28/2014, 1280897, Page277 of 315

**A-1762**

1    subcommittee?

2    A    Correct.

3    Q    As such, were you -- did you have authority to direct

4    the Vitamin C manufacturers in China in terms of what to do

5    in connection with their production and pricing and quotas?

6              MR. ISAACSON:  Objection; leading.

7              THE COURT:  Sustained.

8              MR. MASON:  All right.  Very well.

9    Q    With respect then to your specific duties as the

10   Vitamin C subcommittee director, what were your duties?

11   A    He is responsible to supervise and instruct the

12   coordination of VC matters.

13   Q    And who were you supervising and instructing?

14   A    Basically, the implementation will be handled by the

15   secretary of the VC subcommittee, which is me as well.

16   Q    Okay.  I'm sorry, sir.  I don't think you understood my

17   question.

18        My question was, you said you were instructing certain

19   people while you were a director of the Vitamin C

20   subcommittee.  So my question is, who or what were you

21   instructing in your capacity as the subcommittee chairman?

22   A    The first row of the director of the VC subcommittee is

23   to deal with business coordinating within the industry.  To

24   organize the export enterprises of his members ten meetings.

25   To discuss export pricing.  And eventually I will make the

HAILI - DIRECT - MASON                                909

1   final decision.

2   Q    Did you make final decisions as to quotas that members

3   of the Vitamin C subcommittee could have?

4            MR. ISAACSON:  Objection.

5            THE COURT:  Sustained.

6   Q    What about quotas?  What were your responsibilities

7   there?

8   A    Before 2001 I made suggestions to the government with

9   respect to quota.  And then after 2002 I directly made

10  decision regarding the export quota.

11  Q    With regard to the latter time period, you mean when

12  verification and shop came?

13  A    Yes, after 2002.

14  Q    Wasn't that in 2002?

15  A    After May 1st of 2002.

16  Q    Have you heard the term as it applies to the Vitamin C

17  subcommittee, "industry coordination"?

18  A    Yes.

19  Q    What does that mean, sir?

20  A    There's a background of how that industry coordination

21  came about.  During the period of time when China was

22  transitioning from planned economy to market economy, there

23  were phenomenas that that occurred economically which was

24  malicious competition.  The reason was during the past

25  when -- during the time of planned economy, the external

```
                 C. Haili - Direct - Mr. Mason            917
```

1  DIRECT EXAMINATION (Continued) BY MR. MASON:

2  Q    Do you mean the Chinese government?

3  A    Yeah, the Chinese government.  It effected -- how to

4  say, what is the well being of the country.  And besides,

5  such development could not be sustained.

6          THE COURT:  Let's have another question, please.

7          MR. MASON:  Respectfully, your Honor, I'm not sure

8  that he's done with his answer.

9          THE COURT:  Are you done with your answer, sir,

10 the question.

11         THE WITNESS:  Not yet.

12         THE COURT:  All right then, you may finish.

13         MR. MASON:  Thank you, sir.

14 A    Wu Yi even said --

15         THE COURT:  All right.  Stop.  Objection

16 sustained.  Go on to something else.

17 Q    Sir, are you familiar with the term "industry

18 self-discipline" as it applies to vitamin C industry in

19 China?

20 A    I am familiar with it.

21 Q    Is it part of your job to know about this topic?

22 A    Yes.

23 Q    What is industry self-discipline as applied to China?

24 A    Industry self-discipline does not mean independent

25 actions from the enterprises.  Under the coordination of the

C. Haili - Direct - Mr. Mason                    918

1   Chamber, we convene meetings, discuss export pricing, and

2   prevent malicious competition in order to protect the

3   healthy development of the VC exports.

4   Q    Okay.  I'll use another term.  Excuse me.  "Malicious

5   competition," please explain what that means?

6   A    Malicious competition happened after MOFTEC loosen the

7   restrictions.  It happened to a lot -- a lot of export --

8   import/export companies.  They compete maliciously fiercely

9   within a small narrow market and limited products, and their

10  method of competition was through pricing.  And that kind of

11  pricing competition caused the country to lose foreign

12  currency intake.  Because such enterprises did not belong to

13  the individuals, they were often sent over from the party

14  cut rates, because all these enterprises were originally

15  state enterprises.

16          Sometimes these people -- these people, in order

17  to save their own positions, they only chase after the sale

18  of the exports, and they did not care about the benefits of

19  such exports.

20  Q    Excuse me.

21  A    That happened during the circumstances when our

22  commerce were not properly administered.

23  Q    Okay.  What is the relationship between industry

24  self-discipline and industry coordination?

25          INTERPRETER:  What was the?

C. Haili - Direct - Mr. Mason                919

1        MR. MASON:  Relationship.

2   A    Self-discipline as a policy is a target that the

3   government would like to implement.  And in order to achieve

4   that target, they do it through industry coordination that

5   is a process.

6   Q    Sir, with respect to --

7        MR. ISAACSON:  I'm going to object and move to

8   strike.

9        THE COURT:  Overruled.

10  Q    With respect to the Chamber of Commerce and western

11  medicine who determines who the top leaders of the Chamber

12  are?

13  A    You are talking about the top man, the director of the

14  Chamber?

15  Q    Yeah.  Who determines who that person is?

16  A    It was nominated and assigned by the Ministry of

17  Commerce.

18  Q    And who has the power to remove the Chamber leaders?

19  A    That would be the Minister of Commerce.

20  Q    And who determines the salary level of the people who

21  work the Chamber?

22  A    Minister of Commerce.

23  Q    Now, focusing, sir, on the vitamin C subcommittee, were

24  vitamin C manufacturers in China members of the vitamin C

25  subcommittee?

**A-1767**

C. Haili - Direct - Mr. Mason                    920

1   A     Yes.

2   Q     Was Weisheng a member?

3   A     Yes.

4   Q     And Hebei Welcome a member?

5   A     Yes.

6   Q     And JJPC?

7   A     Yes.

8   Q     And NEPG?

9   A     Yes.

10  Q     As the director of the vitamin C subcommittee, did you

11  have authority over these companies?

12  A     Yes.

13  Q     Did you have the authority to tell them what to do in

14  terms of pricing of exports?

15          MR. ISAACSON:  Objection, leading.

16          THE COURT:  Sustained.

17  Q     What could you -- what could you do with respect to

18  pricing decisions as related to the prices these companies

19  might charge for exports?

20  A     I had the authority to designate the minimum export

21  price.

22  Q     Okay.  What authority did you have with respect to the

23  export quotas?

24  A     With respect to export quota after 2002, and the

25  Chamber set up the verification chop procedure, I have the

C. Haili - Direct - Mr. Mason                921

1   responsibility to coordinate VC export pricing, including

2   coordinate the export quantity.

3   Q    You mean after May 1, 2002?

4   A    Correct.

5   Q    And with respect to whether or not you could direct the

6   companies to stop production, what authority do you have

7   there?

8   A    I could instruct them to stop production.

9   Q    What authority, if any, did you have to penalize or

10  punish the vitamin C subcommittee members, the distributors,

11  if they did not follow your directions in these regards?

12  A    I stopped the verification and chop so they could not

13  export, and the export was their lifeline.

14  Q    Did you have authority to stop their export?

15  A    Stop what?

16  Q    Did you have the authority to stop their export?

17  A    I did.

18          THE COURT:  You said "Woe ya" (Phonetic).

19          THE WITNESS:  I did.

20          THE COURT:  I thought he said didn't.  He in fact

21  said "I did."

22  Q    Sir, can I direct your attention to Exhibit 9,

23  Defendant's Exhibit 9.  Mr. Qiao, did you have that exhibit

24  in front of you?

25  A    I do.

**A-1769**

```
                        Sidebar                         924
```

1          MR. ISAACSON:  May I say something about what your

2     Honor said about this specific regulation?  Because this is

3     the regulation which the witness has already misstated,

4     because this is the below cost pricing regulation, which is

5     referred to as the low price, which is page 60 of the

6     summary judgment decision that said it was irrelevant to the

7     defendants' agreement regarding output.

8          MR. MASON:  Your Honor --

9          THE COURT:  Right.  I did rule it irrelevant, and

10    that's why I'm not going to have the jury start determining

11    what provision of Chinese law were applicable and what

12    portions were not applicable.  All the jury needs to know

13    from this witness is he believed he was acting pursuant to

14    Chinese rules and regulations, that's all that matters.  And

15    then they will determine, based on his belief and his

16    communications with the defendants, whether there is a

17    compulsion defense here.  I'm not letting in the Chinese law

18    in front of this jury.

19         MR. MASON:  Your Honor, you started out at the

20    sidebar saying you wanted to know more about the

21    relationship with this document, so --

22         THE COURT:  No, I don't think I did that.

23         MR. MASON:  Well, I didn't mean to misstate what

24    the court said, but --

25         THE COURT:  What I said was as I said before, I

**A-1770**

Sidebar                                                    925

1  started out the sidebar like the last sidebar by saying this
2  witness should be communicating to the jury what he saw,
3  heard, did and said; that's his testimony, okay?
4        MR. MASON:  Well, what he did, your Honor, and
5  what he testified he did was implement this regulation and
6  used it in his job.  I mean, that's what he did.
7        THE COURT:  I have no problem with his testimony
8  that his thought was that he was acting in accordance with
9  the Chinese legal requirements of his job.  He can say that.
10  The jury is not going to get involved in determining whether
11  in fact Chinese law required him to do what he did.  Because
12  as Mr. Isaacson points out, I already ruled the 1996
13  directive was not relevant as far as 2002, Mr. Mason.
14        MR. MASON:  Thank you, your Honor.  Your Honor, so
15  we don't have this constant issue, because I don't want to
16  burden the record here, but there are other regulations that
17  we've identified in evidence.
18        THE COURT:  Yes, I'm not letting in any of the
19  Chinese legal materials.  And to the extent that you marked
20  them as exhibits, those are all being excluded.
21        MR. MASON:  Well, there are different categories
22  of them, but I'm not going to ask him about them in the
23  testimony, but maybe later on you can hear us on that.  I
24  don't want to waive our objection to it by not asking about
25  it.

Sidebar                                          926

1          THE COURT:  Well, it's up to the Second Circuit

2     what you will or will not have weighed.  I've given you

3     direction on this one, which I think is out.  I think from

4     that you should be able to tell what's out.

5          The things that, for example, Professor Shen

6     considered in his affidavit interpreting Chinese law are the

7     things that I'm not going to place before the jury, because

8     I don't want the jury doing what Professor Shen purported to

9     do in which I did under 44.1.

10          MR. MASON:  Well, may I ask what your Honor was

11     referring to when you said "There was reliable evidence, the

12     regulatory regime is relevant with the testimony of Qiao."?

13          THE COURT:  It was relevant to my determination of

14     Chinese law, and Mr. Qiao's testimony may or may not have

15     helped me make that determination of Chinese law, but we are

16     past that here, we're trying a compulsion defense.

17          MR. MASON:  You said the regulatory regime in

18     which the defendants operated is relevant to the jury's

19     finding concerning the defenses of state action and

20     sovereign compulsion."  And you said we have wide latitude

21     in trying to prove this and now you are blocking the

22     regulations that are directly relevant.

23          THE COURT:  Well, you know, I believe that by

24     allowing Mr. Qiao to testify, that he believes he was acting

25     pursuant to Chinese law and regulation, I have accomplished

```
                    Sidebar                      927
```

1   what I intended to by that passage.  To the extent that you

2   think I'm not, and maybe you are right about that, I've

3   revisited the issue, and I think it would be inappropriate

4   to put Chinese legal materials in front of this jury.

5            MR. MASON:  Okay.  Thank you Judge.

6            (End of bench conference at 3:51 p.m.)

7               (Continued on the next page.)

8                    *****

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C. Haili - Direct - Mr. Mason                    930

1  Q    Would it be possible to give us an abbreviated

2  explanation?

3           MR. ISAACSON:  Objection, foundation.

4           THE COURT:  Overruled.

5  A    Quota was set up by the Ministry of Commerce or the

6  former MOFTEC with the recommendation from the Chamber.  It

7  would be the annual export amount.  And the Chamber would

8  organize with the export enterprises with respect to minimum

9  export pricing.  And once the quota came out, the Chamber of

10 Commerce will issue the amount to the local special

11 commissioners' offices through MOFTEC.  And these local

12 special commissioners' offices are the organizations who

13 will issue these such export licenses.

14           Once the Chamber set up the price, the minimum

15 export price, they will issue the notice to all the various

16 local special commissioners' offices, including the special

17 commissioners' offices and the quota and license

18 administration bureau.  When the enterprises export, they

19 take the export contract, they go to such commissioner

20 special offices to receive the export license, and the

21 offices that issued such license will examine the export

22 contracts of the enterprises.  Two items.  One, whether it

23 is within their quota amounts.  Second, whether it complies

24 with the minimum pricing that was specified by the Chamber;

25 that means, above the minimum pricing.  If they comply with

C. Haili - Direct - Mr. Mason                    931

1  those, then the export licenses will be issued.  When the

2  enterprises got such license, licenses and quota, they will

3  report to customs for exportation.  Without the export

4  license, they will not be able to export.  Finished.

5  Q    Thank you.  When you refer to special offices, were

6  these government offices, Chinese government offices you

7  were referring to?

8  A    It's the special commissioners' offices from the MOFCOM

9  to the various localities, for example, Guangzhau, Daliam,

10 Qingdao, Tianjim, Shanghai, et cetera.

11 Q    These offices were controlled by MOFCOM?

12 A    They were all offices set up by MOFTEC.

13 Q    Just to be clear here, MOFCOM and MOFTEC are the same

14 organization or the same agency, they just changed their

15 name?

16 A    They changed name, but at the same time Minister of

17 Commerce increase its duties, including the facilitation of

18 in land commerce.

19        MR. MASON:  Your Honor, before I get to this next

20 document, can we have a sidebar on it?

21        THE COURT:  Sure.

22        (Continued on the next page for sidebar

23 conference.)

24                        *****

25

Proceedings                                    942

1   doing and why he thought he was doing it.

2          You know, for better or worse, the government of

3   China had decided not to directly participate as a fact

4   witness in this case.  And --

5          MR. MASON:  Well, respectfully, your Honor, you

6   called them a liar, basically.

7          THE COURT:  No.  No, Mr. Mason, that's not fair.

8   I did not accept their statement of legal position.  That's

9   a legal determination I have to make.  To say that they're a

10  liar implies that I found they were acting pursuant to some

11  malicious purpose, and I didn't find that.  I have no reason

12  to find that.  I just didn't find it to be a credible

13  presentation of factual information.  So really, you should

14  not toss around hyperbole like that.

15         MR. ISAACSON:  I expect your Honor sometimes

16  disagreed with the US Government.

17         THE COURT:  It happens from time-to-time.  All

18  right.  I'm going to exclude the document under Rule 403.

19  It does not limit Mr. Qiao's ability to testify as to why he

20  did what he did, but I'm still waiting to hear, because I've

21  only heard in very general terms so far what he did, that's

22  what the jury needs to hear from this witness, because

23  that's what will allow it to determine whether the

24  defendants' actions were compelled or not.

25         The rest of this is just, at best, background,

954

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
in re:                          :  06-MD-1738 (BMC)
VITAMIN C ANTITRUST             :
LITIGATION,                     :
                                :
        Plaintiff,              :  United States Courthouse
                                :  Brooklyn, New York
        -against-               :
                                :
                                :
                                :  Wednesday, March 6, 2013
HEBEI WELCOME PHARMACEUTICAL    :  9:30 a.m.
CO. LTD., et al,                :
                                :
        Defendants.             :
                                :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S :

 For the Plaintiff:        SUSMAN GODFREY, LLP
                           BY: **JAMES T. SOUTHWICK, ESQ.**
                               **SHAWN L. RAYMOND, ESQ.**
                               **KATHERINE H. KUNZ, ESQ.**
                           BOIES SCHILLER & FLEXNER, LLP
                           BY:  **WILLIAM A. ISAACSON, ESQ.**
                               **TANYA S. CHUTKAN, ESQ.**
                               **JENNIFER MILICI, ESQ.**
                           HAUSFELD, LLP
                           BY: **BRIAN A. RATNER, ESQ.**
                               **BRENT W. LANDAU, ESQ.**
                               **MELINDA R. COOLIDGE, ESQ.**
 For the Defendants:       ZELLE HOFMANN VOELBEL & MASON, LLP
                           BY: **ERIC BUETZOW, ESQ.**
                               **JIANGXIAO HOU, ESQ.**
                               **DANIEL MASON, ESQ.**
                           BAKER & MCKENZIE, LLP
                           BY: **CHARLES HOWARD CRITCHLOW, ESQ.**
                               **DARRELL PRESCOTT, ESQ.**
                               **CATHERINE YUNIE STILLMAN, ESQ.**

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*Mary Agnes Drury, RPR*
*Official Court Reporter*

**A-1777**

C. Haili - Direct - Mr. Mason                967

1   A    I studied and research about it.

2   Q    Did those directives, policies and regulations

3   authorize you to conduct the affairs of the vitamin C

4   subcommittee?

5   A    Yes.

6   Q    And were those directives, policies and regulations,

7   did they come from the Government of China?

8            MR. ISAACSON:  Objection.

9            THE COURT:  Overruled.

10  A    Yes.

11  Q    If I can please direct your attention to Article 15 to

12  subpart five.  It says to report -- again, this is under

13  members obligations.  To report vitamin C exports the

14  previous two months to the subcommittee every odd month?

15  A    Yes.

16  Q    And did the members comply with that requirement?

17  A    Yes.

18  Q    During the time you were involved with the vitamin C

19  subcommittee?

20  A    Correct.

21  Q    And then number under six, Article 15 it says, strictly

22  execute export coordinated price set by the Chamber and keep

23  it confidential.  Do you see that, sir?

24  A    I do.

25  Q    And who at the Chamber was responsible for setting the

```
              C. Haili - Direct - Mr. Mason              968
```

1  export coordinating price that members had to follow?

2  A    I was responsible was MOFTEC.

3        MR. MASON:  You know, I just didn't hear that,

4  your Honor.  I just didn't hear it.

5  A    I would be responsible towards MOFTEC.

6  Q    And who determined, who in the vitamin C subcommittee

7  determined what the export coordinated price would be as set

8  by the Chamber?

9  A    Me.

10 Q    Can you please look at Article 16, please.  Do you see

11 the reference there to potential or violations of the

12 Chamber -- of the charter of the Chamber -- excuse me, of

13 the subcommittee?

14 A    I do.

15 Q    And it says, "Failure to implement any resolution or

16 regulation of the subcommittee and failure to perform any

17 members obligations shall be punished by the subcommittee."

18 A    I do.

19 Q    And it goes on to say at the end of Article 16 that at

20 punishments -- and I'm paraphrasing -- the punishments

21 conclude either a suspension and even -- and I'll quote,

22 even cancel vitamin C export right of such violating member?

23 A    Yes.

24 Q    And during the time you were at the vitamin C

25 subcommittee, Mr. Qiao, were these penalties -- were these

A-1779

C. Haili - Direct - Mr. Mason                    969

1   potential penalties in effect?

2   A    Correct.

3   Q    And who had the -- excuse me, who had the power to

4   impose these penalties?

5   A    The Ministry of Commerce had the authority, MOFTEC.

6   Q    And what was your role in imposing these penalties, if

7   any?

8   A    I would report it back to MOFTEC and suggest that

9   MOFTEC will implement the penalty.

10  Q    And did you have the power and authority to do that?

11  A    I had the authority.

12  Q    After verification and chop came in this 2002, did your

13  authority with regard to imposing penalties increase?

14        MR. ISAACSON:  Objection, leading.

15        THE COURT:  Overruled.

16  A    It increased.

17  Q    And what was the difference between the preverification

18  and chop period before 2002 and after the verification and

19  chop in 2002 with regard to what power you had with regard

20  to penalties?

21  A    After 2002 I could actually stop the verification and

22  chop process for the violating members, and they had no way

23  to export.  Before 2001, I could only make the

24  recommendation, I could not execute it.

25  Q    Okay.  Again, when you say "after 2002," do you mean

C. Haili - Direct - Mr. Mason                    972

1    state actually instructed Mr. Qiao to do.  You can consider

2    it only for Mr. Qiao -- what Mr. Qiao thought he was able to

3    do.

4    BY MR. MASON:

5    Q    Sir, do you recall a vitamin C subcommittee meeting in

6    December 2000?

7    A    I do.

8    Q    Did you attend the meeting?

9    A    I did.

10   Q    Did you convene the meeting?

11   A    I ordered it to be convened.

12   Q    And did the members of the vitamin C subcommittee

13   attend that meeting?

14   A    Correct.

15   Q    By the way, did they have a choice to attend that

16   meeting or not or did they have a choice to attend the

17   vitamin C subcommittee meetings in general or not?

18   A    No.

19   Q    Why didn't they have a choice?

20   A    Because they must attend.

21   Q    Who said they must attend?

22   A    There was a request of the government.

23   Q    Did you direct them to attend?

24   A    Yes.

25   Q    At the December 1, 2000, meeting, sir, do you recall

C. Haili - Direct - Mr. Mason                982

1   meeting about your authority under verification and chop?

2   A    From 2002 the Chamber is going to implement

3   verification and chop management.  They are going to

4   restrict the export amount with respect to 2002.

5   Q    Okay.  Mr. Qiao, I believe you testified that your

6   authority increased under verification and chop?

7   A    Yes.

8   Q    Now, what I want to ask you is what did you tell the

9   members of the vitamin C subcommittee about your increased

10  authority?  What did you tell them in that regard?

11  A    I told them if they do not, if they do not follow the

12  specification, I could stop the verification and chop

13  process, I could prevent them from exporting.

14  Q    Okay.  Sir, could you explain the mechanics of the

15  verification and chop system as you implemented it?

16  A    The process went like this:  Once the enterprise signed

17  an export -- a vitamin C export contract, that contract

18  would be faxed to the Chamber, and on this contract the

19  Chamber would look at the pricing area and put a chop on it.

20            MR. MASON:  Your Honor, may I hand him this box?

21            THE COURT:  Sure.  Well, is it marked?

22            MR. MASON:  No, it's -- I'm not going to offer it

23  in evidence, but I'd like him to --

24            THE COURT:  Okay.

25            MR. MASON:  Should I show your Honor first?

A-1782

C. Haili - Direct - Mr. Mason                    983

1    You've seen it, Bill?

2              MR. ISAACSON:  Yes.

3              THE WITNESS:  Another one.

4              MR. MASON:  I have to ask the questions.

5              THE WITNESS:  The other one.

6              THE COURT:  All right.  Look --

7              MR. MASON:  I'm not understanding.  Oh, the other

8    -- do I have the wrong -- okay.  I got the other stamp.

9    I'll hand this to him.

10   Q    Okay.  Mr. Qiao, you're holding in your hand what looks

11   like a stamp.  Could you -- is that the chop?  Is that the

12   chop?

13   A    At the location of the pricing on the contract.

14   Q    Okay.  So --

15   A    I put a chop mark on it.

16   Q    So you're stamping just a page in front of you and is

17   that how it worked?

18   A    Where it says the pricing, I put a chop seal on it.

19   Q    Okay.  And when you looked at the price that was on the

20   contract what were you looking for or what were you trying

21   to determine?

22   A    I would look -- I would look if the pricing is lower

23   than my minimum price, it must be higher than my minimum

24   price.  If it was lower than my minimum price, then I would

25   not put the chop on it.

C. Haili - Direct - Mr. Mason                984

1   Q    And what would happen?  I mean, what was the -- what

2   was the rule about what would happen if there wasn't a chop?

3   A    The customs would not let them export.

4   Q    And then after the -- let's take a case where the chop

5   was put on the contract, what happened to the contract?

6   A    We would make a copy for ourselves for filing.  I take

7   this chopped contract and let it be sent to the company by

8   express mail.  Then once the company gets this contract,

9   they will go to report to customs for exportation and the

10  officials at customs will look at whether that's such a red

11  seal chop on it.  Without the sealed chop, they will not let

12  it pass, and the Chamber will have a statistical calculation

13  of the total export -- production amounts of the

14  enterprises.

15           Once the export quantity was specified after

16  May 1st, 2002, anything that exceeded that from each of the

17  enterprises would not be able to get the verification and

18  chop, and so the export volume was controlled as well.

19  Q    When you explained the verification and chop procedure

20  to the manufacturers, did they say anything about what they

21  thought of the process?

22  A    They would say, like, well, give me a larger amount of

23  exportation, it can be too small.

24  Q    And what would happen when they would -- they

25  complained about their inadequate, in their view, export

C. Haili - Direct - Mr. Mason                    988

1   Q    Did you continue to direct manufacturers to participate

2   in the process of the vitamin C subcommittee after

3   verification and chop?

4   A    Yes.

5   Q    And did you continue to direct export minimum prices

6   after verification and chop?

7   A    Yes.

8   Q    And did you retain the authority to impose production

9   limits on the manufacturers after verification and chop?

10  A    Yes.

11  Q    And did you maintain the power to restrict export

12  volumes under verification and chop?

13  A    Yes.

14  Q    Sir, I'd like to ask you about the typical routine of a

15  various -- excuse me, of a vitamin C subcommittee meeting

16  so that we can understand how the meetings worked, how the

17  process worked.  So when you convene the meetings of the

18  vitamin C subcommittee, before you made any decisions were

19  there discussions about the topics?

20  A    Generally speaking we first conduct a discussion with

21  respect to market conditions.

22  Q    And why were you interested in hearing from the

23  vitamin C manufacturers about market conditions?

24  A    Because they are closest to the market, the Chamber

25  does not engage in exportation, does not do sale of

```
              C. Haili - Direct - Mr. Mason              989
```

1   anything.

2   Q    So did you want to receive information from the

3   vitamin C manufacturers about what was going on in the

4   marketplace?

5   A    Yes.

6   Q    And did you encourage these sorts of discussions?

7   A    Yes.

8   Q    Did you let the members say what they wanted?

9   A    Yes.

10  Q    But when it came time to make a decision as to either

11  price or allocation of quotas or production limitations, who

12  made that decision?

13  A    It was my decision.

14  Q    Did you always at the conclusion of a vitamin C

15  subcommittee make a decision or give a direction?

16  A    Yes.

17  Q    Did you sometime not give a direction at the end of a

18  meeting?

19  A    Yeah, that happened, too.

20  Q    Okay.  So what would a circumstance be where you heard

21  a decision at the subcommittee meeting and you decided not

22  to give a direction or decision?

23  A    Once the industry was conducting well and the market

24  was rather stable, and then I didn't need to give any

25  instructions, and the pricing was above the minimum price,

Case 13-4791, Document 160, 07/28/2014, 1280897, Page301 of 315

1   there was not -- there was not -- the malicious competition

2   was nonexistence.

3   Q    Then you wouldn't feel that you needed to make another

4   direction at that time?

5   A    Yes.

6   Q    Sir, did you give directions to the vitamin C

7   subcommittee members about whether or not they should

8   discuss pricing among themselves outside of vitamin C

9   subcommittee meetings?

10  A    It has always been requested ever since 1993.

11  Q    Well, did you give directions in that regard?

12  A    I asked to them conduct regular communications sharing

13  information.

14  Q    Even outside the meetings?

15  A    Yes.

16  Q    And did you -- excuse me.  Did you direct them to

17  report back to you about what these communications were?

18  A    Yeah, they must report it back to me.

19  Q    And why did you want reports back to you about what

20  vitamin C subcommittee members had discussed concerning

21  pricing discussions that you had directed them to engage in?

22  A    In order to prevent any customer from using the price

23  from one enterprise to force down the price of another

24  enterprise, and that will collapse the whole arrangement.

25  Q    Sir, did you report back to MOFTEC or MOFCOM after you

C. Haili - Direct - Mr. Mason                    991

1   had a vitamin C subcommittee meeting?

2   A    Yes.

3   Q    Would you advise -- let's say after verification and

4   chop, would you advise MOFTEC or MOFCOM what happened at the

5   meeting?

6   A    Yes.

7   Q    Why did you report back to MOFTEC or MOFCOM after the

8   vitamin C subcommittee meetings?

9   A    Because we were are under the supervision and the

10  direction.

11  Q    Sir, could you look at exhibit -- I'm sorry, 32,

12  please?

13          INTERPRETER:  No.  No.  32, counsel?  31?  Yes.

14          MR. MASON:  May I hand this, your Honor?

15          THE COURT:  Sure.  I have a 32A and B for what

16  it's worth.

17          MR. MASON:  I think it's 32B.  32A.  32B.

18          THE COURT:  Okay.

19          MR. ISAACSON:  32B.

20  BY MR. MASON:

21  Q    Do you have that, sir?

22  A    I do.

23  Q    Do you recognize it?

24  A    I do.

25  Q    What is it?

HIALI - DIRECT - MASON                    1014

1   A    Because of market reasons.  It cannot -- it is

2   intractable.  One pass the pricing kept sliding.  It's like

3   a wave hitting right in front of you, you can use your two

4   hands.  You cannot parry it.

5              MR. MASON:  Is that a word?

6              THE COURT:  It is.  You don't fence?

7              MR. MASON:  No, Your Honor.

8              THE COURT:  It means stepping to the side.

9              MR. MASON:  Sorry.

10  Q    Mr. Qiao, are you being compensated for testifying and

11  for preparing for this trial?

12  A    I get compensated for my time.

13  Q    Is there a formula in that regard?

14  A    No.

15  Q    Well, is it based upon an hourly rate?

16  A    Yes.

17  Q    Okay.  So could you explain the basis upon which you're

18  being compensated for your time.

19  A    It was calculated according to my end salary before

20  retirement in 2010.

21  Q    Okay.  And have you been paid anything yet?

22  A    You mean, already paid?

23  Q    Yes.

24  A    Yes.

25  Q    Okay.  And in connection with what you've done, do you

```
                HIALI - DIRECT - MASON                1015
```

1  recall you gave a deposition?

2  A    Yes.

3  Q    And you recall it lasted a couple days?

4  A    Which time?

5  Q    Well, in August.

6  A    There were two times in August.

7  Q    Yes.  Well, there was one deposition and it lasted a

8  couple of days.

9       Do you recall that?

10 A    I remember.

11 Q    Okay.  And do you also recall that you were required to

12 submit some papers to the Court?

13 A    I didn't understand it.

14 Q    You signed an affidavit?

15 A    Yes.

16 Q    Okay.  How much money have you been paid so far?

17 A    Over 6,000 U.S.

18 Q    U.S. dollars?

19 A    Correct.

20 Q    And does that include your travel from China?

21 A    Not included.

22 Q    So are your expenses paid?

23 A    What expenses?

24 Q    For the airplane, for example.

25 A    Yes, yes.

```
                HIALI - DIRECT - CRITCHLOW              1017
```

1  Q    Have you ever testified where there was a jury and a

2  judge sitting?

3  A    No.

4  Q    But do you understand what it means to tell the truth?

5  A    I understand.

6  Q    And do you recall, because I know you're not familiar

7  with, before you testified you were asked to tell the truth

8  by the clerk of the Court?

9  A    I remember.

10 Q    And have you done your best to do that?

11 A    Yes.

12         MR. MASON:  Just one moment, Your Honor.

13         THE COURT:  All right.

14         MR. MASON:  Thank you, Your Honor.  I will pass

15 the witness.

16         THE COURT:  All right.  Any questions by

17 codefendants?

18 DIRECT EXAMINATION

19 BY MR. CRITCHLOW:

20 Q    Good morning, Mr. Qiao.

21 A    Good morning.

22 Q    Mr. Qiao, was North China Pharmaceutical Group

23 Corporation ever a member of the Chamber?

24 A    No.

25 Q    Was North China Pharmaceutical Group Corporation ever a

A-1791

HIALI - DIRECT - CRITCHLOW                    1018

1   member of the Vitamin C subcommittee?

2   A    No.

3   Q    Under the bylaws that you drafted, the 2002 bylaws, was

4   North China Pharmaceutical Group Corporation eligible to be

5   a member of the Vitamin C subcommittee?

6   A    No.

7   Q    Under the bylaws -- under those bylaws that you

8   drafted, was anyone representing North China Pharmaceutical

9   Group Corporation eligible to be rotating president of the

10  subcommittee?

11  A    Impossible.

12  Q    At the subcommittee meetings, did anyone ever tell you

13  that they were attending as a representative of North China

14  Pharmaceutical Group Corporation?

15  A    No.

16  Q    Do you know a Mr. Huang Pinqi?

17  A    I do.

18  Q    Did Mr. Huang Pinqi ever attend meetings of the Vitamin

19  C subcommittee?

20  A    He did.

21  Q    Did Mr. Huang Pinqi ever tell you at any subcommittee

22  meeting that he was attending as a representative of North

23  China Pharmaceutical Group Corporation?

24  A    No.

25  Q    As you understood it based on what Mr. Huang Pinqi said

**A-1792**

HIALI - DIRECT - CRITCHLOW                           1019

1    to you and what he did at Vitamin C subcommittee meetings,

2    who was he representing?

3    A    He represented Hebei Welcome.

4    Q    I'd like to show you a document that's previously been

5    put into evidence as Plaintiffs' Exhibit 124.

6            MR. CRITCHLOW:  May I approach to hand it to the

7    witness, Your Honor?

8            THE COURT:  You may.

9            THE WITNESS:  Did you say "plaintiff"?

10            MR. CRITCHLOW:  Yes.  I don't think it's in the

11    binder.

12    Q    And Mr. Qiao, after you've had a chance to look at it,

13    I'd ask you have you seen this document before?

14    A    I have.

15    Q    Did you write it?

16    A    Some of it was written by me.

17    Q    I'd like to direct your attention to a portion that

18    discusses a Vitamin C subcommittee meeting held on

19    November 23rd, 2004.

20            Do you see that portion, sir?

21    A    I do.

22    Q    Did you write that portion?

23    A    Yes.

24    Q    Okay.  Now, in that portion, you write that the

25    committee decided during the meeting to elect the deputy

HIALI - DIRECT - CRITCHLOW                    1020

1   general manager of North China Pharmaceutical Group

2   Corporation, Mr. Huang Pinqi as the next rotating president

3   of the committee for the year 2000.

4        Can you tell us why, since you've testified Mr. Huang

5   Pinqi never told you that he was representing North China

6   Pharmaceutical Group Corporation at any subcommittee

7   meeting, can you tell us why you identified him as being

8   from North China Pharmaceutical Group Corporation?

9   A    He was like that was the higher position of him as the

10  deputy general manager at North China.  As the person, that

11  is an honor to be in that position.  The way I wrote it is

12  to show respect to him.

13  Q    I may -- we may not be familiar with practices in China

14  with respect to showing respect.  Can you explain that, sir.

15  A    The position at the enterprise, sometimes, you know,

16  the enterprise position is equivalent to an administrative

17  position.  For example, Mr. Huang Pinqi, he was a general

18  manager at Welcome so his administrative position was

19  director.  And then from the director he was promoted to be

20  the deputy general manager.

21       For a cadet or cadre in China, that is a big deal.  So

22  in order to show respect towards him, that's how I wrote it.

23  It did not mean that he represented North China

24  Pharmaceutical Group.

25  Q    One other question.  A few moments ago you testified

HIALI - CROSS - ISAACSON                    1021

1  that someone from MOFTEC instructed you to call the November

2  2001 meeting.

3  A    Yes.

4  Q    What was the name of the person from MOFTEC who told

5  you to call?

6  A    Xia Xiang.

7           THE COURT:  I think we got it.

8           THE WITNESS:  X-i-a  X-i-a-n-g.

9           THE INTERPRETER:  Last name is X-i-a-n-g.

10          MR. CRITCHLOW:  Thank you very much.  No further

11 questions.

12          THE COURT:  All right.  Cross-examination.

13 CROSS-EXAMINATION

14 BY MR. ISAACSON:

15 Q    Good morning.

16 A    Good morning.

17 Q    Sir, yesterday we passed around an identification badge

18 with your picture on it.  Do you remember that?  And that

19 badge allowed you to be admitted to enter four buildings

20 where the Ministry of Commerce is located, right?

21 A    I can enter the main guard entrance with entry.  Once

22 I'm there, I can go to any building.

23 Q    Right.  It's a building pass for those four buildings,

24 right?

25 A    Yes.

```
                HIALI - CROSS - ISAACSON                1022
```

1  Q    And your office, is it not in any one of those

2  buildings, is it?

3  A    Right.

4  Q    This was a building pass for four buildings where you

5  don't have an office?

6  A    Yes.

7  Q    Sir, I'm going to show you what's been marked as

8  Plaintiffs' Exhibit 234.

9       You've seen this document before, right, sir?

10 A    I have.

11 Q    You wrote this document?

12 A    Yes.

13 Q    This was a report you wrote to the Ministry of

14 Commerce?

15 A    Correct.

16 Q    Report is dated July 17th, 2003?

17 A    Yes.

18 Q    Okay.  Ministry of Commerce made a request to your boss

19 at the Chamber to do this report, right?

20 A    Yes.

21           MR. MASON:  Your Honor, can I -- object on

22 leading.  I don't know if Your Honor is going to deal with

23 it.

24           THE COURT:  It's cross-examination.  Go ahead.

25 Q    Ministry of Commerce asked you to make this report on

HIALI - CROSS - ISAACSON                    1028

1   Commerce, right?

2            THE COURT:  I think you should rephrase.

3   Q    All right.  You go on to say -- well, specifically here

4   you were discussing, sir -- you were discussing here, sir,

5   regulations and rules formulated by companies in the

6   industry organized by the Chambers of Commerce.

7   A    Yes.

8   Q    And you say that they also -- it's also difficult to

9   gain support from government departments, right?

10  A    Correct.

11  Q    You also say, "These rules and regulations simply

12  become formality," end quote.  Only "honest fellows will

13  follow."

14  A    Yes.

15  Q    At the time you wrote this report in 2003, sir, you

16  were telling the Ministry you did not have the power to

17  enforce self-discipline measures, right?

18  A    With respect to the Penicillin industry, I did not have

19  the authority.

20  Q    All right.  Sir, you mentioned the deposition that took

21  place over two days.  Page 235, beginning at line 16.

22  Trevor, could you play that for me.

23       (Videotape played.)

24  Q    At your deposition, you told me it was right that you

25  were telling the Ministry you did not have the power to

HIALI - CROSS - ISAACSON                    1029

1    enforce self-discipline measures.  And you didn't say

2    anything about Penicillin, did you?

3    A    The fact that I did not mention at that time does not

4    mean that I did not -- it did not refer to the Penicillin

5    industry.

6    Q    Okay.  You gave me -- you told Mr. Mason, you

7    understand what truthful testimony is, right?

8              MR. MASON:  Your Honor, this is -- objection.

9              THE COURT:  Overruled.

10   A    I understand.

11   Q    You gave truthful testimony at your deposition, didn't

12   you, sir?

13   A    Yes.

14   Q    Now, in this report, you told the Ministry that when

15   companies did not exercise self-discipline, you did not have

16   any means of controlling the situation, right?

17   A    Aside from Vitamin C.

18   Q    Sir, can we -- your deposition, now we're at, Trevor,

19   at 232, beginning at line 5.

20        I'm going to again show you what you said when I asked

21   you that question at your deposition, sir.

22        (Videotape played.)

23   Q    What you told me at your deposition, sir, was that you

24   didn't have the authority to restrain -- no means of

25   restraining the company, no means of sanctioning them, no

HIALI - CROSS - ISAACSON                    1030

1   means of controlling them.  That's what you told me at your

2   deposition, sir, without mentioning Penicillin.

3   A    Just like I said earlier over there, I say if the

4   government will supply certain means to us, it would have

5   been better.

6   Q    It wasn't just a matter of making it better, sir, was

7   it?  You told the government that your rules were simply a

8   formality and only honest fellows will follow.

9   A    If there was no controlling means, that's surely to

10  happen.

11  Q    And then you asked the Ministry, you said, we need

12  legislation to define the legal status of the Chambers of

13  Commerce.

14  A    Yes.

15  Q    And you said that when verification and chop was in

16  place, right?

17  A    Correct.

18  Q    And there was no question about the legal status of the

19  Ministry of Commerce in July of 2003, was there?

20  A    The Ministry of Commerce?

21  Q    It had clear legal status, right?

22  A    Yes.

23  Q    It wasn't like the Chamber?

24  A    Right.

25  Q    And then you told the Ministry, "We also need support

Case 13-4791, Document 160, 07/28/2014, 1280897, Page314 of 315

1  I was not given authority to.  Because the Chamber is not

2  just regulating Vitamin C.  There are many other

3  merchandise.

4  Q    None of what you're telling me now is what you wrote in

5  July 2003, is it?

6  A    In '03, what I wrote in this section was not referring

7  to Vitamin C.  The first section I was referring to the

8  accomplishments of Vitamin C.

9             THE COURT:  Mr. Isaacson, maybe you want to wrap

10  up this line.

11            MR. ISAACSON:  Yeah.  I had one more question on

12  this.

13  Q    What you're telling me now is different from what you

14  told me in your deposition, isn't it, sir?

15  A    Basically the same.  Not much different.

16            MR. ISAACSON:  All right.  Thank you, sir.

17  Q    I want to talk to you about export volumes or quotas.

18  It's your testimony, isn't it, that the Chamber did not use

19  verification and chop to control export volume between March

20  2003 and July 2006?

21            THE INTERPRETER:  You did not or you did?

22            MR. ISAACSON:  You did not.

23  A    Yes.

24  Q    Let me just make sure I have it correct.  Is it correct

25  that you did not use verification and chop to control export

**A-1800**

HIALI - CROSS - ISAACSON                    1033

1   volume between March 2003 and July 2006?

2   A    Yes.

3   Q    And you did not give instructions about the quantities

4   for export of Vitamin C from March 2003 to July 2006?

5   A    It just through establishing the warehouse and stoppage

6   of production to control.

7   Q    I'm talking about the quantities for export, sir.  You

8   did not give instructions about the quantities for export of

9   Vitamin C from March 2003 to July 2006, did you?

10  A    Yes.

11  Q    And you did not give any directions at all for the

12  quantity of exports for Vitamin C from March 2003 to July

13  2006?

14  A    Yes.

15  Q    For example, you did not give any directions to

16  Mr. Feng about the quantity of Weisheng's exports from

17  February 2003 to July 2006?

18  A    Yes.

19  Q    Okay.  Now, from March 2003 to July 2006, it's your

20  testimony that you only elected to control the minimum price

21  and not the volume, right?

22  A    Yes.

23  Q    From March 2003 to June 2006, what you're saying is the

24  only way you had to control the companies was verification

25  and chop for a minimum price?